UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-06145-CIV-DIMITROULEAS
Magistrate Judge Snow

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated,

Plaintiffs,

vs.



BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national association,

Defendant.

_____/

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
## MOTION TO ALLOW NOTIFICATION TO POTENTIAL CLASS MEMBERS

COME NOW the Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE, on

behalf of themselves and all others similarly situated, and hereby file this, their Reply

Memorandum in Support of Motion to Allow Notification to Potential Class Members  as

follows:

Defendant has clearly lost sight of the elements set forth in *Dybach v. State of

Florida, Dept. of Corrections*, 942 F.2d 1562 (11th Cir. 1991), in its specious argument

against class notification.  Defendant does not, as it cannot, dispute that the *Dybach* test

contains a relatively uncomplicated two-part analysis which the Court must undertake when

evaluating a motion to allow notification for potential collective actions under the Fair Labor

Standards Act, 29 U.S.C. § 216(b).  Thus, in order to achieve notification, the named



Plaintiffs must demonstrate only that (a) there exist individuals similarly situated to themselves, and (b) these similarly situated individuals may desire to "opt-in" if notified of their right to do so. *Dybach, supra*, 942 F.2d 1567-68. *See also Garner v. G.D. Searle Pharmaceuticals & Co.*, 802 F. Supp. 418, 422 (M.D. Ala. 1991), citing *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165 (1989) ("To impose a strict standard of proof on the plaintiffs at this stage would unnecessarily hinder the development of collective actions and would undermine the 'broad or remedial goals' ... of the FLSA."); *Tucker v. Labor Leasing, Inc.*, 155 F.R.D. 687, 690 (M.D. Fla. 1994) ("Plaintiffs will be hard pressed to prove there are similarly situated employees who *desire* to join this lawsuit if they can have no contact with any of these employees to inquire about the desire one way or another.") (emphasis in original). Because of the opt-in nature of a § 216(b) collective action, the initial *Dybach* burden is purposely not "[a] heavy one." *Grayson v. K-Mart Corp.*, 79 F.3d 1086 (11th Cir. 1996). Therefore, because the Court has minimal evidence at the notice stage, the district court's determination as to whether notice of the action should be given to potential class members "is made using a fairly lenient standard, and typically results in ... [notification] ..." *Mooney, et al. v. Aramco Services Co., et al.*, 54 F.3d 1207 (5th Cir. 1995).

Under this standard, the Plaintiffs have clearly satisfied the two-pronged *Dybach* analysis sufficient to result in nationwide notification.

First, Plaintiffs have provided the Court with over one hundred (100) opt-in Consents from all over the United States from persons who are similarly situated to the Plaintiffs, in

-2-

that (1) they worked as Consumer Banker (personal banker) IIs, IIIs, or IVs subsequent to December 1997, (2) were classified as non-exempt, (3) worked in excess of forty (40) hours in one or more workweeks, and (4) were either not permitted to record the excess hours or were simply not paid for them. In these respects, these individuals who have expressed a desire to vindicate their rights under the FLSA, along with the named Plaintiffs, are virtually identical to the named Plaintiffs, which is a much higher level of "similarly situated" than *Dybach* requires. *Riojas v. Seal Produce, Inc.*, 82 F.R.D. 613, 616 (S.D. Tex. 1979); *Heagney v. European American Bank*, 122 F.R.D. 125, 127 (E.D.N.Y. 1988). Moreover, even without the benefit of formal class notification by the Court, these persons have expressed a desire to vindicate their rights by joining with the named-Plaintiffs in this lawsuit. Under any reading of the *Dybach* test, and the lenient standard established thereby at this stage of the proceedings, the Plaintiffs have met their burden.

Nevertheless, the Defendant argues that the Plaintiffs have failed to meet their burden for the following spurious reasons.    First, the Defendant complains that approximately one hundred (100) opt-ins must have been solicited by Plaintiffs' counsel to join in this suit, as they were also opt-in plaintiffs in the companion suit of *Levine v. NationsBank*, hinting at some nefarious conduct on the part of counsel. Defendant appears to forget that the opt-in plaintiffs in the *Levine* matter were, and until the matter is concluded, still are clients of Plaintiffs' counsel, and whatever attorney-client privileged conversations may or may not have occurred between counsel and their clients are simply

-3-

none of Defendant's business. Thus, even assuming *arguendo* that Plaintiffs' counsel did speak to their clients about the named Plaintiffs' complaints, they would have acted well within their obligations as counselors under the Rules Governing the Florida Bar. Indeed, *for an attorney not to apprise his or her clients of their rights and possible violations* thereof would be a violation of the attorney's obligations, and could be tantamount to malpractice.

For the Defendant to thus begin with the faulty premise of improper attorney conduct and then make the unwarranted quantum leap that because Plaintiffs' counsel "almost certainly contacted all 1,300 opt-in plaintiffs in *Levine* and invited them to join this action, the Court could conclude that all consumer bankers who wish to opt into this matter already have done so and 'class notice', therefore, is unnecessary" is plainly ludicrous. The Court will recall that the operative period in *Levine* was **up until** December 1997 when NATIONSBANK reclassified the Consumer Banker II, III, and IV positions as non-exempt. The operative period in the instant case begins **following** December 1997 **after** the reclassification, and alleges that despite the newly appropriate classification of Consumer Bankers IIs, IIIs, and IVs as non-exempt, NATIONSBANK nevertheless continued to refuse to pay these employees overtime.

Defendant next claims that the purported similarly situated employees in fact are not similarly situated because their affidavits are perjurious at best, according to Defendant's records (which Defendant has not as of yet produced). This contention is plainly spurious,

-4-

as it seeks only to draw the focus away from the *Dybach* analysis, where it necessarily lies

to the merits of the dispute which are not appropriate for determination at this time.

