UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-06145-CIV-DIMITROULEAS
Magistrate Judge Snow

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated,

    Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NationsBank, N.A., a national association,

    Defendant.



_____/

## PLAINTIFFS' MOTION TO AMEND COMPLAINT TO ADD PLAINTIFF, RODNEY N. HENSLEY AND INCORPORATED MEMORANDUM OF LAW

COME NOW the Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE, on

behalf of themselves and all others similarly situated, by and through their undersigned

counsel, and, pursuant to Federal Rule of Civil Procedure 15 (a) move this Honorable

Court to permit them to amend their Complaint to include Rodney N. Hensley as a party

Plaintiff, and show as follows:

1.    Plaintiffs' filed the above-referenced Complaint on January 31, 2000, pursuant to

    the *Fair Labor Standards Act*, 29 U.S.C. §§ 201 et. seq. ("FLSA"), "on behalf of

    themselves and all other employees of NationsBank similarly situated."

2.    Plaintiffs' alleged in their Complaint that they worked for NationsBank as Consumer

    Banker II's and III's; that NationsBank reclassified their positions as non-exempt for



purposes of the FLSA in or about December, 1997; and that between December 1997 and October 29, 1999, they and other similarly situated NationsBank employees worked "many times in excess" of 40 hours per week; and that NationsBank violated the FLSA by failing to pay them and other similarly situated employees overtime for hours worked in excess of forty (40) hours per week. See Complaint ¶'s 8, 9, 11, 14 and 16.

3.    The potential "class" of Plaintiffs, as set forth in the Plaintiffs' Complaint, would consist of all individuals who were "similarly situated" to the named Plaintiffs; i.e., all those persons who were in the position of Consumer Banker II, III or IV from December 1997 forward, or performing the same or similar jobs of a Consumer Banker II, III or IV from December 1997 forward.

4.    On or about June 7, 2000, Plaintiffs filed with this Court, and served upon the Defendant, a Notice of Filing of a Consent to become Party Plaintiff for Rodney N. Hensley.    In so filing, Hensley "opted-in" as a party Plaintiff to the above-referenced litigation.

5.    On or about October 23, 2000, Defendant, NationsBank caused to be filed its Motion for Summary Judgment in the above-referenced matter, claiming that, *inter alia*, Opt-In Plaintiff Rodney N. Hensley should be essentially disqualified from participating in this lawsuit, and judgment therefore entered in favor of NationsBank and against Mr. Hensley, because he "left his position" as a Consumer Banker II, III or IV on or about June 30, 1997, prior to the operative date of December, 1997.

*Escudero, et al.v. BankAmerica Corporation, etc.*
Case No. 00-06145-Civ-Dimitrouleas

6.    Mr. Hensley has moved from Tennessee to Alabama, and could not be found in time to respond to the Defendant's Motion for Summary Judgment along with the initial Response which Plaintiffs filed prior. However, since that time, Plaintiffs have made contact with Mr. Hensley and have learned that Mr. Hensley is indeed similarly situated to the Plaintiffs and not only should not have summary judgment entered against him,[1] but ought to be allowed to enter the lawsuit as an additional named Plaintiff and have the Complaint amended to reflect his participation as a similarly situated individual to the named Plaintiffs, Escudero and Drake.

7.    Indeed, Mr. Hensley, as reflected in an Affidavit that will be forthcoming to the Court within the next few days, worked as a Consumer Banker III in Brentwood, Tennessee for NationsBank until approximately June 30, 1997, at which time he was transferred to an in-store banker's position at the Harris-Teeter Supermarket, Brentwood, Tennessee. As an in-store banker, Mr. Hensley performed the exact same functions he had performed as a Consumer Banker III at the banking center, but rather performed them in the in-store bank facility at the Harris-Teeter Supermarket instead of in the traditional banking center. While employed in the in-store bank classification, Mr. Hensley continued to carry a business card which listed him as a consumer banker. According to Mr. Hensley, he was one of the first in-store bankers in the State of Tennessee, which was piloting its in-store banker project after the one in Georgia.

---

[1] See Plaintiff's Second Amended Final Response to Defendant's Motion for Summary Judgment, filed simultaneously herewith.

8.    Mr. Hensley remained an in-store banker for NationsBank at the Harris-Teeter location in Brentwood, Tennessee until January 15, 1999 when he left NationsBank's employ.

9.    As this Court will recall, a similar situation occurred in the *Levine v. NationsBank* matter and the *Perlman v. NationsBank* matter, both cases previously filed and disposed of before this Court. In the *Levine* matter, after the Court ordered notification to all other individuals similarly situated to the named Plaintiffs, NationsBank provided to the Plaintiffs information on in-store bankers as persons *similarly situated to the consumer bankers, stating that in-store bankers were* considered, during the relevant time period, i.e. prior to December 1997, consumer bankers everywhere but in Florida. (A.1 attached).

10.    By the time the Plaintiffs became aware of the in-store banker classification, filed the *Perlman* suit, and requested consolidation of *Perlman* with *Levine*, the *Levine* case was so far along in litigation that the Court was reluctant to grant consolidation. (A. 2). Moreover, the Court found that many of the in-store bankers had been included in the *Levine* litigation already, and therefore granted notification in *Perlman* only throughout the state of Florida, where the in-store bankers were in fact separately classified.

