UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 00-06145-CIV-DIMITROULEAS/Johnson

| | |
|---|---|
| ROXANNA L. ESCUDERO, and ) <br> KIMBERLY DRAKE, on behalf of ) <br> themselves and all others similarly ) <br> situated, ) <br>  ) <br>           Plaintiffs, ) <br>  ) <br> vs. ) <br>  ) <br> BANKAMERICA CORPORATION, ) <br> a foreign corporation d/b/a ) <br> BANK OF AMERICA CORPORATION, ) <br> a foreign corporation, f/k/a ) <br> NATIONSBANK, N.A., a national ) <br> association, ) <br>  ) <br>           Defendant ) | **NIGHT BOX** <br> **FILED** <br><br> JAN - 8 2001 <br><br> CLARENCE MADDOX <br> CLERK, USDC / SDFL / FTL |

## NationsBank's Response in Opposition to Plaintiffs' Motion to Amend Complaint to Add Plaintiff, Rodney N. Hensley

Bank of America Corporation (f/k/a BankAmerica Corporation) and Bank of

America, N.A. (f/k/a NationsBank, N.A.)(collectively referred to herein as

"NationsBank"), by counsel, hereby responds as follows in opposition to Plaintiffs' Motion

to Amend Complaint to add Plaintiff, Rodney N. Hensley ("Motion to Amend"):

### Statement of the Case and Relevant Facts

1.      On January 31, 2000, Plaintiffs Roxanna L. Escudero and Kimberly Drake

(collectively hereinafter "Plaintiffs") filed the above-captioned action pursuant to the Fair

Labor Standards Act, 29 U.S.C. §§ 201, et seq. ("FLSA"), "on behalf of themselves and all

1



others similarly situated." Plaintiffs allege that they worked for NationsBank as Consumer
Banker IIs and IIIs; that NationsBank reclassified their position as non-exempt for
purposes of the FLSA in December, 1997; that NationsBank paid them on an hourly basis;
and that, between December, 1997, and October 29, 1999, they worked "many times in
excess" of forty hours per week. See Complaint and Demand for Jury Trial ("Complaint"),
¶¶4, 8 and 9, a copy of which is appended hereto as Exhibit A.

2.      Plaintiffs further allege in their Complaint that NationsBank violated the
FLSA by not paying them any overtime for those hours they worked in excess of forty
hours per week, and by also preventing them from recording the number of hours they
worked in excess of forty hours per week. See Complaint, ¶¶14-16, appended hereto as
Exhibit A.

3.      Plaintiffs also allege in their Complaint that the putative class of plaintiffs
they purport to represent in this action consists of Consumer Banker IIs, IIIs and IVs
employed by NationsBank after December, 1997, who were "subject to the pay policies,
practices, and procedures described [in the Complaint]." See Complaint, ¶¶ 10, 14,
appended hereto as Exhibit A.

4.      On June 7, 2000, plaintiffs filed with this Court and served upon defendant's
counsel a Notice of Filing of Consent to Become Party Plaintiff for Rodney N. Hensley
("Hensley"), to which notice his consent form was attached. See Notice of Filing of
Consent to Become Party Plaintiff for Rodney N. Hensley appended hereto as Exhibit B.

2

On his consent form, Hensley indicated his new mailing address in Alabama as of July 14, 2000. Id.

5.     This Court entered a scheduling order in this action on July 10, 2000, that set a discovery completion deadline of March 1, 2001, and further set trial for June 11, 2001. See Order Setting Trial Date & Discovery Deadlines, ¶3 (Dkt. Entry 107).

6.     On August 21, 2000, nearly seven months after filing their Complaint, Plaintiffs filed their Motion to Allow Notification to Potential Class Members, as authorized by the Fair Labor Standards Act, 29 U.S.C. §216(b) ("Motion to Allow Notification"), in which they sought authorization to send notification of their action to "all Consumer Banker IIs, IIIs, and IVs who performed services for [NationsBank] anytime [sic] since the positions were reclassified as non-exempt in or about December, 1997." See Motion to Allow Notification, ¶14 (Dkt. Entry 111).

7.     On October 23, 2000, NationsBank moved for summary judgment on the claims of forty (40) opt-in plaintiffs in this action who had either: (1) resigned from their employment with NationsBank prior to December 17, 1997; or (2) had transferred out of their Consumer Banker II, III or IV positions prior to December 17, 1997. See NationsBank's Motion for Summary Judgment and corresponding Concise Statement of Material Facts As to Which NationsBank Contends There is No Genuine Issue to Be Tried ("Concise Statements of Facts"). See Dkt. Entries 120 & 122. Hensley's claim was included in this second group of plaintiffs against whom NationsBank moved for summary

3

judgment because he transferred out of his Consumer Banker position on June 30, 1997.
See Concise Statement of Facts, ¶8 (Dkt. Entry 122).

8.    Plaintiffs did not respond to NationsBank's Motion for Summary Judgment
on Hensley's claim until December 19, 2000. See Plaintiffs' Second Amended Final
Response to Defendant's Motion for Summary Judgment ("Second Amended Final
Response"). See Dkt. Entry 151. In that response, plaintiffs contend Hensley's claim is
not subject to summary judgment because he worked as an Instore Banker after December
17, 1997, see Second Amended Final Response, p. 3; a job position plaintiffs now seek for
the first time to add to the above-captioned action they filed on behalf of Consumer Banker
IIs, IIIs and IVs. See Complaint, ¶¶10 & 14, appended hereto as Exhibit A.

9.    As the basis for their Second Amended Final Response, plaintiffs filed
Hensley's affidavit with this Court on December 21, 2000, wherein he testified that he
worked as an Instore Banker II for NationsBank after December 17, 1997, and that, in his
opinion, his duties as an Instore Banker were identical to those performed by consumer
bankers. See Affidavit of Rodney Hensley ("Hensley affidavit"), ¶¶3, 4 & 8, a copy of
which is appended hereto as Exhibit C.

10.    On December 19, 2000, almost eleven months after plaintiffs filed their
initial Complaint, more than six months after Hensley became an opt-in plaintiff, four
months after plaintiffs filed their Motion to Allow Notification, two months after
NationsBank filed its Motion for Summary Judgment, and approximately two months
before the close of discovery, plaintiffs filed their Motion to Amend in which they seek to

4

include Hensley as a "named" plaintiff and to add for the first time an entirely new class of potential opt-in plaintiffs, i.e., Instore Bankers.

11.     Plaintiffs allege in their proposed Amended Complaint that they and Hensley purport to bring their action "on behalf of themselves and all others similarly situated" who worked for NationsBank "many times in excess" of forty hours per week as "Consumer Banker IIs, IIIs or IVs, in-store bankers, **or other individuals**" after December 17, 1997, "but were not paid overtime." See Proposed Amended Complaint, ¶¶12, 16, 18 & 21 (emphasis added), a copy of which is appended hereto as Exhibit D.

12.     As a relevant aside, with their Motion to Amend, plaintiffs apparently also seek to expand the scope of their pending Motion to Allow Notification to include "**all** similarly situated employees, including consumer banker II, III and IV and in-store bankers (emphasis original)." See Motion to Amend, ¶¶ 15, 16. This issue is not properly before the Court; nor have plaintiffs even attempted in their Motion to Amend to satisfy the factors necessary to justify "class" notice in an FLSA collective action. Plaintiffs have failed to identify any Instore Bankers who were denied overtime pay to which they were entitled and who may wish to opt-in to this matter. Plaintiffs have failed to establish that NationsBank had a common practice or scheme of denying its Instore Bankers the overtime pay to which they were entitled.[1] To date, the only "evidence" submitted by

---

[1]     Indeed, the most recent evidence before the Court is that no such scheme exists as evidenced by the December 15, 2000, jury verdict in Mintz, et al. v. NationsBank, N.A., 98-8632-CIV-DIMITROULEAS, in favor of NationsBank and against non-exempt Consumer Bankers from three different states and four different regions of the Bank.

5

plaintiffs in support of their desire for "class" notice are the at best woefully inaccurate and

at worst perjurous affidavits of former Consumer Bankers. See NationsBank's Opposition

to Plaintiffs' Motion to Allow Notification to Potential Class Members (Dkt Entry 114) &

NationsBank's Motion for Leave to File a Supplemental Response to Plaintiffs' Motion to

Allow Notification to Potential Class Members (Dkt. Entry 118).

## Argument

I.    Plaintiffs Knew of the Existence, Nature and Geographic Scope of the Instore
      Banker Position Months Before they Filed their Original Complaint and their
      Motion to Amend on the Basis of Newly Discovered Evidence, therefore, is a
      Sham.

      A.    Plaintiffs' counsel were not mislead or confused regarding Instore Bankers.

      In their Motion to Amend, plaintiffs now seek to magnify the scope of this action

less than sixty days before the close of discovery based on the remarkable and incredible

allegation that they only recently discovered a "similarly situated" class of NationsBank

employees, i.e., Instore Bankers, who may want to participate. Plaintiffs even accuse

NationsBank in their Motion to Amend of "purposefully" hiding from them the "nature of

the [Instore Banker] position and its similarity to the position of consumer banker." See

Motion to Amend, ¶14. These contentions are a complete ruse!

      First, plaintiffs' counsel have known of the existence and job responsibilities of the

Instore Banker for at least two years. On November 11, 1998, during their prosecution of

Levine, et al. v. NationsBank, 98-6306-CIV-DIMITROULEAS, plaintiffs' counsel deposed

Ellen Martin, NationsBank's Strategic Initiatives Project Manager. During that deposition,

6

which occurred more than two years before plaintiffs filed their Motion to Amend here,
Ms. Martin testified regarding the nature and job responsibilities of the Instore Banker
position. See Deposition of Ellen Martin ("Martin Deposition") at 229-51, collectively
appended hereto as Exhibit E. Plaintiffs' counsel relied on this testimony to argue in
Levine that the Court should extend "class" notice to Instore Bankers in that case because
of the alleged similarities between the Consumer Banker and Instore Banker position; an
attempt which this Court unequivocally rejected.[2] For plaintiffs' counsel to assert now that
their Motion to Amend should be granted because NationsBank "purposefully" hid the
"nature of the [Instore Banker] position and its similarity to the position of consumer
banker" is absurd and disingenuous at best. Their attempt to add Instore Bankers to the
above-captioned action at this late stage should be rejected.

Second, plaintiffs' counsel also have known of the geographic regions in which the
Instore Bankers have worked for NationsBank for at least two years. Ellen Martin
identified for plaintiffs' counsel in Levine the states in which Instore Bankers worked for
the Bank. See Exhibit E. Furthermore, in 1998 plaintiffs' counsel filed suit against
NationsBank on behalf of Instore Bankers. See Perlman, et al. v. NationsBank, N.A., 98-
8805-CIV-DIMITROULEAS. Plaintiffs' counsel thereafter requested the Court, not once

---

[2]      See Plaintiffs' Motion to Shorten Time for Compliance with Discovery [and] for
Extension of Notice Period, corresponding Reply Memorandum in support of said motion
and this Court's September 23, 1999 Order on said motion in the Levine matter, appended
hereto as Exhibits F, G and H, respectively.

7

but twice, to authorize "nationwide" notice to all NationsBank Instore Bankers.[3]
NationsBank assumes plaintiffs' counsel had a good faith basis for seeking nationwide
class notice in Perlman. They filed the instant case approximately ninety days after first
seeking "class" notice in Perlman and their apparent claim now that they are surprised to
learn of Instore Bankers working outside of the State of Florida, therefore, is bizarre.

Third, plaintiffs' counsel have represented the former Instore Banker who allegedly
exposed NationsBank's purported "deception" – that is, Rodney N. Hensley – since at least
December 8, 1998.[4] Although plaintiffs' counsel have had complete access to Hensley
since that date, it was not until after NationsBank filed its Motion for Summary Judgment
that plaintiffs' counsel even bothered to ask Hensley to identify his dates of employment or
job classification(s) with NationsBank. See Affidavit of Anne Hinds, ¶2, appended hereto
as Exhibit K. Plaintiffs' counsel's excuse that Hensley "could not be found" because he
moved from Tennessee to Alabama cannot excuse their lack of diligence. See Motion to
Amend, ¶6. When he filed his consent on June 7, 2000, Hensley informed the Court,
NationsBank and presumably plaintiffs' counsel that he was moving to Alabama and

---

[3]    See Plaintiff's Motion to Allow Notification to Potential Class Members filed in
Perlman, ¶¶1, 5 & Plaintiff's Motion to Enlarge the Scope of Notification to Nationwide
Status in Perlman, ¶¶9-12, copies of which are appended hereto as Exhibits I and J,
respectively.

[4]    Hensley retained plaintiffs' counsel certainly no later than December 8, 1998 – that
is, the date on which Hensley became an opt-in plaintiff in the Levine matter. See Consent
to Become Party Plaintiff for Rodney N. Hensley in Levine, appended hereto as Exhibit L.

8

informed all interested parties of his new address. See Exhibit C. Neither NationsBank nor the Court should be delayed or prejudiced by plaintiffs' counsel's failure to investigate or prosecute plaintiffs' claims in a timely manner.

B.     Instore Bankers did not "fall through the cracks."

In their Motion to Amend, plaintiffs assert that there is a group of Instore Bankers like putative named-plaintiff Hensley who essentially "fell through the cracks" of Levine and Perlman, and thus must be included in the instant case so that they will have knowledge of their potential FLSA claims against NationsBank. See Motion to Amend, ¶¶11, 12. Plaintiffs' assertion is beguiling and without merit for several reasons.

First, the individuals who were entitled to notice in Levine and Perlman are not members of the class of employees plaintiffs' counsel now seek to represent here. The Court in Levine ordered notice to all consumer bankers who had been classified as exempt for overtime pay purposes prior to December 17, 1997. The Court in Perlman ordered notice to all Instore Bankers in Florida who had been classified as exempt for overtime pay purposes prior to December 17, 1997. These two plaintiff "classes" do not include the individuals plaintiffs' counsel now seeks to represent – that is, non-exempt Instore Bankers – regardless of their location.

Second, the standard bearer put forth by plaintiffs' counsel does not even represent this alleged "forgotten" class. Hensley received notice and opted-in to Levine on December 8, 1998, see Exhibit L; which was approximately eighteen months after he transferred to his Instore Banker position with NationsBank. See Exhibit C. The very

9

person plaintiffs now tender to this Court as evidence of the "forgotten" class, therefore,

has now twice received "notice" of his ability to sue NationsBank for alleged overtime law

violations.[5]

Third, even if there are individuals who "fell through the cracks" in Levine and

Perlman, inclusion of and notice to those individuals in the instant case could not vindicate

the rights at issue in those two previous cases.  Levine and Perlman both involved

allegations that, prior to December 17, 1997, the Bank misclassified the Consumer and

Instore Banker positions as exempt for purposes of overtime pay.  In stark contrast,

Consumer Bankers allege in the instant case that they were forced to work "off the clock"

after the Bank re-classified their positions in December, 1997, as non-exempt.  Plaintiffs'

theory that the rights of these alleged "forgotten" plaintiffs, even if such plaintiffs existed,

would be protected or vindicated here, therefore, is a nonsequitor and would make even a

red herring blush.

C.    Plaintiffs' Motion to Amend Should be Denied because it is Futile, is the
      Product of Undue Delay and Would Prejudice NationsBank and the Court.

When distilled to its essence, there is nothing new or novel in plaintiffs' attempt

here to add Instore Bankers to the class of plaintiffs at issue in the instant case. As they did

in Levine, based on the alleged similarities between Consumer Bankers and Instore

---

[5]    Hensley received authorized notice in Levine and, NationsBank submits,
unauthorized notice in the instant case when plaintiffs' counsel invited him to join as an
opt-in plaintiff.

10

Bankers, plaintiffs attempt here to increase the scope of this case by adding Instore Bankers as named and opt-in plaintiffs. As this Court concluded in Levine, however, the two positions "are not similarly situated for purposes of the FLSA" and to try the claims of these two job categories in a single proceeding would result in an inefficient and unwieldy proceeding. See Exhibit H.

In fact, plaintiffs in their Motion to Amend appear to want to include within the scope of this proceeding all Consumer Bankers, Instore Bankers and "other individuals who perform similar duties." See Proposed Amended Complaint, ¶12, appended hereto as Exhibit D. There is simply no legal or factual basis to permit such expansive joinder. In Aldred, et al. v. NationsBank of Florida, 97-7547-CIV-DIMITROULEAS, for example, this Court limited the "class" to a single job category because the various non-exempt positions plaintiffs sought to join in this single action encompassed different job responsibilities, salaries, locations and, most importantly, plaintiffs reported to different supervisors who allegedly forced them to work "off the clock." See September 2, 1998, Omnibus Order in Aldred, a copy of which is appended hereto as Exhibit M. Here, as in Aldred and Levine, the joinder of such disparate plaintiffs would all but eradicate any hope for a defined and efficient trial. Accord Allison v. Citgo Petroleum Corp., 151 F.3d 402, 419-20 (5th Cir. 1998)(affirming the trial court's denial of class certification in a disparate treatment/impact racial discrimination claim based, in part, on the Seventh Amendment implications created by the unwieldy and varied nature of such actions).

11

In addition, even if it were proper to include Instore Bankers in this proceeding, an examination of the factors courts consider when evaluating a Motion to Amend establish that plaintiffs' Motion to Amend should be denied.  More specifically, whether to grant a Motion to Amend is committed to the sound discretion of the trial court and should be denied where it is futile, prejudicial to the party opposing the amendment and/or the product of undue delay, bad faith or dilatory motive.  See Papapanos v. Lufthansa German Airlines, 1996 U.S. Dist. Lexis 6433 (S.D. Fla. 1996); Radisson Hotels International, Inc. v. Amelia Investments, Inc., 1992 U.S. Dist. Lexis 9614 (M.D. Fla. 1992).  See also Bryson v. City of Waycross, 888 F.2d 1562 (11th Cir. 1989).

Here, based upon information known to them for more than two years, plaintiffs in their proposed amendment essentially seek to add an entirely new class of employees to this action less than two months before discovery ends based on the allegations of a putative named plaintiff who himself cannot sustain a claim for alleged overtime pay. Plaintiffs' Motion to Amend, therefore, should be denied, and the Court should reject plaintiffs' transparent attempt to inject Instore Bankers into this Consumer Banker action.

1.     Plaintiffs' Motion should be rejected because their proposed amendment is the product of undue delay and would be an exercise in futility.

Plaintiffs contend that they were "utterly unaware" of the nature and scope of the Instore Banker position until "just a few days" before the filing of their Motion to Amend. See Motion to Amend, ¶¶6, 12.  As demonstrated above, this self-serving assertion is utterly absurd, see supra at 6-7, and neither NationsBank nor this Court should have to

12

-06145-LRJ    Document 159    Entered on FLSD Docket 01/09/2001    Pa

00-06145-Civ-Dimitrouleas
Escudero, etc. vs. BankAmerica

endure the delay, and corresponding prejudice, engendered by plaintiffs' apathy in properly investigating their case. See Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1419 (11th Cir. 1998). See also Payne v. Ryder Sys., Inc. Long Term Disability Plan, 173 F.R.D. 537, 540 (M.D. Fla. 1997)(motion to amend denied because movant has unduly delayed the filing of such motion despite having prior knowledge of the facts pertinent to the proposed amendment).

Moreover, there also can be no dispute that plaintiffs' proposed amendment would be an exercise in futility. As noted above, plaintiffs seek to amend their Complaint to name Rodney N. Hensley as an additional named plaintiff in this action. Although they concede that Hensley did not work as a non-exempt Consumer Banker during the relevant time period as defined by their original Complaint, see Motion to Amend, ¶7 & Exhibit C, plaintiffs' assert that Hensley should be included as an additional named plaintiff because he worked as a non-exempt Instore Banker "but [was] not paid overtime." See Proposed Amended Complaint, ¶16, appended hereto as Exhibit D. The Court, however, should stand vigilant against a party's attempt to amend the pleadings to assert a futile claim, Haliburton & Assoc., Inc. v. Few & Co., 774 F.2d 441, 444 (11th Cir. 1985); Pohto v. Leiser, 738 F. Supp. 474, 477 (M.D. Fla. 1990); and a review of Hensley's purported claim leads to the inescapable conclusion that his claim would be futile.