In the first place, a motion for notification in no way requires nor involves a

determination on the merits of Plaintiffs' claims for unpaid overtime. As the Southern

District of New York stated in *Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 262 (S.D.N.Y.

1997):

> [T]he Court need not evaluate the merits of plaintiffs' claims in
> order to determine that the definable group of "similarly
> situated" plaintiffs can exist here. ...

What Defendant raises here is simply a credibility issue that must await trial in this

matter. At this early juncture, Defendant would have this Court determine that its records

are *per se* more credible than the affidavits of the potential opt-ins. Moreover, the

Defendant's argument that its records belie completely the claims of the opt-ins and turn

them into perjurers is simply a *non-sequitur*, inasmuch as even assuming *arguendo* that

the Defendant may have in fact paid the opt-ins for some overtime incurred, it may not

have paid them in full.[1]  Notwithstanding the accuracy or inaccuracy of the thirteen (13)

---

[1]  Nevertheless, whether the affiants' testimony is indeed accurate can be addressed
at the appropriate time, through the discovery process. It may be that these thirteen (13)
affiants, or some of them, are in fact ineligible to join this action, just as certain putative
opt-ins were found to be ineligible in *Levine* and *Perlman*. However, that has absolutely no
effect on the propriety of granting notification or whether the Plaintiffs have made the
required showing under *Dybach*, and to interject this issue at this early stage of the
proceedings, when the Defendant has access to all of the relevant information and the
Plaintiffs have none except what can be gleaned from the limited pre-notification discovery

-5-

affidavits, however, the Defendant has not even attempted to question the authenticity of the remaining ninety-four (94) opt-ins' claims, whether by production of records, counter-affidavits, or otherwise.

In addition, Defendant faults the affidavits for simply being "boilerplate" and not naming the names of persons whom the affiants believe may be interested in opting in. This is simply belied by the affidavits themselves. For example, Juan C. Valdez, Sr., whose affidavit is first in Exhibit "B" to the motion, identified, at paragraph 7 of his affidavit, at least three individuals whom he declares may be interested in opting in because they worked in excess of forty (40) hours in given work weeks for which they did not receive appropriate compensation. Similarly, Marilyn Blackmon, at paragraph 7 of her affidavit, provides the names of two individuals whom she believes may be interested in opting in if they were notified. Cari M. Ford, at paragraph 7 of her affidavit, gives the name of three persons whom she believes might be interesting in opting in. Affiant Jeff Motley identifies at least one person whom he believes would be interested in opting in. Affiant Julia Kozel, at paragraph 7 of her affidavit, identifies at least one person whom she believes would be interested in opting in. Affiant Virginia Francois likewise identifies at least one person whom she believes would be interested in opting in. Affiant Elizabeth Ann Melton identifies

_____

available to them, is clearly improper. It is perhaps to avoid just this sort of situation that the *Dybach* criteria consciously do not include an examination of the merits or the evidence in this fashion.

-6-

at paragraph 7 of her affidavit at least three individuals whom she believes would be interested in opting in. Affiant Diane Kirkland identifies at least one individual at paragraph 7 of her affidavit whom she believes would be interested in opting in. Moreover, virtually every single affiant identifies the name or names of the NATIONSBANK managers who prevented them from recording or otherwise being paid for the overtime which they worked.

Plaintiffs concur with the Defendant that, unlike the *Levine* and *Perlman* companion suits, the instant case does not involve a readily identifiable situation such as a misclassification of a properly non-exempt category of employees as exempt. However, such a cohesive, readily definable situation is not required for notification under the *Dybach* test. *See, e.g., Belcher v. Shoney's, Inc.*, 927 F. Supp. 249 (M.D. Tenn. 1996) (in which five named plaintiffs alleged that the defendant (a nationwide restaurant chain) had failed to properly pay overtime compensation to hourly employees on a nationwide basis, by, for instance, paying the hourly employees "off the clock"). At the point when the *Belcher* plaintiffs moved for nationwide notification, approximately four hundred individuals had already filed consent forms, representing twenty-two states and over two hundred cities. The *Belcher* court granted nationwide notification, holding that the plaintiffs had "made a sufficient showing ... that the individuals to whom they seek to send notice of [the] lawsuit are 'similarly situated' to them to warrant the issuance of court-supervised notice." *Id.* at 251. The court stated that the affidavits submitted in support of the motion for notification "indicate[d] that these practices were not limited to a single store or region." *Id.* at 252.

-7-

The court ordered that such notice be issued to all the persons employed on an hourly basis by Shoney's anytime within the three (3) year period prior to the filing of the lawsuit. *Id.* at 252.

In the instant case, although there is no structurally designed wrongful conduct, such as  misclassification of an entire category of employees as there was in the companion cases of *Levine* and *Perlman,* Plaintiffs have already established that Defendant NATIONSBANK had, at the very least, an unwritten policy and practice of holding the line on overtime as a means of controlling its costs (Exhibit "1"; Exhibit "2"; Exhibit "3"; Exhibit "4"). Failure to manage overtime appropriately, and the resultant failure to manage costs could affect a banking center manager's job (Exhibit "5"). Moreover, NATIONSBANK's proclivity to interfere with the rights of its hourly employees to collect overtime pay has already been amply demonstrated with other groups of non-exempt employees in the companion cases of *Aldred, Mintz,* and *Barnes* (Exhibit "6").