11.    In the instant case, however, particularly as concerns Mr. Hensley, the Tennessee in-store banker program does not appear to be included in the post December, 1997 consumer banker classification. Indeed, NationsBank has moved for summary judgment on the ostensible grounds that he is **not** similarly situated to the

consumer bankers II, III or IV because he "left the position". Moreover, as Ellen Martin's deposition indicates, the in-store banker program was starting to be rolled out in other states besides Florida, separate and apart from the consumer banker position, such that in-store banker, as time went on, appears to have become a separate classification altogether. Thus, unlike in the time frame of the *Levine* litigation, the in-store bankers, who are in fact similarly situated in job responsibility to the consumer bankers, would not be "picked up" with the consumer bankers in any notification process that might arise in the instant case, as they were in *Levine*.

12.    Because of the situation as it existed in *Levine*, and the change in that situation which has apparently come about in NationsBank's personnel structure since that time, the Plaintiffs were utterly unaware of the evident growth of the in-store banker classification and concomitant separation of that classification from the consumer banker classification which is now apparently the case, until Mr. Hensley "opted-in" to the above-referenced litigation and NationsBank surreptitiously moved for summary judgment, stating only that Hensley had "left the position" of consumer banker without stating where he went. Because of the difficulty in locating and reaching Mr. Hensley, the Plaintiffs were equally unaware of where Mr. Hensley had gone and the nature of his transfer until just a few days ago.

13.    Federal Rule of Civil Procedure 15(a) clearly requires that "leave [to amend a complaint] shall be freely given when justice so requires." The decision of whether justice requires amendment to a complaint is committed to the sound discretion of the trial judge, who may consider such factors as "prejudice to the opposing party,

undue delay, repeated failure to cure deficiencies with prior amendment, bad faith, dilatory motive and futility of amendment." *Guilbeaux v. 3927 Foundation, Inc.*, 117 F.R.D. 387, 394 (E.D. Tex. 1998). *See also*, *Zenith Radio Corp. v. Haseltine Research, Inc.*, 401 U.S. 321 (1971); *Southern Constructors Group v. Dyne electric Company*, 2 F. 3rd 606, 611, (5th Cir. 1993) (Rule 15 evinces a bias in favor of granting leave to amend).

14.    In the instant case, the pre-trial scheduling order does not impose a deadline until February 8, 2001 for Rule 15 (a) motions such as the instant one. Therefore, not only are Plaintiffs' filing this motion well within the deadline, any delay in filing such a motion is a direct result of NationsBank's own actions. While NationsBank stated that Mr. Hensley left the position of "consumer banker" to go to another position, it purposefully hid the nature of the other position and its similarity to the position of consumer banker. Therefore, in light of the factors which the Court should consider in determining whether to allow the amendment, the Court should take into account the prejudice to the Plaintiffs if this amendment is not allowed.

15.    Moreover, summary judgment against Mr. Hensley under these circumstances is wholly improper, and it is disingenuous of NationsBank even to have moved for same under these circumstances. This is especially true where, as here, the testimony of NationsBank's own principal, Ellen Martin, evidences an expanding role for the in-store bankers, such that it was inappropriate for NationsBank to move for summary judgment against Rodney Hensley instead of accepting him as a similarly situated employee to the named Plaintiffs, as he was performing essentially the

same functions as a consumer banker II, III or IV, but inside of a grocery store rather than a traditional banking center. Clearly, when the Plaintiffs' filed this claim on behalf of themselves and all other similarly situated, they did not limit their complaint only to consumer bankers II, III or IV's, but rather they meant what they said: all those similarly situated, which would include all those performing the duties of a consumer banker II, III or IV who were treated similarly to the consumer bankers; that is, wrongly classified as exempt until December 1997, then made non-exempt but denied overtime anyway.

16. It is for this reason that the Plaintiffs' requested amendment should be allowed, and Rodney N. Hensley should be added as a named Plaintiff relating back to the date he opted-in to the instant lawsuit and notification, if granted, should include **all** similarly situated employees, including consumer bankers II, III and IV and in-store bankers.

Respectfully submitted,

MUCHNICK, WASSERMAN, DOLIN & LEVINE, LLP
Attorneys for Plaintiff
4000 Hollywood Boulevard, Suite 620 North
Hollywood, Florida 33021
(954) 989-8100 - Broward
(305) 624-9100 - Dade

By: 

SUSAN L. DOLIN, ESQ.
Fla. Bar No. 708690
ELISSA S. HULNICK, ESQ.
Fla. Bar No.: 0315000

*Escudero, et al.v. BankAmerica Corporation, etc.*
Case No. 00-06145-Civ-Dimitrouleas

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished by U.S. mail to: Richard F. Kane, Esq., McGUIRE WOODS, 3700 NationsBank

Plaza, Charlotte, North Carolina 28280; Michael T. Burke, Esq., JOHNSON, ANSELMO,

MURDOCH, BURKE & GEORGE, P.A., 790 East Broward Blvd., Suite 400, P.O. Box

030220, Ft. Lauderdale, Florida 33303-0220, on this ___ day of December, 2000.