In their proposed amendment, plaintiffs again unequivocally assert that the class of putative plaintiffs would include current and former NationsBank employees to whom NationsBank allegedly paid no overtime compensation. See Proposed Amended

13

Complaint, ¶¶10, 18, appended hereto as Exhibit D. In his detailed affidavit, however,

Hensley does not testify that he worked any overtime hours for which NationsBank failed

to pay him. See Affidavit of Rodney N. Hensley, appended hereto as Exhibit C. Such

testimony is conspicuously absent from Hensley's affidavit for good reason.[6]

In 1998, Hensley recorded 147.50 hours of overtime hours for which the Bank paid

him $2,548.97 in overtime compensation. See Affidavit of Timothy Smith, ¶4, appended

hereto as Exhibit N. Before he quit his job on January 15, 1999, Hensley recorded four

additional hours of overtime for which the Bank paid him $69.00 in overtime

compensation. Id. He, therefore, does not even allege and certainly cannot establish that,

as a non-exempt Instore Banker, he worked overtime hours for which NationsBank failed

to compensate him. His claim would be ripe for summary judgment as soon as it was filed

and his inclusion and the inclusion of his claim would be futile.[7]

---

[6]    Hensley's conspicuous silence on this issue is in stark contrast to the affidavits
submitted by plaintiffs in support of their request for "class" notice which are demonstrably
false if not perjurous. See NationsBank's Motion for Sanctions and Incorporated
Memorandum of Law (Dkt. Entry 130).

[7]    As noted in NationsBank's Concise Statement of Material Facts supporting its
Motion for Summary Judgment (Dkt. Entry 122) and the Hensley Affidavit, see Exhibit C,
Hensley also cannot sustain a claim that he worked overtime hours as a non-exempt
Consumer Banker for which the Bank failed to pay him because he transferred out of the
Consumer Banker position while it was classified as exempt for overtime pay purposes.

14

2.    Plaintiffs proposed amendment would severely prejudice NationsBank's
defense by potentially adding dozens of opt-in plaintiffs as discovery closes.

In their proposed amendment, plaintiffs seek to name Hensley as a "named"

representative for a new class of NationsBank employees – Instore Bankers – who are

purportedly eligible to participate in this action.  This proposed amendment, if allowed,

and its concomitant multiplication of the number of plaintiffs participating in this action

would wreak havoc upon and severely prejudice NationsBank's defense of this action.

First, completing discovery for the approximately seventy-one remaining plaintiffs

by the March 1 discovery deadline already imposes a substantial burden on NationsBank

and its ability to defend itself in this matter.[8]  The addition of even a few additional

plaintiffs, not to mention the dozens of Instore Bankers to whom plaintiffs presumably

would like to give notice of this action, would present an insurmountable discovery

challenge to NationsBank given the short period of time remaining to complete discovery.

Second, even if the additional discovery tasks could be completed on time,

plaintiffs' proposed amendment would impose excessive, unanticipated costs upon

NationsBank.  Should the Court grant plaintiffs' proposed amendment, NationsBank would

have to commence discovery from its initial stages; thus, losing economies of scale the

Bank initially enjoyed by conducting phased discovery against the entire class.

---

[8]

This number presumes the Court will grant NationsBank's pending Motion for
Summary Judgment on the claims of the forty opt-in plaintiffs who are the subject of the
Bank's October 23, 2000, Motion. (Dkt. Entries 120, 121 & 122).

15

NationsBank, therefore, would be forced to repeat the following for each new opt-in plaintiff: (1) search its current and archived personnel and payroll databases for pertinent records; (2) locate and interview co-workers and supervisors; and (3) arrange and schedule depositions.

In short, plaintiffs' proposed amendment would force NationsBank into an extended discovery period, would significantly delay trial, and would cause NationsBank to incur additional, unplanned and incalculable expenses and manpower investments. Such burdens are the quintessential definition of prejudice, and compel the denial of plaintiffs' Motion to Amend. See Nolin v. Douglas County, 903 F.2d 1546, 1550-51 (11th Cir. 1990), overruled on other grounds by McKinney v. Pate, 20 F.3d 1550 (11th Cir. 1994). See also Niesse v. Shalala, 17 F.3d 264, 266 (8th Cir. 1994)(denying plaintiff's motion to amend to bring class action where class issues would require "considerable additional discovery"); Acosta-Mestre v. Hilton Int'l. of Puerto Rico, Inc., 156 F.3d 49, 51-53 (1st Cir. 1998) (motion to amend properly denied where motion, when filed near the close of discovery, would extend discovery by at least four months and delay trial for at least twelve months).[9]

---

[9]     See Radisson Hotels, 1992 U.S. Dist. Lexis 9614 (denying leave to amend based on undue prejudice where the proposed amendment would "enlarge the number of proposed claimants to approximately 300 members which would expand the scope of [the] litigation such as to render [the] Court's scheduling order unworkable and cause additional discovery and trial delay")

16

## Conclusion

Based on the foregoing arguments, NationsBank, by counsel, hereby respectfully

requests the Court to deny Plaintiffs' Motion to Amend and to award such other and further

relief as the Court deems just and proper.

This the 8th day of January, 2001.

Michael T. Burke (Fla. Bar No. 338771)
Johnson, Anselmo, Murdoch, Burke & George P.A.
790 East Broward Blvd., Suite 400
P.O. Box 030220
Fort Lauderdale, Florida 33303-0220
(954) 463-0100
(954) 463-2444 (Facsimile)

Richard F. Kane (NC Bar No. 5694)
Bruce M. Steen, (Va. Bar No. 31062)
McGuireWoods LLP
3700 Bank of America Plaza
Charlotte, North Carolina 28280
(704) 373-8999
(704) 373-8990 (Facsimile)

Attorneys for Bank of America Corporation

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been served this

day by U.S. mail, postage prepaid, upon plaintiffs' counsel as listed below:

>
> Susan L. Dolin, Esq.
> Elissa S. Hulnick, Esq.
> Muchnick, Wasserman, Dolin & Levine, LLP
> Presidential Circle Building, Suite 620 North
> 4000 Hollywood Blvd.
> Hollywood, FL 33021
>
> Caryl Boies, Esq.
> Anne E. Hinds, Esq.
> Boies, Schiller & Flexner, LLP
> 2435 Hollywood Boulevard, Suite 200
> Hollywood, FL 33020

This the 8th day of January, 2001.

Michael T. Burke

*United States District Court*

_____SOUTHERN_____DISTRICT OF _____FLORIDA_____

## SUMMONS IN A CIVIL CASE

CASE NO.
# 00-06145

## CIV-FERGUSON

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated,

MAGISTRATE JUDGE
SNOW

      Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national association,

      Defendant.

_____/

TO:  **BANKAMERICA CORPORATION
By Serving MCGUIRE, WOODS, BATTLE & BOOTHE
Attorneys for Defendant
3700 NationsBank Plaza
101 South Tryon Street
Charlotte, North Carolina 28280-0001**

    **YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Susan L. Dolin, Esq.
MUCHNICK, WASSERMAN, DOLIN & LEVINE, LLP.
Presidential Circle Building, Suite 620 North
4000 Hollywood Boulevard
Hollywood, Florida 33021

an answer to the Complaint which is herewith served upon you, within **twenty (20)** days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint. You must also file your answer with the Clerk of the Court within a reasonable period of time after service.

**Clarence Maddox**

DATE:    JAN 3 1 2000

CLERK

By: _____
(Deputy Clerk)

**EXHIBIT**
A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

_____ _____D.C.

. . JAN 3 F  A. 10: 24

Case No. **00 - 06145**   . . : JDO X
. . : ST CT.
. . FLA - HIA

**CIV - FERGUSON**

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated,

Plaintiffs,

MAGISTRATE JUDGE
SNOW

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national association,

Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

COME NOW the Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE, on

behalf of themselves and all others similarly situated, by and through their undersigned

counsel, and sue the Defendants, BANKAMERICA CORPORATION, a foreign corporation,

d/b/a BANK OF AMERICA CORPORATION, a foreign corporation, f/k/a NATIONSBANK,

N.A., a national association, and for their cause of action declare and aver as follows:

1.     Plaintiff,    ROXANNA    L.    ESCUDERO    (hereinafter    referred    to    as

"ESCUDERO"), is a former employee of Defendants, BANKAMERICA CORPORATION

d/b/a  BANK OF AMERICA CORPORATION, f/k/a NATIONSBANK, N.A., (hereinafter

collectively referred to as "NATIONSBANK").  ESCUDERO is a citizen and resident of

Broward County, Florida, over the age of 18 years, and otherwise *sui juris*.

2.     Plaintiff, KIMBERLY DRAKE (hereinafter referred to as "DRAKE"), is a former

employee of NATIONSBANK. DRAKE is a citizen and resident of Broward County, Florida, over the age of 18 years, and otherwise *sui juris*.

3.      Defendant, NATIONSBANK, is a national association regulated by the Federal Deposit Insurance Corporation, engaged in the business of banking in the State of Florida and elsewhere, and is within the jurisdiction of this Court.

4.      Plaintiffs bring this action on behalf of themselves and all other employees of NATIONSBANK, similarly situated to them, throughout the NATIONSBANK system, for compensation and other relief under the Fair Labor Standards Act, as amended, 29 U.S.C. §201, *et seq.* (hereinafter referred to as "the FLSA").

5.      This action is brought to recover from NATIONSBANK unpaid overtime compensation, liquidated damages, costs and reasonable attorneys' fees, as well as declaratory and injunctive relief, under the provisions of the FLSA, 29 U.S.C. §201, *et seq.*, and specifically under 29 U.S.C. §216(b).

6.      Jurisdiction is conferred on this Court by 28 U.S.C. §1337 and by 29 U.S.C. §216(b). NATIONSBANK is, and at all times pertinent to this Complaint, was, engaged in interstate commerce. At all times material hereto, the annual gross revenue of NATIONSBANK was, and continues to be, in excess of $500,000.00, per annum.

7.      By reason of the foregoing, NATIONSBANK was, during all times hereafter mentioned, and is, an enterprise engaged in commerce or in the production of goods for commerce as defined in §§3(r) and 3(s) of the FLSA, 29 U.S.C. §203(r) and §203(s).

8.      In or about October, 1997, Plaintiff ESCUDERO became employed by NATIONSBANK, initially as a "Consumer Banker II." In or about July, 1999, ESCUDERO became a "Consumer Banker III", and she remained a Consumer Banker III until her

2

termination on or about October, 29, 1999. By reason of such employment, ESCUDERO was employed during such period by an enterprise engaged in commerce within the meaning of 29 U.S.C. §§206(a) and 207(a). Further, ESCUDERO herself was engaged in commerce. The work performed by ESCUDERO was directly essential to the business operations of NATIONSBANK in interstate commerce.

9.      In or about October, 1997, Plaintiff DRAKE became employed by NATIONSBANK, initially as a "Consumer Banker II." In or about August, 1999, DRAKE became a "Consumer Banker III," and she remained a Consumer Banker III until her termination on or about October 29, 1999. By reason of such employment, DRAKE was employed during such period by an enterprise engaged in commerce within the meaning of 29 U.S.C. §§206(a) and 207(a). Further, DRAKE herself was engaged in commerce. The work performed by DRAKE was directly essential to the business operations of NATIONSBANK in interstate commerce.

10.     The additional persons who may become Plaintiffs in this action are employees of NATIONSBANK, throughout the NATIONSBANK system, employed as Consumer Bankers II, III or IV and subject to the pay policies, practices, and procedures described in the paragraphs below.

11.     At all times pertinent to this Complaint, NATIONSBANK failed to comply with 29 U.S.C. §201-19 in that Plaintiffs, and those employees similarly situated to Plaintiffs throughout the NATIONSBANK system, performed hours of service for NATIONSBANK for which no provision was made by NATIONSBANK to properly pay Plaintiffs, and those employees similarly situated to Plaintiffs.

3

12. At all times material hereto, NATIONSBANK had, and still has, a position called "Consumer Banker." At all times material hereto, NATIONSBANK had, and still has, four (4) different levels for its position of "Consumer Banker": Consumer Banker I; Consumer Banker II; Consumer Banker III; and Consumer Banker IV. At all times material hereto, the job duties of "Consumer Bankers," regardless of the different levels, were, and are, the same. The only difference between the different levels was, and is, the sales goals that each particular Consumer Banker level must meet.

13. At all times material hereto, NATIONSBANK correctly classified the position of Consumer Banker I as non-exempt for purposes of the overtime provisions of the FLSA. In or about December 1997, NATIONSBANK reclassified the positions of Consumer Banker II, III and, IV as non-exempt for purposes of the overtime provisions of the FLSA. Prior to in or about December, 1997, NATIONSBANK had intentionally misclassified the positions of Consumer Banker II, III, and IV as exempt. This intentional misclassification is the subject of a separate lawsuit styled *Beverly Levine, et al. v. NationsBank, N.A.*, Case No. 98-6306-CIV-DIMITROULEAS.

14. In the course of their employment as Consumer Bankers II, III or IV with NATIONSBANK, and subsequent to NATIONSBANK's reclassification of these positions as non-exempt in or about December, 1997, Plaintiffs, and other similarly situated employees throughout the NATIONSBANK system, including Consumer Bankers II, III and IV, worked the number of hours required of them, many times in excess of forty (40), but were not paid overtime.

15. Moreover, NATIONSBANK's supervisory personnel either refused to permit Plaintiffs, and, upon information and belief, other similarly situated employees, to record

4

the number of hours worked in excess of forty (40) or expressly instructed Plaintiffs, and, upon information and belief, other similarly situated employees, against recording the number of hours worked in excess of forty (40), both in clear violation of NATIONSBANK's record-keeping obligations under the FLSA, specifically §211(c).

16.    The pay policies, practices and procedures of NATIONSBANK, as described in the above paragraphs, violated the FLSA by failing to provide for overtime pay to Plaintiffs, and other similarly situated employees, including Consumer Bankers II, III and IV, throughout the NATIONSBANK system, for those hours worked in excess of forty (40).

17.    As a result of NATIONSBANK's violation of the FLSA's record keeping requirements, as described above, NATIONSBANK has failed to keep and/or maintain accurate time records for Plaintiff's and all other similarly situated employees. Nevertheless, whatever records may exist concerning the number of hours worked by Plaintiffs, and all other similarly situated employees, including Consumer Bankers II, III and IV, throughout the NATIONSBANK system, and the compensation actually paid to such employees, are in the exclusive possession and sole custody and control of NATIONSBANK, and Plaintiffs are unable to state at this time the exact amount due and owing them or each similarly situated employee. Plaintiffs propose to obtain such information by appropriate discovery to be taken promptly in this case.

## COUNT I - RECOVERY OF UNPAID OVERTIME

18.    Plaintiffs reaver and reallege all allegations contained in paragraphs 1 through 17 above as if fully set forth herein.

19.    Plaintiffs are entitled to be paid time and one half for each hour worked in excess of forty (40) per work week and to have such overtime calculated in accordance

5

with Federal Regulations, to include commission/bonus payments earned in the appropriate work week in the calculation of the regular rate for the purposes of determining overtime entitlement. All similarly situated current and former employees are similarly owed their overtime pay, calculated properly, for those overtime hours they worked and for which they were not properly paid.

20.    By reason of the said intentional, willful and unlawful acts of NATIONSBANK, all Plaintiffs (Plaintiffs and those similarly situated to them) have suffered damages plus incurred costs and reasonable attorneys' fees.

21.    As a result of NATIONSBANK's violations of the FLSA, all Plaintiffs (Plaintiffs and those similarly situated to them) are entitled to liquidated damages in an amount equal to that which they are owed as unpaid overtime.

22.    Because NATIONSBANK's violations of the FLSA were, and, upon information and belief, continue to be, willful, Plaintiffs and those similarly situated to them are entitled to their damages for a period of up to three (3) years preceding the date of filing of this lawsuit.

WHEREFORE, Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE, and those similarly situated to them, who have or will opt into this action, respectfully request that this Honorable Court declare NATIONSBANK's above-described actions to be in violation of the FLSA, enjoin NATIONSBANK from further engaging in such violations, enter judgment against Defendant, NATIONSBANK, for the wages and overtime payments due them for the hours worked by them for which they have not been properly compen-sated, along with liquidated damages, award reasonable attorneys' fees and costs of suit, and grant all other relief the Court deems just and proper, including pre-judgment interest.

**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Dated this 28th day of January, 2000.

Respectfully submitted,

MUCHNICK WASSERMAN DOLIN & LEVINE, LLP
Attorneys for Plaintiffs
4000 Hollywood Boulevard
Suite 620 North
Hollywood, Florida 33021
(954) 989-8100 - Broward/(305) 624-9100 - Dade
(954) 989-8700 - Fax

By: _____

DANIEL R. LEVINE, ESQ.
Fla. Bar No.: 0057861
ADAM S. CHOTINER, ESQ.
Fla. Bar No.: 0146315

-and-

BOIES, SCHILLER & FLEXNER L.L.P.
2435 Hollywood Boulevard
Hollywood, Florida 33020

7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

ROXANNA ESCUDERO, on
behalf of herself and all others
similarly situated,

CASE NO. 00-06145-CIV-FERGUSON

    Plaintiff

vs.

NATIONSBANK, N.A.,

    Defendant.

_____/

### NOTICE OF FILING

COMES NOW the Plaintiff, ROXANNA ESCUDERO, by and through her undersigned counsel, and notifies the court of the following filings:

1.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Deana B. Justice

2.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Suzanne Czwojdak

3.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Marilyn Barnes

4.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Lillian Moreno

5.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Patricia J. Wood

6.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Lily Rubenstein

7.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Susie S. Reynolds

8.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Jeffrey Scott Taylor

9.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Rodney Hensley

10.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Karen Woroschinski

11.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Dayton J. Pehl

12.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Joe J. Northcutt

1

EXHIBIT
B

13.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Elizabeth A. Langley

14.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Nettie Parks

15.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Stephanie M. Strozier

16.    Consent to Become Party Plaintiff pursuant to 29 U.S.C. §216(b) for Karen G. Greene

Dated: June 7, 2000

Respectfully Submitted,
BOIES, SCHILLER & FLEXNER
Attorneys for Plaintiffs
2435 Hollywood Boulevard
Hollywood, FL 33020
(954) 929-1190
(954) 929-1185 - Fax

By: _____

Anne E. Hinds, Esq.
Fla. Bar No. 0964972

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

ROXANNA ESCUDERO, on                        Case No.:00-06145-CIV-
behalf of herself and all others            FERGUSON
similarly situated,

    Plaintiff

vs.

NATIONSBANK, N.A.,

    Defendant.

_____/

## CONSENT TO BECOME PARTY PLAINTIFF

I understand that I may be eligible to join this lawsuit filed by a former employee of
BankAmerica corporation d/b/a Bank of America Corporation f/k/a NationsBank N.A. to recover
overtime wages.

By choosing to join this lawsuit, I understand that I designate the representative Plaintiff,
Roxanna Escudero, as my agent to make decisions on my behalf concerning the litigation,
including the method and manner of conducting this litigation, entering into settlement
agreements, entering into agreements with Plaintiffs' counsel concerning attorneys fees and
costs, and all other matters pertaining to this lawsuit. These decisions and agreements made and
entered into by the representative Plaintiff will be binding on me if I join this lawsuit.

I understand that the designated representative Plaintiff has entered in a Contingency Fee
Agreement with the law firms of Boies Schiller & Flexner LLP, and Muchnick Wasserman Dolin
& Levine LLP which applies to all Plaintiffs who join in this lawsuit. If I join the lawsuit, I
agree to be bound by such Contingency Fee Agreement. I understand that under the terms of that
Contingency Fee Agreement, the law firms' attorneys fees and costs shall only be paid out of a
recovery, by judgment or settlement, in this action; and that if no such recovery is obtained, I
will not be held responsible for such attorneys fees or costs. I further understand that I may
obtain a copy of the Contingency Fee Agreement upon requesting it from Plaintiffs' counsel.

By choosing to join in this lawsuit, I understand that I will be bound by the judgment, whether it
is favorable or unfavorable. I will also be bound by, and will share in, as the court may direct,
any settlement that may be negotiated on behalf of all Plaintiffs.

If I choose not to join this lawsuit, I acknowledge and understand that I will not be affected by any judgment or settlement rendered or reached in this lawsuit, whether favorable or unfavorable to the Plaintiffs and I will not be entitled to share in any amounts recovered by the Plaintiffs whether by judgment or settlement.

I hereby consent to join in this lawsuit:

_____
Signature

_5-28-00_____
Date

PLEASE PRINT OR TYPE THE FOLLOWING INFORMATION:

Name __RODNEY HENSLEY_____

Street address __5728 Brentwood Trace, Brentwood, TN 37027__

★ Moving July 14, 2000
New Mailing address __116 Octavia Drive_____

City, State & Zip code __Meridianville, AL 35759__

Daytime Phone __615-406-7902_____

Evening Phone __615-406-7902_____

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-06145-CIV-DIMITROULEAS/SNOW

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others similarly situated,
        Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national association,
        Defendant.

_____/



### NOTICE OF FILING

COMES NOW the Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE,

by and through their undersigned counsel, and notify this Court of the following filing:

1. Affidavit of Rodney N. Hensley in connection with Plaintiff's Second Amended

Final Response to Defendant's Motion for Summary Judgment and Motion for Leave to

Amend Complaint.