Accordingly, that individual overtime may be authorized and managed at the direct supervisor and banking center manager levels instead of from higher administrative levels does not avail the Defendant here. Indeed, as in the *Belcher* case, at this point and prior to any discovery or Court-supervised notification, approximately one hundred (100) persons representing fourteen (14) states as well as the District of Columbia have come forward to state that the Defendant has engaged in unlawful pay practices in their banking centers and/or regions. Thus, even if the unlawful pay practices may be emanating from

-8-

the direct supervisor and banking center manager level (which has yet to be proven), the

evidence amply demonstrates that it is a nationwide problem not limited to a single banking

center or region. The instant case therefore presents a *Belcher* type situation where

similarly situated employees are located nationwide, even though the unlawful acts may

have taken place on a location-by-location basis. *Realite v. Ark Restaurants Corp.*, 7 F.

Supp. 2d 303, 309 (S.D.N.Y. 1998) (noting *Belcher* court finding that "all [hourly]

employees were 'similarly situated' whether or not named plaintiff had worked at each

particular Shoney's location).

Accordingly, the Defendant's suggestion that notification be limited to the banking

centers at which the named Plaintiffs were employed is plainly inappropriate and flies in

the face of the record evidence.[2]

WHEREFORE, Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE, on

behalf of themselves and all others similarly situated, respectfully request this Honorable

Court to grant their Motion to Allow Notification of Potential Class Members, as authorized

---

[2] The fact that the Defendant employed some managers, such as Phyllis Kennedy Brown, who refused to engage in these unlawful pay practices, does not detract from the Plaintiffs' meeting of the *Dybach* test. Rather, it simply shows that while the unlawful pay practices may not have occurred at every single location throughout the NATIONSBANK system, just as they occurred at a sufficient number of Shoney's restaurants in *Belcher* to warrant nationwide notification, they occurred at enough NATIONSBANK locations to warrant nationwide notification under the *Dybach* test. Notification will accomplish the apprising of similarly situated Consumer Banker IIs, IIIs, and IVs who were subjected to the unlawful pay practices of an opportunity to vindicate their rights, while those who were not subjected to the unlawful pay practices simply will not be eligible to join the suit.

*Escudero, et al. v. BankAmerica Corporation, etc.*
Case No. 00-06145-Civ-Dimitrouleas

by the Fair Labor Standards Act, 29 U.S.C. § 216(b), throughout the Defendant's

nationwide system.

Respectfully submitted,

MUCHNICK, WASSERMAN, DOLIN
& LEVINE, LLP
Attorneys for Plaintiffs
4000 Hollywood Boulevard, Ste 620N
Hollywood, FL 33021
(954) 989-8100 - Broward
(305) 624-9100 - Dade
(954) 989-8700 - Fax

By: _____
SUSAN L. DOLIN, ESQ.
Fla. Bar No. 708690
DANIEL R. LEVINE, ESQ.
Fla. Bar No. 0057861

-and-

BOIES, SCHILLER & FLEXNER L.L.P.
2435 Hollywood Boulevard
Hollywood, Florida 33020

-10-

*Escudero, et al. v. BankAmerica Corporation, etc.*
Case No. 00-06145-Civ-Dimitrouleas

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via U.S.

Mail this $\underline{28}$ day of September, 2000 to: Michael T. Burke, Esq., Johnson, Anselmo et

al., 790 East Broward Boulevard, Suite 400, Fort Lauderdale, Florida 33303-0220 and

Richard F. Kane, Esq., McGuire, Woods, Battle & Boothe, 3700 NationsBank Plaza,

Charlotte, NC 28280.

MUCHNICK, WASSERMAN, DOLIN
& LEVINE, LLP
Attorneys for Plaintiffs
4000 Hollywood Boulevard, Ste 620N
Hollywood, FL 33021
(954) 989-8100 - Broward
(305) 624-9100 - Dade
(954) 989-8700 - Fax

By: _____

SUSAN L. DOLIN, ESQ.
E-mail: sldolin@mwdl-law.com
DANIEL R. LEVINE, ESQ.
E-mail: drlevine@mwdl-law.com

F:\WPDOCS\~SLD\Escudero\Pleading\Notification Reply Memo.wpd

-11-



# HUSEBY & ASSOCIATES
AN **Interim** LEGAL SERVICES™ COMPANY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 98-6306-CIV-DIMITROULEAS
MAGISTRATE JUDGE BANDSTRA

- - - - - - - - - - - - - - - - - - X
                    :

BEVERLY LEVINE, et al,     :

           Plaintiffs,   :

                   :

           vs.            :

                   :

NATIONSBANK, N.A.,       :
a national association,   :

                   :

           Defendant.   :
- - - - - - - - - - - - - - - - - - X

COPY

<u>Deposition</u> of <u>ELLEN D. MARTIN</u>, <u>Volume I</u>
(Taken by Plaintiffs)
Charlotte, North Carolina
November 18, 1998

Reported by:   Janet L. Cooper,
                Registered Professional Reporter
                Notary Public



EXHIBIT

THE OAK HOUSE • 1316 HARDING PLACE • CHARLOTTE, NC 28204 • (704) 333-9889 • FAX (704) 372-4593

ATLANTA, GA / GAINESVILLE, GA / ASHEVILLE, NC / GREENSBORO, NC / RALEIGH, NC / WINSTON-SALEM, NC / COLUMBIA, SC / GREENVILLE, SC / FLORENCE, SC / CHATTANOOGA, TN

http://www.huseby.com • email: rpr@huseby.com

1   the agenda --

2          Q.   Right.

3          A.   -- is we would focus on counseling in

4   one meeting, how to appropriately counsel an

5   associate. And maybe the next meeting, we would

6   talk about, you know, some supervisory

7   responsibilities. But specifically, I don't

8   recall talking about overtime in and of itself.

9          Q.   Do you recall whether or not

10  NationsBank had a policy that they did not wish

11  to pay overtime?

12         A.   No.

13         Q.   And when I say that -- well, let me

14  expand on that a little bit.

15         Do you recall ever discussing a policy

16  whereby NationsBank wanted managers to manage the

17  banking centers so that overtime would not be

18  necessary?