MUCHNICK, WASSERMAN, DOLIN &
LEVINE, LLP
Attorneys for Plaintiff
4000 Hollywood Boulevard, Suite 620 North
Hollywood, Florida 33021
(954) 989-8100 - Broward
(305) 624-9100 - Dade

By: _____

SUSAN L. DOLIN, ESQ.
Fla. Bar No. 708690
ELISSA S. HULNICK, ESQ.
Fla. Bar No.: 0315000

**HUSEBY & ASSOCIATES**
AN **Int-rim** LEGAL SERVICES™ COMPANY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 98-6306-CIV-DIMITROULEAS
MAGISTRATE JUDGE BANDSTRA

```
- - - - - - - - - - - - - - - - - - X
                                    :
BEVERLY LEVINE, et al,              :
                                    :
              Plaintiffs,           :
                                    :
              vs.                   :
                                    :
NATIONSBANK, N.A.,                  :
a national association,             :
                                    :
              Defendant.            :
- - - - - - - - - - - - - - - - - - X
```

COPY

<u>Deposition</u> of <u>ELLEN D. MARTIN</u>, <u>Volume II</u>
(Taken by Plaintiffs)
Charlotte, North Carolina
November 18, 1998

Reported by:   Janet L. Cooper,
               Registered Professional Reporter
               Notary Public

THE OAK HOUSE • 1316 HARDING PLACE • CHARLOTTE, NC 28204 • (704) 333-9889 • FAX (704) 372-4593

ATLANTA, GA / GAINESVILLE, GA / ASHEVILLE, NC / GREENSBORO, NC / RALEIGH, NC / WINSTON-SALEM, NC / COLUMBIA, SC / GREENVILLE, SC / FLORENCE, SC / CHATTANOOGA, TN

http://www.huseby.com • email rpr@huseby.com

```
 1          A.    Oh, after it went to

 2          Q.    Have you discussed

 3   anybody other than the attorr

 4          A.    No.

 5          Q.    Have you read any'

 6   yourself for the depositior

 7          A.    I looked over th

 8   guidelines.  I did look over the chart ..

 9   went over line by line about the accounts and

10   things like that.  I looked over the job

11   descriptions, appraisals, things like that.

12          Q.    You mean performance appraisals for

13   CBs?

14          A.    Not specific ones.  I mean the

15   appraisal that we use for CBs.

16          Q.    You mean the form?

17          A.    Right.  Not specific individual

18   appraisals.

19          Q.    Got it.  Are you familiar with the term

20   "in-store banker"?

21          A.    Oh, I'm afraid I am.  Yes, I am.

22          Q.    Tell me what the in-store banker does.

23          A.    You know, it depends on the state

24   you're talking about.  It depends on the type of

25   in-store facility that you're talking about.
```

```
 1        Q.   Can you tell me when
 2   banker became a position at Nat
 3        A.   In-store banker beca
 4   NationsBank prior to my enter
 5   I'm in, so I can't give you a
 6        Q.   Since that was abo
 7   can you give me an idea of when
 8        A.   Sure.  I came into the role in Januar,
 9   of '97.
10        Q.   Okay.
11        A.   In-store banker was created for Florida
12   market.
13        Q.   Only?
14        A.   At the time, yes.  As they rolled out
15   or began their in-store franchise, sometime in
16   '96.  I'm not certain exactly when.
17        Q.   Prior to the creation of the in-store
18   banker -- and I'm going to call it ISB.
19        A.   All right.
20        Q.   Prior to the creation of that for the
21   Florida market, did it exist anywhere else in the
22   NationsBank system?
23        A.   Not in-store banker, no.
24        Q.   Okay.
25        A.   In-store bankers are consumer bankers
```

```
 1    in Texas and in Georgia.

 2         Q.    Are there any in-store b

 3    time in 1996 when they were creat

 4    up through December of 1997 when

 5    were all made nonexempt, or are

 6    in-store bankers other than the ˍ

 7         A.    Yes, there are.  There are in-store

 8    bankers in the Carolinas, which would mainly be

 9    North Carolina.  I'm not sure if we even have any

10    in-stores in South Carolina.  But there may be

11    one in South Carolina.

12              There are in-store bankers in our

13    Midwest market, and I think they're only in

14    St. Louis, but they may be in Kansas City and

15    Oklahoma as well.  But definitely St. Louis.

16         Q.    And these positions were instituted

17    sometime between 1996 and December of 1997?

18         A.    I can't say in St. Louis if that's

19    true.

20         Q.    When did they come in in St. Louis?

21         A.    Actually, it would have been in '97.

22    Yes.  It would have been in '97.

23         Q.    Before December?

24         A.    Yes.  It's before December.  I'm

25    getting my years mixed up here, but it would have
```

1   been in St. Louis.  In the Carolinas

2   now understand, they continue to add in-store

3   centers as we speak.

4        Q.    Sure.

5        A.    So there were some in all of the

6   markets I talked about.