> MUCHNICK, WASSERMAN, DOLIN
> & LEVINE, LLP
> Attorneys for Plaintiffs
> 4000 Hollywood Boulevard, Suite 620N
> Hollywood, FL 33021
> (954) 989-8100 - Broward
> (305) 624-9100 - Dade
> (954) 989-8700 - Fax
>
> By: _____
>    SUSAN L. DOLIN, ESQ.
>    Fla. Bar No. 708690
>
>    -and-
>
> BOIES, SCHILLER & FLEXNER L.L.P.
> 2435 Hollywood Boulevard
> Hollywood, Florida 33020



EXHIBIT
C

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via U.S. Mail this __21__ day of December, 2000 to: Michael T. Burke, Esq., Johnson, Anselmo et al., 790 East Broward Boulevard, Suite 400, Fort Lauderdale, Florida 33303-0220 and Richard F. Kane, Esq., McGuireWoods, 3700 NationsBank Plaza, 101 South Tyron Street, Charlotte, NC 28280.

By: _____

SUSAN L. DOLIN, ESQ.
E-Mail: sldolin@mwdl-law.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-06145-CIV-DIMITROULEAS
Magistrate Judge Snow

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated of herself and
all others

        Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national
association,

        Defendants.

_____\

## AFFIDAVIT OF RODNEY N. HENSLEY

STATE OF INDIANA  )
             :SS
COUNTY OF Tipton )

BEFORE ME, the undersigned authority, on this date personally appeared

RODNEY N. HENSLEY. who, after first being duly sworn deposes and says:

1.    My name is Rodney N. Hensley.

2.    I have personal knowledge of the facts recited in this Affidavit.

3. I worked as a Consumer Banker III in Brentwood, Tennessee until approximately June 30, 1997. At that time, I was transferred to an In-Store Banker position at the Harris-Teeter Supermarket in Brentwood, Tennessee.

4. As an in-store banker, I performed the exact same functions I had performed at the banking center, but performed them in the In-Store Bank at the Harris-Teeter supermarket instead of in the traditional banking center.

5. My business card still stated that I was a consumer banker.

6. Instead of a Consumer Banker III, I was an In-Store Banker II, and when I asked my regional executive, John Boydstein, or his assistant (Ellis Simmons), whose name I can not remember, what the difference was between a Consumer Banker III and an In-Store Banker II, one or both of them stated that there was no difference.

7. To the best of my knowledge, I was one of the first In-Store Bankers in the State of Tennessee, which was piloting its In-Store Banker project after the one in Georgia.

8. I remained an In-Store Banker at the Harris-Teeter location in Brentwood, Tennessee until January 15, 1999, when I left NationsBank's employ.

FURTHER AFFIANT SAYETH NAUGHT.

_____
RODNEY N. HENSLEY

SWORN TO AND SUBSCRIBED before me this 20th day of December, 2000, by RODNEY N. HENSLEY, who is personally known to me, or who produced Tenn. Drivers License as identification, and who did take an oath.

Tipton County Notary
Howard Co. Residence
Exp Feb, 6, 2008

_____
Notary Public
My Commission Expires:

Sherry L. Rahl
_____
Acknowledger's Name Stamped,
Typed or Printed

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6145-CIV-Dimitrouleas
Magistrate Judge Snow

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated,

        Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national association,

        Defendants.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COME NOW the Plaintiffs, ROXANNA L. ESCUDERO, KIMBERLY DRAKE and

RODNEY N. HENSLEY on behalf of themselves and all others similarly situated, by and

through their undersigned counsel, and sue the Defendants, BANKAMERICA CORPORA-

TION, a foreign corporation, d/b/a BANK OF AMERICA CORPORATION, a foreign

corporation, f/k/a NATIONSBANK, N.A., a national association, and for their cause of

action declare and aver as follows:

1.    Plaintiff, ROXANNA L. ESCUDERO (hereinafter referred to as

"ESCUDERO"), is a former employee of Defendants, BANKAMERICA CORPORATION

d/b/a BANK OF AMERICA CORPORATION, f/k/a NATIONSBANK, N.A., (hereinafter

collectively referred to as "NATIONSBANK"). ESCUDERO is a citizen and resident of

Broward County, Florida, over the age of 18 years, and otherwise *sui juris*.



EXHIBIT

2.    Plaintiff, KIMBERLY DRAKE (hereinafter referred to as "DRAKE"), is a former employee of NATIONSBANK. DRAKE is a citizen and resident of Broward County, Florida, over the age of 18 years, and otherwise *sui juris*.

3.    Plaintiff, RODNEY N. HENSLEY (hereinafter referred to as "HENSLEY") is a former employee of NATIONSBANK. HENSLEY is a citizen and resident of Tennessee, over the age of 18 years, and otherwise *sui juris*.

4.    Defendant, NATIONSBANK, is a national association regulated by the Federal Deposit Insurance Corporation, engaged in the business of banking in the State of Florida and elsewhere, and is within the jurisdiction of this Court.

5.    Plaintiffs bring this action on behalf of themselves and all other employees of NATIONSBANK, similarly situated to them, throughout the NATIONSBANK system, for compensation and other relief under the Fair Labor Standards Act, as amended, 29 U.S.C. §201, *et seq.* (hereinafter referred to as "the FLSA").

6.    This action is brought to recover from NATIONSBANK unpaid overtime compensation, liquidated damages, costs and reasonable attorneys' fees, as well as declaratory and injunctive relief, under the provisions of the FLSA, 29 U.S.C. §201, *et seq.*, and specifically under 29 U.S.C. §216(b).

7.    Jurisdiction is conferred on this Court by 28 U.S.C. §1337 and by 29 U.S.C. §216(b). NATIONSBANK is, and at all times pertinent to this Complaint, was, engaged in interstate commerce.    At all times material hereto, the annual gross revenue of NATIONSBANK was, and continues to be, in excess of $500,000.00, per annum.

2

8.    By reason of the foregoing, NATIONSBANK was, during all times hereafter mentioned, and is, an enterprise engaged in commerce or in the production of goods for commerce as defined in §§3(r) and 3(s) of the FLSA, 29 U.S.C. §203(r) and §203(s).

9.    In or about October, 1997, Plaintiff ESCUDERO became employed by NATIONSBANK, initially as a "Consumer Banker II." In or about July, 1999, ESCUDERO became a "Consumer Banker III", and she remained a Consumer Banker III until her termination on or about October, 29, 1999. By reason of such employment, ESCUDERO was employed during such period by an enterprise engaged in commerce within the meaning of 29 U.S.C. §§206(a) and 207(a). Further, ESCUDERO herself was engaged in commerce. The work performed by ESCUDERO was directly essential to the business operations of NATIONSBANK in interstate commerce.

10.    In or about October, 1997, Plaintiff DRAKE became employed by NATIONSBANK, initially as a "Consumer Banker II." In or about August, 1999, DRAKE became a "Consumer Banker III," and she remained a Consumer Banker III until her termination on or about October 29, 1999. By reason of such employment, DRAKE was employed during such period by an enterprise engaged in commerce within the meaning of 29 U.S.C. §§206(a) and 207(a). Further, DRAKE herself was engaged in commerce. The work performed by DRAKE was directly essential to the business operations of NATIONSBANK in interstate commerce.

11.    Plaintiff HENSLEY worked at NationsBank as a Consumer Banker III in Brentwood, Tennessee until approximately June 30, 1997. At that time, HENSLEY was transferred to the position of "in-store banker" I at the Harris-Teeter Supermarket in Brentwood, Tennessee, where he continued to perform the same functions as he had

3

performed as a Consumer Banker III, but in a supermarket facility setting rather than in a traditional banking center setting, until he left Defendant's employ on or about January 15, 1999. While in the "in-store banker" classification, HENSLEY carried business cards which continued to identify him as a consumer banker to customers of Defendant NATIONSBANK.

12.    The additional persons who may become Plaintiffs in this action are employees of NATIONSBANK, throughout the NATIONSBANK system, employed as Consumer Bankers II, III or IV, in-store bankers, or other individuals who perform like or similar duties and were subject to the pay policies, practices, and procedures described in the paragraphs below.

13.    At all times pertinent to this Complaint, NATIONSBANK failed to comply with 29 U.S.C. §201-19 in that Plaintiffs, and those employees similarly situated to Plaintiffs throughout the NATIONSBANK system, performed hours of service for NATIONSBANK for which no provision was made by NATIONSBANK to properly pay Plaintiffs, and those employees similarly situated to Plaintiffs.

14.    At all times material hereto, NATIONSBANK had, and still has, a position called "Consumer Banker" or "personal banker" and "in-store banker."    At all times material hereto, NATIONSBANK had, and still has, four (4) different levels for its position of "Consumer Banker": Consumer Banker I; Consumer Banker II; Consumer Banker III; and Consumer Banker IV, and two (2) levels for its "in-store banker", In-Store Banker I and In-Store Banker II. At all times material hereto, the job duties of "Consumer Bankers" and in-store bankers, regardless of the different levels, were, and are, the same. The only

4

difference between the different levels was, and is, the sales goals that each particular Consumer Banker or in-store banker level must meet.

15.     At all times material hereto, NATIONSBANK correctly classified the position of Consumer Banker I as non-exempt for purposes of the overtime provisions of the FLSA. In or about December 1997, NATIONSBANK reclassified the positions of Consumer Banker II, III and, IV, and the in-store banker I and II,  as non-exempt for purposes of the overtime provisions of the FLSA.  Prior to in or about December, 1997, NATIONSBANK had intentionally misclassified the positions of Consumer Banker II, III, and IV, and the in-store banker I and II, as exempt.  This intentional misclassification is the subject of two separate lawsuits styled *Beverly Levine, et al. v. NationsBank, N.A.*, Case No. 98-6306-CIV-DIMITROULEAS (consumer bankers) and *Perlman, et al v. NationsBank, N.A..*, Case No. 98-8805-CIV-DIMITROULEAS (in-store bankers).

16.     In the course of their employment as Consumer Bankers II, III or IV or in-store bankers I and II with NATIONSBANK, and subsequent to NATIONSBANK's reclassification of these positions as non-exempt in or about December, 1997, Plaintiffs, and other similarly situated employees throughout the NATIONSBANK system, including Consumer Bankers II, III and IV and in-store bankers I and II,  worked the number of hours required of them, many times in excess of forty (40), but were not paid overtime.

17.     Moreover, NATIONSBANK's supervisory personnel either refused to permit Plaintiffs, and, upon information and belief, other similarly situated employees, to record the number of hours worked in excess of forty (40) or expressly instructed Plaintiffs, and, upon information and belief, other similarly situated employees, against recording the

5

number of hours worked in excess of forty (40), both in clear violation of NATIONSBANK's record-keeping obligations under the FLSA, specifically §211(c).

18.     The pay policies, practices and procedures of NATIONSBANK, as described in the above paragraphs, violated the FLSA by failing to provide for overtime pay to Plaintiffs, and other similarly situated employees, including Consumer Bankers II, III and IV and in-store bankers I and II throughout the NATIONSBANK system, for those hours worked in excess of forty (40).

19.     As a result of NATIONSBANK's violation of the FLSA's record keeping requirements, as described above, NATIONSBANK has failed to keep and/or maintain accurate time records for Plaintiff's and all other similarly situated employees. Nevertheless, whatever records may exist concerning the number of hours worked by Plaintiffs, and all other similarly situated employees, including Consumer Bankers II, III and IV and in-store bankers I and II throughout the NATIONSBANK system, and the compensation actually paid to such employees, are in the exclusive possession and sole custody and control of NATIONSBANK, and Plaintiffs are unable to state at this time the exact amount due and owing them or each similarly situated employee. Plaintiffs propose to obtain such information by appropriate discovery to be taken promptly in this case.

## COUNT I - RECOVERY OF UNPAID OVERTIME

20.     Plaintiffs reaver and reallege all allegations contained in paragraphs 1 through 19 above as if fully set forth herein.

21.     Plaintiffs are entitled to be paid time and one half for each hour worked in excess of forty (40) per work week and to have such overtime calculated in accordance with Federal Regulations, to include commission/bonus payments earned in the

6

appropriate work week in the calculation of the regular rate for the purposes of determining overtime entitlement. All similarly situated current and former employees are similarly owed their overtime pay, calculated properly, for those overtime hours they worked and for which they were not properly paid.

22. By reason of the said intentional, willful and unlawful acts of NATIONSBANK, all Plaintiffs (Plaintiffs and those similarly situated to them) have suffered damages plus incurred costs and reasonable attorneys' fees.

23. As a result of NATIONSBANK's violations of the FLSA, all Plaintiffs (Plaintiffs and those similarly situated to them) are entitled to liquidated damages in an amount equal to that which they are owed as unpaid overtime.

24. Because NATIONSBANK's violations of the FLSA were, and, upon information and belief, continue to be, willful, Plaintiffs and those similarly situated to them are entitled to their damages for a period of up to three (3) years preceding the date of filing of this lawsuit.

WHEREFORE, Plaintiffs, ROXANNA L. ESCUDERO, KIMBERLY DRAKE, RODNEY N. HENSLEY and those similarly situated to them, who have opted in or will opt into this action, respectfully request that this Honorable Court declare NATIONSBANK's above-described actions to be in violation of the FLSA, enjoin NATIONSBANK from further engaging in such violations, enter judgment against Defendant, NATIONSBANK, for the wages and overtime payments due them for the hours worked by them for which they have not been properly compensated, along with liquidated damages, award reasonable attorneys' fees and costs of suit, and grant all other relief the Court deems just and proper, including pre-judgment interest.

**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Dated this 19th day of December, 2000.

Respectfully submitted,

MUCHNICK WASSERMAN DOLIN & LEVINE, LLP
Attorneys for Plaintiffs
4000 Hollywood Boulevard
Suite 620 North
Hollywood, Florida 33021
(954) 989-8100 - Broward/(305) 624-9100 - Dade
(954) 989-8700 - Fax

By: _____

SUSAN L. DOLIN, ESQ.
Fla. Bar No.: 708690
DANIEL R. LEVINE, ESQ.
Fla. Bar No.: 0057861

-and-

BOIES, SCHILLER & FLEXNER L.L.P.
2435 Hollywood Boulevard
Hollywood, Florida 33020

8

# HUSEBY & ASSOCIATES
AN **Int>rim** LEGAL SERVICES™ COMPANY



COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 98-6306-CIV-DIMITROULEAS
MAGISTRATE JUDGE BANDSTRA

```
- - - - - - - - - - - - - - - - - X
                                    :
BEVERLY LEVINE, et al,              :
                                    :
               Plaintiffs,          :
                                    :
          vs.                       :
                                    :
NATIONSBANK, N.A.,                  :
a national association,             :
                                    :
               Defendant.           :
- - - - - - - - - - - - - - - - - X
```

**Deposition of ELLEN D. MARTIN, Volume II**
(Taken by Plaintiffs)
Charlotte, North Carolina
November 18, 1998

Reported by:   Janet L. Cooper,
               Registered Professional Reporter
               Notary Public

**EXHIBIT**

E



THE OAK HOUSE • 1316 HARDING PLACE • CHARLOTTE, NC 28204 • (704) 333-9889 • FAX (704) 372-4593

ATLANTA, GA / GAINESVILLE, GA / ASHEVILLE, NC / GREENSBORO, NC / RALEIGH, NC / WINSTON-SALEM, NC / COLUMBIA, SC / GREENVILLE, SC / FLORENCE, SC / CHATTANOOGA, TN

http://www.huseby.com • email_npr@huseby.com

203

Deposition of **ELLEN D. MARTIN**, taken by
the Plaintiffs, at McGuire, Woods, Battle & Booth,
LLP, 3700 NationsBank Plaza, 101 South Tryon Street,
Charlotte, North Carolina, on the 18th day of
November, 1998, at 9:20 a.m., before Janet L. Cooper,
Registered Professional Reporter and Notary Public.

## C O N T E N T S

**The Witness: Ellen D. Martin**                **Examination**

By Ms. Dolin . . . . . . . . . . . . . . . . 4

By Ms. Dolin (Continued) . . . . . . . . . 157

### Volume II

By Ms. Dolin (Continued) . . . . . . . . . 204

## I N D E X   O F   T H E   E X H I B I T S

**For the Plaintiffs**                                        **Page**

### Volume II

29      NationsBank Job Posting System,        246
        Description of In-Store Banker I

\* \* \*

```
 1        A.    Oh, after it went to litigation?  No.
 2        Q.    Have you discussed the lawsuit with
 3   anybody other than the attorneys?
 4        A.    No.
 5        Q.    Have you read anything to prepare
 6   yourself for the deposition today?
 7        A.    I looked over the Freedom to Act
 8   guidelines.  I did look over the chart that we
 9   went over line by line about the accounts and
10   things like that.  I looked over the job
11   descriptions, appraisals, things like that.
12        Q.    You mean performance appraisals for
13   CBs?
14        A.    Not specific ones.  I mean the
15   appraisal that we use for CBs.
16        Q.    You mean the form?
17        A.    Right.  Not specific individual
18   appraisals.
19        Q.    Got it.  Are you familiar with the term
20   "in-store banker"?
21        A.    Oh, I'm afraid I am.  Yes, I am.
22        Q.    Tell me what the in-store banker does.
23        A.    You know, it depends on the state
24   you're talking about.  It depends on the type of
25   in-store facility that you're talking about.
```

230

```
 1          Q.   Can you tell me when the in-store
 2   banker became a position at NationsBank.
 3          A.   In-store banker became a position at
 4   NationsBank prior to my entering the current role
 5   I'm in, so I can't give you a --
 6          Q.   Since that was about five hours ago,
 7   can you give me an idea of when that happened.
 8          A.   Sure.  I came into the role in January
 9   of '97.
10          Q.   Okay.
11          A.   In-store banker was created for Florida
12   market.
13          Q.   Only?
14          A.   At the time, yes.  As they rolled out
15   or began their in-store franchise, sometime in
16   '96.  I'm not certain exactly when.
17          Q.   Prior to the creation of the in-store
18   banker -- and I'm going to call it ISB.
19          A.   All right.
20          Q.   Prior to the creation of that for the
21   Florida market, did it exist anywhere else in the
22   NationsBank system?
23          A.   Not in-store banker, no.
24          Q.   Okay.
25          A.   In-store bankers are consumer bankers
```

1  | in Texas and in Georgia.

2  |     Q.    Are there any in-store bankers from the

3  | time in 1996 when they were created for Florida

4  | up through December of 1997 when consumer bankers

5  | were all made nonexempt, or are there any other

6  | in-store bankers other than the ones in Florida?

7  |     A.    Yes, there are.    There are in-store

8  | bankers in the Carolinas, which would mainly be

9  | North Carolina.    I'm not sure if we even have any

10 | in-stores in South Carolina.    But there may be

11 | one in South Carolina.

12 |     There are in-store bankers in our

13 | Midwest market, and I think they're only in

14 | St. Louis, but they may be in Kansas City and

15 | Oklahoma as well.    But definitely St. Louis.

16 |     Q.    And these positions were instituted

17 | sometime between 1996 and December of 1997?

18 |     A.    I can't say in St. Louis if that's

19 | true.

20 |     Q.    When did they come in in St. Louis?

21 |     A.    Actually, it would have been in '97.

22 | Yes.    It would have been in '97.

23 |     Q.    Before December?

24 |     A.    Yes.    It's before December.    I'm

25 | getting my years mixed up here, but it would have

1    been in '97 in St. Louis.  In the Carolinas --

2    now understand, they continue to add in-store

3    centers as we speak.

4        Q.   Sure.

5        A.   So there were some in all of the

6    markets I talked about.

7        Q.   Now, in 1996 the ISBs, in-store

8    bankers, in Florida, they were exempt or

9    nonexempt?

10       A.   Exempt.

11       Q.   And what about in the other markets,

12   the Carolinas?

13       A.   Exempt.

14       Q.   And the Midwest market?  All exempt?

15       A.   Right.  All were Exempt.

16       Q.   Now, did they become nonexempt the same

17   time the consumer bankers became nonexempt?

18       A.   Yes, they did.

19       Q.   And how many in-store bankers, if you

20   know, are we talking about between the time the

21   position was created and the time they became

22   nonexempt?

23       A.   I really don't have an exact number.

24       Q.   Do you have a general ballpark figure?

25       A.   You know, I really don't.  I would have

1    to figure out how many centers there were at that

2    time.  And again, we literally add centers almost

3    one a week in some markets.  And I'd have to

4    figure out how many centers there were, and then

5    I could make some assumptions to be able to

6    ballpark it.  But I just can't do math in my

7    head.

8         Q.    You said there were consumer bankers in

9    Texas and Georgia?

10         A.    Right.

11         Q.    What do you mean?  You actually had

12    people performing in-store, but they were called

13    consumer bankers?

14         A.    It helps to understand kind of how we

15    came about in-store.

16         Q.    Let's go there.  Let me do it this way:

17    Tell me what an in-store bankers does.  When the

18    position was first -- did you inherit those from

19    some other bank?