19         A.   I wouldn't say that overtime wouldn't

20  be necessary. But overtime is a personnel

21  expense, and managers of banking centers are

22  really small business owners and would be

23  encouraged to manage expenses as any small

24  business owner would be encouraged to manage

25  expenses.

1

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA

2          CASE NO.:  97-6912 CIV-HIGHSMITH

3

4

5    ELLEN MALONEY,
     on behalf of herself and
6    all other similarly situated,

7                    Plaintiff,

8    vs.

9    NATIONSBANK OF FLORIDA, N.A.,
     a national association,

10                   Defendant.
11   _____/

12

13

14

15               DEPOSITION OF JILL BORSKY

16

17

18
                     710 N. Presidential Circle Building
19                   4000 Hollywood Boulevard
                     Hollywood, Florida
20                   March 5, 1998
                     9:05 o'clock A.M.
21

22
                      **EXHIBIT**
23
                         2
24

25

10

```
 1          A.   I wouldn't see them individually.  I've
 2    been at meetings where budgets have been handed out.
 3          Q.   On those budgets, the overtime dollars
 4    listed has been zero?
 5          A.   I don't know.  I haven't looked at it
 6    that closely.
 7          Q.   Can you tell me what the prevailing
 8    current policy, if you will, is with respect to the
 9    Nationsbank -- You're only familiar with Florida, I
10    take it?
11          A.   Right.
12          Q.   All right.  In Florida with respect to
13    overtime?
14          A.   I'm sorry, can you repeat your question?
15               (Thereupon, the preceding question was
16          read back by the court reporter.)
17               THE WITNESS:  So the current prevailing
18          policy?
19    BY MS. DOLIN:
20          Q.   What is the client's policy, if you will?
21          A.   It hasn't changed for the most part.  The
22    company tries to control overtime.
23          Q.   How is it determined whether an employee
24    can work overtime?
25          A.   It varies from each banking center.
```

```
 1        UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF FLORIDA
 2
              CASE NO. 97-6912 CIV-HIGHSMITH
 3

 4
   ELLEN MALONEY,
 5 on behalf of herself and
   all other similarly situated,
 6
              Plaintiffs,
 7
        vs.
 8
   NATIONSBANK OF FLORIDA, N.A.
 9 a national association,

10           Defendant.
   --------------------------/
11

12

13

14              Hollywood, Florida

15              April 13th, 1998

16              10:50 a.m.

17

18         ------------

19
             DEPOSITION
20
                OF
21
             CYD ALDERMAN
22

23

24

25
```

Page 2

```
 1 APPEARANCES:

 2
     MUCHNICK, WASSERMAN & DOLIN
 3   4000 Hollywood Boulevard, Suite 710 North
     Hollywood, Florida 33021
 4   BY: SUSAN L. DOLIN, ESQ.,
     BY: DANIEL R. LEVINE, ESQ.,
 5   appearing on behalf of the Plaintiffs,

 6
     McGUIRE WOODS BATTLE & BOOTHE LLP
 7   3700 NationsBank Plaza
     101 South Tryon Street
 8   Charlotte, North Carolina 28280-0001
     BY: JOHN M. SMITH, ESQ.,
 9   appearing on behalf of Defendant.

10

11      INDEX

12

13
   WITNESS      DIRECT CROSS  REDIRECT RECROSS
14
   CYD ALDERMAN
15
   By Mrs. Dolin    4
16

17

18      EXHIBITS

19 PLAINTIFF'S      FOR IDENTIFICATION

20    No Exhibits Offered

21
   DEFENDANT'S      FOR IDENTIFICATION
22
      No Exhibits Offered
23

24

25
```

EXHIBIT

3

Page 4

2    Deposition of CYD ALDERMAN, a witness of lawful
3  age, taken by the Plaintiffs for the purpose of
4  discovery for use as evidence in the above-entitled
5  cause, wherein ELLEN MALONEY, on behalf of herself and
6  all other similarly situated are the Plaintiffs, and
7  NATIONSBANK OF FLORIDA, N.A. a national association is
8  the Defendant, pending in the United States District
9  Court, Southern District of Florida, pursuant to notice
10 heretofore filed, before Michele Marie Moons, Court
11 Reporter and Notary Public in and for the State of
12 Florida at Large, at 4000 Hollywood Boulevard, Suite
13 710 North, Hollywood, Broward County, Florida, on the
14 13th day of April, 1998, commencing at 10:50 a.m.
15              ------------
16
17 Thereupon:
18              CYD ALDERMAN,
19 a witness named in the notice heretofore filed, being
20 of lawful age, and being first duly sworn in the above
21 cause, testified on her oath as follows:
22         DIRECT EXAMINATION
23 BY MRS. DOLIN:
24    Q. Can you please state your name?
25    A. Cyd Alderman.

1     Q. Spell Cyd for me.
2     A. C-y-d.
3     Q. A-l-d-e-r-m-a-n?
4     A. Yes.
5     Q. Your address, please?
6     A. It is One Financial Plaza.
7     Q. Fort Lauderdale?
8     A. Uh-huh.
9     Q. Zip code, please?
10    A. I am not sure. I just recently changed office
11 locations. That is why I am hesitating. Let me see if I
12 have a card with me. I don't have it with me.
13    Q. Okay.
14    A. Sorry about that.
15    Q. The phone number?
16    A. Area code (954) 765-2170.
17    Q. Are you currently employed?
18    A. Yes.
19    Q. Whereas?
20    A. NationsBank.
21    Q. How long have you been with NationsBank?
22    A. Five years.
23    Q. What is your current position with
24 NationsBank?
25    A. Personnel generalist.