7        Q.    Now, in 1996 the ISBs, in-store

8   bankers, in Florida, they were exempt or

9   nonexempt?

10        A.    Exempt.

11        Q.    And what about in the other markets,

12   the Carolinas?

13        A.    Exempt.

14        Q.    And the Midwest market?  All exempt?

15        A.    Right.  All were Exempt.

16        Q.    Now, did they become nonexempt the same

17   time the consumer bankers became nonexempt?

18        A.    Yes, they did.

19        Q.    And how many in-store bankers, if you

20   know, are we talking about between the time the

21   position was created and the time they became

22   nonexempt?

23        A.    I really don't have an exact number.

24        Q.    Do you have a general ballpark figure?

25        A.    You know, I really don't.  I would have

1 to figure out how many centers there were at that

2 time. And again, we literally add centers almost

3 one a week in some markets. And I'd have to

4 figure out how many centers there were, and then

5 I could make some assumptions to be able to

6 ballpark it. But I just can't do math in my

7 head.

8     Q.    You said there were consumer bankers in

9 Texas and Georgia?

10     A.    Right.

11     Q.    What do you mean? You actually had

12 people performing in-store, but they were called

13 consumer bankers?

14     A.    It helps to understand kind of how we

15 came about in-store.

16     Q.    Let's go there. Let me do it this way:

17 Tell me what an in-store bankers does. When the

18 position was first -- did you inherit those from

19 some other bank?

20     A.    Yes.

21     Q.    Okay.

22     A.    And I think that's why it might be

23 important for you to understand. In-store's a

24 relatively new concept in banking. It's been

25 around since the late 70s, but branches have been

```
 1    around since the 1800s, so it puts it in context.

 2            For NationsBank, we really have only

 3    been involved in in-store since 1995 when we

 4    acquired BankSouth, which was a Georgia bank

 5    predominantly.  There might have been a few

 6    offices in Florida.  I'm not certain.

 7            But when we acquired BankSouth, we

 8    acquired a relatively large number of in-store

 9    bankers in the Kroger stores.

10        Q.   Can you give me an estimate of how

11    many.

12        A.   About 75.  And those had been in

13    existence since 1986.  So that was one of the

14    franchises we inherited.

15        Q.   Now, when you inherited the BankSouth

16    folks, 75 in-store bankers, did you classify them

17    as consumer bankers at the time?

18        A.   Yes.  Because that was in '96 before we

19    had created the in-store banker job code.

20        Q.   So when you did the mapping, as they

21    called it --

22        A.   Yes.

23        Q.   -- they became consumer bankers?

24        A.   Right.

25        Q.   And they continued to work at the
```

1    Krogers?

2         A.    Yes.    And in our Texas market in '95,

3    we did a pilot and opened a few stores in

4    Albertson's in Texas and continued our rollout of

5    in-store in Texas in 1996.    And again, all of

6    this was prior to any new codes having been

7    created.

8         Q.    And these folks were classified as

9    consumer bankers?

10        A.    Yes, they were.

11        Q.    Was there a time that the

12   classification was ever changed to in-store

13   banker?

14        A.    No.

15        Q.    So these people that worked at the

16   Krogers in Georgia and possibly Florida have

17   always been classified as consumer bankers?

18        A.    Not Florida.

19        Q.    I thought you said they might have had

20   a couple in Florida.

21        A.    Well, if BankSouth had any branches.

22   They did not have any in-stores in Florida.

23        Q.    So that was confined to Georgia?

24        A.    Yes.    Yes, it was.

25        Q.    I just want to make sure that I'm

```
 2  │  Georgia, the folks that worked at the Krogers
 3  │  were classified as consumer bankers and have
 4  │  never been classified as anything else with
 5  │  NationsBank; is that true?
 6  │      A.   Yes.  That's correct.
 7  │      Q.   Same thing with the Texas pilot with
 8  │  Albertson's?
 9  │      A.   Right.  And the continued Texas rollout
10  │  to the present.
11  │      Q.   They're still consumer bankers?
12  │      A.   They're still consumer bankers.
13  │      Q.   Now, tell me then what the in-store
14  │  banker is.
15  │      A.   An in-store banker -- and the reason
16  │  the title was created for Florida was because the
17  │  concept that we were -- "instituting" is probably
18  │  the wrong word.  But the concept that we were
19  │  testing in Florida with our contract that we
20  │  signed with Winn-Dixie was when Publix went
21  │  Barnett.
22  │      Q.   I was going to say --
23  │      A.   You look confused.
24  │      Q.   -- I have a Winn-Dixie by my house, and
25  │  it doesn't have you in it.  It's got some other
```

1   bank I've never heard of.

2            A.    It's not all Winn-Dixies, and our

3   relationships are typically exclusive but not

4   always.

5            Q.    Okay.

6            A.    At any rate, our concept that we were

7   testing in Florida was a different kind of

8   associate.  In bank terms we called it a

9   universal associate.