20         A.    Yes.

21         Q.    Okay.

22         A.    And I think that's why it might be

23    important for you to understand.  In-store's a

24    relatively new concept in banking.  It's been

25    around since the late 70s, but branches have been

```
 1    around since the 1800s, so it puts it in context.
 2              For NationsBank, we really have only
 3    been involved in in-store since 1995 when we
 4    acquired BankSouth, which was a Georgia bank
 5    predominantly.  There might have been a few
 6    offices in Florida.  I'm not certain.
 7              But when we acquired BankSouth, we
 8    acquired a relatively large number of in-store
 9    bankers in the Kroger stores.
10         Q.   Can you give me an estimate of how
11    many.
12         A.   About 75.  And those had been in
13    existence since 1986.  So that was one of the
14    franchises we inherited.
15         Q.   Now, when you inherited the BankSouth
16    folks, 75 in-store bankers, did you classify them
17    as consumer bankers at the time?
18         A.   Yes.  Because that was in '96 before we
19    had created the in-store banker job code.
20         Q.   So when you did the mapping, as they
21    called it --
22         A.   Yes.
23         Q.   -- they became consumer bankers?
24         A.   Right.
25         Q.   And they continued to work at the
```

1    Krogers?

2         A.    Yes.    And in our Texas market in '95,

3    we did a pilot and opened a few stores in

4    Albertson's in Texas and continued our rollout of

5    in-store in Texas in 1996.    And again, all of

6    this was prior to any new codes having been

7    created.

8         Q.    And these folks were classified as

9    consumer bankers?

10         A.    Yes, they were.

11         Q.    Was there a time that the

12    classification was ever changed to in-store

13    banker?

14         A.    No.

15         Q.    So these people that worked at the

16    Krogers in Georgia and possibly Florida have

17    always been classified as consumer bankers?

18         A.    Not Florida.

19         Q.    I thought you said they might have had

20    a couple in Florida.

21         A.    Well, if BankSouth had any branches.

22    They did not have any in-stores in Florida.

23         Q.    So that was confined to Georgia?

24         A.    Yes.    Yes, it was.

25         Q.    I just want to make sure that I'm

1    absolutely clear.  When you acquired BankSouth in

2    Georgia, the folks that worked at the Krogers

3    were classified as consumer bankers and have

4    never been classified as anything else with

5    NationsBank; is that true?

6         A.   Yes.  That's correct.

7         Q.   Same thing with the Texas pilot with

8    Albertson's?

9         A.   Right.  And the continued Texas rollout

10   to the present.

11        Q.   They're still consumer bankers?

12        A.   They're still consumer bankers.

13        Q.   Now, tell me then what the in-store

14   banker is.

15        A.   An in-store banker -- and the reason

16   the title was created for Florida was because the

17   concept that we were -- "instituting" is probably

18   the wrong word.  But the concept that we were

19   testing in Florida with our contract that we

20   signed with Winn-Dixie was when Publix went

21   Barnett.

22        Q.   I was going to say --

23        A.   You look confused.

24        Q.   -- I have a Winn-Dixie by my house, and

25   it doesn't have you in it.  It's got some other

1   bank I've never heard of.

2        A.    It's not all Winn-Dixies, and our

3   relationships are typically exclusive but not

4   always.

5        Q.    Okay.

6        A.    At any rate, our concept that we were

7   testing in Florida was a different kind of

8   associate.   In bank terms we called it a

9   universal associate.

10           It probably would help to understand as

11  well, in Georgia and Texas, if you walked into

12  one of the grocery stores where our office is, it

13  looks like a little branch.   It's got a teller

14  line.   It's got a couple of desks or a couple of

15  areas for a consumer banker to sit.   Sometimes

16  there's an office for a manager, but it's a very

17  confined space.   It's not even as big as this

18  room typically.

19           And the concept we used in Florida was

20  much different.   It didn't look like a branch at

21  all.   We didn't have a teller line.   In most of

22  these facilities in Florida, there is not a

23  teller module, is what we call it.

24       Q.    Okay.

25       A.    We have the capability to take a teller

 1   transaction in the back of the house behind the

 2   scenes, and the reason that is -- and these

 3   centers were conceived as customer service or

 4   customer sales locations where we could sell our

 5   products and services, offer the array of the

 6   financial products and services that we have to

 7   largely what was noncustomers of NationsBank.

 8        The majority of the people that come

 9   into a grocery store are not our current

10   customers, so they're prospects.

11        Q.   People who bank at NationsBank don't do

12   grocery shopping?

13        A.   They don't eat.  No, I mean, the

14   statistics show in the grocery store industry --

15   this is information that is widely circulated.  I

16   don't know how it was generated.  But it says

17   that basically 80 to 90 percent of people that

18   come into a grocery store are not your current

19   customers.  Now again, I'm sure that changes

20   depending upon your market share in a particular

21   market.  I don't know.  They tend to shop in the

22   same centers as well.

23        So we saw this as a real opportunity

24   for prospecting and to get new customers.  You

25   had that traffic of people who would not come

1    into your banking center because they weren't

2    your current customers.

3         Q.    Right.

4         A.    And that is the difference, because 80

5    to 90 percent of the people that come into your

6    banking center are your current customers.  They

7    have "bank" on their to-do list that day, and

8    they come in to see you for whatever reason.  In

9    the grocery store, that's not the case.

10         So it was largely a prospecting

11   environment.  We didn't want it to be perceived

12   as a mini-banking center that would just be used

13   for quick check-cashing kinds of activities.  So

14   it was really a whole new concept of being a

15   sales center.

16         Q.    Okay.

17         A.    And we saw the opportunity there, you

18   know, for prospecting.  We, you know, just felt

19   it -- and the type of associate we were hiring

20   was going to be that universal, in quotes, kind

21   of associate that would be able to take care of

22   any need of a customer even if that meant

23   accepting a transaction.  Although, their primary

24   focus was to help migrate transactions.

25         So if you came in and said, "I want to

```
 1   deposit a check," we'd say, "Did you bring your
 2   ATM card?  Let me show you how to use the ATM."
 3        Q.   I don't have one.
 4        A.   You would have been the exception.
 5             MS. BOIES:  They would have gotten you
 6   one.
 7             THE WITNESS:  We would have ordered you
 8   one.
 9   BY MS. DOLIN:
10        Q.   Many people have tried.
11        A.   But that was -- it was called concept
12   selling.
13        Q.   Okay.
14        A.   And so it was a new type of role.
15        Q.   What then would the associates, the
16   universal associates -- who I'm assuming later
17   became known as in-store bankers?
18        A.   That universal is only terms that we
19   use internally.
20        Q.   I understand.
21        A.   It was always classified as an in-store
22   banker.
23        Q.   What exactly do they do?
24        A.   They do a variety of things.  They
25   would obviously respond to any customer need.  So
```

1    if a NationsBank, you know, customer approached

2    them and said, "Can you help me" with any kind of

3    transaction that we've already discussed, an

4    in-store banker should be able to do that same

5    kind of offering of products, helping customers.

6         What we encourage an in-store, which is

7    a little different than in the banking centers,

8    is we do try to migrate any service kinds of

9    requests to our 1-800 number.

10    Q.    I see.  Like if I decided to stop in

11    while I'm shopping and say, "What's my balance?"

12    they would give me the toll-free number?

13    A.    Right.  We would, in a nice way, say,

14    "Boy, you didn't need to stop in and do that.

15    You could call our 1-800 number."  We wouldn't

16    just say, "Here.  Call this number."  And if a

17    customer was adamant that they wanted you to

18    check the balance, you have a Merlin System

19    there, and you can check their balance.

20         So you can respond basically to any

21    customer need, you know, both from a product or

22    service need to a research item need, et cetera.

23    If they wanted teller transactions, there was

24    limited functionality there.  It is a very small

25    space.  We have a vault, honestly, the size of a

1   college refrigerator, so you can't keep large

2   amounts of cash.

3        Q.   Sure.

4        A.   You can't keep large change orders.

5        Q.   So they could never cash a very large

6   check?

7        A.   No.

8        Q.   But they could cash a check if they

9   needed to?

10        A.   If they needed to.  They really are

11   very stringently monitored for the kinds of

12   transactions they provide.  But the bottom line

13   is, if a customer is adamant that they want you

14   to take a deposit for them, the in-store banker

15   is going to take a deposit for them.  But often

16   times, it's in the back of the house.  It's not

17   visible that they can even do it, and customers

18   are accepting of that.

19        Q.   So what else do they do?

20        A.   In some cases -- and this was certainly

21   true initially -- they were expected to, what we

22   call, aisle market.  Aisle like in the aisles.

23        Q.   Set up a little stand next to the free

24   pizza samples?

25        A.   No.  Walk the aisles.  No.  Walk the

```
 1    aisles and talk to customers and prospect and all
 2    of that.
 3         Q.   Okay.
 4         A.   In some cases they bagged groceries,
 5    again, in order to get the ability to build a
 6    rapport.
 7         Q.   I'm standing here loading your
 8    groceries and saying, "By the way, would you like
 9    to open a checking account?"
10         A.   In some case, yes.  But we found very
11    quickly that was not an effective way.  People
12    don't want to be talking about their financial
13    needs in the mayonnaise aisle.
14         Q.   Do they also offer to take your
15    groceries out to the parking lot for you?
16         A.   Sure.  Sure.  They absolutely would.
17    All in an effort to build a rapport with an
18    individual that is not there to do their banking.
19         Q.   Is the person -- okay.  Aisle
20    marketing.  What else?
21         A.   In some markets, specifically Texas,
22    they were very aggressive in going outside the
23    banking center and looking for business.  And
24    that really was very -- not very specific to
25    Texas, but they really were very successful at
```

1   doing that.

2        Q.    Now, the folks in Texas that got

3   aggressive in going outside the banking center,

4   those were the ones who were classed as CBs?

5        A.    Yes.    They were actually going not even

6   outside the banking center, outside grocery

7   stores is what I meant to say.

8        Q.    That's what I mean.    Yes.    I understood

9   you.    They actually left the premises?

10        A.    Yes.    And they would go in the

11   neighborhoods.    They would try to establish

12   relationships with home improvement contractors,

13   with Realtors, with other mortgage broker

14   companies to, you know, get business.    And we're

15   very successful at doing so.

16        Q.    What else?    Anything else?

17        A.    They -- I mean, it's a unique position

18   in that it is so much more of a prospecting

19   environment than in a traditional banking center

20   where you have the customer at your desk and you

21   are expected to identify and serve needs right

22   then.    Because again, most of the people that

23   they're dealing with are not current customers,

24   so they are trying to establish a time where they

25   can meet with the customer.

1          Again understand, customers are not

2    very amenable to having you interrupt what could

3    be a very quick trip they've planned to the

4    grocery store, so they're trying to set up other

5    times to meet with you.  "Gosh, is there a time I

6    can call you or we can sit down and go over what

7    your needs are?" et cetera.  So they are very

8    much in a cold calling kind of environment.

9        Q.    Now, how many ISBs do you usually have

10   in one in-store facility?

11       A.    One center?  It would vary.  But I'd

12   say on overage maybe two to three.

13       Q.    Are these people expected to leave the

14   center and go out and prospect in the

15   neighborhoods?

16       A.    That's a desire.  I don't know how

17   often that really happens, but that's a desire.

18   And when you say ISBs, I'm assuming you mean

19   Florida and any place else they are located, like

20   St. Louis or the Carolinas.

21       Q.    Right.

22       A.    Okay.

23       Q.    Now, do the ISB positions that have

24   been created since the acquisitions of those

25   banks in Georgia and the Texas pilot project --

1    the ISB, you're saying, is different from the

2    consumer banker in the grocery stores in Texas

3    and Georgia, as I understand your testimony.

4         A.    Well, it's -- I do think it's still the

5    same environmental issues that I just discussed.

6    In essence, it's a prospecting environment as

7    opposed to --

8         Q.    For Texas and Georgia consumer bankers

9    that are in grocery stores as well?

10        A.    In grocery stores, yes.

11        Q.    Okay.

12        A.    They are in centers that resemble

13   banking centers.  And in Georgia, specifically

14   since that channel is 12 years old in Georgia,

15   they have very high customer volumes.

16             MS. BOIES:    Let's get this marked as

17   the next in order, please.

18             (Plaintiffs' Exhibit No. 29 was marked.)

19   BY MS. DOLIN:

20        Q.    Just let me know when you've had time

21   to look at it.

22        A.    I've looked at it.

23        Q.    Do you recognize Exhibit 29?

24        A.    It's a screen from our internal job

25   posting system that has not a full job

1    description but has the additional skills they're

2    looking for for an in-store banker.

3        Q.    Additional to what?

4        A.    Normally on a job posting screen like

5    this, that job description area would be filled

6    in that has, you know, a synopsis of the job

7    description.  And then in additional skills, it

8    typically lists the requirements that they're

9    looking for.

10       Q.    Is this the or at least part of the job

11   description that's in place now for the in-store

12   banker?

13       A.    You know, honestly, I have not reviewed

14   the in-store banker job description in several

15   months, and so I'd need to look at it.

16       Q.    Are there differing levels of in-store

17   banker?  I see this says in-store banker I.

18       A.    There are two levels:  In-store banker

19   I, in-store banker II.

20       Q.    How do they differ?

21       A.    How do you mean, how do they differ?

22       Q.    What's the difference between level I

23   and level II?

24       A.    Again, not having participated in the

25   development of those job descriptions or having

248

```
 1    reviewed them recently, I couldn't tell you right
 2    now.
 3         Q.    You don't know the difference between
 4    the two levels right now as we sit here?
 5         A.    No, I don't.
 6         Q.    Who would have that information?
 7         A.    I mean, it would be me, but honestly,
 8    we just decided I would testify on this.
 9         Q.    Oh, okay.  Are there formal job
10    descriptions for ISB I and ISB II?
11         A.    Yes, there are.
12         Q.    And that would include the folks in
13    Florida, the Carolinas --
14         A.    -- St. Louis --
15         Q.    -- Midwest --
16         A.    Right.
17         Q.    -- and possibly Kansas and Oklahoma?
18         A.    Yes.
19         Q.    Now, those folks were -- do you know
20    when the positions were created for the Midwest?
21         A.    It was when we began -- we acquired
22    Boatmen's and in early '97 were -- had signed a
23    contract with a grocery store out there and had
24    made the decision to staff them the same way that
25    we staffed our Florida bank and to use that same
```

249

1    kind of model.  Not to build a mini-branch, but

2    to have more of a sales center.

3        Q.    So the Midwest ones was sometime early

4    in '97?

5        A.    It was early in '97 that we began

6    hiring for those.  I seem to remember they were

7    going to open in May or June or July or something

8    like that.

9        Q.    What about North and South Carolina?

10       A.    It was the same time.

11       Q.    Same time?

12       A.    Uh-huh.

13       Q.    And Florida's came about --

14       A.    It began in '96.  We probably had --

15   and again, this was prior to entering the current

16   job I am in.  And I believe they had signed the

17   contract in April or May of '96 and opened their

18   first stores in --

19       Q.    With Winn-Dixie?

20       A.    With Winn-Dixie, right.  This is not

21   Barnett.  They had their own franchise going.

22       Q.    Right.

23       A.    But I believe we opened our first

24   stores in the September/October time frame.