CondenseIt™

Page 9

1   Q. -- for consumer bankers?
2   A. Okay.
3   Q. Is that still in use?
4   A. This particular sheet I am not sure, I don't
5   know. What I have seen are the job descriptions.
6   Q. Okay. Consumer bankers I and II?
7   A. II, III and IV.
8   Q. So exhibits 4 and 5 and you still, these are
9   still being used?
10  A. Yes, those are still being used. This
11  particular sheet, I don't know.
12  Q. Fair enough.
13      MR. LEVINE: Referring to Exhibit No. 3.
14      MRS. DOLIN: Right.
15  BY MRS. DOLIN:
16  Q. Exhibit No. 3 is not being used?
17  A. I don't know.
18  Q. I am sorry. You don't know whether it is or
19  not?
20  _ A. Right.
21  Q. Now, do you recall or were you in your
22  position as personnel generalist when the consumer
23  bankers were all made exempt for consumer bankers I's?
24  A. I was not there when they were made exempt.
25  Q. Okay. But you were there when they were moved

Page 10

1   back to nonexempt?
2   A. That's correct.
3   Q. How did you find out that the consumer banker
4   position was going to be made nonexempt?
5   A. By my manager.
6   Q. Who was that?
7   A. Wende Stambaugh.
8   Q. Okay. Did you receive any kind of an e-mail
9   or memorandum or anything to that effect?
10  A. I believe it was in person with her.
11  Q. Did you receive anything in writing, any
12  follow-up before or after her meeting?
13  A. I don't recall.
14  Q. Did she tell you who had made the decision to
15  make them nonexempt?
16  A. She did not tell me who had made the
17  decision.
18  Q. Did she tell you why the decision had been
19  made?
20  A. Why.
21  Q. Yes.
22  A. To be consistent. We had gone through a
23  merger with Boatmen's and also now with Barnett and to
24  have consistency throughout our entire organization we
25  were going to change the sales associates to nonexempt.

Page 11

1   Q. Okay. And was that done at one particular
2   time or was that done gradually?
3   A. It was December 16th, 1997 was the effective
4   date.
5   Q. For all regions?
6   A. Yes.
7   Q. Markets, as you call them?
8   A. Yes.
9   Q. As a personnel generalist, did you ever get
10  any reports from any employees, any associates, that
11  they were not being allowed to record overtime hours?
12  A. No.
13  Q. No complaints like that from any employees?
14  A. Huh-uh.
15  Q. Did you ever have occasion to hear about
16  whether employees were complaining about not being able
17  to record overtime hours?
18  A. No
19  Q. Did you ever receive reports that employees
20  were being asked to change time cards that reflected
21  overtime hours?
22  A. No.
23  Q. Did you ever hear about any employees being
24  asked to change time cards to not reflect overtime
25  hours?

Page 12

1   A. No.
2   Q. Did NationsBank have a policy of managing
3   overtime so as to keep it as low as possible?
4   A. Yes, we do.
5   Q. You still do that today?
6   A. Yes, we do.
7   Q. Does NationsBank have any policy of
8   compensation time in lieu of overtime pay?
9   A. The only thing would be within the same work
10  week. If an associate foresees having overtime they are
11  to let their manager know and within that same work
12  week the manager could have them maybe come in late or
13  go home early within that same week.
14  Q. And if the overtime is unexpected and comes
15  or occurs on a Friday and there is no time to give comp
16  time within that same work week, are they then paid for
17  it?
18  A. Yes.
19  Q. When the decision was made to switch them
20  back to nonexempt, okay, was back pay or back overtime
21  given to the consumer bankers for the period when they
22  worked overtime while they were worked as exempt?
23  A. No.
24  Q. Did you have occasion to have a visit from
25  the Department of Labor at any of the branches that you

Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
                     CASE NO. 97-6912 CIV-HIGHSMITH
 3

 4
    ELLEN MALONEY,
 5  on behalf of herself and
    all other similarly situated,
 6
             Plaintiffs,
 7
         vs.
 8
    NATIONSBANK OF FLORIDA, N.A.
 9  a national association,

10            Defendant.
    ------------------------------/
11

12

13

14             Hollywood, Florida

15             April 13th, 1998

16             9:10 o'clock a.m.

17

18        ------------

19
               DEPOSITION
20
                  OF
21
             DAPHNE COVER
22

23

24

25
```

Page 2

```
 1  APPEARANCES:

 2

 3     MUCHNICK, WASSERMAN & DOLIN
       4000 Hollywood Boulevard, Suite 710 North
 4     Hollywood, Florida 33021
       BY: SUSAN L. DOLIN, ESQ.
 5     BY: DANIEL R. LEVINE, ESQ.
       appearing on behalf of the Plaintiffs.
 6

 7     McGUIRE WOODS BATTLE & BOOTHE LLP
       3700 NationsBank Plaza
 8     101 South Tryon Street
       Charlotte, North Carolina 28280-0001
 9     BY: JOHN M. SMITH, ESQ.,
       appearing on behalf of Defendant.
10

11

12

13

14

15

16

17

18

19

20
                   EXHIBIT
21

22                   4
23

24

25
```

Page 3

```
 1                  INDEX
 2
 3
    WITNESS    DIRECT CROSS  REDIRECT RECROSS
 4
 5  DAPHNE COVER
 6  By Mrs. Dolin    4
 7
 8             EXHIBITS
 9
    PLAINTIFF'S          FOR IDENTIFICATION
10
        1           36
11
        2           39
12
        3           40
13
        4           40
14
        5           40
15
        6           43              4.2
16
17
    DEFENDANT'S          FOR IDENTIFICATION
18
        No Exhibits Offered
19
20
21
22
23
24
25
```

Page 4