10           It probably would help to understand as

11  well, in Georgia and Texas, if you walked into

12  one of the grocery stores where our office is, it

13  looks like a little branch.  It's got a teller

14  line.  It's got a couple of desks or a couple of

15  areas for a consumer banker to sit.  Sometimes

16  there's an office for a manager, but it's a very

17  confined space.  It's not even as big as this

18  room typically.

19           And the concept we used in Florida was

20  much different.  It didn't look like a branch at

21  all.  We didn't have a teller line.  In most of

22  these facilities in Florida, there is not a

23  teller module, is what we call it.

24           Q.    Okay.

25           A.    We have the capability to take a teller

1   transaction in the back of the house behind the

2   scenes, and the reason that is -- and these

3   centers were conceived as customer service or

4   customer sales locations where we could sell our

5   products and services, offer the array of the

6   financial products and services that we have to

7   largely what was noncustomers of NationsBank.

8           The majority of the people that come

9   into a grocery store are not our current

10  customers, so they're prospects.

11          Q.   People who bank at NationsBank don't do

12  grocery shopping?

13          A.   They don't eat.  No, I mean, the

14  statistics show in the grocery store industry --

15  this is information that is widely circulated.  I

16  don't know how it was generated.  But it says

17  that basically 80 to 90 percent of people that

18  come into a grocery store are not your current

19  customers.  Now again, I'm sure that changes

20  depending upon your market share in a particular

21  market.  I don't know.  They tend to shop in the

22  same centers as well.

23          So we saw this as a real opportunity

24  for prospecting and to get new customers.  You

25  had that traffic of people who would not come

1    into your banking center because they weren't

2    your current customers.

3        Q.    Right.

4        A.    And that is the difference, because 80

5    to 90 percent of the people that come into your

6    banking center are your current customers.  They

7    have "bank" on their to-do list that day, and

8    they come in to see you for whatever reason.  In

9    the grocery store, that's not the case.

10            So it was largely a prospecting

11   environment.  We didn't want it to be perceived

12   as a mini-banking center that would just be used

13   for quick check-cashing kinds of activities.  So

14   it was really a whole new concept of being a

15   sales center.

16       Q.    Okay.

17       A.    And we saw the opportunity there, you

18   know, for prospecting.  We, you know, just felt

19   it -- and the type of associate we were hiring

20   was going to be that universal, in quotes, kind

21   of associate that would be able to take care of

22   any need of a customer even if that meant

23   accepting a transaction.  Although, their primary

24   focus was to help migrate transactions.

25            So if you came in and said, "I want to

1    deposit a check," we'd say, "Did you bring your

2    ATM card?  Let me show you how to use the ATM."

3        Q.    I don't have one.

4        A.    You would have been the exception.

5            MS. BOIES:  They would have gotten you

6    one.

7            THE WITNESS:  We would have ordered you

8    one.

9    BY MS. DOLIN:

10       Q.    Many people have tried.

11       A.    But that was -- it was called concept

12   selling.

13       Q.    Okay.

14       A.    And so it was a new type of role.

15       Q.    What then would the associates, the

16   universal associates -- who I'm assuming later

17   became known as in-store bankers?

18       A.    That universal is only terms that we

19   use internally.

20       Q.    I understand.

21       A.    It was always classified as an in-store

22   banker.

23       Q.    What exactly do they do?

24       A.    They do a variety of things.  They

25   would obviously respond to any customer need.  So

1    if a NationsBank, you know, customer approached

2    them and said, "Can you help me" with any kind of

3    transaction that we've already discussed, an

4    in-store banker should be able to do that same

5    kind of offering of products, helping customers.

6          What we encourage an in-store, which is

7    a little different than in the banking centers,

8    is we do try to migrate any service kinds of

9    requests to our 1-800 number.

10    Q.    I see.  Like if I decided to stop in

11    while I'm shopping and say, "What's my balance?"

12    they would give me the toll-free number?

13    A.    Right.  We would, in a nice way, say,

14    "Boy, you didn't need to stop in and do that.

15    You could call our 1-800 number."  We wouldn't

16    just say, "Here.  Call this number."  And if a

17    customer was adamant that they wanted you to

18    check the balance, you have a Merlin System

19    there, and you can check their balance.

20          So you can respond basically to any

21    customer need, you know, both from a product or

22    service need to a research item need, et cetera.