25       Q.    Of '96?

```
1        A.    Of '96.  And we probably had a dozen
2   centers by the end of '96 that were open, and
3   rollout continues as we speak.
4        Q.    But now they're nonexempt, and they
5   have been since December of '97?
6        A.    That's correct.
7             MS. DOLIN:  Just give us two minutes.
8   We're about done.
9                (Recess in Proceedings)
10  BY MS. DOLIN:
11       Q.    I've got two questions.  Nan Blizard's
12  consulting firm.  What is the name of it?
13       A.    I really don't know.
14       Q.    Where is she located?
15       A.    In Richmond, Virginia.
16       Q.    And remember before we were talking
17  about how you divided NationsBank into certain
18  geographical areas?  You had the mid-Atlantic.
19  You had Florida.  What are those particular
20  little chunks called?
21       A.    There is --
22       Q.    We call them regions, but what do you
23  all call them?
24       A.    We call them banking groups.
25       Q.    Banking groups.  Okay.
```

```
1           MS. DOLIN:  No more questions.  Thank
2   you.
3                (Signature reserved)
4        (Whereupon, at 3:45 p.m., the taking of the
5   deposition ceased.)
6
7
8
9
10
11
12
13   _____Ellen D Martin_____
14              Signature of the Witness
15
16   SUBSCRIBED and SWORN TO before me this $22^{nd}$ day
17   of _December_____, 1998.
18
19   _____Mitchell J Stewart_____
20              NOTARY PUBLIC
21
22   My Commission expires:  _May 1, 1999_____
23
24
25
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

BEVERLY LEVINE, et al.

Plaintiffs,

vs.

CASE NO.: 98-6306-CIV-DIMITROULEAS
Magistrate Judge Bandstra

NATIONSBANK, N.A.,
a national association

Defendant.
_____/

### PLAINTIFFS' MOTION TO SHORTEN TIME FOR COMPLIANCE WITH DISCOVERY, FOR EXTENSION OF NOTICE PERIOD AND INCORPORATED MEMORANDUM OF LAW

COME NOW the Plaintiffs, BEVERLY LEVINE *et al.*, by and through their undersigned attorneys, and, pursuant to Fed. R. Civ. P. 34(a), hereby request this Honorable Court to shorten the time for Defendant to comply with Plaintiffs' discovery and to extend the notice period, and in support show as follows:

1.      On or about March 27, 1998, Plaintiffs BEVERLY LEVINE and LINDA MARLENE MELTON filed the instant lawsuit on behalf of themselves *and all others similarly situated.* LEVINE and MELTON were employed by Defendant as Consumer Bankers III and II respectively.

2.      On or about March 27, 1998, Plaintiffs filed, together with the Complaint, a Motion to Allow Notification to Potential Class Members Pursuant to 29 U.S.C. § 216(b), those class members being all other employees "similarly situated" to the Plaintiffs.

3.      On or about September 2, 1998, this Court entered an order allowing notification of the instant lawsuit to all employees *employed as Consumer Banker II, III and IV.* The Court further ordered Defendant to provide to Plaintiffs "the name, last known address, and phone number of all those employed by Defendant as a Consumer Banker II, III, or IV during any time after September 1, 1995."



EXHIBIT

F

4.    Discovery in both the instant case and another suit against this Defendant revealed that the main functions performed by the Consumer Bankers, regardless of "rank", were related to the sale of the Defendant's products. *See* Motion to Allow Notification to Potential Class Members Pursuant to 29 U.S.C. §216(b) and Reply Memorandum of Law in Support of Motion to Allow Notification.

5.    Recently, Plaintiffs have learned that Defendant employs another "classification" of employees who appear to do the identical job of a "Consumer Banker II, III, or IV" (sales), but are called "In-Store Bankers." These "In-Store Bankers" perform their jobs away from Defendant's branches, or "banking centers," and instead perform them inside of other facilities, such as grocery stores or supermarkets, where Defendant maintains a facility where its customers can do their banking business while patronizing the supermarket or other business. See Exhibits "A" and "B" attached hereto. Moreover, these employees are, and at all times material hereto, have been classified as exempt and worked overtime.

6.    Obviously, if "In-Store Bankers" perform the same or even similar tasks as do "Consumer Bankers," they are "similarly situated" employees to "Consumer Bankers" and are, and were, entitled to be notified of the pendency of this lawsuit, even if they are called by a different name by virtue of the fact that they perform their duties in remote locations. Yet, Defendant has never revealed the existence of these so-called "In-Store Bankers," never provided information regarding them in response to Plaintiff's discovery propounded thus far.

7.    While Defendant might attempt to argue that the Court's order went only to information on Consumer Bankers, the plain answer is that all of the information provided by Defendant to the Plaintiffs (and to the Court, in response to broader discovery, was directed solely to the "Consumer Banker" classification; Defendant never revealed that it employed, in

2

essence, "Consumer Bankers" by another name. This is **despite** the breadth of the first

Interrogatory which Plaintiffs propounded to Defendant on June 16, 1998, which requested:

> Pursuant to the Court's Order granting Plaintiffs' Motion to Allow Notification, please identify by name and last known residential address and telephone number each and every current and former employee **who performed the duties of** or held the position of Consumer Banker II, III or IV from March 26, 1995 to the present, throughout the NATIONSBANK system, to include every banking center, branch or other facility throughout the United States [emphasis added].

Similarly, Plaintiffs' First Request to Produce, propounded to Defendant on the same day,

asked for:

> Pursuant to the Court's Order granting Plaintiffs' Motion to Allow Notification, please produce all records and/or computerized information identifying by name and last known residential address and telephone number each and every current and former employee **who performed the duties of** or ⌐held the position of Consumer Banker II, III or IV from March 26, 1995 to the present, throughout the NATIONSBANK system, to include every banking center, branch or other facility throughout the United States.

8. Although Defendant objected to this Interrogatory and Request to Produce, the

Court overruled those objections. Yet, when Defendant ultimately provided the lists of names,

Defendant did not include "In-Store Bankers" even though they were clearly covered by the

discovery requests. Nor did Defendant ever even reveal the existence of these "In-Store

Bankers."

9. Because of Defendant's failure to provide the information regarding "In-Store

Bankers", Plaintiffs now find themselves in the unenviable position of having to pursue

discovery regarding a whole new classification of NationsBank employee (which really is not

new at all).

3

10.     In order to accomplish that, Plaintiff has propounded additional discovery consisting of a Fourth Request to Produce, seeking information as to the "In-Store Banker" position, and a Notice of Taking Deposition of a Corporate Representative *duces tecum* pursuant to Fed. R. Civ. P. 30 (b)(6) for production at the deposition of some of the information called for in the Fourth Request for Production. Normally, Fed. R. Civ. P. 34 provides 30 days for a response to such requests. However, the prescribed notice period for eligible employees to opt in to this litigation expires on December 15, 1998. If the Plaintiffs are forced to wait the requisite 30 days to get this information, that will leave precious little time to notify current or former employees who may have been eligible to opt in but were precluded from doing so through Defendant's own failure to provide full and complete discovery information. Accordingly, Plaintiffs request this Honorable Court to shorten the time available for Defendant to respond to the discovery to ten (10) days. Further, Plaintiffs would request this Honorable Court to grant a forty-five (45) day extension, to January 30, 1999, within which to notify eligible employees of their rights to opt in to the instant litigation and for them to do so.

11.     Plaintiffs' undersigned counsel has conferred with defense counsel in an effort to resolve all or some of the issues raised in this Motion, but the issues could not be resolved. Defense counsel objects to the granting of this Motion.

WHEREFORE, Plaintiffs BEVERLY LEVINE *et al* respectfully request that this Honorable Court grant their Motion, and enter an Order as follows:

1.     Shorting the time within which Defendant may respond to the discovery propounded regarding the "In-Store Bankers" to ten (10) days;

2.     Extending the time for the notification period to current and former employees eligible or potentially eligible to opt-in to this litigation, and for the eligible current and former employees to opt in, for forty-five (45) days, or until January 30, 1999; and,

4

3.     Taking such other and further action as this Court shall deem just and reasonable

in the premises.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via FAX and U.S. Mail to: Michael T. Burke, Esq., Johnson, Anselmo et al., 790 East Broward Boulevard, Suite 400, Fort Lauderdale, Florida 33303-0220 and Richard F. Kane, Esq., McGuire, Woods, Battle & Boothe, 3700 NationsBank Plaza, Charlotte, NC 28280, this **3̶0̶** day of October, 1998.

MUCHNICK, WASSERMAN & DOLIN
Attorneys for Plaintiffs
4000 Hollywood Boulevard, Suite 620 North
Hollywood, Florida 33021
(954) 989-8100 Broward
(954) 989-8700 Fax

By: _____
SUSAN L. DOLIN, Esq.
Fla. Bar No.: 708690
DANIEL R. LEVINE, Esq.
Fla. Bar No.: 0057861

and

Gary Harris, Esq.
Caryl Boies, Esq.
BOIES & SCHILLER L.L.P.
390 North Orange Ave., Ste. 1890
Orlando, Florida 32801

5

NATIONSBANK JOB POSTING SYSTEM    OCT 13, 1998
POSITION INFORMATION - SCREEN 2 OF 2

REQUISITION NUMBER: 98-0008071    TITLE: INSTORE BANKER I    A
JOB DESCRIPTION:

ADDITIONAL    RESPONSIBILITIES FOR GENERATING SALES AND EXPANDING
SKILLS    RELATIONSHIPS OF NEW AND EXISTING CUSTOMERS THROUGH THE
EXECUTION OF THE INSTORE MARKETING PLAN. THE INSTORE
BANKER PERFORMS DIVERSE FUNCTIONS INCLUDING SALES,
RELATIONSHIP SELLING, PROVIDING QUALITY CUSTOMER SERVICE
AND CREATING ADDITIONAL SALES WHILE PROVIDING TRANSACTION

PF3 PREV    PF9 PREV POS    PF10 NEXT POS    PF12 MAIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

BEVERLY LEVINE, et al.                    CASE NO.: 98-6306-CIV-DIMITROULEAS

       Plaintiffs,                    Magistrate Judge Bandstra

vs.

NATIONSBANK, N.A.,
a national association

       Defendant.
_____/

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
## THEIR MOTIONS TO SHORTEN TIME TO COMPLY WITH
## DISCOVERY AND FOR EXTENSION OF NOTICE PERIOD

COME NOW THE Plaintiffs, BEVERLY LEVINE et al, and hereby file this, their

Reply Memorandum in Support of their Motions to Shorten Time to Comply with Discovery

and to extend the notice period to the potential opt-in plaintiffs, and show as follows:

The gravamen of the Defendant's response to Plaintiffs' Motion is to blame the

plaintiffs for some perceived internal inability to comply with the Court's deadline, for which

Plaintiffs now seek the remedy of a shortened period for Defendant to reply to discovery

and a lengthened period to notify the members of the putative class. Defendant's actions,

however, and only Defendant's actions, are the root cause for both of these requests.

First, Plaintiffs requested these remedies due to NationsBank's failure to reveal the

existence of the in-store banker position, even though Plaintiffs requested discovery on all

employees, whether titled Consumer Bankers or not, who performed similar or identical

work to that performed by the Consumer Bankers. Defendant conveniently overlooked the

in-store bankers, even though they fit the description of the employees for whom

information was requested by the Plaintiffs in their discovery requests. And while



Defendant may be correct that the only evidence which Plaintiffs have produced in support of this contention is their own attorneys' testimony as to conversations they had with in-store bankers who called for information on the litigation, together with a partial job description of the in-store banker position, the failure of Plaintiffs to provide additional information can be laid squarely at the feet of Defendant, which failed to even reveal the existence of the position and the incumbent employees, let alone provide information about them responsive to Plaintiffs' discovery requests.

Be that as it may, however, Plaintiffs have since deposed the designated corporate representative with the most knowledge of the in-store banker position, Ellen Martin. Ms. Martin, currently the project manager in charge of strategic initiatives for the consumer bank (Exh. 1, p. 7), testified that Defendant has two different types of "in-store bankers." As a general proposition, these are employees who work out of mini-banking facilities located inside supermarkets rather than at NationsBank banking centers. Those who were acquired from Defendant's mergers with other banks, notably in Georgia, were consolidated, or "mapped," into the NationsBank system as consumer bankers (Exh. 1, p. 230-231, 233-234). Similarly, after acquiring these first in-store bankers, NationsBank launched a pilot project with the Albertson's supermarket chain in Texas, where they were also known as "consumer bankers." (Exh. 1, p. 230-231, 235).

Sometime in 1996, the "in-store banker" position was created for Florida, and at about the same time, instituted in the Carolinas, St. Louis, and possibly Kansas City and Oklahoma as well (Exh. 1, p. 230-231). Like the consumer bankers II-IV, the in-store bankers were classified as exempt for FLSA purposes (Exh. 1, p. 232). They remained exempt until December 1997, when they were re-classified as non-exempt along with the

consumer bankers (Exh. 1, p. 232).

The ostensible distinctions between the in-store bankers and the consumer bankers who work in supermarkets in Texas and Georgia are as follows: 1) the in-store facilities in Texas and Georgia more closely resemble miniature banking centers, complete with small teller lines, while there is no "teller module" in the other in-store facilities; 2) as a result, the in-store bankers, while they have the capability to, and do, perform teller or transactional functions, focus more on intensive "prospecting,"--that is, sales of NationsBank products (Exh. 1, p. 239-240). The idea was entitled "concept selling." (Exh. 1, p. 240). "Concept selling" involved responding to customer service needs, such as performing teller transactions to researching problems (checking balances, tracing back transactions on the computer system, etc.), just as a consumer banker (or a teller) would do in a banking center (Exh. 1, p. 55-57; 241-242). "Concept selling" also involved "aisle marketing," where the in-store banker actually walked the aisles of the supermarket where the NationsBank facility was located to try to sell bank products to the supermarket customers (Exh. 1, p. 242-243). The in-store bankers would also bag groceries and help carry packages out to the supermarket customers' cars in an effort to sell the bank products (Exh. 1, p. 243).[1] And regardless of the physical lay-out -- that is, whether the NationsBank facility in the supermarket has a teller module or not--the environment is one of "prospecting" for sales (Exh. 1, p. 246).

---

[1]      Ms. Martin further testified that in some markets, notably Texas, the in-store bankers got aggressive in leaving the actual supermarket premises to canvas in the surrounding neighborhoods. Texas, however, was one of the two markets where the NationsBank personnel on the premises of the supermarkets were actually classified as consumer bankers rather than as in-store bankers (Exh. 1, p. 243-244). As to the in-store bankers generally leaving the premises, Ms. Martin testified that this was "a desire" although she had no idea as to how often it actually occurred (Exh. 1, p. 245).

The Court will recall that sales is exactly what the job of the consumer banker is
(Exh. 2, p. 32). The only distinction between consumer bankers and in-store bankers is
that the former does the job within an actual banking center, usually with an established
customer base, and the latter does the job in a designated section of a supermarket with
more cold selling. The fact is, as Jill Borsky, a Florida personnel manager, stated:

> Consumer bankers are responsible for selling the bank
> products, all products including loans, checking accounts,
> make referrals to other lines of business.

(Exh. 2, p. 32). The environmental differences between the in-store bankers and the
consumer bankers, then, are meaningless in terms of the actual work which they perform,
and that work is identical to that performed by consumer bankers in the banking centers
--sales. This point is driven home when it is considered that the NationsBank employees
who sell the Bank's products in supermarket locations in Georgia and Texas are, and have
always been, classified as consumer bankers, and the others as in-store bankers.

Accordingly, Defendant was clearly obligated to provide the Plaintiffs with
information responsive to their discovery requests which pertained to the in-store bankers
as well as the consumer bankers. Defendant's failure to do so has in fact prejudiced the
rights of the in-store bankers who should have been notified of their eligibility to opt in as
plaintiffs in this litigation,[2] but because of Defendant's conduct were in fact precluded from

---

[2]    It is no answer to say, as Defendant does here, that the in-store bankers
could simply file their own claim. In fact, a separate lawsuit has been filed by Plaintiff
María Periman as a representative of the in-store bankers. This measure was taken in
an abundance of caution for two reasons: 1) the time is quickly running on the
notification and opt-in period which could potentially foreclose action by the in-store
bankers if they delay in litigating until the Court rules upon these Motions; and 2) each
day that passes is another day lost on the statute of limitations for the in-store bankers.
Obviously, it would facilitate the judicial economy, and help control the costs and
attorney expenses, if the in-store bankers were included in the consumer bankers'
lawsuit. This makes even more sense when it is considered that those NationsBank

doing so. Defendant cannot be permitted to profit from its own wrongdoing.

Second, Defendant overlooks the fact that, on top of failing to reveal the existence of the in-store bankers or providing any discovery as to them, Defendant also provided Plaintiffs with an incomplete list of consumer banker opt-ins. That omission cost approximately 100 potentially eligible opt-ins at least two months' time from the notification period. Even more importantly, Defendant's conduct has given Plaintiffs justifiable reasons to be skeptical as to the accuracy and thoroughness of Defendant's disclosures to date. To that end, the Plaintiffs, in an abundance of caution, have embarked upon a course of additional discovery designed to reveal the underlying evidence in support of Defendant's disclosures, particularly the names of all of the consumer bankers. To that end, Plaintiffs have requested information as to the electronic data bases in which the Defendant stores personnel information on the consumer bankers (and the in-store bankers), and have noticed an inspection of the actual computer system and data bases themselves by an expert. The reason for taking these drastic steps is nothing other than Defendant's failure to produce accurate and complete information the first time. If the Plaintiffs are to be held to the current deadline for notification and opting in, then obviously the time for providing responses for discovery must be dramatically shortened, particularly when objections and motions to compel can reasonably be anticipated. On the other hand, extending the time for notification and opting in alleviates this problem, at least to a degree.[3] Again, Defendant should not be permitted to gain by its own wrongdoing.

_____

employees working at supermarkets in Texas and Georgia are in fact included in the consumer bankers' suit as they are classified as such.

[3]    Once again, it is no answer to contend, as Defendant does here, that the notification and opt-in period should be extended, if at all, only for the newly disclosed names and the in-store bankers if the Court should rule that the latter were wrongfully

WHEREFORE, Plaintiffs BEVERLY LEVINE *et al* respectfully request that this Honorable Court grant their Motions, and enter an Order as follows:

1.   Shortening the time within which Defendant may respond to the Plaintiffs' Request for Inspection to ten (10) days;

2.   Extending the time for eligible employees to opt-in to this litigation for sixty (60) days;

3.   Sanctioning the Defendant, including, if the Court deems it appropriate, awarding to the Plaintiffs their expenses incurred as a result of the Defendant's failure to fully and completely disclose the names of potential opt-ins, including, but not limited to, in-store bankers, including reasonable attorney's fees; and

4.   Taking such other and further action as this Court shall deem just and proper in the premises.

---

excluded. This contention does not account for the review of the disclosures which Defendant has already made, and which Plaintiffs must undertake when they receive the latest requested discovery, in order to confirm the accuracy and completeness of those disclosures.

WE HEREBY CERTIFY that a true and correct copy of the foregoing was sent via

U.S. Mail to: Michael T. Burke, Esq., Johnson, Anselmo et al., 790 East Broward

Boulevard, Suite 400, Fort Lauderdale, Florida 33303-0220 and Richard F. Kane, Esq.,

McGuire, Woods, Battle & Boothe, 3700 NationsBank Plaza, Charlotte, NC 28280, this

$25$ day of November, 1998.

> MUCHNICK, WASSERMAN & DOLIN
> Attorneys for Plaintiffs
> 4000 Hollywood Boulevard, Suite 620 North
> Hollywood, Florida 33021
> (954) 989-8100 Broward
> (954) 989-8700 Fax
>
> By: _____
>
> SUSAN L. DOLIN, Esq.
> Fla. Bar No.: 708690
> DANIEL R. LEVINE, Esq.
> Fla. Bar No.: 0057861
>
> and
>
> Gary Harris, Esq.
> Caryl Boies, Esq.
> BOIES & SCHILLER L.L.P.
> 390 North Orange Ave., Ste. 1890
> Orlando, Florida 32801

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 98-6306-CIV-DIMITROULEAS

BEVERLY LEVINE, et al.,
on behalf of themselves and all                              Magistrate Judge Johnson
others similarly situated,

      Plaintiffs,

vs.

NATIONSBANK, N.A.,
a national association,

      Defendant.

_____/

```
FILED by _____ D.C.