```
 1
 2       Deposition of DAPHNE COVER, a witness of lawful
 3  age, taken by the Plaintiffs for the purpose of
 4  discovery and for use as evidence in the above-entitled
 5  cause, wherein ELLEN MALONEY, on behalf of herself and
 6  all other similarly situated are the Plaintiffs, and
 7  NATIONSBANK OF FLORIDA, N.A. a national associationn is
 8  the Defendant, pending in the United States District
 9  Court, Southern District of Florida, pursuant to notice
10  heretofore filed, before Michele Marie Moons, Court
11  Reporter and Notary Public in and for the State of
12  Florida at Large, at 4000 Hollywood Boulevard, Suite
13  710 North, Hollywood , Broward County, Florida, on the
14  13th day of April, 1998, commencing at 9:10 o'clock
15  a.m.
16          ------------
17  Thereupon:
18          DAPHNE COVER,
19  a witness named in the notice heretofore filed, being
20  of lawful age, and being first duly sworn in the above
21  cause, testified on her oath as follows:
22          DIRECT EXAMINATION
23  BY MRS. DOLIN:
24      Q  Can you please state your name for the
25  record?
```

Page 13

1 only managing but also the fact that, you know, if you
2 were a supervisor, I would have to look at the book, I
3 guess I am guessing here, but there was information as
4 a supervisor that you would have to know.
5      If it covered labor laws, I am not really
6 sure.
7      Q. All right. Now, you are familiar with the
8 consumer banker position, are you not? Let me ask you
9 this first.
10      With respect to NationsBank, do they have a
11 policy of not having their nonexempt employees work
12 overtime? Are you aware of that?
13      A. Can you repeat that?
14      Q. Yes. Does NationsBank have a policy, policy
15 may not be the right word, but is it NationsBank's₁
16 desire that its nonexempt employees not work overtime?
17      A. The policy is if you work overtime you are
18 paid overtime. Overtime is very expensive so managers
19 are asked to manage that.
20      – Q. Good.
21      A. But there is no policy, if I understood your ·
22 question correctly, that you are not to work overtime.
23      Q. That was probably a badly worded question.
24      It is NationsBank's desire to limit overtime
25 as much as possible?

Page 14

1      A. Right, because of the expense.
2      Q. Sure, and that is okay. How do they go about
3 managing the overtime?
4      A. Each manager is responsible for managing
5 their department or banking center.
6      Q. Is that the branch manager?
7      A. Yes, uh-huh.
8      Q. Okay, okay. Now, if an employee is nonexempt,
9 are they expected to fill out time cards?
10      A. Yes.
11      Q. Do you know how those time cards are filled
12 out? Is there a clock they punch or --
13      A. For which department? If you are talking
14 about here, just here in the branches?
15      Q. Right, in the branches.
16      A. It is a card, they manually fill out their
17 time they are working.
18      Q. In hand, by hand?
19      A. By hand, yes.
20      Q. And that will go for all the nonexempt
21 positions in the branch?
22      A. Yes.
23      Q. That would include tellers?
24      A. Yes.
25      Q. Consumer banker 1s?

Page 15

1      A. Correct.
2      Q. And I guess just as of late IIs, IIIs and IVs
3 as well?
4      A. Yes.
5      Q. But let's go back before the time that
6 consumer bankers IIs, IIIs and IVs were made nonexempt
7 again.
8      A. Exempt status then?
9      Q. Right, when they had exempt status.
10      A. Okay.
11      Q. So they would have filled out time cards?
12      A. Yes.
13      Q. By hand?
14      A. Yes.                ⁄.∵
15      Q. And is the manager supposed to have reviewed
16 the time cards?
17      A. Yes, the managers are responsible for
18 reviewing them for accuracy and making sure that the
19 person has completed their time card.
20      Q. Okay. Now, the time card, as I understand it,
21 is a two-week time card?
22      A. Yes.
23      Q. Is the review by the manager done at the end
24 of each week or at the end of the two-week period?
25      A. I really couldn't say. I would think they

Page 16

1 would do it at the end of the two weeks because the
2 time cards are turned in on the 15th or the 16th and
3 the last day of the month. So not being the manager, I
4 really couldn't say when they are actually looking at
5 those time cards.
6      Q. Okay. What are the time cards supposed to
7 reflect, to the best of your knowledge?
8      A. The actual hours that the associate is
9 working.
10      Q. Is the manager, branch manager paid on, does
11 the branch manager receive any incentives or bonuses or
12 anything like that?
13      A. For?
14      Q. Anything having to do with job performance.
15      A. The banking center managers receive
16 incentives based on their performance individually and
17 also for their banking center and how they are doing.
18      Q Profitability?
19      A. Uh-huh.
20      Q. That is a yes?
21      A. Yes.
22      Q. Okay.
23      A. I am sorry.
24      Q. That is all right.
25      If a manager has a lot of overtime does that