23    If they wanted teller transactions, there was

24    limited functionality there.  It is a very small

25    space.  We have a vault, honestly, the size of a

```
 1    college refrigerator, so you can't keep large

 2    amounts of cash.

 3         Q.    Sure.

 4         A.    You can't keep large change orders.

 5         Q.    So they could never cash a very large

 6    check?

 7         A.    No.

 8         Q.    But they could cash a check if they

 9    needed to?

10         A.    If they needed to.  They really are

11    very stringently monitored for the kinds of

12    transactions they provide.  But the bottom line

13    is, if a customer is adamant that they want you

14    to take a deposit for them, the in-store banker

15    is going to take a deposit for them.  But often

16    times, it's in the back of the house.  It's not

17    visible that they can even do it, and customers

18    are accepting of that.

19         Q.    So what else do they do?

20         A.    In some cases -- and this was certainly

21    true initially -- they were expected to, what we

22    call, aisle market.  Aisle like in the aisles.

23         Q.    Set up a little stand next to the free

24    pizza samples?

25         A.    No.  Walk the aisles.  No.  Walk the
```

```
 1    aisles and talk to customers and prospect and all
 2    of that.
 3        Q.    Okay.
 4        A.    In some cases they bagged groceries,
 5    again, in order to get the ability to build a
 6    rapport.
 7        Q.    I'm standing here loading your
 8    groceries and saying, "By the way, would you like
 9    to open a checking account?"
10        A.    In some case, yes.  But we found very
11    quickly that was not an effective way.  People
12    don't want to be talking about their financial
13    needs in the mayonnaise aisle.
14        Q.    Do they also offer to take your
15    groceries out to the parking lot for you?
16        A.    Sure.  Sure.  They absolutely would.
17    All in an effort to build a rapport with an
18    individual that is not there to do their banking.
19        Q.    Is the person -- okay.  Aisle
20    marketing.  What else?
21        A.    In some markets, specifically Texas,
22    they were very aggressive in going outside the
23    banking center and looking for business.  And
24    that really was very -- not very specific to
25    Texas, but they really were very successful at
```

*where they are CB*

1   doing that.

2        Q.   Now, the folks in Texas that got

3   aggressive in going outside the banking center,

4   those were the ones who were classed as CBs?

5        A.   Yes.   They were actually going not even

6   outside the banking center, outside grocery

7   stores is what I meant to say.

8        Q.   That's what I mean.   Yes.   I understood

9   you.   They actually left the premises?

10       A.   Yes.   And they would go in the

11  neighborhoods.   They would try to establish

12  relationships with home improvement contractors,

13  with Realtors, with other mortgage broker

14  companies to, you know, get business.   And we're

15  very successful at doing so.

16       Q.   What else?   Anything else?

17       A.   They -- I mean, it's a unique position

18  in that it is so much more of a prospecting

19  environment than in a traditional banking center

20  where you have the customer at your desk and you

21  are expected to identify and serve needs right

22  then.   Because again, most of the people that

23  they're dealing with are not current customers,

24  so they are trying to establish a time where they

25  can meet with the customer.

1      Again understand, customers are not

2   very amenable to having you interrupt what could

3   be a very quick trip they've planned to the

4   grocery store, so they're trying to set up other

5   times to meet with you.  "Gosh, is there a time I

6   can call you or we can sit down and go over what

7   your needs are?" et cetera.  So they are very

8   much in a cold calling kind of environment.

9         Q.   Now, how many ISBs do you usually have

10  in one in-store facility?

11        A.   One center?  It would vary.  But I'd

12  say on overage maybe two to three.

13        Q.   Are these people expected to leave the

14  center and go out and prospect in the

15  neighborhoods?

16        A.   That's a desire.  I don't know how

17  often that really happens, but that's a desire.

18  And when you say ISBs, I'm assuming you mean

19  Florida and any place else they are located, like

20  St. Louis or the Carolinas.

21        Q.   Right.

22        A.   Okay.

23        Q.   Now, do the ISB positions that have

24  been created since the acquisitions of those

25  banks in Georgia and the Texas pilot project --

1  the ISB, you're saying, is different from the

2  consumer banker in the grocery stores in Texas

3  and Georgia, as I understand your testimony.

4      A.    Well, it's -- I do think it's still the

5  same environmental issues that I just discussed.

6  In essence, it's a prospecting environment as

7  opposed to --

8      Q.    For Texas and Georgia consumer bankers

9  that are in grocery stores as well?

10     A.    In grocery stores, yes.

11     Q.    Okay.

12     A.    They are in centers that resemble

13  banking centers.  And in Georgia, specifically

14  since that channel is 12 years old in Georgia,

15  they have very high customer volumes.

16         MS. BOIES:  Let's get this marked as

17  the next in order, please.

18         (Plaintiffs' Exhibit No. 29 was marked.)

19  BY MS. DOLIN:

20     Q.    Just let me know when you've had time

21  to look at it.

22     A.    I've looked at it.

23     Q.    Do you recognize Exhibit 29?

24     A.    It's a screen from our internal job

25  posting system that has not a full job

1    description but has the additional skills they're

2    looking for for an in-store banker.

3        Q.    Additional to what?

4        A.    Normally on a job posting screen like

5    this, that job description area would be filled

6    in that has, you know, a synopsis of the job

7    description.    And then in additional skills, it

8    typically lists the requirements that they're

9    looking for.

10        Q.    Is this the or at least part of the job

11    description that's in place now for the in-store

12    banker?

13        A.    You know, honestly, I have not reviewed

14    the in-store banker job description in several

15    months, and so I'd need to look at it.

16        Q.    Are there differing levels of in-store

17    banker?    I see this says in-store banker I.

18        A.    There are two levels:    In-store banker

19    I, in-store banker II.

20        Q.    How do they differ?

21        A.    How do you mean, how do they differ?

22        Q.    What's the difference between level I

23    and level II?

24        A.    Again, not having participated in the

25    development of those job descriptions or having

1    reviewed them recently, I couldn't tell you right

2    now.