    SEP 2 3 1999

   C. ....  ...  ...E
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI
```

## OMNIBUS ORDER

    THIS CAUSE came before the Court upon the following motions:

1.    Plaintiffs' Motion to Shorten the Time for Compliance with Discovery [DE 677-1] and to
    Extend the Time of Notice Period [DE 677-2];

2.    Plaintiffs' Second Motion to Shorten the Time for Compliance with Discovery [DE 768-1],
    to extend time of notice period [DE 768-2] and for sanctions [DE 768-3];

3.    Defendant's Motion to Impose Sanctions [DE 1551-1], for corrective action [DE 1551-2],
    and for hearing on this motion [DE 1552];

4.    Plaintiffs' Motion for Extension of Notice Period [DE 1553];

5.    Defendant's Motion for Hearing [DE 1577] on Plaintiff's Motion to Compel;

6.    Plaintiffs' Motions for Status Conference [DE 1577, 1612];

7.    Plaintiffs' Objections and Appeal [DE 1582] of the Magistrate Judge's Order on Motion
    to Compel;

8.    Defendant's Motion to File Motion to Decertify Collective Action [DE 1585];



EXHIBIT

_H_

9.    Defendant's Motion for Admission Pro Hac Vice [DE 1590];

10.   Defendant's Motion to Amend Scheduling Order [DE 1619];

11.   Defendant's Appeal [DE 1621] of Magistrate Judge's Order of June 17, 1999 [DE 1616];

12.   Defendant's Appeal [DE 1633-1] of Magistrate Judge's Order of July 28, 1999 [DE
      1629]; and,

13.   Defendant's Motion to Stay Enforcement [DE 1633-2] of Magistrate Judge's Order of
      July 28, 1999.

      The Court has carefully considered all of these motions, and the entire file herein, and is

otherwise fully advised in the premises. The Court regrets the delay in resolving these motions.

## I. BACKGROUND

      Plaintiffs' second amended complaint asserts a claim for unpaid overtime under the Fair

Labor Standards Act, 29 U.S.C. §216, ("FLSA") for employees who were employed as

Consumer Bankers II, III or IV for defendant Nationsbank during a certain period.  On

September 1, 1998, this Court entered an order allowing notification of potential class members

pursuant to the FLSA and Dybach v. State of Florida Dep't of Corrections, 942 F.2d 1562 (11th

Cir. 1991) ("concluding that the 'broad remedial purpose of the Act' is best served if the district

court is deemed to have the power to give such notice to other potential members of the plaintiff

class to 'opt-in' if they so desire and by the district court's exercise of that power under

appropriate conditions.").  In addition, after input from the parties, the Court specified the

particular notice form to be sent to potential class members.  Shortly after the Court allowed

notification and ordered Defendant to provide name and address information of potential class

members to Plaintiffs, disputes arose over such notification.

      Plaintiffs have alleged that Defendant delayed disclosure of certain categories of potential

2

class members to hinder those potential class members from opting in to the class prior to the
deadline set by the Court. Consequently, Plaintiffs moved for an extension of the notice period.
The Defendant alleges that Plaintiffs then unilaterally sent a "Second Notice" to potential class
members without Court approval, and have sought sanctions and corrective action for this
Second Notice, alleging that an additional 500 or so individuals opted in to this litigation after
receiving the Second Notice. Defendant also has moved to extend its deadline to file a motion to
decertify the class, and to amend the scheduling order in this case.

While these disputes over the notification were ongoing, various discovery motions were
ruled upon by the Magistrate Judge. These rulings included the denial of part of Plaintiff's
motion to compel certain information from Defendant, the granting of Plaintiffs' motion for
protective order as to discovery from opt-in plaintiffs, and the granting of Plaintiffs' motion for
removal from the Court file of certain inadvertently filed privileged information by some opt-in
plaintiffs. These three rulings have been appealed by one or the other party to the undersigned,
and will be addressed herein.

## II. DISCUSSION

### A. In-Store Bankers

After an extensive review of the various motions pertaining to the notification process in
this case (motions 1, 2, 3, and 4 listed above), the Court concludes that the potential plaintiffs
who were "in-store bankers" should be part of a separate lawsuit, rather than combined with the
Consumer Bankers II, III, and IV that are involved in the instant case. While Plaintiffs make a
strong argument that the duties of In-Store Bankers and Consumer Bankers are similar, those
duties are performed in a different environment, thus bolstering the argument of Defendant that
the positions are not similarly situated for purposes of the FLSA. Moreover, the severance of

3

consumer bankers and in-store bankers will result in more efficient trials on the merits, if necessary, in each case.[1] Accordingly, Plaintiff's first Motion to Shorten Time for Compliance [DE 677-1] is thereby denied.

## B. The Notification Process

Plaintiffs have moved to shorten the time period for discovery for Nationsbank to disclose all potential class members and to extend the opt-in time period due to their assertions that Nationsbank did not timely disclose all potential class members. Nationsbank concedes that about 117 names were disclosed after the deadline set by the Court and has no objection to a brief extension for those individuals. Again, after reviewing the entire record, the Court will exercise its discretion under its "broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and the parties," and deny Plaintiff's motion to shorten the time for compliance. Hoffman-La Roche, Inc. v. Sperling, 110 S.Ct. 482, 486-87 (1989). However, the Court grants Plaintiffs' motions to extend the deadline for all potential class members to March 31, 1999.[2] Id. Thus, all opt-in plaintiffs who have filed their consents prior to March 31, 1999 will be deemed to be members of the class for this action, subject, of course, to any future motion to decertify the class.[3]

With regard to the competing motions for sanctions, Plaintiffs' motion for sanctions for

---

[1] The Court notes that in fact, a separate lawsuit by an In-Store Banker plaintiff, Perlman v. Nationsbank (98-CIV-8805-DIMITROULEAS), is pending before this Court.

[2] The Court file contains only five consents filed after March 31, 1999. See docket entries 1592 (Janice McGee), 1593 (David Samples), 1599 (Jason Wright), 1625 (Patricia Gregg), and 1632 (Janus G. Adams).

[3] Rather then create two or three different deadlines depending upon when Defendant supplemented the disclosure of names and addresses of potential class members, the Court extends the deadline for all potential class members.

4

Defendant's alleged failure to fully disclose potential class members with current address information, and Defendant's motion for sanctions because Plaintiffs' counsel sent an additional notice to potential class members without Court approval, the Court will deny both motions.

The Court concludes that Nationsbank's actions with regard to compliance with this Court's order of September 1, 1998 to turn over to Plaintiff the lists of potential class members is not sanctionable, beyond the Court's extension of the time period for all potential class members to March 31, 1999. Such an extension cures much of the alleged prejudice to Plaintiffs from Defendant's actions with regard to disclosure of current addresses.

With regard to Plaintiffs' counsel's mailing of a unilateral second notice to potential class members, while it would have been preferable to obtain prior court approval, under the circumstances of this case, given that Plaintiff had two pending motions before the Court at that time seeking relief regarding the notification process, and given Plaintiffs' frustration at the supplemental disclosure by Defendants of additional names,[4] the Court will not sanction Plaintiff's conduct. The unilateral "second notice" sent by Plaintiffs counsel is not deceptive and is factually accurate (943 consents is "approximately 1,000," and individual Plaintiffs do not need to present their own records of overtime, although obviously such contemporaneous records provide more weight towards meeting Plaintiffs' burden of proof than simple memory or oral testimony).

## C. Appeals of Magistrate Judge's Orders

Turning now to the parties' various appeals of certain discovery orders issued by the

---

[4] The Court does not imply any wilful conduct on the part of Defendants to hinder notification. In fact, Defendants had a continuing duty to supplement such disclosures. The Court did not impose sanctions upon Defendants, although it is granting Plaintiffs relief in extending the opt-in deadline for all respondents.

Magistrate Judges in this case,<sup>5</sup> the Court will overrule all objections and affirm the three discovery orders. Pursuant to 28 U.S.C. § 636(b)(1)(A), Magistrate Judges may decide non-dispositive motions. Upon objection by a party, the District Court may reconsider any pretrial matter where it has been shown that the Magistrate Judge's order is "clearly erroneous or contrary to law." See 28 U.S.C. § 636(b)(1); Massey v. United Transp. Union, 868 F. Supp. 1385, 1388 (S.D.Ga.1994) (stating that a magistrate judge's order will be set aside when clearly erroneous or contrary to law), aff'd, 65 F.3d 183 (11th Cir.1995). Accordingly, unless the Magistrate Judges' determinations with respect to the discovery matters at issue were clearly erroneous, or contrary to law, those determinations shall not be disturbed.

As to Plaintiff's appeal of Magistrate Judge Bandstra's order denying in part Plaintiff's motion to compel, the Court finds that the order was not clearly erroneous or contrary to law. The Court agrees with Judge Bandstra's conclusions as stated in his order. In addition, given this Court's extension of the deadline for consents to March 31, 1999, and given this Court's conclusion that in-store bankers should be severed to the other pending lawsuit, Magistrate Judge Bandstra's conclusions that relate to these two issues are further supported.

Next, Defendant appealed Judge Johnson's Order [DE 1616] denying Defendant's motion to compel discovery from opt-in plaintiffs. Upon a de novo review, this Court agrees with the legal conclusions of Judge Johnson that Defendants have not shown a particularized need for the information requested from opt-in plaintiffs, particularly since Defendant should have this information in its files. Cox v. American Cast Iron Pipe Company, 784 F.2d 1546, 1555-57

---

<sup>5</sup> The first order [DE 1576] was issued by Magistrate Judge Bandstra. The Magistrate Judge assignment was subsequently changed pursuant to Administrative Order 99-27 (affecting the entire Southern District and not just this Judge or this case), and Magistrate Judge Johnson issued the other two discovery orders on appeal to the undersigned [DE's 1616 and 1629].

6

(11th Cir.), *cert. denied*, 107 S.Ct. 274 (1986).

Finally, Defendant also appealed Judge Johnson's Order [DE 1629] denying Defendant's
Motion to Compel and granting Plaintiffs' Motion to Remove Privileged Documents from the
court file. These motions concern the inadvertent filing with the Court by opt-in plaintiffs of
questionnaires sent to plaintiffs by plaintiffs' counsel. The Defendants sought to compel
disclosure of all documents sent by Plaintiffs' counsel to plaintiffs and potential plaintiffs, while
Plaintiffs seek removal from the Court file of these questionnaires. Judge Johnson's lengthy 19
page opinion expertly describes this dispute and the various legal theories and factors a Court
may use to decide these issues. Judge Johnson concluded the attorney-client privilege protects
the information sent by counsel to plaintiffs, while that privilege was not waived by the
inadvertent filing with the Court of some of that information.

Upon a de novo review of the legal issues, the Court agrees with Judge Johnson's legal
conclusions raised by these motions. Accordingly, Defendant's appeal is overruled and the
motion to stay enforcement is denied. Upon this Court's de novo review of the Court file, at
least the following docket entries shall be removed from the file: 763, 767, 770, 771, 772, 779,
963, 964, 1526, 1529, 1544, 1545, 1583, and 1584.[6] Plaintiff's counsel may pick up and sign for
these documents at the Clerk's office in Fort Lauderdale.[7] Any docket entries completely
removed will be replaced by a single sheet of paper noting the docket number and stating that
this docket entry was removed per Court order. In addition, pursuant to Judge Johnson's Order,

---

[6] If a consent has been filed with the same docket entry as the questionnaire, then the
consent would remain on file and only the questionnaire removed.

[7] Plaintiff's counsel should wait a few days to allow the Clerk's office time to remove the
documents.

7

Defendant shall return to Plaintiffs' counsel all such privileged documents, and any copies thereof, currently in Defendant's possession within ten (10) days from the date hereof.

### D. Future Deadlines

As for how to proceed in this case from this point forward given the above rulings, the parties shall attend the previous scheduled calendar call in this case, set for 10:00am, tomorrow, Setpember 24, 1999. The Court grants Defendant's motions to extend time to file a motion to decertify collective action and to amend the scheduling order, with the precise timetable for the motion, any remaining discovery, summary judgment deadline, and trial schedule to be decided at time of tomorrow morning's status conference. Out-of-state counsel wishing to appear by telephone may contact chambers at 954-769-5650 to state their need to appear by telephone.

### III. CONCLUSION

Accordingly, for the reasons expressed above, it is **ORDERED AND ADJUDGED** as follows:

1.  Plaintiffs' Motion to Shorten the Time for Compliance with Discovery [DE 677-1] and to Extend the Time of Notice Period [DE 677-2] is hereby **DENIED**;

2.  Plaintiffs' Second Motion to Shorten the Time for Compliance with Discovery [DE 768-1] and for Sanctions [DE 768-3] is hereby **DENIED**;

3.  Plaintiffs' Second Motion to extend time of notice period [DE 768-2] is hereby **GRANTED** for all opt-in plaintiffs through March 31, 1999;

4.  Defendant's Motion to Impose Sanctions [DE 1551-1], for corrective action [DE 1551-2], and for hearing on this motion [DE 1552] is hereby **DENIED**;

5.  Plaintiffs' Motion for Extension of Notice Period [DE 1553] is hereby **GRANTED** for all opt-in plaintiffs through March 31, 1999;

8

6.    Plaintiffs' Motions for Status Conference [DE 1577, 1612] are hereby **DENIED**;

7.    Defendant's Motion for Hearing [DE 1560] is hereby **DENIED** as moot as the Magistrate

      Judge issued a ruling on that motion [DE 1576].

8.    Plaintiffs' Objections and Appeal [DE 1582] of Magistrate Judge Bandstra's Order [DE

      1576] is hereby **OVERRULED**, and the Magistrate Judge's Order is **AFFIRMED**;

9.    Defendant's Motion to File Motion to Decertify Collective Action [DE 1585] is hereby

      **GRANTED** in part. At tomorrow's status conference, the Court will determine the

      remaining schedule in this case;

10.   Defendant's Motion for Admission Pro Hac Vice [DE 1590] to permit a limited

      appearance by Bruce M. Steen is hereby **GRANTED**;

11.   Defendant's Motion to Amend Scheduling Order [DE 1619] is hereby **GRANTED**. At

      tomorrow's status conference, the Court will determine the remaining schedule in this

      case;

12.   Defendant's Appeal [DE 1621] of Magistrate Judge's Order of June 17, 1999 [DE 1616]

      is hereby **OVERRULED**, and the Magistrate Judge's Order is **AFFIRMED**;

13.   Defendant's Appeal [DE 1633-1] of Magistrate Judge's Order of July 28, 1999

      [DE 1629] is hereby **OVERRULED**, and the Magistrate Judge's Order is **AFFIRMED**;

14.   Defendant's Motion to Stay Enforcement [DE 1633-2] of Magistrate Judge's Order of

      July 28, 1999 is hereby **DENIED**;

15.   The calendar call scheduled for 10:00am, tomorrow, September 24, 1999, shall be a

9

status conference to reset the deadlines left in this case.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida,

this _____ day of September, 1999.

WILLIAM P. DIMITROULEAS
United States District Judge

copies furnished to:

Daniel R. Levine, Esq./Susan Dolin, Esq. (fax to 954-989-8700)
Caryl L. Boise, Esq./Gary K. Harris, Esq. (fax to 954-929-1185)
Michael T. Burke, Esq. (fax to 954-463-2444)
Richard F. Kane, Esq./John Smith, Esq. (fax to 704-373-8990)
Bruce Steen, Esq. (fax to 804-980-2271)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 98-8805-CIV-DIMITROULEAS

MARLA PERLMAN,
on behalf of herself and
all others similarly situated,

Plaintiff,

vs.



NATIONSBANK, N.A.,
a national association

Defendant.
_____/

## PLAINTIFF'S MOTION TO ALLOW NATIONWIDE NOTIFICATION TO POTENTIAL CLASS MEMBERS PURSUANT TO 29 U.S.C. § 216(b) AND INCORPORATED MEMORANDUM OF LAW

COMES NOW the Plaintiff, MARLA PERLMAN, on behalf of herself and all others similarly situated, by and through her undersigned counsel, and hereby moves this Honorable Court for an Order authorizing nationwide notification to all potential class members in this action and, in support of her Motion states as follows:

1.     As the Court is aware, this is an action seeking unpaid overtime compensation pursuant to the Fair Labor Standards Act ("FLSA"). Plaintiff was employed by Defendant as an "In-Store Banker," a position which Plaintiff alleges was misclassified as "exempt" for purposes of the overtime requirements of the FLSA. As will be shown, the position of In-Store Banker is substantially equivalent to the position of "Consumer Banker." As the Court knows, the issue of whether Defendant misclassified the positions of Consumer Banker II, III, and IV as exempt under the FLSA is the subject of the litigation styled *Beverly Levine, et. al. v. NationsBank, N.A.*, Case No. 98-6306-CIV-DIMITROULEAS.

2.     The FLSA, at 29 U.S.C. § 216(b), provides that an action for unpaid overtime



EXHIBIT
I

compensation may be maintained by "...any one or more employees for and on behalf of [themselves]...and other employees similarly situated."

3.    The Complaint in the instant action alleges that Plaintiff, as well as other similarly situated employees, have been damaged as a result of Defendant's failure to properly compensate Plaintiff and such other similarly situated employees for all hours worked by them, in violation of the Fair Labor Standards Act, 29 U.S.C. §201, et seq. (hereinafter referred to as "FLSA").

4.    Plaintiff will serve upon Defendant an interrogatory requesting the name, address and phone number of all current and former In-Store Bankers nationwide similarly situated to the Plaintiff and not paid overtime, and who were employed on or after November 10, 1995, three (3) years prior to the filing of the instant lawsuit.

5.    Each improperly classified (and therefore improperly paid) employee who performed services for Defendant on or after November 10, 1995, is entitled to notification of the pendency of this action and of his/her right to consent to becoming a party to this action.  29 U.S.C. §216(b).

6.    The form of notification Plaintiffs propose to provide is in the form of Exhibit "1", a copy of which is attached hereto.

7.    The notification to potential class members as requested herein (and in the form of Exhibit "1") is the only practical and efficient method of notifying all similarly situated current and former employees of the pendency of this action and of their opt-in rights under the FLSA.

WHEREFORE, Plaintiff moves for entry of an Order permitting nationwide notification to all potential class members of the pendency of this action and of their statutory right to opt-in to this action and to become a party to such action in the form of Exhibit "1" attached hereto.

2

## MEMORANDUM OF LAW

### A.   THE INSTANT ACTION IS MAINTAINED PURSUANT TO 29 U.S.C. §216(b).

The FLSA specifically authorizes a party plaintiff to maintain an action on behalf of

herself and those similarly situated to her. 29 U.S.C. §216(b). 29 U.S.C. §216(b) provides,

in pertinent part:

> an action to recover liability... may be maintained against any
> employer...by any one or more employees for and on behalf of
> ...themselves and other employees similarly situated.  No
> employee shall be a party plaintiff to any such action unless
> she gives her consent in writing to become such party and
> such consent is filed in the court in which such action is
> brought.

The instant action is such an action.  Plaintiff has alleged that she and all others similarly

situated to her, to-wit, former and current In-Store Bankers throughout the NATIONSBANK

system nationwide who were misclassified as exempt by Defendant, were subject to a

payroll policy, practice and procedure transgressing the requirements of the FLSA.

### B.   NATURE OF COLLECTIVE ACTION UNDER THE FLSA

29 U.S.C. §216(b) is a *collective* action provision created by statute, independent

of and unrelated to the *class* action covered by Fed. R. Civ. P. 23. *See LaChappell v.*

*Owens-Illinois, Inc.,* 513 F.2d 286, 289 (5th Cir. 1975) (*per curiam*).

In *LaChappell,* the Fifth Circuit Court of Appeals specifically recognized that Fed.

R. Civ. P. 23 and 29 U.S.C. §216(b) are "mutually exclusive" and "irreconcilable".

*LaChappell,* 513 F.2d at 289. This is because of the "opt-in" nature of 29 U.S.C. §216(b)

and "opt-out" nature of Rule 23.  *Id.*  In opt-in actions, potential class members need

considerably less protection since they are not bound by the outcome of the action unless

they specifically opt-in.  Conversely, in opt-out actions, potential class members are bound

by the outcome of the action.  Thus, more stringent protections are necessary for Rule 23

class members.  *Schmit v. Fuller Brush Co.,* 527 F.2d 532, 536 (8th Cir. 1975); *Church v.*

3

*Consolidated Freightways, Inc.,* 137 F.R.D. 294 (N.D. Cal. 1991); *Garner v. G.D. Searle,* 802 F. Supp. 418, 421 (N.D. Ala. 1991).

### C.    PLAINTIFFS HAVE DEFINED THE POTENTIAL CLASS WITH ADEQUATE SPECIFICITY, TO-WIT, ALL CURRENT AND FORMER IN-STORE BANKERS NATIONWIDE WHO WERE CLASSIFIED AS EXEMPT.

For purposes of defining a class pursuant to 29 U.S. C. §216(b), Plaintiff need only demonstrate that the defined class is comprised of current and former employees who are similarly situated to Plaintiff with regard to Defendant's payroll policy, practice and procedure, and who may desire to opt-in to this lawsuit if given notice. 29 U.S.C. §216(b); *Dybach v. State of Florida Department of Corrections,* 942 F.2d 1562 (11th Cir. 1991). There is no requirement of "strict symmetry" or "absolute identity"; rather, potential class members must meet only a "sufficiently similar" standard. *Glass v. IDS Financial Services, Inc.,* 778 F. Supp. 1029, 1081 (D. Minn. 1991) (an allegation that a single decision, policy or plan precipitated the challenged action was sufficient to define the class); *Heagney v. European American Bank,* 122 F.R.D. 125, 127 (E.D.N.Y. 1988) (plaintiffs need not be identically situated to potential class members).

In *Church,* a single decision, policy or plan was again sufficient for employees affected thereby to constitute a 29 U.S.C. § 216(b) class. *Church,* 137 F.R.D. at 306. The court specifically noted that the strict class definitional and numerical requirements of Rule 23 are not necessary in § 216(b) actions. *Id.* The court then specifically addressed the applicability of each of the Rule 23 requirements. With respect to the requirements of commonality and typicality, the court held that:

> ...the better view is that a class claim is not defeated simply because the proposed classes performed a variety of different jobs at different locations, reported to different supervisors or left employment for different reasons than the named plaintiffs. What governs the scope of the class is whether the named plaintiffs and his class members were all affected by a similar plan infected by discrimination. The plaintiffs need not be

4

identically situated to potential class members. *Id* at 308.

The Plaintiff has sufficiently alleged the class – all current or former In-Store Bankers nationwide who were classified by Defendant as exempt, and thus not paid overtime, and employed by Defendant within the three years prior to the filing of the lawsuit. This class was adversely affected by a single decision, policy or plan of Defendant. *See* Complaint. In fact, the alleged payroll policy, practice and procedure of Defendant affects all current and former In-Store Bankers nationwide who are and were being misclassified as exempt in the same manner as Plaintiff was affected. The fact that many employees who elect to opt-in to this action may have had or have a different (i) rate of pay or (ii) number of overtime hours, does not in any way affect the similarity of their positions. *Id.* at 308. It was, after all, Defendant's policy, practice and procedure of intentionally misclassifying these employees as exempt that precipitated this action.

## D.    THE COURT SHOULD FACILITATE NOTICE TO ALL POTENTIAL PLAINTIFFS.

In *Hoffman-La Roche, Inc. v. Sperling*, 483 U.S. 465, 468 (1989), the United States Supreme Court held:

> ...a district court has both a duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and the parties.