```
                                                          1
 1            .           UNITED STATES DISTRICT COURT
                          SOUTHERN DISTRICT OF FLORIDA
 2                          FORT LAUDERDALE DIVISION
 3                 CASE NO.: 98-6306-CIV-DIMITROULEAS
                          Magistrate Judge Bandstra
 4
      ----------------------------X
 5    BEVERLY LEVINE, et al.,          :
                                       :
 6            Plaintiffs,              :
                                       :
 7    v.                               :
                                       :
 8    NATIONSBANK, N.A.,               :
      a national association,          :
 9                                     :
              Defendant.               :
10    ----------------------------X
11
12                          COPY
13
14
15
16            DEPOSITION OF MOLLY M. BARBER
                   (Taken by Plaintiffs)
17             Charlotte, North Carolina
                    October 27, 1999
18
19
20
21
22    Reported by:   Dayna H. Lowe
                     Court Reporter
23                   Notary Public
24                         EXHIBIT
25                           5
```

96

1    Q.   You would only know from the time you were in

2  compensation?

3    A.   Correct.

4    Q.   From '97 to the current time, do you know of

5  any, again, practice or concern by NationsBank to keep

6  the overtime down as a way to control costs?

7    A.   I would say yes, that's probably a budget item

8  that's controllable, and, like any other expense, we

9  would be looking at ways to maintain that.

10    Q.   Now, you said a banking center manager was

11  incented on the performance of the whole center, correct?

12    A.   Correct.

13    Q.   And that would include the profitability of the

14  center?

15    A.   No, not really.

16    Q.   How would it work?

17    A.   The sales of accounts or opening of accounts

18  and service, but it is not tied to any income statement

19  summary or results, no.

20    Q.   So if somebody was working at a branch that,

21  for some reason, had high sales but was losing money,

22  they could still get their incentive points?

23    A.   They could, yes.

24    Q.   Do you know of any situations where a bank has

25  high sales and loses money?

97

1      A.   I don't directly, no.  I guess anything's

2   possible, but no.

3      Q.   You don't know of any?

4      A.   No.  Huh-uh.  I don't even know if we measure

5   income statement at that level anymore, at the banking

6   center level.

7      Q.   When would that have stopped, if it did?

8      A.   Several years back.  You really need to ask a

9   finance person that question.

10          (Mr. DuPre entered the proceeding.)

11          BY MS. DOLIN:

12     Q.   If a banking center was unable to control its

13  costs in an effective manner, would that affect the

14  incentive of the banking center manager?

15     A.   No.  It may affect their job, but it would not

16  affect their incentive pay, not under the program that

17  was in place.

18     Q.   Now, do you know when NationsBank found out

19  about the Department of Labor's opinion on the Boatmen's

20  complaint?

21     A.   We were aware of it before we made our final

22  decision.

23     Q.   Was it after you learned of the mapping

24  problems between the Boatmen's consumer bank equivalents

25  and NationsBank consumer bankers?

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

JACQUELINE MINTZ, on behalf
of herself and all others
similarly situated,

CASE NO.: 98-8632-CIV-DIMITROULEAS
Magistrate Judge Vitunic

Plaintiff,

vs.

NATIONSBANK, N.A.,
a national association

Defendant.
_____/

### AFFIDAVIT OF PHYLLIS KENNEDY BROWN

STATE OF MARYLAND        )
                         ) SS:
COUNTY OF PRINCE GEORGE'S )

BEFORE ME, the undersigned authority, on this date personally appeared PHYLLIS

KENNEDY BROWN, who, after first being duly sworn deposes and says:

1.    My name is PHYLLIS KENNEDY BROWN.

2.    I have personal knowledge of the facts recited in this Affidavit.

3.    Prior to September 1, 1995, I was employed as a manager by NationsBank, N.A. at

the Seat Pleasant, Maryland branch.

4.    At one point while I was a manager, we had a managers' meeting at which it was

announced that all Consumer Bankers, regardless of their level, i.e. I-IV, were expected to do

telemarketing in the evenings. I opposed this measure, because I knew that NationsBank did not

want to pay its employees overtime. I voiced my opposition at the meeting, stating that to require

the Consumer Bankers to work without paying them overtime, at least those who were classified as

non-exempt, was against the law. I was told, "You are the manager. Manage it."



EXHIBIT
6

5. I refused to permit Consumer Bankers working under my direction to work overtime without being paid for it. I attempted to schedule them so that they would not work overtime and still get their telemarketing done, but it was very difficult because NationsBank had just gone through a downsizing and we did not have sufficient people to get all of the work done without having employees work overtime at least occasionally.

6. NationsBank put the burden on the individual managers to "manage" the overtime but still have the Consumer Bankers work evenings doing telemarketing. NationsBank made us managers feel threatened that our jobs were in jeopardy if we paid overtime or let the employees claim overtime. Despite this, however, some managers, particularly the more experienced managers such as me, saw to it that employees who worked overtime were paid overtime. Other managers, however, did not allow their employees to report overtime, nor were the employees paid for the overtime.

7. After I protested NationsBank's directive, I was demoted to a Consumer Banker IV on September 1, 1995.

Further Affiant Sayeth Naught.

PHYLLIS KENNEDY BROWN

SWORN TO AND SUBSCRIBED before me this 21 day of October 1998, by PHYLLIS KENNEDY BROWN, who is personally known to me, or who produced _____ as identification, and who did/did not take an oath.

Notary Public. State of Maryland
My Commission Expires:

Acknowledger's Name Stamped.
Typed or Printed

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE

JULIET ALDRED, on behalf
of herself and all others
similarly situated,

CASE NO.: 97-7547-CIV-DIMITROULEAS
Magistrate Judge Johnson

Plaintiff,

vs.

NATIONSBANK, N.A.,
a national association

Defendant.