3         Q.    You don't know the difference between

4    the two levels right now as we sit here?

5         A.    No, I don't.

6         Q.    Who would have that information?

7         A.    I mean, it would be me, but honestly,

8    we just decided I would testify on this.

9         Q.    Oh, okay.  Are there formal job

10   descriptions for ISB I and ISB II?

11        A.    Yes, there are.

12        Q.    And that would include the folks in

13   Florida, the Carolinas --

14        A.    -- St. Louis --

15        Q.    -- Midwest --

16        A.    Right.

17        Q.    -- and possibly Kansas and Oklahoma?

18        A.    Yes.

19        Q.    Now, those folks were -- do you know

20   when the positions were created for the Midwest?

21        A.    It was when we began -- we acquired

22   Boatmen's and in early '97 were -- had signed a

23   contract with a grocery store out there and had

24   made the decision to staff them the same way that

25   we staffed our Florida bank and to use that same

1    kind of model.  Not to build a mini-branch, but

2    to have more of a sales center.

3        Q.    So the Midwest ones was sometime early

4    in '97?

5        A.    It was early in '97 that we began

6    hiring for those.  I seem to remember they were

7    going to open in May or June or July or something

8    like that.

9        Q.    What about North and South Carolina?

10        A.    It was the same time.

11        Q.    Same time?

12        A.    Uh-huh.

13        Q.    And Florida's came about --

14        A.    It began in '96.  We probably had --

15    and again, this was prior to entering the current

16    job I am in.  And I believe they had signed the

17    contract in April or May of '96 and opened their

18    first stores in --

19        Q.    With Winn-Dixie?

20        A.    With Winn-Dixie, right.  This is not

21    Barnett.  They had their own franchise going.

22        Q.    Right.

23        A.    But I believe we opened our first

24    stores in the September/October time frame.

25        Q.    Of '96?

1    A.    Of '96.   And we probably had a dozen

2    centers by the end of '96 that were open, and

3    rollout continues as we speak.

4        Q.    But now they're nonexempt, and they

5    have been since December of '97?

6        A.    That's correct.

7            MS. DOLIN:   Just give us two minutes.

8    We're about done.

9            (Recess in Proceedings)

10   BY MS. DOLIN:

11       Q.    I've got two questions.   Nan Blizard's

12   consulting firm.   What is the name of it?

13       A.    I really don't know.

14       Q.    Where is she located?

15       A.    In Richmond, Virginia.

16       Q.    And remember before we were talking

17   about how you divided NationsBank into certain

18   geographical areas?   You had the mid-Atlantic.

19   You had Florida.   What are those particular

20   little chunks called?

21       A.    There is --

22       Q.    We call them regions, but what do you

23   all call them?

24       A.    We call them banking groups.

25       Q.    Banking groups.   Okay.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 98-8805-CIV-DIMITROULEAS

MARLA PERLMAN, on behalf of herself
and all others similarly situated,

Plaintiffs,

Magistrate Judge Johnson

vs.

NATIONSBANK, N.A.,
a national association,

Defendant.
_____/

## ORDER GRANTING IN PART PLAINTIFFS' MOTION TO ALLOW NATIONWIDE NOTIFICATION TO POTENTIAL CLASS MEMBERS

THIS CAUSE is before the Court upon Plaintiffs' Motion to Allow Nationwide

Notification to Potential Class Members [DE 26], and the Joint Motion to Amend Scheduling

Order [DE 27]. The Court has carefully considered the motions and is otherwise fully advised in

the premises. The Court notes that a reply to Defendant's Response was due December 2, 1999,

as the response was served by mail on November 22, 1999, and the Courthouse was open on

November 26, 1999.

### I. BACKGROUND

Plaintiff's verified complaint asserts a claim for unpaid overtime under the Fair Labor

Standards Act, 29 U.S.C. §216, ("FLSA") for employees who were employed as In-Store

Bankers for defendant Nationsbank during a certain period. Plaintiff filed a motion to allow

notification to potential class members under the "opt-in" class action provision allowed under

Section 216(b). Two persons in addition to Plaintiff have filed affidavits agreeing to become a

party to this lawsuit. Plaintiff worked as an In-Store banker in Delray Beach, Florida, while the

other two potential parties worked in Vero Beach, Florida and Jacksonville, Florida.

## II. DISCUSSION

Plaintiff seeks an order of this court allowing nationwide notification of potential class members under Section 216(b) of the FLSA. It is settled in the Eleventh Circuit that a district court has the authority under the FLSA to issue an order requiring notice to similarly situated persons. See Dybach v. State of Florida Dep't of Corrections, 942 F.2d 1562 (11th Cir.1991) (noting a split in the circuits and "concluding that the 'broad remedial purpose of the Act' is best served if the district court is deemed to have the power to give such notice to other potential members of the plaintiff class to 'opt-in' if they so desire and by the district court's exercise of that power under appropriate conditions.") (citations omitted). Before determining whether to exercise such power, however, Dybach instructs the district court that it "should satisfy itself that there are other employees of the department-employer who desire to 'opt-in' and who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions." Id. at 1567-1568. If the district court concludes that there are such other employees, the court then has the discretion to establish the specific procedures to be followed with respect to such possible opting-in. Id. at 1568.