It is this "duty" and "broad authority" that Plaintiffs request this Honorable Court exercise with respect to the notification of the affected class – all In-Store Bankers who were intentionally misclassified as exempt, and employed by Defendant within the three years prior to the filing of the instant action. In actions such as this, the exercise of such authority is "inevitable". *Id* at 487.

Congress has clearly stated its policy supporting collective actions. In *Hoffman-La Roche*, the Supreme Court noted:

> Congress has stated its policy that ADEA plaintiffs should have

5

> the opportunity to proceed collectively. A collective action allows age discrimination plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. *Id* at 486.[1]

Collective actions serve the dual interests of justice and efficient case management. *Id.* Plaintiff, Defendant, and this Court would benefit through avoiding a multiplicity of duplicative suits, expediting the disposition of this action and reducing the attorneys' fees, costs and expenses associated with each affected individual having to pursue his or her own action. *Id.*

Judicial intervention at an early stage ensures timely, accurate and informative disclosure to all similarly situated employees. *Id.* Such disclosure will expedite the instant action by apprising Defendant as to the identity of all claimants at the earliest possible time. Since the Court's involvement in the notification process is "inevitable", it should occur prior to the notification of class members and the filing of a significant number of notices of consent. *Id.*

In the absence of a court-authorized notification to all similarly situated employees, those employees would in all likelihood (i) not receive timely, complete and accurate information as to the pendency of this action, (ii) lack meaningful access to the court, and (iii) have no practical or efficient method of vindicating their rights. *Riojas v. Seal Products, Inc.,* 82 F.R.D. 613 (S.D. Tex. 1979) (providing notice was required through notions of fundamental fairness).

The current and former employees of Defendant who are and/or were similarly situated to Plaintiff are those In-Store Bankers who were classified as exempt by the Defendant for overtime hours worked, and who were employed at any time after three years preceding the filing of the instant suit. Individually, these employees have little or no

---

[1]    29 U.S.C. §216(b) applies equally to actions arising under the FLSA and actions arising under the ADEA.

6

(i) access to counsel, (ii) knowledge of the relevant terms and provisions of the FLSA or (iii) funds to finance a lawsuit seeking his/her legally required wages. To deny notice to these individuals is tantamount to rewarding Defendant for its failure to compensate them in accordance with the FLSA since the claims of these individuals in all likelihood would never be pursued for a number of reasons, not the least of which is the expiration of the statute of limitations (29 U.S.C. § 255). In fact, each day that passes without these individuals filing their notice of consent is a windfall to Defendant because one more day of uncompensated hours is legally forfeited. In *Geller v. Markham,* 19 F.E.P. Cases 622, 623 (D. Conn. 1979), a showing that the similarly situated employees were not aware of the pendency of the action was sufficient to authorize notice.

As Judge Haight aptly recognized in *Allen v. Marshall Field & Co.,* 93 F.R.D. 438, 443 (N.D. Ill. 1982):

> to deny class treatment would be tantamount to declaring that any employer can escape ADEA class liability so long as it discriminates against a diverse group of people over a wide geographic range in a number of ways, such as termination, salary, promotions, and working conditions.

The reasoning of Judge Haight was quite correctly followed by Judge Jansen in *Church,* 137 F.R.D. at 309, and Judge Dearie in *Heagney,* 122 F.R.D. at 127. Imposing the strict class action requirements of Fed. R. Civ. P. 23 to the instant actions is certainly counter to both the remedial nature of the FLSA and the congressional policy of allowing collective actions to recover overtime compensation. *Braunstein,* 600 F.2d at 336; *Bean v. Crocker Nat'l Bank,* 600 F.2d 754, 759 (9th Cir. 1979).

### E.    OTHER INDIVIDUALS HAVE ALREADY CONSENTED TO OPT-IN TO THIS LITIGATION.

On or about December 24, 1998, Rafael Pabon caused to be filed his Consent to Become a Party Plaintiff pursuant to 29 U.S.C. §216(b) and opted-in to the instant litigation. Subsequently, on or about July 13, 1999, Traci Ratcliff caused to be filed her

7

Consent to Become a Party Plaintiff pursuant to 29 U.S.C. §216(b) and also opted-in to the instant action.

Plaintiff, MARLA PERLMAN, was employed as an In-Store Banker at Defendant's Delray Beach, Florida In-Store banking center. *See* deposition of MARLA PERLMAN attached hereto as Exhibit "2." Opt-in Plaintiff Rafael Pabon was employed as an In-Store Banker at a Winn-Dixie supermarket located in Vero Beach, Florida. *See* deposition of RAFAEL PABON attached hereto as Exhibit "3." Opt-in Plaintiff Traci Ratcliff was employed as an In-Store Banker at a Winn-Dixie supermarket located in Jacksonville, Florida. *See* Affidavit of Traci Ratcliff attached hereto as Exhibit "4."[2]

### F.   JUST AS THIS COURT GRANTED A MOTION TO NOTIFY IN *LEVINE V. NATIONSBANK, N.A.*, THE INSTANT MOTION SHOULD SIMILARLY BE GRANTED.

On or about September 2, 1998, this Court entered an Omnibus Order in *Levine v. NationsBank, N.A., inter alia,* granting the *Levine* Plaintiffs' Motion to Allow Notification. This Court held that the *Levine* Plaintiffs had demonstrated the requirements for notification as delineated in *Dybach v. State of Fla. Dept. of Corrections,* 942 F.2d 1562, 1567-68 (11th Cir. 1991), to wit, the existence of other employees who desire to "opt-in" and who are "similarly situated" with respect to their job requirements and with regard to their pay provisions.

These same requirements are met in the case *sub judice.* In fact, "In-Store Bankers" are essentially "Consumer Bankers" who work in a mini-banking center contained within a supermarket. In the course of the *Levine* litigation, the *Levine* Plaintiffs deposed Ellen Martin, Defendant's project manager in charge of strategic initiatives for the

---

[2]     It is clear that Plaintiff has established that there are other individuals who may desire to opt-in to this action if given notice. *See* Exhibit "4." Moreover, the response to the notification in *Levine,* where more than 1,600 individuals have elected to opt-in, demonstrates that current and former NationsBank employees are very interested in receiving notice of overtime litigation and consenting to opt-in.

consumer bank. A copy of relevant excerpts from her deposition is attached hereto as Exhibit "5." More specifically, Ms. Martin was involved in implementing NationsBank's "In-Store" program. See Exhibit "5," p. 8. Ms. Martin testified that, in Texas and Georgia, "In-Store Bankers" are actually titled, for NationsBank purposes, "Consumer Bankers." Exhibit "5," pp. 230-231.[3] Moreover, when NationsBank "inherited" in-store bankers from certain other banks which NationsBank had purchased or merged with, NationsBank initially titled them as "Consumer Bankers" until the "In-Store Banker" designation was created. Exhibit "5," pp. 234. Finally, there can be no doubt that the "In-Store Bankers" were subject to the same company-wide payroll practices as the "Consumer Bankers" in Levine: **Both** the Consumer Banker positions implicated in Levine **and** the In-Store Bankers here were both re-classified as "non-exempt" for purposes of the overtime provisions of the FLSA at the exact same time, in or about December, 1997. Exhibit "5," pp. 232, 250.[4]

---

[3]     Thus, NationBank's in-store bankers in Texas and Georgia have already been provided notice of the Levine litigation and their right to opt-in to that suit, inasmuch as NationsBank titled them and referred to them internally as "Consumer Bankers." It would be patently absurd for these individuals in Texas and Georgia, who worked in supermarkets, to be permitted to receive notice of the Levine litigation while at the same time preventing notice of the instant litigation to be provided to all other "in-store bankers" who also worked in supermarkets and were actually titled "In-Store Bankers" by NationsBank.

[4]     Plaintiff has been hindered in her discovery efforts. Specifically, although Magistrate Judge Johnson ordered Defendant to identify the other In-Store Bankers at the same locations where PERLMAN and PABON worked, Plaintiff and her counsel were forbidden from contacting these individuals. Thus, Plaintiff has attempted to depose these persons, and, to date has deposed Geoffrey J. Grosso and Arlene T. Mendez-Nouel. These individuals testified that, although they were employed as In-Store Bankers, they were classified as non-exempt and are thus not similarly situated to Plaintiff. However, even if notice of this lawsuit ends up being sent to individuals not similarly situated to Plaintiff (as a result of being classified as non-exempt), and such individuals then choose to opt-in to this litigation, Defendant would certainly be in the position to realize that inappropriate persons have opted-in and could request that they be removed as opt-in Plaintiffs. Of course, Plaintiff would have no objection to such a properly-based request. At this point, Plaintiff has no way of knowing which In-Store

9

## CONCLUSION

Based on the foregoing, all current and former In-Store Bankers throughout the NATIONSBANK system nationwide who were intentionally misclassified as exempt and employed by Defendant within the three year period prior to the filing of this lawsuit should be provided notification of the pendency of this action and of their right to opt-into this action should they file a notice of consent with the clerk of this court.

Respectfully submitted,

MUCHNICK, WASSERMAN & DOLIN
Attorneys for Plaintiff
4000 Hollywood Boulevard, Suite 620 North
Hollywood, FL 33021
(954) 989-8100 / (305) 624-9100
(954) 989-8700 - Fax

By
DANIEL R. LEVINE, Esq.
Fla. Bar No. 0057861

---

Bankers are or were classified as exempt or non-exempt, and submits that nationwide notification should be sent to *all* current and former In-Store Bankers nationwide, leaving the question of which persons are properly admitted as opt-in Plaintiffs for another day.

10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via U.S. Mail this $\underline{4^{th}}$ day of November, 1999, to: Michael T. Burke, Esq., Johnson, Anselmo et al., 790 East Broward Boulevard, Suite 400, Fort Lauderdale, Florida 33303-0220 and Richard F. Kane, Esq., McGuire, Woods, Battle & Boothe, 3700 NationsBank Plaza, Charlotte, NC 28280.

Respectfully submitted,

MUCHNICK, WASSERMAN & DOLIN
Attorneys for Plaintiff
4000 Hollywood Boulevard, Suite 620 North
Hollywood, FL 33021
(954) 989-8100 / (305) 624-9100
(954) 989-8700 - Fax

By: _____
        DANIEL R. LEVINE, Esq.
        Fla. Bar No. 0057861

11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 98-8805-CIV-DIMITROULEAS
Magistrate Judge Johnson

MARLA PERLMAN,
on behalf of herself and
all others similarly situated,

      Plaintiff,

vs.

NATIONSBANK, N.A.,
a national association

      Defendant.
_____/

### PLAINTIFF'S MOTION TO ENLARGE THE SCOPE OF NOTIFICATION TO NATIONWIDE STATUS, FOR EQUITABLE TOLLING AND INCORPORATED MEMORANDUM OF LAW

COMES NOW the Plaintiff, MARLA PERLMAN, on behalf of herself and all others similarly situated, by and through her undersigned counsel, and hereby moves this Honorable Court for an Order enlarging the scope of notification to all potential class members *nationwide* and tolling the statute of limitations for all opt-in Plaintiffs, as follows:

1. As the Court is aware, this is an action seeking unpaid overtime compensation pursuant to the Fair Labor Standards Act ("FLSA"). Plaintiff was employed by Defendant as an "In-Store Banker," a position which Plaintiff alleges was misclassified as "exempt" for purposes of the overtime requirements of the FLSA.

2. On or about November 4, 1999, Plaintiff filed her Motion to Allow Nationwide Notification to Potential Class Members Pursuant to 29 U.S.C. §216(b) and Incorporated Memorandum of Law.

3. On or about December 3, 1999, this Court entered its Order Granting in Part Plaintiff's Motion to Allow Notification to Potential Class Members. Specifically, this Court granted notification to In-Store Bankers *in Florida only*.



**EXHIBIT**

5

4.  This Court's December 3, 1999 Order was grounded in the two (2) part test for FLSA notification enunciated by the Eleventh Circuit in *Dybach v. State of Florida Department of Corrections*, 942 F.2d 1562 (11th Cir. 1991): the district court "should satisfy itself that there are [1] other employees of the defendant-employer who desire to 'opt-in' and [2] who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions." *Id.* at 1568.

5.  This Court had little difficulty concluding that Plaintiff had satisfied the second part of the *Dybach* test, inasmuch as she had demonstrated that "Nationbank's corporate personnel department treated *all* In-Store Bankers the same as far as their job requirements and pay requirements."

6.  With regard to the first part of the *Dybach* test, this Court concluded that "*the evidence* [did not] support nationwide notification. . . ." (emphasis in original). In a footnote, this Court distinguished its order granting *nationwide* notification in the *Levine* litigation by noting that, in the instant case, Defendant opposed nationwide notification, while in *Levine* "a geographical limitation was not an issue." This Court also found that "limiting notification to employees who worked at Florida locations will allow a more efficient notification process and more efficient litigation."

7.  Although this Court did not specifically state as much in its December 3, 1999 Order, Plaintiff presumes that "the evidence", as indicated in the above paragraph, referred to the two (2) individuals who had opted-in to this case at the time this Court ruled on the original Motion to Allow Notification.

8.  Pursuant to this Court's December 3, 1999 Order, notification has been effectuated to In-Store Bankers in Florida.

2

  
### THE SCOPE OF NOTIFICATION SHOULD BE ENLARGED TO NATIONWIDE
### STATUS

9.      *To date, over one hundred (100) In-Store Bankers who worked at Florida banking centers have filed consent forms and "opted-in" to this lawsuit.*

10.     Thus, it is abundantly clear that Plaintiff now easily satisfies the first prong of the *Dybach* test. A significant number of notified individuals have elected to join this lawsuit, plainly evidencing the existence of **many** other individuals who "desire to 'opt-in'" to this lawsuit. Indeed, it is eminently reasonable to conclude that, given notification, In-Store Bankers who worked in states other than Florida would be desirous of opting-in to this lawsuit as their Florida colleagues.[1]

11.     With regard to the second *Dybach* prong, Plaintiff would again submit that there really is no practical difference between the instant case and *Levine*, at least as far as the proper geographic scope of notification is concerned. This Court recently reaffirmed this conclusion in its May 8, 2000 Order granting Defendant's Motion for Reconsideration of this Court's prior *Mintz* Order granting nationwide notification, entered in the *Mintz v. NationsBank* case. Significantly, this Court noted:

> In *Perlman* and *Levine*, Nationsbank had a clear policy of exempting **all** In-Store Bankers and Consumer Bankers II, III and IV from overtime pay. ***Thus, those individuals were similarly situated.***

12.     Moreover, the parties can still accomplish nationwide notification at this juncture

---

[1]      Moreover, In-Store Bankers from Texas and Georgia have previously been given notice of their right to recover unpaid overtime compensation in *Levine*; while Plaintiff does not believe that these individuals are entitled to notice in this lawsuit (since that would result in potentially duplicative claims), Plaintiff does believe that this provides further justification for enlarging the scope of notification here to all In-Store Bankers nationwide. Any other result is fundamentally unfair and prejudicial to those In-Store Bankers who have never received notice, when in fact they (1) are similarly situated and (2) may be desirous of opting-in. In fact, on this last note, based on the response in Florida alone, it is quite likely that In-Store Bankers nationwide **would be** desirous of opting-in.

3

without jeopardizing the September 25, 2000 trial date. If this Court is inclined to grant this Motion, notification can be sent out immediately to all ISBs nationwide, with the exception of Texas and Georgia. NATIONSBANK can e-mail Plaintiff's counsel the names and addresses and Plaintiff's counsel will send out notification immediately, and would suggest July 31, 2000, as the cutoff date by which nationwide opt-ins would have to file their Consents.

## THE STATUTE OF LIMITATIONS SHOULD BE TOLLED TO SEPTEMBER 2, 1998, OR ALTERNATIVELY, TO DECEMBER 3, 1999

13.    Further, assuming this Court is inclined to enlarge the scope of notification to nationwide status, principles of justice and fundamental fairness dictate that the statute of limitations for the potential opt-in Plaintiffs be tolled. In this vein, Plaintiff would submit that *all* opt-In Plaintiffs in this case, including those from states other than Florida, are entitled to have their individual statute of limitations tolled back to September 2, 1998, the date of this Court's Order granting notification in *Levine*, such that the statute of limitations period would be from September 2, 1995 or September 2, 1996 (depending on the issue of wilfulness) until the date each opt-in Plaintiff filed his or her Consent. Plaintiff refers this Court to her Motion for Equitable Tolling of Opt-In Plaintiffs' Statute of Limitations and Incorporated Memorandum of Law ("Motion for Equitable Tolling"), filed on or about April 14, 2000, as well as their Reply Memorandum filed concurrently herewith. Should this Court deny Plaintiff's April 14, 2000 Motion for Equitable Tolling, Plaintiff would alternatively submit that *all* opt-in Plaintiffs in this case, including those from states other than Florida (assuming again that this Court is inclined to enlarge the scope of notification to nationwide status), are entitled to have their individuals statue of limitations tolled back to December 3, 1999, the date this Court originally granted notification to In-Store Bankers from Florida banking centers. Failure to do so would

4

result in non-Florida In-Store Bankers losing approximately *five (5)* months of potentially compensable time, *simply because they did not work in Florida.* This would be a patently unfair and incongruous result.

14.    In opposition to tolling, Defendant may argue that this Court is currently without authority to toll the statute of limitations of potential opt-in Plaintiffs who have not yet opted-in. Indeed, relying on *United States v. Cook*, 795 F.2d 987 (Fed. Cir. 1986), Defendant previously advanced such an argument in opposing a motion for equitable tolling in *Mintz*. In *Cook*, an FLSA case, the Federal Circuit held that a district court may not enter an order tolling the statute of limitations for *potential* opt-in plaintiffs; only after the opt-in plaintiffs actually file their consent forms and opt-in to the collective action is a motion to toll ripe for adjudication pursuant to the "case or controversy" requirement of Article III of the Constitution. *Id.* at 994.

15.    Plaintiff would submit that *Cook*, although still "good law," is contrary to analogous Supreme Court and Eleventh Circuit precedent.

16.    In *Crown, Cork and Seal Co, Inc. v. Parker*, 462 U.S. 345 (1983), the Supreme Court reaffirmed its prior decision in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), and held that "*the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class . . .*" *Crown*, 462 U.S. at 354, quoting *American Pipe*, 414 U.S. at 554.

17.    Although the instant case is not a Rule 23 class action, the reasoning used by the Supreme Court in *Crown* results in the same conclusion in a FLSA collective action:

> The Court noted in *American Pipe* that a tolling rule for class actions is not inconsistent with the purposes served by statutes of limitations.    Limitations periods are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights, but these ends are met when a class action is commenced. . . . And a class complaint notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic

5

> identities of the potential plaintiffs who may participate in the
> judgment.    The defendant will be aware of the need to
> preserve evidence and witnesses respecting the claims of all
> the members of the class.   Tolling the statute of limitations
> thus creates no potential for unfair surprise. . . .

*Crown*, 462 U.S. at 352-53 (internal quotation marks and citations omitted).

18.    Indeed, in *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374 (11th Cir. 1998), the
Eleventh Circuit applied *Crown* in ruling on a tolling question in an action under the
Age Discrimination in Employment Act ("ADEA"), reiterating that "the
commencement of a class action suspends the applicable statute of limitations for
all asserted members of the putative class." *Id.* at 1378.[2]

19.    Thus, *Crown* and *Armstrong* dictate that the instant Motion to toll the statute of
limitations for *all* opt-in Plaintiffs, including those who have not yet opted-in, is in
fact ripe for adjudication, and that the statute of limitations for *all* opt-in Plaintiffs
must be tolled, at a minimum, from December 3, 1999, the date this Court initially
granted notification to Florida In-Store Bankers.

20.    In any event, applying the Eleventh Circuit's "case or controversy" ripeness analysis
to the instant case, rather than the brief inquiry provided in *Cook*, demonstrates that
all opt-in Plaintiffs (including those not yet provided notice) have a sufficient "case
or controversy" interest to satisfy the requirements of Article III, such that a motion
to toll the statute of limitations for those potential class members who have not yet
opted-in is indeed ripe for adjudication.   The ripeness inquiry asks

> "whether there is sufficient injury to meet Article III's
> requirement of a case or controversy and, if so, whether the
> claim is sufficiently mature, and the issues sufficiently defined
> and concrete, to permit effective decisionmaking by the court."

___
[2]    As the Court is aware, the ADEA shares the enforcement provisions of the
FLSA, 29 U.S.C. §216(b).   Accordingly, "class actions" under the ADEA are, in fact,
governed by the FLSA's "collective action" opt-in mechanism. *See Hoffman-LaRoche v.
Sperling, 483 U.S. 465 (1989).*

6

*Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589 (11ᵗʰ Cir.1997) (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11ᵗʰ Cir.1995).

21.     Once this Court enlarges the scope of notification to nationwide status, assuming it is included to do so, all implicated potential class members will have a legally cognizable interest in this lawsuit. These persons will be putative class members, whose interests have been, are, and will continue to be represented by the Plaintiff. "Individual standing requirements must be met by anyone attempting to represent his own interest *or those of a class.*" *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11ᵗʰ Cir.1984) (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

22.     According to the argument advanced by Defendant in opposition to tolling in *Mintz*, this Court would need to wait until each opt-in Plaintiff actually filed his or consent form before ruling on a motion to toll. Such a result surely flies in the face of the representative "collective action" authorized by the FLSA. The potential opt-in Plaintiffs become putative class members once notification is authorized, and at such time these persons have a cognizable interest in this litigation, and thus the requirements of Article III are satisfied. Of course, if, at some later point, Defendant believes for whatever reason that the statute of limitations for any individual opt-in Plaintiff(s) should not have been tolled, Defendant is free to make a motion to that effect.

23.     Finally, no prejudice will inure to the Defendant (other than the obvious) by granting this Motion. It is simply a matter of recalculating damages. Defendant has already deposed class representative Plaintiffs PERLMAN, PABON and RATCLIFF. In so doing, Defendant has questioned all three individuals about their claims, *from the beginning of their tenure as ISBs* (as opposed to a shorter time period for purposes of the statute of limitations).

7

WHEREFORE, Plaintiff, MARLA PERLMAN, on behalf of herself and all others similarly situated, respectfully requests that this Honorable Court grant her Motion to Enlarge the Scope of Notification to Nationwide Status, for Equitable Tolling and Incorporated Memorandum of Law, and enter an Order as follows:

a)    Enlarging the geographic scope of notification in the instant case to nationwide status, and authorizing notification to *all* In-Store Bankers employed by Defendant for the same time period previously approved with respect to Florida In-Store Bankers;

b)    Tolling the statute of limitations for *all* opt-in Plaintiffs in the instant case to September 2, 1998, or, in the alternative, tolling the statue of limitations for *all* opt-in Plaintiffs in the instant case to December 3, 1999; and