_____/

## AFFIDAVIT OF JASON ROYAL

STATE OF FLORIDA      )
                      ) ss:
COUNTY OF BROWARD )

BEFORE ME, the undersigned authority, on this date personally appeared JASON

ROYAL who, after first being duly sworn deposes and says:

1.    My name is JASON ROYAL.

2.    I have personal knowledge of the facts recited in this Affidavit.

3.    I am a former employee of NATIONSBANK, having worked for it from

approximately October 1995 to approximately April 1997.

4.    From approximately September 1996 to February 1997, I was located at

NATIONSBANK's Plantation branch. My position was Consumer Banker II. As such, I was

classified as "exempt" for purposes of the overtime laws. However, during my tenure at

the Plantation branch, I became aware of "non-exempt" employees who were required to

work overtime, but not allowed to record their overtime hours on their time cards, and,

consequently, not paid for the overtime that they worked. In fact, many of these non-

exempt employees complained to me about this practice of NATIONSBANK.

Further Affiant Sayeth Naught.

_____
JASON ROYAL

SWORN TO AND SUBSCRIBED before me this _7_ day of July, 1998, by JASON
ROYAL, who is personally known to me, or who produced FLORIDA DRIVERS License as
identification, and who did/did not take an oath.

_____
Notary Public, State of Florida

My Commission Expires
January 26, 2000
_____
Acknowledger's Name Stamped,
Typed or Printed

Ronald J. Cappietore
MY COMMISSION # CC496162 EXPIRES
January 26, 2000
BONDED THRU TROY FAIN INSURANCE, INC.

2

. UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
·FORT LAUDERDALE

JULIET ALDRED, on behalf
of herself and all others
similarly situated,

CASE NO.: 97-7547-CIV-DIMITROULEAS
Magistrate Judge Johnson

Plaintiff,

vs.

NATIONSBANK, N.A.,
a national association

Defendant.

_____/

### AFFIDAVIT OF SUSAN L. DOLIN

STATE OF FLORIDA      )
                      ) ss:
COUNTY OF BROWARD      )

BEFORE ME, the undersigned authority, on this date personally appeared SUSAN L.

DOLIN who, after first being duly sworn, deposes and says:

1.   My name is SUSAN L. DOLIN.

2.   I have personal knowledge of the facts recited in this Affidavit.

3.   I am lead counsel for the Plaintiff in the above-captained case.

4.   In furtherance of my representation of the Plaintiff in this matter I have had

telephonic conversations with two (2) former NATIONSBANK employees.

5.   These former NATIONSBANK employees have informed me that they are

witnesses to and/or victims of NATIONSBANK's unlawful pay practices as detailed in the

Plaintiff's Complaint in the above-captioned case.

6.   Specifically, Phyllis Kennedy Brown has indicated that she witnessed

NATIONSBANK's unlawful pay practices as detailed in the Plaintiff's Complaint, and is willing to

sign a sworn affidavit attesting to her specific knowledge.

7. Furthermore, Scott Jueckstock has indicated that he was a victim of NATIONSBANK's unlawful pay practices as detailed in the Plaintiff's Complaint, and desire to opt-in to the above-captioned case.

8. Phyllis Kennedy Brown has indicated that she knows of managers throughout NATIONSBANK in Maryland who did not permit tellers to record overtime.

9. Scott Jueckstock has indicated that he knows of instances where NATIONSBANK managers have refused to permit tellers to record overtime, and was himself a victim of this very practice at a NATIONSBANK branch in Broward County, Florida.

Further Affiant Sayeth Naught.

SUSAN L. DOLIN

SWORN TO AND SUBSCRIBED before me this 15 day of October 1998, by SUSAN L. DOLIN, who is personally known to me, or who produced ____________ as identification, and who did/did not take an oath.

Notary Public, State of Florida

My Commission Expires:

Kimberly Shinder
Acknowledger's Name Stamped,
Typed or Printed

KIMBERLY SHINDER
Notary Public, State of Florida
My Comm. Expires Dec 25, 1999
No. CC 520662
Bonded Thru Official Notary Service
1-(800) 723-0121

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE

JULIET ALDRED, on behalf                     CASE NO.: 97-7547-CIV-DIMITROULEAS
of herself and all others                    Magistrate Judge Johnson
similarly situated,

      Plaintiff,

vs.

NATIONSBANK, N.A.,
a national association

      Defendant.
_____/

### AFFIDAVIT OF DANIEL R. LEVINE

STATE OF FLORIDA    )
               ) ss:
COUNTY OF BROWARD    )

BEFORE ME, the undersigned authority, on this date personally appeared DANIEL R. LEVINE who, after first being duly sworn, deposes and says:

1.    My name is DANIEL R. LEVINE.

2.    I have personal knowledge of the facts recited in this Affidavit.

3.    I am associate counsel for the Plaintiff in the above-captioned case.

4.    In furtherance of my representation of the Plaintiff in this matter I have had telephonic conversations with several former NATIONSBANK employees.

5.    These former NATIONSBANK employees have informed me that they are witnesses to and/or victims of NATIONSBANK's unlawful pay practices as detailed in the Plaintiff's Complaint in the above-captioned case.

6.    Specifically, Phyllis Kennedy Brown, Tammy Beaulieu, and Agnes Forsythe have indicated that they witnessed NATIONSBANK's unlawful pay practices as detailed in the Plaintiff's Complaint, and are willing to sign sworn affidavits attesting to their specific knowledge.

7.    Furthermore, Charlene Hutchins and Kim Clark have indicated that they were victims of NATIONSBANK's unlawful pay practices as detailed in the Plaintiff's Complaint, and desire to opt-in to the above-captioned case.

8.    Phyllis Kennedy Brown has indicated that she knows of managers throughout NATIONSBANK in Maryland who did not permit tellers to record overtime.

9.    Tammy Beaulieu, Agnes Forsythe, Charlene Hutchins, and Kim Clark have indicated that they know of instances where NATIONSBANK managers have refused to permit tellers to record overtime, and in the case of Charlene Hutchins and Kim Clark, these individuals were also victims of these very practices, at NATIONSBANK branches in Broward County, Florida.

Further Affiant Sayeth Naught.

_____
DANIEL R. LEVINE

SWORN TO AND SUBSCRIBED before me this 15 day of October 1998, by DANIEL R. LEVINE, who is personally known to me, or who produced _____ as identification, and who did/did not take an oath.

_____
Notary Public, State of Florida

My Commission Expires:

Kimberly Shinder
Acknowledger's Name Stamped,
Typed or Printed

KIMBERLY SHINDER
Notary Public, State of Florida
My Comm. Expires Dec. 25, 1999
No. CC 520662
Bonded Thru Official Notary Service
1-(800) 733-0121