Turning to the first step of the Dybach test, it is clear that there are other similarly situated employees who desire to opt-in. As of today, there are about at least two additional plaintiffs who have agreed to be added to this action.[1] The Court notes that one additional plaintiff, Traci Ratcliff, states in her affidavit attached as Exhibit 4 to the instant motion, that she is aware of other individuals wishing to opt in to this litigation.

---

[1] The Court notes that the docket sheet for this case does not contain the Consent to become a party plaintiff by Rafael Pabon. His consent was inadvertently docketed at entry 1532 in Levine v. Nationsbank, Case No. 98-6306-CIV-DIMITROULEAS. The Consent of Traci Ratcliff was docketed at entry number 20 in this case.

2

Defendant argues that Plaintiff has not met her burden of establishing that other individuals desire to opt-in to this litigation.[2] While the Court agrees that the evidence to support nationwide notificiation does not exist, the Court is satisfied that there are other In-Store bankers in Florida who desire to opt-in to this case.[3]

As to the second step of Dybach, the issue before the court is whether In-Store Bankers are similarly situated with respect to their job requirements and with regard to their pay provisions for purposes of allowing notification to potential class members were due overtime or were exempt under the FLSA. The Court notes that Defendant does not argue that Plaintiff has not met this step of Dybach. On its own analysis, the Court determines that Plaintiff has presented sufficient evidence to satisfy the Court that Nationsbank's corporate personnel department treated all In-Store Bankers the same as far as their job requirements and pay requirements. The court notes that the Eleventh Circuit has held that while plaintiffs bear the burden of demonstrating a "reasonable basis" for a class-wide action, the burden "is not heavy." Grayson v. K Mart Corporation, 79 F.3d 1086, 1097 (11th Cir. 1996).

### III. CONCLUSION

The Court is satisfied, pursuant to Dybach, that there are other In-Store Banker

---

[2] The Court notes that Defendant does not oppose the motion on the basis of untimeliness. The deadline in this case for Rule 14, 15, 19 motions was July 30, 1999, a deadline not extended by other orders. The instant motion, while not based upon those rules, essentially seeks to add parties to the case. Since Defendant did not raise a timeliness argument, and since it is not absolutely clear that the July 30, 1999 deadline applied to the instant motion, the Court will not *sua sponte* deny the instant motion on that basis.

[3] Unlike this Court's decision in Levine v. Nationsbank, Case No. 98-6306-CIV-DIMITROULEAS, Order of September 1, 1998, where a geographical limitation was not an issue, here Nationsbank opposes nationwide notification. The Court finds that limiting notification to employees who worked at Florida locations will allow a more efficient notification process and more efficient litigation.

3

employees of the defendant who desire to opt-in and who are similarly situated with respect to their job requirements and with regard to their pay provisions. This determination should not be interpreted as a ruling on the merits of plaintiff's case, but merely on plaintiff's burden necessary to allow notification of potential class members. Accordingly, it is **ORDERED AND ADJUDGED** that:

1. Plaintiffs' Motion to Allow Nationwide Notification to Potential Class Members [DE 26] is hereby **GRANTED** in part per the attached order;

2. The Joint Motion to Amend Scheduling Order [DE 27] is hereby **GRANTED.** The Court will issue a separate scheduling order for this case.

3. The Clerk shall docket the Consent to become a party plaintiff by Rafael Pabon, currently docketed at entry 1532 in Levine v. Nationsbank, Case No. 98-6306-CIV-DIMITROULEAS, in this case with the same docket date as in the Levine case.

4. By December 23, 1999, Defendants shall provide to Plaintiff's counsel the name, last known address, and phone number of all those employed by defendant as an In Store Banker in Florida during any time after November 10, 1995.

5. As soon as that information is provided, a notice, in the form submitted as Exhibit 1 to Plaintiff's Motion with certain exceptions listed below, shall be mailed via first class mail to each individual to whom a notice must be mailed pursuant to this Order, shall be made at the sole cost and expense of plaintiffs and shall allow up to 90 days in which to file the Notice of Consent;

6. Plaintiff's Notification submitted as Exhibit 1 to her motion shall be amended to add "in Florida" in the "TO:" section after "Nationsbank, N.A." and in section "3." after "NATIONSBANK employees" in the third line;

4

7.  Plaintiff's counsel shall compose a Notice of Consent to accompany the notification form. Such notice shall contain space for potential class members to submit, at a minimum, their name, current address, residency address if different from mailing address, signature, and date of signature;

8.  Counsel for Plaintiff may not attempt unsolicited contact with potential class members who have not yet filed their consents without prior court approval.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this _____ day of December, 1999.

WILLIAM P. DIMITROULEAS
United States District Judge

copies to:

Susan Dolin, Esq./Daniel R. Levine, Esq.
Caryl Boies, Esq./Gary K. Harris, Esq.
Michael T. Burke, Esq.
Richard F. Kane, Esq./John Smith, Esq.
Bruce M. Steen, Esq.