c)    Taking such further action as is just and proper.

Respectfully submitted,

MUCHNICK, WASSERMAN,
DOLIN & LEVINE, LLP
Attorneys for Plaintiff
4000 Hollywood Boulevard
Suite 620 North
Hollywood, FL 33021
(954) 989-8100 - Broward
(305) 624-9100 - Dade
(954) 989-8700 - Fax

By: _____

DANIEL R. LEVINE, ESQ.
Fla. Bar No. 0057861

8

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via U.S. Mail this $\underline{/8}$ day of May, 2000, to: Michael T. Burke, Esq., Johnson, Anselmo et al., 790 East Broward Boulevard, Suite 400, Fort Lauderdale, Florida 33303-0220 and Richard F. Kane, Esq., McGuire, Woods, Battle & Boothe, 3700 NationsBank Plaza, Charlotte, NC 28280.

MUCHNICK, WASSERMAN,
DOLIN & LEVINE, LLP
Attorneys for Plaintiff
4000 Hollywood Boulevard
Suite 620 North
Hollywood, FL 33021
(954) 989-8100 - Broward
(305) 624-9100 - Dade
(954) 989-8700 - Fax

By: _____

'DANIEL R. LEVINE, ESQ.
Fla. Bar No. 0057861

9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-06145-CIV-DIMITROULEAS/SNOW

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated,
     Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national association,
     Defendant.

_____/

## NOTICE OF FILING

COMES NOW the Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE,
by and through their undersigned counsel, and notify this Court of the following filing:

1.    Affidavit of Anne Hinds in connection with Plaintiff's Response to
Defendant's Motion for Summary Judgment.

2.    Plaintiff's Second Amended Final Response to Defendant's Motion for
Summary Judgment.

MUCHNICK, WASSERMAN, DOLIN
& LEVINE, LLP
Attorneys for Plaintiffs
4000 Hollywood Boulevard, Suite 620N
Hollywood, FL 33021
(954) 989-8100 - Broward
(305) 624-9100 - Dade
(954) 989-8700 - Fax

By: _____

SUSAN L. DOLIN, ESQ.
Fla. Bar No. 708690


EXHIBIT
K

-and-

BOIES, SCHILLER & FLEXNER L.L.P.
2435 Hollywood Boulevard
Hollywood, Florida 33020

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via U.S.

Mail this _____ day of December, 2000 to: Michael T. Burke, Esq., Johnson, Anselmo et

al., 790 East Broward Boulevard, Suite 400, Fort Lauderdale, Florida 33303-0220 and

Richard F. Kane, Esq., McGuireWoods, 3700 NationsBank Plaza, 101 South Tyron Street,

Charlotte, NC 28280.

By: _____

SUSAN L. DOLIN, ESQ.
E-Mail: sldolin@mwdl-law.com

**AFFIDAVIT OF ANNE HINDS**
STATE OF FLORIDA )
) ss:
COUNTY OF BROWARD )

BEFORE ME, the undersigned authority, on this date personally appeared ANNE
HINDS who, after first being duly sworn deposes and says:

1. My name is ANNE HINDS. I have personal knowledge of the facts recited in this
Affidavit.

2. In response to NationBank's Motion For Summary Judgment, whereby NationsBank
claimed certain opt-in Plaintiffs to be ineligible, in or about November of 2000, I sent a
letter to the claimed ineligible Plaintiffs requesting they fill in their dates of employment
with NationsBank as well as their position during their employment with NationsBank.
Enclosed with the letter was a response form the opt-in Plaintiffs were requested to fill
out and sign, detailing their dates of employment and position with NationsBank during
the relevant period.

3. In or about November the response forms from the above mentioned Plaintiffs began
to arrive into my office. Three of the opt-in Plaintiffs, Eloise Batts, June McKinley and
Rodney Hensley, signed statements that they did in fact work during the relevant time
period performing the duties and responsibilities of a Consumer Banker II, III or IV.

4. Since November of 2000, I have attempted to contact these three individuals in an
effort to confirm this information, and obtain sworn statements to this effect. In the
interim, however, Plaintiffs filed unsworn signed statements in contravention of
Defendant's Motion For Summary Judgement.

5. Eloise Batts has signed an affidavit which was filed with this Court. Rodney Hinsley
is in the process of preparing an affidavit to be filed with this Court, and, as a result ,
Plaintiffs are moving to amend their complaint.  A delay ensued speaking directly to
June McKinley, because she changed her telephone number and the new number was
not learned until December 18, 2000.

FURTHER AFFIANT SAYETH NAUGHT.
Anne Hinds
SWORN TO AND SUBSCRIBED before me this _18_ day of _Dec_____, 2000, by
Anne Hinds, who is personally known to me, or who produced _____
as identification, and who did take an oath.

Notary Public
My Commission Expires:

_____
Acknowledger's Name Stamped,
Typed or Printed

OFFICIAL NOTARY SEAL
KATHIE H HART
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC883385
MY COMMISSION EXP. OCT. 27,2003

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

FILED BY _____ D.C

90 DEC -8 PH 4: 11

CARL J. MENKE
CLERK U.S. DIST. CT.
S.D. OF FLA.

BEVERLY LEVINE, et al.

Plaintiffs,

vs.

NATIONSBANK, N.A.,
a national association

Defendant.
_____/

CASE NO.: 98-6306-CIV-DIMITROULEAS
Magistrate Judge Bandstra

## CONSENT TO BECOME PARTY PLAINTIFF

I have been notified that the Court has authorized this lawsuit, filed by past and present employees of NationsBank N.A. to recover overtime wages, to become a collective action and that I am eligible to join those employees as a Plaintiff in that lawsuit.

By choosing to join this lawsuit, I understand that I designate the representative Plaintiffs as my agents to make decisions on my behalf concerning the litigation, including the method and manner of conducting this litigation, entering into settlement agreements, entering into agreements with Plaintiffs' attorneys concerning attorneys fees and costs, and all other matters pertaining to this lawsuit. These decisions and agreements made and entered into by the representative Plaintiffs will be binding on me if I join this lawsuit.

I understand that the designated representative Plaintiffs have entered into a Contingency Fee Agreement with the law firms of MUCHNICK, WASSERMAN & DOLIN and BOIES & SCHILLER, L.L.P. which apply to all Plaintiffs who join in this lawsuit. If I join in the lawsuit, I agree to be bound by such Contingency Fee Agreement. I understand that under the terms of that Contingency Fee Agreement, the law firms' attorneys fees and costs shall only be paid out of a recovery by judgment or settlement against NationsBank in this action; and that if no such recovery is obtained, I will not be held responsible for such attorneys fees or costs. I further understand that I may obtain a copy of the Contingency Fee Agreement upon requesting same from the attorneys.

By choosing to join in this lawsuit, I understand that I will be bound by the judgment, whether it is favorable or unfavorable. I will also be bound by, and will share in, as the Court may direct, any settlement that may be negotiated on behalf of all Plaintiffs.

1

EXHIBIT

L

If I choose not to join this lawsuit, I acknowledge and understand that I will not be affected by any judgment or settlement rendered or reached in this lawsuit, whether favorable or unfavorable to the Plaintiffs and I will not be entitled to share in any amounts recovered by the Plaintiffs whether by judgment or settlement.

I hereby consent to join in this lawsuit.

_____
**SIGNATURE**

DATE: _12-1-98_

PLEASE PRINT OR TYPE THE INFORMATION BELOW:

NAME: _Rodney Hensley_

STREET NAME & NO. _5728 Brentwood Trace_

CITY, STATE& ZIP CODE _Brentwood, TN 37027_

PHONE NUMBERS WHERE YOU CAN BE REACHED:

DAY: _615-376 5430_

EVENING: _615-661-8043_

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 97-7547-CIV-DIMITROULEAS

JULIET ALDRED, on behalf of
herself and all others similarly
situated,

       Plaintiffs,

vs.

NATIONSBANK, N.A.,

       Defendant.

_____/



FILED by _____ D.C.

SEP 0 2 1998

CARLOS JUCIERE
CLERK U.S. DIST. CT.
S.D. OF FLS.  MIAMI

## OMNIBUS ORDER

THIS CAUSE is before the Court upon the following motions:

1. Plaintiff's Motion to Allow Notification to Potential Class Members Pursuant to 29

U.S.C. § 216(b) [DE 29];

2. Plaintiff's Motion to Correct Scrivener's Error in Complaint [DE 31], which the Court

construes as the Plaintiff's Motion for Leave to Amend; and

3. Plaintiff's Motion to Reconsider and Objections to Magistrate Judge's June 23, 1998

Order [DE 46];

The Court has carefully considered the motions and is otherwise fully advised in the

premises.

### I. BACKGROUND

The plaintiff, Juliet Aldred, a former employee and bank teller with Nationsbank, filed

the instant action asserting a claim for unpaid overtime under the Fair Labor Standards Act, 29

U.S.C. § 216, ("FLSA") on behalf of herself and all others similarly situated. Aldred alleges that

she and other similarly situated current and former non-exempt employees worked the number of



EXHIBIT
M

hours required of them, many times in excess of forty (40), but were not paid overtime. Aldred

further alleges that Nationsbank supervisory personnel either refused to permit her to record the

number of hours she worked in excess of forty (40) or simply instructed the plaintiff that she was

not allowed to record the number of hours she worked in excess of forty (40), both in clear

violation of Nationsbank's record-keeping obligation under the FLSA. Nationsbank denies the

allegations and further asserts that it has a policy in place that overtime must be calculated on a

completed workweek and paid at time and a half for hours worked over forty (40). To date, no

other plaintiffs have opted-in the present action as permitted by 29 U.S.C. § 216(b).[1]

## II. DISCUSSION

### A. Notification of Putative Class Members

Aldred has filed the instant motion seeking leave of this Court to notify all potential class

members, pursuant to 29 U.S.C. § 216(b), that they have the right to opt-in the present action.

Aldred has defined the potential class, without any geographic limitation, as "all current and

former non-exempt employees" of Nationsbank.

Section 216(b) of the FLSA provides that an action for unpaid overtime compensation

may be maintained by "any one or more employees for and on behalf of [themselves] . . . and

other employees similarly situated." It is settled in this Circuit that a district court has the

authority under the FLSA to issue an order requiring notice of an action to such similarly situated

persons. See Dybach v. State of Florida Dep't of Corrections, 942 F.2d 1562 (11th Cir.1991)

---

[1] The Court also has a separate class action, Levine v. Nationsbank, Case No. 98-6306
(S.D. Fla.), brought by consumer banker employees, who were classified as exempt employees,
against Nationsbank for unpaid overtime compensation under the FLSA. These plaintiffs are
also represented by the same attorneys representing Aldred. In the Levine case, twenty-five
individuals had already elected to opt-in prior to this Court's resolution of the plaintiffs' motion
to allow notification of potential class members.

(noting a split in the circuits and "concluding that the 'broad remedial purpose of the Act' is best served if the district court is deemed to have the power to give such notice to other potential members of the plaintiff class to 'opt-in' if they so desire and by the district court's exercise of that power under appropriate conditions.") (citations omitted). Before determining whether to exercise such discretion, however, Dybach instructs the district court that it "should satisfy itself that there are other employees of the department-employer who desire to 'opt-in' and who are 'similarly situated' with respect to their job requirements and with regard to their pay provisions." Id. at 1567-1568. The Eleventh Circuit has held that while plaintiffs bear the burden of demonstrating a "reasonable basis" for a class-wide action, the burden "is not heavy." Grayson v. K Mart Corporation, 79 F.3d 1086, 1097 (11th Cir. 1996); Haynes v. Singer Co., Inc., 696 F.2d 884, 887 (11th Cir.1983). If the district court concludes that there are such other employees, the court then has the discretion to establish the specific procedures to be followed with respect to such possible opting-in. Dybach, 942 F.2d at 1568.

Turning to the first step of the Dybach test, Aldred has provided no support that any other non-exempt employees would desire to opt-in to the present action. Rather, Aldred asserts that she needs some discovery to obtain the names of other similarly situated employees in order to ascertain whether they would wish to opt in. The Court will address the discovery issue below. At this point in the litigation, however, the Court is not satisfied that there are other non-exempt employees who desire to opt-in this case.

Turning to the second step of the Dybach test, the parties dispute whether there are other similarly situated employees with respect to their job requirements and with regard to their pay provisions. Specifically, Aldred argues that each non-exempt employee who performed services for Nationsbank on or after December 15, 1994, three years prior to the filing of the instant

3

lawsuit,[2] is a similarly situated employee. Aldred also asserts she has served an interrogatory upon Nationsbank requesting the identity of such potential class members.

The defendants respond by asserting the potential class is overbroad and such potential class members are not similarly situated to Aldred. Specifically, Nationsbank argues that Aldred's employment position code was one of 228 non-exempt job codes used in Florida and there were 899 different job codes for non-exempt personnel nationwide. Further, Nationsbank notes as of December 31, 1997, there were 4,991 non-exempt employees in Florida and 52,353 non-exempt employees nationwide.

In support of her motion, Aldred has submitted an affidavit from herself, an affidavit from Jason Royal, a former consumer banker employee with Nationsbank, and a transcript of a deposition of Cindy Haimowitz, a Nationsbank Regional Sales Support Manager. The Court finds that these affidavits and transcripts, along with the other support provided by Aldred, are not sufficient to satisfy this Court that there are other employees of Nationsbank who are similarly situated with respect to their job requirements and with regard to their pay provisions. Dybach, 942 F.2d at 1567-1568; see also Haynes v. Singer Co., Inc., 696 F.2d 884 (11th Cir.1983) (finding that unsupported assertions that FLSA violations were widespread and that additional plaintiffs would come from other stores owned by employer not sufficient to authorize notice to other potential class members).

At the outset, the Court notes that Aldred does not dispute that Nationsbank had a written policy of compensating non-exempt employees who worked and recorded in excess of forty

---

[2] The Court notes that the statute of limitations continues to run with respect to any individual who may wish to opt-in to the present action until such individual files a written consent to specifically opt-in to the present action. Grayson v. K Mart Corporation, 79 F.3d 1086, 1106 (11th Cir. 1996).

4

hours in a workweek an overtime wage rate of one and one-half times the regular hourly rate. Rather, Aldred alleges there was an unwritten policy of preventing non-exempt employees from reporting such overtime hours. At this point, Aldred has not provided any support that this alleged unwritten policy was either a corporate policy from the upper management of Nationsbank or a widespread practice among several Nationsbank's branches. Moreover, the only allegations to date are by Aldred that this practice occurred in the branches where she worked. Therefore, the Court finds that Aldred has failed to provide any support that there were other similarly situated non-exempt employees who were subjected to the same unwritten practices which violate the FLSA, other than at the branches where she worked.

The Court further notes that Aldred was employed as a bank teller, which was only one of numerous categories of non-exempt employees. Aldred has provided no support for the proposition that all non-exempt employees, regardless of the job description and requirements, are similarly situated to bank tellers. The Court notes that the numerous categories of non-exempt jobs would encompass different job responsibilities, salaries, and locations. Most importantly, in light of the allegation of an unwritten policy of supervisors prohibiting employees from reporting overtime hours, the various non-exempt employees would report to different supervisors. Therefore, the Court finds that at a minimum, any potential class should be limited to Aldred's employment position of bank teller.

Turning to the affidavits and transcripts, Aldred's affidavit states that the practices complained of occurred "no matter at which branch [she] worked." Aldred states she was employed by Nationsbank from January 1996 to November 1997, or approximately 100 weeks.[3]

[3] Nationsbank argues that Aldred admitted in her deposition that she did not work any overtime at the Coral Ridge or Deerfield branches. Aldred attempts to refute this argument. For

5

Although not stated in her affidavit, Aldred's complaint estimates the total number of overtime hours she worked (in excess of forty hours each week) totaled only fifty hours for the entire period she was employed by Nationsbank, or approximately one hour of overtime every other week. This is insufficient to establish a widespread practice of directing employees not to record and be compensated for hours which the employees actually worked. Further, while Aldred's affidavit also states there were other non-exempt persons she knew of who were not permitted to record their overtime hours, she has not provided affidavits from these individuals nor have any of these individuals sought to opt-in to the present action. See Tucker v. Labor Leasing, Inc., 872 F.Supp. 941, 948-949 (M.D. Fla.1994).

Moreover, neither the affidavit of Jason Royal nor the transcript of Cindy Haimowitz provide much additional support. Jason Royal was an exempt employee who states that several non-exempt employees complained to him that they were required to work overtime but were not allowed to record their overtime hours. However, he fails to give any names and his statement is merely unsupported hearsay. Further, the testimony of Cindy Haimowitz was that Nationsbank prohibited the practices complained of by Aldred. She testified that she became aware of only one instance where an employee worked more than forty hours without recording the overtime. However, this employee received compensation in the form of additional vacation (comp time) in another week. This isolated instance is certainly not sufficient to establish the widespread practice alleged by Aldred.

Finally, Aldred asserts that she has been denied discovery concerning other potential class members, which has hampered her ability to establish the existence of other similarly

---

purposes of the present motion, the Court assumes that Aldred had unreported overtime at all branches where she worked.

situated employees. This argument has some merit, and as discussed below, the Court will permit some limited discovery. At this stage of the proceedings, however, it appears that the plaintiff is merely on a fishing expedition. Therefore, the Court will not permit the widespread notification of numerous current and former employees of Nationsbank of the present action without the sufficient showing under Dybach.

### B. Motion to Correct Scrivener's Error/ Motion for Leave to Amend Complaint

Aldred has filed a motion to correct scrivener's error asserting the original complaint contained scrivener's errors she now seeks to correct. Nationsbank has responded asserting the scrivener's errors amount to an attempt to amend the complaint. This Court agrees, and therefore, the Court will construe the motion as a motion for leave to amend.

Rule 15(a) of the Federal Rules of Civil Procedures provides that a party may amend the party's pleading "by leave of court or by written consent of the adverse party" and that "leave shall be freely given when justice so requires." In construing Rule 15(a), the Supreme Court has held that

> In the absence of any apparent or declared reason–such as undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, etc.–the leave sought should, as the rules require, be "freely given."

Foman v. Davis, 371 U.S. 178, 182 (1962).

Nationsbank asserts that the time period for filing any amendments passed one month prior to the filing of the present motion, and therefore, any amendment to the complaint would be untimely. The Court notes, however, that the case is not set for trial until November 1998. Accordingly, the Court will grant Aldred leave to file the Corrected Complaint as an Amended Complaint.

7

## C. Discovery Objections

On June 23, 1998, Magistrate Judge Linnea R. Johnson issued an Order granting Aldred's

Motion to Compel in all respects except for the following two interrogatories:

6. Please identify all employees (including former employees) who were terminated or resigned from employment with Defendant, NATIONSBANK, for the last three (3) years who held the same or similar position Plaintiff held with Defendant, and for each, provide their last known residential address and telephone number.

10. Please identify every past and present "Teller" of Defendant, who worked for Defendant since December 15, 1994.

Aldred asserts this information is necessary to determine whether other similarly situated

employees exist. To a limited extent, this Court agrees.

As noted above, the Court finds that any potential class members are limited to current or

former bank tellers. Further, the Court notes that Aldred has agreed to limit her discovery

requests to branches located in Broward County, Florida. The Court notes that Aldred has

provided some support for her allegations that the complained of practices occurred at the

branches where she worked as a teller. The Court further notes that former and current tellers at

these branches may have relevant information concerning Aldred's own claim. Therefore, the

Court will permit limited discovery of tellers who were employed at the same branches where

Aldred worked. This information should also provide Aldred with sufficient information to find

additional plaintiffs to opt-in and meet the requirements of Dybach, if possible.

8

III. CONCLUSION

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion to Allow Notification to Potential Class Members Pursuant to 29 U.S.C. § 216(b) [DE 29] is hereby **DENIED**, without prejudice, for leave to refile at a later point if Aldred can meet the requirements for such notification under Dybach.

2. Plaintiff's Motion to Correct Scrivener's Error in Complaint [DE 31], which the Court construes as the Plaintiff's Motion for Leave to Amend, is hereby **GRANTED** and the Plaintiff's Corrected Complaint [annexed to DE 31] is deemed filed; and

3. Plaintiff's Motion to Reconsider and Objections to Magistrate Judge's June 23, 1998 Order [DE 46] is hereby **GRANTED** in part and **DENIED** in part as follows:

A. Within fifteen (15) days of the date of this Order, the Defendant shall respond to Plaintiff's Interrogatories 6 and 10 solely with respect to all bank tellers who worked at the same branches as Aldred after December 15, 1994; and

B. In all other respects, Plaintiff's Motion to Reconsider and Objections to Magistrate Judge's June 23, 1998 Order [DE 46] is hereby **DENIED**;

**DONE AND ORDERED** in Chambers at Ft. Lauderdale, Florida, this ___ day of September, 1998.

WILLIAM P. DIMITROULEAS
United States District Judge

9

Copies furnished to:

Susan L. Dolin, Esq.
Daniel R. Levine, Esq.
Richard F. Kane, Esq.
Gary K. Harris, Esq.
Michael T. Burke, Esq.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 00-06145-CIV-DIMITROULEAS/Snow

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
Themselves and all others similarly
situated,

              Plaintiffs,

Vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national
Association,

              Defendant.

## AFFIDAVIT OF TIMOTHY J. SMITH

Timothy J. Smith, being first duly sworn, deposes and says as follows:

1.      I am over 21 years of age and I am under no legal or mental disability or duress. I am competent to be a witness, and have personal knowledge of the facts attested to herein.

2.      I am currently employed by Bank of America as an Assistant Vice President, Business Analyst II. I am authorized by the Bank to make this Affidavit on its behalf.

3.      I make this Affidavit based upon my personal knowledge and my review of the Bank's personnel and payroll records.

4.      The Bank employed Rodney N. Hensley from February 1, 1996 through January 15, 1999. Based upon my review of the Bank's payroll register, Mr. Hensley reported 147.50 hours of overtime on the time records that he submitted to the Bank in 1998. Mr. Hensely reported 4.00 hours of overtime on the time records that he submitted to the Bank in 1999 for the



EXHIBIT
N

period of January 1, 1999 through January 15, 1999. The Bank's payroll register also indicates

that the Bank paid Mr. Hensley a total of $2, 548.97 in overtime pay during 1998 and $69.00

during 1999.

Further this affiant sayeth not.

Timothy J. Smith

STATE OF GEORGIA

COUNTY OF DeKalb

To Wit:

The foregoing Affidavit was personally subscribed and sworn to before me,

Mary Davis , a Notary Public for the above-referenced

jurisdiction, on January 5th, 2001 by TIMOTHY J. SMITH.

Notary Public
Notary Public Gwinnett County, Georgia
My Commission Expires Jan. 23, 2004

(Official Seal)

My Commission Expires:

2