UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-06145-CIV-DIMITROULEAS,
Magistrate Judge Johnson

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated,

       Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national association,

       Defendant.

_____/

## PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE
## TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION

COME NOW the Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE, on

behalf of themselves and all others similarly situated, and, hereby file this, their Reply to

Defendant's Response to Plaintiffs' Motion to Compel Production served by Plaintiff on or

about January 31, 2001, as follows:

As the Court is by now well familiar, this is a collective action lawsuit to redress the

failure of Defendant to pay to employees overtime as required under the provisions of the

Fair Labor Standards Act, 29 U.S.C. § 201, et seq. More specifically, the Plaintiffs are

consumer bankers IIs, IIIs, and IVs who were reclassified by the Defendant as non-exempt

as of December 17, 1997, but who are complaining that since that time, they have been



denied the opportunity by Defendant to record their overtime hours as well as denied the overtime pay as a result of Defendant's actions.

As the Court well knows, the Fair Labor Standards Act places the burden of keeping **accurate** records of hours worked by non-exempt employees squarely upon the employer. 29 U.S.C. § 211(c); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946); *Etienne v. Inter-County SEC. Corp.*, 173 F.3d 1372, 1376 (11th Cir. 1999); *Amcor, Inc. v. Brock*, 780 F.2d 897, 900 (11th Cir.1986); *Olson v. Superior Pontiac-GMC, Inc.*, 776 F.2d 265, 267 (11th Cir.1985); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 470 (11th Cir.1982); *Skipper v. Superior Dairies, Inc.*, 512 F.2d 409, 411 (5th Cir.1975); *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825, 828 (5th Cir.1973); *Mitchell v. Mitchell Truck Line, Inc.*, 286 F.2d 721, 724 (5th Cir.1961).

In the instant case, the "official" time records, which the Defendant is required by law to keep, are clearly in dispute as to their accuracy, based on the very nature of the complaint. Indeed, there is testimony and evidence that the official time records in the case have been altered by Defendant's managers to eliminate overtime (A.1; A.2[1]; A.3).[2]

Given the inaccuracies in recording, as well as the evidence of alterations of the "official" records required to be kept by NationsBank detailing the hours worked by these Plaintiffs, it is clearly within the Plaintiffs' province to seek, and the Defendant's burden to produce, records which will show the Plaintiffs' time worked in a more accurate fashion. To that end, when the employees would open the bank, they would have to record their alarm codes, and when they would turn on their computers, they would have to log in (A4;

---

[1]Indeed, the Defendant could only produce two time sheets in all for Plaintiff Mobley.

[2]It should be noted that, as per the testimony cited, some of the official time cards for Ms. Kirkland are also missing.

A.5). In addition, many of the banking centers kept logs in which employees would have to sign in and sign out, which would show what time they came and left (*Id.*).

NationsBank has put forward arguments as to burdensomeness and expense in objecting to producing these alternative records, arguing that they should not be required to produce them. However, the complaints put forward by the Defendant are no more than the woes of a mega-corporation which has, in effect, been overtaken by its technology. The excuses asserted by NationsBank as to why it should not be required to produce these records simply begs the question; the law, plainly and simply, requires the Defendant to keep accurate records of its non-exempt employees' time. The "official" time records – the time sheets – are at best suspect and at worst completely inaccurate, even possibly deliberately altered. Accordingly, then, Defendant is bound to produce whatever records it may have which accurately reflect the time actually worked by its non-exempt employees. It simply cannot hide behind the shield of its gigantic size and its convoluted technology to escape its duty in this regard. Indeed, if it does so, it does so at its own peril. *Mt. Clemens, supra.*

The foregoing answers the Defendant's relevance objection to these records as well. It may well be that the computers have automatic shut-off features, which may cause the computer log-on and log-off times to not be as otherwise accurate as they might be. However, given the tainted nature of the "official" time sheets, the Defendant should be required to produce the secondary records that it has, given its plain burden of keeping records of its non-exempt employees' hours. Moreover, NationsBank has utterly failed to evidence that any particular opt-in Plaintiff or named Plaintiff in this suit, or any opt-in Plaintiff yet to be, through the notification process or otherwise, utilized more than one

computer during any one given day, such that the deposition testimony cited above is contradicted to an extent that makes the probative value of these records outweighed by any other consideration.

Accordingly, NationsBank's objections should be denied, and NationsBank should be compelled to produce the secondary records which show the time actually worked by the non-exempt Plaintiffs in this action, namely, the computer log-on and log-off times, the alarm codes, and the vault logs.

Respectfully submitted,

MUCHNICK, WASSERMAN, DOLIN
& LEVINE, LLP
Attorneys for Plaintiffs
4000 Hollywood Boulevard, Ste 620N
Hollywood, FL 33021
(954) 989-8100 - Broward
(305) 624-9100 - Dade
(954) 989-8700 - Fax

By: _____
SUSAN L. DOLIN, ESQ.
Fla. Bar No. 708690

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via U.S. Mail and Facsimile, this _9 th_ day of March, 2001 to: Michael T. Burke, Esq., Johnson, Anselmo et al., 790 East Broward Boulevard, Suite 400, Fort Lauderdale, Florida 33303-0220, and Richard F. Kane, Esq., McGuireWoods LLP, 3700 NationsBank Plaza, 101 South Tyron Street, Charlotte, NC 28280, and BOIES, SCHILLER & FLEXNER, LLP, 2435 Hollywood Boulevard, Hollywood, Florida 33020, and Mark J. Langdon, Esq., McGuireWoods LLP, 3700 Bank of America Plaza, 101 South Tryon Street, Charlotte, NC 28280.

By: _____

SUSAN L. DOLIN, ESQ.
E-mail: sldolin@mwdl-law.com

F:\WPDOCS\~SLD\Escudero\Pleading\response.compel mtn.wpd



**Page 1**

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
2
     Case No.: 00-06145-CIV-DIMITROULEAS
3    Magistrate Judge Snow
4
     ROXANNA L. ESCUDERO and        )
5    KIMBERLY DRAKE, on behalf of  )
     themselves and all others      )
6    Similarly situated,            )
                                    )
7         Plaintiffs,               )
     Vs.                            )
8                                   )
     BANKAMERICA CORPORATION, a    )
9    Foreign corporation d/b/a BANK )
     OF AMERICA CORPORATION, a     )
10   Foreign corporation f/k/a     )
     NATIONSBANK, N.A., a national )
11   Association,                   )
                                    )
12        Defendant.                )
     - - - - - - - - - - - - - - - - -
13                337 E. Las Olas Boulevard
                  Fort Lauderdale, Florida
14                July 14th, 2000
                  9:30 a.m. - 11:35 a.m.
15
     APPEARANCES:
16
     MUCHNICK, WASSERMAN, DOLIN & LEVINE, LLP
17   By SUSAN DOLIN, ESQ.
     Attorney for the Plaintiffs
18
     McGUIRE, WOODS, BATTLE & BOOTHE, LLP
19   By RICHARD F. KANE, ESQ.
     Attorney for the Defendant
20
     Also Present: Justin Steinmark - Law Clerk
21
22
23            DEPOSITION
                  OF
24
         NANCY ROJAS
25
     DOWNTOWN REPORTING  (954) 522-3376

**Page 2**

1              I N D E X
2    WITNESS: NANCY ROJAS
3                              PAGE
4    DIRECT EXAMINATION
     BY MR. KANE               3
5
     CROSS EXAMINATION
6    BY MS. DOLIN              100
7    REDIRECT EXAMINATION
     BY MR. KANE               101
8
9
10         E X H I B I T  I N D E X
11
12   Defendant's Exhibit Number 1 for I.D.      6
13   Defendant's Exhibit Number 2 for I.D.      11
14
15
16      + + + + + + + + +
17
18
19
20
21
22
23
24
25
     DOWNTOWN REPORTING  (954) 522-3376

**Page 3**

1         Deposition of NANCY ROJAS, a witness of lawful
2    age, taken by the Defendant, for the purpose of
3    discovery and for use as evidence in the above entitled
4    cause, wherein: ROXANNA L. ESCUDERO and KIMBERLY DRAKE,
5    on behalf of themselves and all others similarly
6    situated, are the Plaintiffs, and BANKAMERICA
7    CORPORATION, a foreign corporation d/b/a BANK OF AMERICA
8    CORPORATION, a foreign corporation, f/k/a NATIONSBANK,
9    N.A., a national association, is the Defendant, in the
10   United States District Court, Southern District of
11   Florida, pursuant to notice heretofore filed, before
12   VICTORIA PAEZ, a Shorthand Reporter notary and Public in
13   and for the State of Florida at Large, at the offices of
14   Downtown Reporting, 337 E. Las Olas Boulevard, Fort
15   Lauderdale, Broward County, Florida, on the 14th day of
16   July, 2000, commencing at 9:30 o'clock A.M.
17         - - -
18   THEREUPON,
19             NANCY ROJAS
20   Being a witness in the notice heretofore filed, being of
21   lawful age, and being first duly sworn in the above
22   cause, testified on her oath as follows:
23         THE WITNESS: Yes.
24            DIRECT EXAMINATION
25   BY MR. KANE:
     DOWNTOWN REPORTING   (954) 522-3376

**Page 4**

1    Q.   State your name.
2    A.   Nancy Margarita Rojas.
3    Q.   Say the middle name again, please.
4    A.   Margarita.
5         MS. DOLIN: Boy, that made me thirsty.
6         THE WITNESS: Sorry. No salt.
7    BY MR. KANE:
8    Q.   What's your address?
9    A.   1515 South Ridgewood, one word, Avenue,
10   Ormond Beach, Florida 31276.
11   Q.   And your Social Security number?
12   A.   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.
13   Q.   Okay. Ms. Rojas, couple of ground rules
14   here. We're going to be asking you a series of
15   questions relating to your claim against NationsBank.
16   And unless you indicate otherwise, I'll assume that you
17   understand my questions.
18   A.   (Witness nodding.)
19   Q.   Okay?
20   A.   Certainly.
21   Q.   All right. And in responding to my
22   questions, you need to respond audibly so that the court
23   reporter may pick up your answer and record it
24   appropriately. Okay?
25   A.   Certainly.
     DOWNTOWN REPORTING   (954) 522-3376

9

1     Q.  Do you have any other documents, other than
2 what you've just produced here, relating to your
3 employment at NationsBank?
4     A.  Yes.
5     Q.  What documents do you have?
6     A.  I have a series of documents which is
7 currently at another attorney's office and I have not
8 picked them up or have not been given them back. I
9 would say there is probably three hundred documents,
10 total paper.
11     Q.  Why didn't you bring those with you as you
12 were directed to?
13     A.  They were at the attorney. They were in
14 possession of another attorney.
15     Q.  Did you request the attorney to give them
16 to you?
17     A.  Yes, but the time frame did not allow for
18 it to come in time. It's at another city.
19     Q.  What city is it in?
20     A.  It's in New Smyrna Beach, Florida.
21     MR. KANE: We will obviously keep this
22 deposition open, Ms. Dolin --
23     MS. DOLIN: Understood.
24     MR. KANE: -- so that the witness will
25 comply with the request for production as
    DOWNTOWN REPORTING   (954) 522-3376

10

1 reflected in the notice of deposition.
2     MS. DOLIN: A request was made to the other
3 attorney.
4     MR. KANE: That's what she said.
5 BY MR. KANE:
6     Q.  What's the name of the other attorney?
7     A.  Her name is Valerie P. Foote.
8     Q.  Spell it for me, please.
9     A.  F-O-O-T-E.
10     Q.  Okay. Why do you have this particular time
11 sheet?
12     A.  This time sheet is a time sheet which
13 reflects idiosyncrasies with the math on the time sheet
14 and the pay that was rendered for that time period.
15 This time sheet is the time sheet where my manager took
16 off overtime without my consent.
17     Q.  Okay. Who was that manager?
18     A.  The individual who gave the orders name is
19 Jacqueline -- boy, I just drew a blank. I'll tell you
20 in a minute. Vickie Mignardi is the one who signed
21 that.
22     MS. DOLIN: Vickie?
23     THE WITNESS: Mignardi. M-I-G-N-A-R-D-I.
24 BY MR. KANE:
25     Q.  Who is Vickie Mignardi?
    DOWNTOWN REPORTING   (954) 522-3376

11

1     A.  Vickie Mignardi is the lead teller for the
2 branch where I was employed.
3     Q.  Okay. Now, you say that your manager took
4 time off --
5     A.  Yes, sir. She --
6     Q.  -- on this timecard?
7     A.  She removed two hours from that timecard,
8 one of which was overtime. I was approached by Jackie,
9 whose name I can't remember all of a sudden, and Vickie
10 Mignardi at my desk in reference to the overtime.
11     (Whereupon, Defendant's Exhibit Number 2
12 was marked for identification.)
13 BY MR. KANE:
14     Q.  Just verify that what has been marked as
15 Exhibit Number 2 is the same as -- is a true and
16 accurate copy of what you have just produced here?
17     A.  Yes.
18     Q.  Now, Ms. Rojas, this time sheet is
19 actually -- the document, I'm sorry, the document is two
20 pages. The time sheet is actually a two-sided sheet of
21 paper, is it not?
22     A.  That is correct.
23     Q.  Okay. Now, and the time period covered by
24 this time sheet is what, again?
25     A.  The capture date would be 12-5-99.
    DOWNTOWN REPORTING   (954) 522-3376

12

1     Q.  All right. And would you tell me where the
2 two hour deletion, I guess, is reflected on here?
3     A.  Not reflected on this particular copy but
4 on the original you would be able to see that the
5 thirty-nine had been replaced or that it was once
6 forty-one and had been replaced by Jackie's handwriting.
7     What I did was after I was approached and
8 told that I could not have the overtime and I stated to
9 the manager that I felt that was not legal and her
10 comment was that she could carry it over as long as it
11 was in the same time period and that she was the manager
12 and she could do that. I then retrieved my time sheet
13 from the mail folder and made a copy of it after I had
14 been approached and after it had been concluded.
15     The two hours I circled after this point in
16 time, 8:50 on Monday to 10:50 and wrote scheduled, these
17 are the two hours which were removed from my time sheet.
18 However, they were not removed fully, they were simply
19 subtracted. So you can see that they have been
20 erased -- well, I will tell you, they have been erased
21 on Monday under daily hours on the left-hand column,
22 there once existed two hours.
23     Q.  Where do you see the marking on the Monday?
24     A.  Well, it's been erased and you can't tell
25 on the copy. On the original you can tell.
    DOWNTOWN REPORTING   (954) 522-3376



**Bank of America**

Mail Code: __FL8-179-01-01__

Name: __ROJAS, NANCY__

MARKING DIRECTIONS

- Erase carefully any bubbles you wish to change.
- Do not make extra marks on the timesheet.

CORRECT: ⊏ ● ⊏ ⊏

## Mandatory information for payroll processing:

**SOCIAL SECURITY #**

2 6 1 0 2 8 2 9 6

**JOB REC.#**

**TIME CAPTURE END DATE**

| Month | Day | Year |
|---|---|---|
| 12 / | 05 / | 99 |

**ROUNDING RULES:**

| | Minutes | | Round to: |
|---|---|---|---|
| :00 | THROUGH | :07 | .00 |
| :08 | THROUGH | :22 | .25 |
| :23 | THROUGH | :37 | .50 |
| :38 | THROUGH | :52 | .75 |
| :53 | THROUGH | :59 | .00 |

| | Hundredths | | Round to: |
|---|---|---|---|
| .00 | THROUGH | .12 | .00 |
| .13 | THROUGH | .37 | .25 |
| .38 | THROUGH | .62 | .50 |
| .63 | THROUGH | .87 | .75 |
| .88 | THROUGH | .99 | .00 |

## BORROWED TIME

Of the hours recorded on the opposite side, indicate the total number of hours worked in cost centers other than your home cost center.

| Co - Cost Center | HRS MIN |
|---|---|
| | |

Total hours worked in the above cost center ▷

| Co ~ Cost Center | HRS MIN |
|---|---|
| | |

Total hours worked in the above cost center ▷

| Co - Cost Center | HRS MIN |
|---|---|
| | |

Total hours worked in the above cost center ▷

Return timesheet to NC1-021-03-14. Written information is not used by Personnel Operations for processing pay; ensure all bubbles are filled in.



ASSOCIATE SIGNATURE

(904) 615-9816

Area Code    Complete Phone #
(Required)

SUPERVISOR SIGNATURE

(9(4) 615 621?

Area Code    Complete Phone #
(Required)

**FOR FULL -TIME ONLY**

**DOCKED HOURS**

To be completed by Supervisor



Bank of America
Form # 00-13-1876B


DEFENDANT'S
EXHIBIT. NO.
FOR IDENTIFICATION

| | DAILY HOURS WORKED | | VACATION | | ILLNESS | | HOLIDAY | | HOLIDAY WKD | | OTHER PAID TIME | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | HRS | MIN | HRS | MIN | HRS | MIN | HRS | MIN | HRS | MIN | HRS | MIN |
| **TUESDAY** | | | | | | | | | | | | |
| **WEDNESDAY** | | | | | | | | | | | | |
| **THURSDAY** | | | | | | | | | | | | |
| **FRIDAY** | | | | | | | | | | | | |
| **SATURDAY** | | | | | | | | | | | | |
| **SUNDAY** | | | | | | | | | | | | |

| TOTALS | DAILY TOTAL= 7 | VACATION TOTAL= 8 | ILLNESS TOTAL= 16 | HOLIDAY TOTAL= 8 | HOLIDAY WKD TOTAL= | OTHER PAID TIME TOTAL= | WEEKLY TOTAL OF HOURS EXCLUDING HOLIDAY WORK! 39 |
|---|---|---|---|---|---|---|---|

| | MONDAY | | TUESDAY | | WEDNESDAY | | THURSDAY | | FRIDAY | | SATURDAY | | SUNDAY | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | IN | OUT | IN | OUT | IN | OUT | IN | OUT | IN | OUT | IN | OUT | IN | OUT |
| Scheduled | 850 | 1050 | 9- | 750 1200 | 1250 1500 | | 9 | 5:00 | 1 | 9 | 7:00 12:00 | | | |



Page 1

[1]          UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
[2]
             CASE NO. 00-6145-CIV-DIMITROULEAS
[3]
     ROXANNA L. ESCUDERO, and            )
[4]  KIMBERLY DRAKE, on behalf of        )
     themselves and all others similary  )
[5]  situated,                           )
                                         )
[6]          Plaintiff's                 )
                                         )
[7]     vs.                              )
                                         )
[8]  BANKAMERICA CORPORATION,            )
     a foreign corporation d/b/a         )
[9]  BANK OF AMERICA CORPORATION,        )
     a foreign corporation, f/k/a        )
[10] NATIONSBANK, N.A., a national       )
     association,                        )
[11]                                     )
             Defendant,                  )
[12] ─────────────────────────────

[13]
                 337 East Las Olas Boulevard
[14]             Fort Lauderdale, Florida
                 February 9, 2001
[15]             10:20 a.m. - 2:25 p.m.
[16]
     APPEARANCES:
[17]
        MUCHNICK, WASSERMAN, DOLIN & LEVINE, LLP
[18]    BY: SUSAN DOLIN, ESQ.
        Attorneys for the Plaintiffs
[19]
        MCGUIRE, WOODS, BATTLE & BOOTHE, LLP
[20]    BY: J. MARK LANGDON, ESQ.
        Attorneys for the Defendant
[21]

[22]             * * *

[23]             DEPOSITION

[24]                OF

[25]           ANGELA MOBLEY

---

Page 2

[1]                 I N D E X

[2]  WITNESS: ANGELA MOBLEY

[3]                              PAGE
     Direct Examination
[4]  By Mr. Langdon                  4

[5]  Cross-Examination
     By Ms. Dolin                  164
[6]
     Redirect Examination
[7]  By Mr. Langdon               166

[8]  Recross-Examination
     By Ms. Dolin                 167
[9]

[10]        CERTIFIED QUESTIONS

[11]  Page 98 Line 13 through Page 101 Line 13

[12]
              E X H I B I T S
[13]
     Defendant's Exhibit No. 1         PAGE 19
[14] (Notice of Deposition)

[15] Defendant's Exhibit No. 2         PAGE 21
     (7-page Planner Calendar)
[16]
     Defendant's Exhibit No. 3         PAGE 52
[17] (Payroll Register Bate Stamped ESC-413)

[18] Defendant's Exhibit No. 4         PAGE 59
     (2-page Time Card for 1/16/98 through
[19] 1/31/98)

[20] Defendant's Exhibit No. 5         PAGE 74
     (2-page Time Card for 12/16/97 through
[21] 12/31/97)

[22] Defendant's Exhibit No. 6         PAGE 93
     (9-page Bank of America's First Requests
[23] for Admissions to Plaintiff Angela Mobley)

[24]

[25]

---

Page 3

[1]        E X H I B I T S continued

[2]  Defendant's Exhibit No. 7         PAGE 94
     (2-page Plaintiff Angela Mobley's Reply to
[3]  Bank of America's First Requests for
     Admissions)
[4]
     Defendant's Exhibit No. 8         PAGE 97
[5]  (2-page Consent to Become Party Plaintiff)

[6]  Defendant's Exhibit No. 9         PAGE 144
     (2-page Affidavit of Angela Mobley)
[7]
     Defendant's Exhibit No. 10        PAGE 153
[8]  (2-page Corrected Affidavit of Angela
     Mobley)
[9]
     Defendant's Exhibit No. 11        PAGE 155
[10] (Time Card for 1/16/98 through 1/31/98)

[11] Defendant's Exhibit No. 12        PAGE 157
     (Time Card for 2/1/98 through 2/5/98)
[12]

[13]

[14]

[15]

[16]

[17]

[18]            ┌──────────────┐
                │   EXHIBIT    │
[19]            │              │
                │      2       │
[20]            │   _____   │
                └──────────────┘
[21]

[22]

[23]

[24]

[25]

---

Page 4

[1]        Deposition of ANGELA MOBLEY, a witness of

[2]  lawful age, taken by the Defendant for the purpose of

[3]  discovery and for use as evidence in the above-entitled

[4]  matter, wherein ROXANNA L. ESCUDERO, and KIMBERLY DRAKE,

[5]  on behalf of themselves and all others similary situated

[6]  are the Plaintiffs and BANKAMERICA CORPORATION, a

[7]  foreign corporation d/b/a BANK OF AMERICA COPORATION, a

[8]  foreign corporation, f/k/a NATIONSBANK, N.A., a national

[9]  association is the Defendant pending in the United

[10] States District Court, Southern District of Florida,

[11] Pursuant to notice heretofore filed, before RUTH STUCK,

[12] Registered Professional Reporter and Notary Public in

[13] and for the State of Florida at Large, taken at 337 East

[14] Las Olas Boulevard, Fort Lauderdale, County of Broward,

[15] State of Florida, on the 9th day of February, 2001,

[16] commencing at 10:20 o'clock a.m.

[17]             * * *

[18] THEREUPON:

[19]             ANGELA MOBLEY

[20] a witness of lawful age, being called as a witness

[21] by the Defendant, having been first duly sworn,

[22] testified as follows:

[23]            DIRECT EXAMINATION

[24] BY MR. LANGDON:

[25]    Q.  Please state your name for the record.

Page 45

[ 1]  association meetings are.

[ 2]    Q.   Let me ask you this, did you understand that

[ 3]  prohibition against leaving the banking center during

[ 4]  the day to developing customers in your own banking

[ 5]  center community to be a corporate NationsBank policy or

[ 6]  was that imposed upon you by Ms. Lomax?

[ 7]    A.   Well, according to Ms. Lomax, we had to be

[ 8]  there every day all day.  So if I were to leave, that

[ 9]  would be some ground for some sort of personal, maybe

[10]  conflict, with my hours.  Because when I leave, she

[11]  doesn't know where I'm going.  But when I leave -- I

[12]  mean, when I'm there, I'm working.  I'm there.  If that

[13]  were the case, I would do that over the phone.

[14]    Q.   Did you ever ask Ms. Lomax whether you could

[15]  leave during the day to go out into the community to try

[16]  to develop customers?

[17]    A.   Actually we talked many times about having --

[18]  there was a school down the street from the branch and

[19]  what we talked about was maybe building some sort of

[20]  relationship with the schools to start first-time

[21]  savings accounts for children but, of course, it was

[22]  recommended that that be done after hours.

[23]    Q.   She told you do not attempt to do that until

[24]  after banking center hours?

[25]    A.   She told me that that would be done on my

Page 46

[ 1]  time.

[ 2]    Q.   That was her specific words?

[ 3]    A.   I don't recall.  In a nutshell, yes, that

[ 4]  would be on my time.

[ 5]    Q.   Let's go to the entry for January 26th.  If

[ 6]  you will read that for me, please, Ms. Mobley.

[ 7]    A.   January 26th, take car in for service at 7:30

[ 8]  a.m. and then I have from 8:30 to 5:00.  I took my car

[ 9]  in probably for oil change and was probably out of

[10]  there.

[11]    Q.   Do you know what the reference 8:30 to 5:00

[12]  is?

[13]    A.   Yes, those were the hours that I was recording

[14]  for my time sheet.  I think maybe it was shortly after

[15]  this time that we may have gone or before this, right in

[16]  this area, that we started to go on the time sheets.

[17]  And I was recording the hours every day.  So when my

[18]  time sheet would arrive, I would just actually take

[19]  these numbers and record them on the time sheet.

[20]    Q.   We'll go into this later.  Let's get through

[21]  these documents first because that raises another line

[22]  of questioning.

[23]         The entry for January 27th, if you could read

[24]  that.

[25]    A.   It's 8:30 to 5:00.

Page 47

[ 1]    Q.   What does that refer?

[ 2]    A.   Hours for the day, compensated hours for the

[ 3]  day.

[ 4]    Q.   I'm going to flip to the fourth page of

[ 5]  Defendant's Exhibit Number 2.  And if you're looking at

[ 6]  that page in a calendar, Ms. Mobley, would it be the

[ 7]  right-hand page for the month of the January?

[ 8]    A.   That is correct.

[ 9]    Q.   The first entry is January 15th?

[10]    A.   That is correct.

[11]    Q.   If you could read that entry, please.

[12]    A.   From 8:00 to 6:50.  Those would be related to

[13]  compensated hours for the day.

[14]    Q.   The next entry for January 16th, if you could

[15]  read that, please.

[16]    A.   Says from 8:30 to 1:00, but I must have gotten

[17]  sidetracked after lunch.

[18]    Q.   What were your typical hours on Friday?

[19]    A.   From 8 a.m. to 7 p.m.

[20]    Q.   And this reference only says 8:30 to 1:00.  Do

[21]  you recall some event transpiring specifically on

[22]  January 16th of 1998 that ended your working day at one

[23]  o'clock?

[24]    A.   No, Fridays were just basically horrific at a

[25]  banking center.  Fridays are paydays.  And, I mean, to

Page 48

[ 1]  say that we were always swamped -- we were always over

[ 2]  swamped on Fridays for limited staff for a number of

[ 3]  reasons.  So to say that -- I couldn't just actually sit

[ 4]  here and record because on Fridays I spent more time

[ 5]  handling customer service issues on the floor versus at

[ 6]  my desk, you know, handling customers so to speak.

[ 7]    Q.   The entry for January 21st, if could you read

[ 8]  that.

[ 9]    A.   8:30 to 5:00, which would be compensated

[10]  hours.

[11]    Q.   The entry for the 22nd?

[12]    A.   8:30 to 5:00.

[13]    Q.   Again, does that refer to compensated hours?

[14]    A.   That is correct.

[15]    Q.   And then Friday, January 23rd, if you could

[16]  read the entry on that date?

[17]    A.   From 8:30 to 1:00.  But that was Fridays so we

[18]  were just really busy on Fridays.

[19]    Q.   Did you -- strike that.

[20]         Was it your practice to record your hours on

[21]  this calendar and then transfer them over to the

[22]  timecard?

[23]    A.   That is correct.

[24]    Q.   The references on the calendar to the various

[25]  hours would be derived from where?  What would you look

**Page 49**

[1] at to determine these hours?

[2] A. The starting hours would be the actual

[3] starting hours. The ending hours would be hours that I

[4] was either told by Tamara Lomax that I should be signed

[5] out as of each day.

[6] Q. Did you make these entries on these calendar

[7] pages daily or would you enter the entries in advance?

[8] A. For the times they wouldn't be entered in

[9] advance unless it was lunch. There were many days

[10] that -- perfect example is Fridays. I truly may have

[11] signed out or here reference one o'clock because I

[12] didn't always bank at NationsBank, but I couldn't even

[13] leave to go to my own branch to do my own banking. So

[14] that was an attempt -- maybe I made an attempt on my

[15] lunch break, which I could not go because Fridays we

[16] were always swamped at branches.

[17] Q. Was it your practice to record these times at

[18] the beginning of the day or at the end of the day?

[19] A. Pretty much at the end of the day.

[20] Q. Let's flip to, I believe, the fifth page of

[21] Exhibit Number 2. And at the very top outside of a date

[22] block it looks like a name and phone number. Could you

[23] read that, please.

[24] A. It says, Nate, (404)278-1266. And actually

[25] that was a customer. So that was just maybe Monday I

**Page 50**

[1] had to call a follow up something with that customer.

[2] Q. The entry for Monday, February 2nd, if you

[3] could read that, please, ma'am.

[4] A. Mandatory meeting after work.

[5] Q. Do you recall what this meeting concerned?

[6] A. I don't recall.

[7] Q. Do you recall whether it was a work-related

[8] meeting or a meeting related to some other function?

[9] A. I'm sure it was work related, was mandatory

[10] after work.

[11] Q. Do you recall that specifically that it was an

[12] after-work meeting related to work?

[13] A. I'm sure I would not put that there if that's

[14] what it was.

[15] Q. The next entry on this page appears to be

[16] February 17th?

[17] A. Uh-huh.

[18] Q. And if you could read that entry, please.

[19] A. That would be from 8:30 to six o'clock.

[20] Q. And, again, does that refer to hours?

[21] A. That's correct.

[22] Q. Let's flip to the sixth page of Defendant's

[23] Exhibit Number 2. And, again, if you're looking at the

[24] calendar for the month of February, it would be the

[25] right-hand page, correct?

**Page 51**

[1] A. That's correct.

[2] Q. First entry is for February 18th. If you

[3] could read that, please.

[4] A. 8:30.

[5] Q. To what does that refer?

[6] A. I arrived at 8:30.

[7] Q. And then you have an entry for February 21st?

[8] A. Uh-huh.

[9] Q. If you could read that.

[10] A. Work.

[11] Q. And then there was an entry made for February

[12] 26th that looks like it's been scratched through. Can

[13] you make heads or tails of that?

[14] A. I am not able to.

[15] MS. DOLIN: Don't guess. If you can read it,

[16] fine.

[17] THE WITNESS: I can't.

[18] BY MR. LANGDON:

[19] Q. And then turn to the last page of the exhibit.

[20] It appears to be the left-hand side of a calendar page

[21] for March, correct?

[22] A. That's correct.

[23] Q. And there's no entries thereon?

[24] A. No entries.

[25] Q. If I understood your testimony correctly

**Page 52**

[1] earlier, you had resigned from your employment with

[2] NationsBank prior to March of '98; is that correct?

[3] A. That's correct.

[4] Q. The next exhibit that you brought with you

[5] this morning is a one-page document that I'm going to

[6] hand to the court reporter and ask her to mark as

[7] Defendant's Exhibit Number 3, I believe.

[8] MS. DOLIN: This is Bate stamped ESC-413. Is

[9] that the one?

[10] MR. LANGDON: Yes.

[11] (Thereupon, document marked as Defendant's

[12] Exhibit Number 3 for identification.)

[13] BY MR. LANGDON:

[14] Q. I'm going to hand you, Ms. Mobley, what's been

[15] marked as Defendant's Exhibit Number 3 and ask you to

[16] take a look at that, please.

[17] A. Okay.

[18] Q. If I could borrow the actual exhibit back

[19] because I believe you have the original document you

[20] produced in front of you, correct?

[21] A. Yes.

[22] Q. I'll refer to the exhibit while you refer to

[23] the original. Do you recognize this document?

[24] A. Yes, it's actually pay stubs.

[25] Q. Are these the form of pay stubs that you

Page 65

[1] which it was intended to track, how would you go about
[2] tracking your time so you could then transfer it on to
[3] the timecard once you received it?
[4]    A.  Well, actually I did not have to really track
[5] my time with the exception of Fridays.  At that time my
[6] branch manager, which was Tamara Lomax, actually
[7] explained to me she was not compensating me for overtime
[8] and I should be logged out every day by 5:00.
[9]    Q.  Let's talk about that a little bit because
[10] that's something I intended to discuss later on in your
[11] deposition today but we can get into that now.
[12]        How did Ms. Lomax inform you that you would
[13] only be compensated for 40 hours a week?
[14]    A.  Because my threshold was not where it was
[15] supposed to be, she was not willing to pay me overtime.
[16]    Q.  When did you have this conversation where
[17] she told you because your threshold -- and I take that
[18] to be related to performance, correct?
[19]    A.  Correct.
[20]    Q.  -- that your threshold was not where they
[21] should be so you were not entitled to overtime?
[22]    A.  That would be when we started the timecards.
[23]    Q.  Your recollection as to when that was is?
[24]    A.  Late December or early January.  So when we
[25] started time sheets, the issue was overtime.  And her

Page 66

[1] explanation to me was she didn't feel it was necessary
[2] to compensate me overtime because my threshold was not
[3] where it should have been.
[4]    Q.  Was this a private conversation between only
[5] you and Ms. Lomax?
[6]    A.  I don't recall.
[7]    Q.  What did she tell you in this conversation as
[8] to how you were then to handle your overtime?
[9]    A.  There was no other option.  She would actually
[10] explain to me that you should be signed out by 5:00.  So
[11] that means each day on my time sheet I had to be signed
[12] out by 5:00.  Or say if it was -- the first week of the
[13] month is a perfect example.  That's a very busy, hectic
[14] week.
[15]        So she may say, well, this week you should be complete
[16] this week by 5:30, regardless of what time I was
[17] actually done.  She indicated to me that my time should
[18] not reflect a minute over 5:30 or five o'clock, whatever
[19] it was at that time.
[20]    Q.  Did she specifically tell you that because of
[21] your threshold levels you were not permitted to record
[22] overtime?
[23]    A.  Yes.
[24]    Q.  She said that in that many words, that because
[25] of your threshold levels, Ms. Mobley, you cannot record

Page 67

[1] overtime?
[2]    A.  Because of my threshold levels that she would
[3] not allow me to work for hours longer than she
[4] indicated, which would be five o'clock or 5:30.  But a
[5] senior branch manager was not allowed to stay and be
[6] compensated because her threshold was always higher.
[7]    Q.  The senior branch manager?
[8]    A.  I mean the senior CB.
[9]    Q.  That was Ms. Billingsly?
[10]    A.  Yes.
[11]    Q.  Did Ms. Lomax ever say to you you are to sign
[12] out at 5:00 every day regardless of whether you worked
[13] longer or not?
[14]    A.  Yes, uh-huh.  She indicated to me either -- I
[15] want to say maybe weekly and it depended on how the week
[16] was.  She would indicate to me, you should be done this
[17] week by five o'clock.
[18]    Q.  Did Ms. Lomax set your schedule on a weekly
[19] basis?
[20]    A.  Pretty much after the time sheets, yes.
[21]    Q.  Did she set the schedules of other branch
[22] personnel on a weekly schedule?
[23]    A.  Actually she set all our schedules before the
[24] time sheets.  We had to be in at eight o'clock.  After
[25] the time sheets it changed to 8:30.

Page 68

[1]    Q.  When would she distribute the schedule she had
[2] created for the week?
[3]    A.  There was no schedule.
[4]    Q.  When would you be informed what your schedule
[5] was going to be for the week?
[6]    A.  Once the time sheet process started, we were
[7] told that our hours would change from 8:00 to 8:30.
[8]    Q.  I understand that.  But at what point in the
[9] week would she come to you and say, Ms. Mobley, your
[10] schedule for this week will be as follows?
[11]    A.  She never told me that.  What she would
[12] explain is that as of this week, you should be done
[13] every day by 5:00.  So that meant to me I need to be
[14] signed out by 5:00.
[15]    Q.  And the term she used was, this week you
[16] should be done every day by 5:00?
[17]    A.  Uh-huh.  And actually to elaborate a little
[18] further, I should be done this week by 5:00, but I still
[19] need to get my threshold up.  So whatever that means to
[20] you, you know, that's what I needed to do.
[21]    Q.  Did she specifically say to you, Ms. Mobley,
[22] you should be done every day this week by 5:00, and if
[23] you work longer than that, you are not to record that
[24] time?
[25]    A.  That I will not be paid for it, uh-huh.

---

**Page 1**

[ 1]             UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA

[ 2]        CASE NO. 00-614S-CIV-DIMITROULEAS

[ 3]
        ROXANNA L. ESCUDERO, and          )
[ 4] KIMBERLY DRAKE, on behalf of         )
        themselves and all others similary )
[ 5] situated,                            )
                                          )
[ 6]          Plaintiff's                 )
                                          )
[ 7]      vs.                             )
                                          )
[ 8] BANKAMERICA CORPORATION,             )
        a foreign corporation d/b/a        )
[ 9] BANK OF AMERICA CORPORATION,         )
        a foreign corporation, f/k/a       )
[10] NATIONSBANK, N.A., a national        )
        association,                       )
[11]                                      )
              Defendant,                  )
[12] ------

[13]
                337 East Las Olas Boulevard
[14]            Fort Lauderdale, Florida
                February 9, 2001
[15]            2:30 p.m. - 5:30 p.m.

[16]
        APPEARANCES:
[17]
        MUCHNICK, WASSERMAN, DOLIN & LEVINE, LLP
[18]    BY: SUSAN DOLIN, ESQ.
        Attorneys for the Plaintiffs
[19]
        MCGUIRE, WOODS, BATTLE & BOOTHE, LLP
[20]    BY: J. MARK LANGDON, ESQ.
        Attorneys for the Defendant
[21]

[22]              * * *

[23]           DEPOSITION

[24]              OF

[25]         DIANE M. KIRKLAND

---

**Page 2**

[ 1]              I N D E X

[ 2] WITNESS: DIANE M. KIRKLAND

[ 3]                                    PAGE
        Direct Examination
[ 4] By Mr. Langdon                      4

[ 5] Cross-Examination
        By Ms. Dolin                    103
[ 6]
        Redirect Examination
[ 7] By Mr. Langdon                     120

[ 8] Recross-Examination
        By Ms. Dolin                    125
[ 9]

[10]
             CERTIFIED QUESTIONS
[11]
        Page 29 Line 25 through Page 30 Line 3
[12]    Page 87 Line 20 through Page 88 Line 20

[13]
              E X H I B I T S
[14]
        Defendant's Exhibit No. 1       PAGE 15
[15] (4-page Notice of Deposition)

[16] Defendant's Exhibit No. 2          PAGE 19
        (9-page Bank of America's First Requests
[17] for Admissions to Plaintiff Diane Kirkland)

[18] Defendant's Exhibit No. 3          PAGE 19
        (2-page Plaintiff Diane Kirkland's Reply to
[19] Bank of America's First Requests for
        Admissions)
[20]
        Defendant's Exhibit No. 4       PAGE 26
[21] (2-page Consent to Become Party Plaintiff)

[22] Defendant's Exhibit No. 5          PAGE 41
        (Handwritten Note)
[23]
        Defendant's Exhibit No. 6       PAGE 81
[24] (2-page Affidavit of Diane Kirkland)

[25]

---

**Page 3**

[ 1]      E X H I B I T S continued

[ 2] Defendant's Exhibit No. 7          PAGE 84
        (3-page Amended Affidavit of Diane Kirkland)
[ 3]
        Defendant's Exhibit No. 8       PAGE 95
[ 4] (Copy of Pay Stubs)

[ 5] Defendant's Exhibit No. 9          PAGE 97
        (3-page Copy of Time Cards)
[ 6]

[ 7]

[ 8]

[ 9]

[10]

[11]

[12]

[13]        **EXHIBIT**

[14]
            _3_
[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

**Page 4**

[ 1]      Deposition of DIANE M. KIRKLAND, a witness of

[ 2] lawful age, taken by the Defendant for the purpose of

[ 3] discovery and for use as evidence in the above-entitled

[ 4] matter, wherein ROXANNA L. ESCUDERO, and KIMBERLY DRAKE,

[ 5] on behalf of themselves and all others similary situated

[ 6] are the Plaintiffs and BANKAMERICA CORPORATION, a

[ 7] foreign corporation d/b/a BANK OF AMERICA COPORATION, a

[ 8] foreign corporation, f/k/a NATIONSBANK, N.A., a national

[ 9] association is the Defendant pending in the United

[10] States District Court, Southern District of Florida,

[11] Pursuant to notice heretofore filed, before RUTH STUCK,

[12] Registered Professional Reporter and Notary Public in

[13] and for the State of Florida at Large, taken at 337 East

[14] Las Olas Boulevard, Fort Lauderdale, County of Broward,

[15] State of Florida, on the 9th day of February, 2001,

[16] commencing at 2:30 o'clock p.m.

[17]              * * *

[18] THEREUPON:

[19]          DIANE M. KIRKLAND

[20] a witness of lawful age, being called as a witness

[21] by the Defendant, having been first duly sworn,

[22] testified as follows:

[23]          DIRECT EXAMINATION

[24] BY MR. LANGDON:

[25]     Q.   Would you state your name for the record,

Page 101

[1]  Q.  And to Ms. Horne's initials also appear?

[2]  A.  Yes.

[3]  Q.  Again, let's look at that second page of the

[4] exhibit. Again, all the information -- strike that.

[5]     All the time entries in the in-out columns for

[6] the dates listed, is that your handwriting?

[7]  A.  Yes.

[8]  Q.  And, again, let's look at the very last page

[9] of Exhibit Number 9. Same question, the handwriting

[10] entry in the in-out column at the top of the timecard,

[11] is that your handwriting?

[12]  A.  Yes.

[13]  Q.  And, again, dropping down to the next row of

[14] information, I believe the first entry is under the

[15] block entry captioned 16M, and the last entry is under

[16] the block entry captioned 28S. Is that your

[17] handwriting, those entries in that row?

[18]  A.  Yes.

[19]  Q.  The entry of 3.0 hours in the overtime block,

[20] is that your handwriting?

[21]  A.  No.

[22]  Q.  Do you recognize that to be the handwriting of

[23] Ms. Horne?

[24]  A.  Yes.

[25]  Q.  And do your initials appear on this timecard

Page 102

[1] as well?

[2]  A.  Yes.

[3]  Q.  And do Ms. Horne's appear?

[4]  A.  Yes.

[5]  Q.  And then if you can just flip over to the back

[6] portion. The time entries in the in-out columns for, I

[7] believe, four dates, is that your handwriting?

[8]  A.  Yes.

[9]  Q.  I'd like to shift gears a little bit, Ms.

[10] Kirkland. We're almost finished.

[11]     I understand you separated from your

[12] employment with the bank in mid March of 1998; is that

[13] correct?

[14]  A.  Yes.

[15]  Q.  Did you resign from your employment with the

[16] bank?

[17]  A.  Yes.

[18]  Q.  For what reasons did you resign?

[19]  A.  To favor more pay at a different employer.

[20]  Q.  Is that the State Farm job in which you are

[21] currently employed?

[22]  A.  Yes.

[23]  Q.  You had a better opportunity?

[24]  A.  Better opportunity, yes.

[25]  Q.  If you can just give me just a second to kind

Page 103

[1] of review my notes, I think we're finished or I'm at

[2] least finished. Ms. Dolin may have some questions for

[3] you.

[4]     Ms. Kirkland, have you testified completely

[5] and truthfully in your deposition here today?

[6]     MS. DOLIN:  Object to form.

[7]     You can answer.

[8]     THE WITNESS:  As far as I can from what I can

[9] remember, yes.

[10] BY MR. LANGDON:

[11]  Q.  To the best of your ability, you answered my

[12] questions truthfully and accurately, correct?

[13]  A.  Yes.

[14]     MR. LANGDON:  That's all the questions I have.

[15] Thank you so much for your time.

[16]     MS. DOLIN:  Can I please have Exhibits 6 and

[17] 7.

[18]           CROSS-EXAMINATION

[19] BY MS. DOLIN:

[20]  Q.  Ms. Kirkland, looking at Exhibits 6 and 7,

[21] now, Mr. Langdon asked you a series of questions about

[22] what Louise Horne may or may not have said. I want to

[23] clear this up. Did you record your hours on your

[24] timecards accurately?

[25]  A.  Accurately?

Page 104

[1]  Q.  Yes, ma'am.

[2]     Did you record every hour that you worked on

[3] the timecards?

[4]  A.  Probably not every hour, no. There are some

[5] timecards that are missing from that period too.

[6]  Q.  We know that. And of the timecards that may

[7] be missing but we don't know what they recorded on, the

[8] timecards that are here, are the timecards recorded

[9] accurately, and you've said no.

[10]     MR. LANGDON:  Objection. I think that's a

[11] mischaracterization of testimony.

[12] BY MS. DOLIN:

[13]  Q.  Did you record the timecards accurately?

[14]  A.  From the best of my knowledge they could have

[15] been, but there could have been some other overtime as

[16] well. But on these particular timecards they probably

[17] are pretty close.

[18]  Q.  Do you know whether on those particular

[19] timecards, which is Exhibit 9, do you know whether those

[20] timecards are completely and truthfully accurate to the

[21] penny, to the hour?

[22]  A.  I can't say.

[23]  Q.  You don't know?

[24]  A.  Exactly.

[25]  Q.  Now, do you have any recollection at all

**Page 105**

[1] during your tenure with NationsBank from 1997, the

[2] summer of '97 to the time you left in mid March of '98

[3] of not recording all your hours on any one timecard?

[4]    A. Can you repeat that again?

[5]    Q. Sure.

[6]      During your tenure with NationsBank, starting

[7] from the time they put you back on the clock as a

[8] consumer banker at the end of mid December, 1997 to the

[9] time you terminated your employment with NationsBank in

[10] mid March, 1998, is there ever any time that you can

[11] recall when you did not record your hours on your

[12] timecard accurately?

[13]    A. Yes.

[14]    Q. Can you tell us why you did that?

[15]    A. Because we weren't allowed to put all the

[16] overtime on there, and it took more time to get my work

[17] done.

[18]    Q. Now, who told you, if anyone did, that you

[19] were not allowed to record all your hours on the

[20] timecard?

[21]    A. Louise Horne may have told us, but for her

[22] exact words, I can't remember a specific time and her

[23] exact words. I know it was known not to record.

[24]    Q. And the person that imparted that knowledge to

[25] you regardless of the words used was Louise Horne?

**Page 106**

[1]      MR. LANGDON: Objection to the form.

[2]      MS. DOLIN: What's wrong with the form?

[3]      MR. LANGDON: I believe it's inconsistent to

[4] what she testified to previous, number one. Two,

[5] it suggests an answer.

[6]      MS. DOLIN: You're saying leading? This is

[7] cross-examination.

[8] BY MS. DOLIN:

[9]    Q. Let me ask it this way, who was it that gave

[10] you that idea — no matter what words might have been

[11] used — that you were not to record the overtime hours

[12] that you didn't record on your timecard?

[13]    A. Louise Horne.

[14]    Q. Now, is it fair to say that you don't remember

[15] exactly what words she used?

[16]    A. Right.

[17]    Q. But that was the idea that was imparted to

[18] you?

[19]    A. Yes.

[20]    Q. Now, let's take a look at this Exhibit 9. I

[21] want you to look at this very carefully. Look at the

[22] first page, for example, a timecard that's listed as

[23] January 1st of '98 through January 15th of '98. Is it

[24] true that you were paid on the 1st and 15th?

[25]    A. Yes.

**Page 107**

[1]    Q. So you would have split weeks? In other

[2] words, some weeks didn't end on a Sunday or start on a

[3] Monday?

[4]    A. Right.

[5]    Q. Now, that would result in carry-over hours?

[6]    A. Yes.

[7]    Q. And carry-over hours are shown in this first

[8] column which is in the first box of the second row of

[9] information?

[10]    A. Right.

[11]    Q. And they would be added up to the next Sunday,

[12] correct?

[13]    A. Right.

[14]    Q. Then that would be a whole week?

[15]    A. Uh-huh.

[16]    Q. Then you would start with the next Monday the

[17] day following the next Sunday?

[18]    A. Yes.

[19]    Q. Now, what I would like to know is you've

[20] already testified that the in-out in-out on your first

[21] timecard is your handwriting, correct?

[22]    A. Correct.

[23]    Q. Looking at the bottom row, second row,

[24] starting with the carry-over hours for 25 and going to

[25] the end of that row, are you absolutely positive that's

**Page 108**

[1] your handwriting?

[2]    A. The 25 I don't think is my handwriting.

[3] Doesn't appear to be my handwriting. But the rest of it

[4] is.

[5]    Q. The rest of it is?

[6]    A. The 25 or the 41 doesn't either appear to be

[7] my writing.

[8]    Q. 41 is not your handwriting either?

[9]    A. That 41 is not my writing.

[10]    Q. The 40 is?

[11]    A. Yes.

[12]    Q. Now, what about the one under the overtime

[13] column?

[14]    A. That's Louise's handwriting.

[15]    Q. Do you know what that scratch out is before

[16] the 1?

[17]    A. No.

[18]    Q. Let's go up to the top column where the

[19] in-outs are. You see 5 Monday on the very top?

[20]    A. Yes.

[21]    Q. And you see the next day is 6 Tuesday, which

[22] would by January 6th, it looks like?

[23]    A. Yes.

[24]    Q. Now, you see the first entry on the in column

[25] of Tuesday the 6th. It says 8:30, correct?

Page 105

[ 1] during your tenure with NationsBank from 1997, the
[ 2] summer of '97 to the time you left in mid March of '98
[ 3] of not recording all your hours on any one timecard?
[ 4] A. Can you repeat that again?
[ 5] Q. Sure.
[ 6] During your tenure with NationsBank, starting
[ 7] from the time they put you back on the clock as a
[ 8] consumer banker at the end of mid December, 1997 to the
[ 9] time you terminated your employment with NationsBank in
[10] mid March, 1998, is there ever any time that you can
[11] recall when you did not record your hours on your
[12] timecard accurately?
[13] A. Yes.
[14] Q. Can you tell us why you did that?
[15] A. Because we weren't allowed to put all the
[16] overtime on there, and it took more time to get my work
[17] done.
[18] Q. Now, who told you, if anyone did, that you
[19] were not allowed to record all your hours on the
[20] timecard?
[21] A. Louise Horne may have told us, but for her
[22] exact words, I can't remember a specific time and her
[23] exact words. I know it was known not to record.
[24] Q. And the person that imparted that knowledge to
[25] you regardless of the words used was Louise Horne?

Page 106

[ 1]       MR. LANGDON: Objection to the form.
[ 2]       MS. DOLIN: What's wrong with the form?
[ 3]       MR. LANGDON: I believe it's inconsistent to
[ 4]   what she testified to previous, number one. Two,
[ 5]   it suggests an answer.
[ 6]       MS. DOLIN: You're saying leading? This is
[ 7]   cross-examination.
[ 8] BY MS. DOLIN:
[ 9] Q. Let me ask it this way, who was it that gave
[10] you that idea -- no matter what words might have been
[11] used -- that you were not to record the overtime hours
[12] that you didn't record on your timecard?
[13] A. Louise Horne.
[14] Q. Now, is it fair to say that you don't remember
[15] exactly what words she used?
[16] A. Right.
[17] Q. But that was the idea that was imparted to
[18] you?
[19] A. Yes.
[20] Q. Now, let's take a look at this Exhibit 9. I
[21] want you to look at this very carefully. Look at the
[22] first page, for example, a timecard that's listed as
[23] January 1st of '98 through January 15th of '98. Is it
[24] true that you were paid on the 1st and 15th?
[25] A. Yes.

Page 107

[ 1] Q. So you would have split weeks? In other
[ 2] words, some weeks didn't end on a Sunday or start on a
[ 3] Monday?
[ 4] A. Right.
[ 5] Q. Now, that would result in carry-over hours?
[ 6] A. Yes.
[ 7] Q. And carry-over hours are shown in this first
[ 8] column which is in the first box of the second row of
[ 9] information?
[10] A. Right.
[11] Q. And they would be added up to the next Sunday,
[12] correct?
[13] A. Right.
[14] Q. Then that would be a whole week?
[15] A. Uh-huh.
[16] Q. Then you would start with the next Monday the
[17] day following the next Sunday?
[18] A. Yes.
[19] Q. Now, what I would like to know is you've
[20] already testified that the in-out in-out on your first
[21] timecard is your handwriting, correct?
[22] A. Correct.
[23] Q. Looking at the bottom row, second row,
[24] starting with the carry-over hours for 25 and going to
[25] the end of that row, are you absolutely positive that's

Page 108

[ 1] your handwriting?
[ 2] A. The 25 I don't think is my handwriting.
[ 3] Doesn't appear to be my handwriting. But the rest of it
[ 4] is.
[ 5] Q. The rest of it is?
[ 6] A. The 25 or the 41 doesn't either appear to be
[ 7] my writing.
[ 8] Q. 41 is not your handwriting either?
[ 9] A. That 41 is not my writing.
[10] Q. The 40 is?
[11] A. Yes.
[12] Q. Now, what about the one under the overtime
[13] column?
[14] A. That's Louise's handwriting.
[15] Q. Do you know what that scratch out is before
[16] the 1?
[17] A. No.
[18] Q. Let's go up to the top column where the
[19] in-outs are. You see 5 Monday on the very top?
[20] A. Yes.
[21] Q. And you see the next day is 6 Tuesday, which
[22] would by January 6th, it looks like?
[23] A. Yes.
[24] Q. Now, you see the first entry on the in column
[25] of Tuesday the 6th. It says 8:30, correct?

Page 109

[1]  A.  Correct.

[2]  Q.  That appears to have been written over

[3]  something else?

[4]  A.  Correct.

[5]  Q.  Do you know what's underneath that?  Can you

[6]  tell?

[7]  A.  It looks like 7:45 but I'm not sure.  I can't

[8]  tell.

[9]  Q.  Changed to 8:30?

[10]  A.  Yes.

[11]  Q.  Who changed it?

[12]  A.  I could have.

[13]  Q.  Do you know why you would have changed it?  Is

[14]  that your writing, that 8:30?  Does that look like the

[15]  way you make your 8's?

[16]  A.  No, not really.  That doesn't look like my

[17]  writing.  Doesn't appear to be my writing.

[18]  Q.  That 8:30 that's scratched in, 8:30 is not

[19]  your writing?

[20]  A.  Right.

[21]  Q.  Go to the next one.  Can you tell, if you can,

[22]  whether 7:45 underneath the 8:30 is your writing?

[23]      MR. LANGDON:  Objection to form.

[24]      If you can tell.

[25]      THE WITNESS:  If I can tell, yes, it appears

Page 110

[1]  the 5 that's under the 0 looks a lot like my 5.

[2] BY MS. DOLIN:

[3]  Q.  Go down to the following day of Wednesday, see

[4]  Wednesday, January 7th?

[5]  A.  Yes.

[6]  Q.  Now, there's an in that's 7:45 and an out that

[7]  says 12:45 and an in that says -- can you read that?

[8]  A.  4:30 it looks like.

[9]  Q.  See under January 7th where it says 14:30?

[10]  A.  Yes.

[11]  Q.  Did you ever use a 24-hour clock when you were

[12]  recording things?

[13]  A.  Yes.

[14]  Q.  What was 14:30?

[15]  A.  Must have been 2:30.  That's military time.

[16]  Q.  And did you ever use military time when you

[17]  would record ins and outs?

[18]      MR. LANGDON:  Objection, asked and answered.

[19] BY MS. DOLIN:

[20]  Q.  You can answer.

[21]  A.  Not normally.

[22]  Q.  Did Louise?

[23]  A.  She may have because that was from -- I think

[24]  a long time ago we used to do military time.

[25]  Q.  She did?

Page 111

[1]  A.  Uh-huh.

[2]  Q.  That's a yes?

[3]  A.  Yes.

[4]  Q.  That 14:30, is that your handwriting?

[5]  A.  It doesn't appear to be my writing.

[6]  Q.  Can you see what's underneath the 14:30?

[7]  A.  No, I can't make it out.

[8]  Q.  You can't make it out at all?  Can you make

[9]  out any of it?

[10]  A.  The last of it might be a 45.

[11]  Q.  Can you see what's -- I'm sorry.  I didn't

[12]  mean to interrupt.

[13]  A.  No, I can't exactly.

[14]  Q.  Can you see what's under it, well, enough to

[15]  notice whether or not what's under it is in your

[16]  handwriting?

[17]  A.  Yes.

[18]  Q.  Is it?

[19]  A.  Yes.

[20]  Q.  Now, let's go back.  You've got the second

[21]  line of information.  You got your carry-over hours of

[22]  25, then January 1st, Tuesday, 8; January 2nd, Friday,

[23]  8; then the 41 with the circle.  Then the next entry is

[24]  January 5th for 8 hours which would correspond for

[25]  Monday the 5th.  Then you have Tuesday the 6th with that

Page 112

[1]  changed entry of 8:30.  You see there's an entry there

[2]  of hours that has -- can you read it?

[3]  A.  It looks like it should have been 8:25 maybe

[4]  underneath instead of 7:50.

[5]  Q.  Did you make that change?  Is that your

[6]  handwriting?

[7]  A.  No.

[8]  Q.  That 7.25, is that your handwriting?

[9]  A.  On the 6th?

[10]  Q.  Yes.

[11]  A.  On the 6th?

[12]  Q.  Yes.

[13]  A.  No.  From the 7 to the 2, that's not my

[14]  handwriting.

[15]  Q.  What about on Wednesday where the 14:30 is

[16]  reflected above it looks like in the box below where the

[17]  actual hours are recorded there's a 7.50, is that your

[18]  handwriting, that 7.50?

[19]  A.  Looks a lot like it but it could -- I don't

[20]  know.

[21]  Q.  Can you see anything underneath that 7.50?

[22]  A.  8.25 it looks like.

[23]  Q.  Can you make it out well enough, the number

[24]  underneath, to know whether that's your handwriting?

[25]  A.  Yes, that is my handwriting.

Page 113

[1] Q. Did you make that change?

[2] A. Not that I recall.

[3] Q. Have you ever changed a timecard or have you

[4] ever given back a timecard to change once you've given

[5] it in?

[6] A. I have changed them before just so they would

[7] equal 40, but I don't remember if I changed this one or

[8] not. Doesn't appear that I did.

[9] Q. Now, without the changes, this one would have

[10] been over 40; isn't that correct?

[11] A. Yes.

[12] Q. Let's go to the next timecard which is 2/1/98,

[13] 2/15/98. You have what looks like a total of 42.25

[14] hours, and then you start again on Monday, which would

[15] be February 2nd, it looks like?

[16] A. Yes.

[17] Q. Now, the in and out is your handwriting?

[18] A. Yes.

[19] Q. And the numbers beneath that recording the

[20] actual hours, is that your handwriting as well?

[21] A. Yes.

[22] Q. 42.25 for the following Sunday?

[23] A. Uh-huh, yes.

[24] Q. So that would be it for that week.

[25] Now, starting the following Monday, starting

Page 114

[1] the 9th – or let me ask you this, on Thursday the 5th,

[2] do you see there where it says 8:30?

[3] A. Yes.

[4] Q. Time in for February 5th?

[5] A. Yes.

[6] Q. And do you know if that was changed?

[7] A. Yes, it was changed.

[8] Q. From what, if you can see? If you can't see,

[9] that's fine.

[10] A. I can't see. It looks like a 45, but I don't

[11] know what the first number is.

[12] Q. That 8:30, is that your writing?

[13] A. It doesn't appear to be my writing, but it

[14] could be because I know I've changed some.

[15] Q. Can you look – you can't tell?

[16] A. No.

[17] Q. Now, if you look underneath 8:30, something

[18] appears to have been written over. Can you see that?

[19] A. Uh-huh.

[20] Q. Yes or no?

[21] A. Yes.

[22] Q. Can you make out what is underneath the 8:30

[23] well enough to see whether what is underneath is your

[24] handwriting?

[25] A. Yes, underneath is my handwriting.

Page 115

[1] Q. But you don't know what it says?

[2] A. But I'm not sure what it says.

[3] Q. Do you know who made that change?

[4] A. No.

[5] Q. Going to the backside of that timecard where

[6] it shows the 9th through the 15th, which I'm assuming is

[7] February, you see where I'm at?

[8] A. Yes.

[9] Q. Looking at the in-out section again, look at

[10] the 10th on Tuesday. You have an out time of what

[11] appears to be 11:30?

[12] A. Yes.

[13] Q. Does there appear to be – is that your

[14] handwriting, that 11:30?

[15] A. It appears to be.

[16] Q. There's something underneath that 11:30, if

[17] you can tell?

[18] A. Looks – I don't know. I can't really tell.

[19] Looks like it's a 00 but I can't tell.

[20] Q. Now, going to – you made these entries in

[21] these timecards with pen or pencil?

[22] A. With pen.

[23] Q. And when you made changes with the timecards,

[24] how was that accomplished?

[25] A. With pen writing over it, I guess. I

Page 116

[1] couldn't – we weren't supposed to. However, at the

[2] beginning I did use White-Out, but I don't think I used

[3] White-Out on this one.

[4] Q. Were you permitted to use White-Out?

[5] A. No, we shouldn't have. I used pen.

[6] Q. White-Out was forbidden?

[7] A. Right. I remember I did it once and got in

[8] trouble, so I didn't do it anymore.

[9] Q. Now, let me show you the back of these

[10] timecards. For example, there's a calculation on the

[11] back of Exhibit 9, first page of Exhibit 9, where it

[12] shows week one, week two, week three, calculation of

[13] exceptions hours, if hours worked are more than 40,

[14] enter hours over 40 as overtime, if hours are less than

[15] 40, enter absence without pay. Those are not filled in,

[16] are they?

[17] A. No.

[18] Q. Are you responsible for filling those in?

[19] A. No.

[20] Q. Do you know who is?

[21] A. No.

[22] Q. Second page of that exhibit, same question.

[23] Are those filled in?

[24] A. No.

[25] Q. Do you know who's responsible for filling them

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true

true



| | 01 THU | 02 FRI | 03 SAT | 04 SUN | 05 MON | 06 TUE | 07 WED | 08 THU |
|---|---|---|---|---|---|---|---|---|

HOLIDAY

Regular
Overtime   Total Hrs
Worked Holiday
Absence Without Pay

Borrowed Hours
Charge to Cost Cntr.
Borrowed Hours
Charge to Cost Cntr.

INITIALS
Employee   Supervisor

Employee Name and Location   Employee No.   Company   City/Branch/Unit   Pay Period

KIRKLAND, DIANE M      FL3-208-01-01      346544830   805 00001620      010198 - 011598



‖⁴ 346544830   ‖⁴



DEFENDANT'S
EXHIBIT
No. 9
29-01



⑊³⁴⁶⁵⁴⁴⁸³⁰ ⑊



Employee Name and Location: KIRKLAND, DIANE M

Employee No. FL3-209-01-01

Company 346544830

City/Branch/Unit 805 0000 1620

Pay Period 021030 · 022898

‖ 346544830 ‖

Page 117

[1]  in?

[2]  A.  No.

[3]  Q.  The back of the third sheet, same question.

[4]  Are those filled in?

[5]  A.  No.

[6]  Q.  Do you know who's responsible for filling them

[7]  in?

[8]  A.  No.

[9]  Q.  Did you ever fill them in?

[10]  A.  No.

[11]  Q.  Now, when you would come into the bank, did

[12]  you -- I think Mr. Langdon asked you about a log.  There

[13]  was a sign-in log, a vault log or something.  Did you

[14]  have any knowledge of that?

[15]      MR. LANGDON:  Objection I don't believe the

[16]  testimony was there was a log that existed.

[17]      THE WITNESS:  Exactly.

[18] BY MS. DOLIN:

[19]  Q.  That's what I'm asking.  There was no log that

[20]  you remember?

[21]  A.  There was none.

[22]  Q.  Would you ever open the bank?

[23]  A.  Yes.

[24]  Q.  When you open the bank, was that dual control?

[25]  A.  Yes.

Page 118

[1]  Q.  When you would open the bank, did you have to

[2]  code in your alarm code?

[3]  A.  Yes.

[4]  Q.  And did you actually do that on occasion?

[5]  A.  Yes.

[6]  Q.  And do you know where those would be recorded?

[7]  A.  No.

[8]  Q.  Where the alarm rings would be recorded?

[9]  A.  No.

[10]  Q.  Now, when you left the bank late, did you have

[11]  to set the alarm or ring out?

[12]  A.  Sometimes if I was the last person, yes.

[13]  Q.  And that happened on occasion?

[14]  A.  On occasion.

[15]  Q.  Again, you would have to ring your alarm code

[16]  in?

[17]  A.  Right, yes.

[18]  Q.  And do you know where those would be logged?

[19]  A.  No.

[20]  Q.  Now, you had a computer at work; did you not?

[21]  A.  Yes.

[22]  Q.  When you would log on to your computer, would

[23]  you do that as soon as you came into the bank?

[24]  A.  Normally, yes.

[25]  Q.  And would that be the last thing you did at

Page 119

[1]  right before you left the bank, you would log off?

[2]  A.  Normally, yes.

[3]  Q.  Were there ever times that you would come into

[4]  the bank and do other things before logging on?

[5]  A.  Sometimes if I got there early I would open

[6]  the branch -- open the vault with the teller and do all

[7]  the teller duties prior to logging into my computer.

[8]  Q.  Now, if you did that, would your time entry be

[9]  recorded somewhere?

[10]  A.  No.

[11]  Q.  Not with an alarm ring, not with anything?

[12]  A.  Well, with an alarm ring it could be, with me

[13]  punching in the codes.

[14]  Q.  But if the teller was the one that punched in

[15]  her codes, yours wouldn't be there?

[16]  A.  Right.

[17]  Q.  There was no other log on which you would

[18]  record your time in?

[19]  A.  Not other than the timecard itself.

[20]  Q.  And we've already shown that those are not

[21]  really accurate; isn't that correct?

[22]  A.  That's correct.

[23]      MR. LANGDON:  Objection.

[24] BY MS. DOLIN:

[25]  Q.  Is there ever a time you would log on your

**EXHIBIT**

**4**

Page 120

[1]  computer and continue to work?

[2]  A.  No, because I needed my computer.

[3]  Q.  Do you know who -- does your computer record

[4]  the time you log in and the time you log off?

[5]  A.  I'm sure it does.

[6]  Q.  Do you know who has those?

[7]  A.  No.

[8]  Q.  Did you have an NB code or NationsBank code

[9]  that you would code into your computer, code number?

[10]  A.  Not that I remember.

[11]  Q.  You don't remember the number?

[12]  A.  You mean in my computer to log in in the

[13]  morning?

[14]  Q.  Right.

[15]  A.  Just probably my password.

[16]  Q.  Do you remember your password?

[17]  A.  No.

[18]  Q.  NBK number?

[19]  A.  No, I don't remember it.

[20]      MS. DOLIN:  I have nothing further.

[21]      MR. LANGDON:  I have a few questions.

[22]      REDIRECT EXAMINATION

[23] BY MR. LANGDON:

[24]  Q.  Ms. Kirkland, Ms. Dolin asked you a series of

[25]  questions concerning timecards and what appears to be

Page 129

[1] it's tools for improvement, marketing tools that were
[2] accessible to us, whatever, that would always be done
[3] after hours. So to really be specific, that's really
[4] hard to determine.
[5]   Q. What is the latest time you recall leaving the
[6] bank after work during that time period?
[7]   A. 9:30.
[8]   Q. When you left at 9:30 on this particular
[9] occasion, were you the last employee in the bank?
[10]   A. If I'm not mistaken, Naomi and I signed out
[11] dual control.
[12]   Q. When you say signed out, what did you have to
[13] do to sign out?
[14]   A. There's a log that's kept in each banking
[15] center with a carbon copy that tells you what time you
[16] arrive and what time you leave. Most times that should
[17] be done under dual control. If it's not, that's
[18] something else. But there are many nights that I was
[19] there that Naomi and I were there together and she we
[20] would both sign the log out because one person should
[21] actually guard the door while the other person affixes
[22] the alarm. So once the alarm is set, there's so much
[23] time in between you leaving that you have to allow it to
[24] set before you actually leave.
[25]   Q. And the standard procedure is to have two

Page 130

[1] people following this process?
[2]   A. That is correct.
[3]   Q. Now, on the nights you worked so late, would
[4] Ms. Billingsly typically be there so you could comply
[5] with this procedure?
[6]   A. I had no security access so she had to close
[7] the branch.
[8]   Q. So you had no security codes by which to
[9] activate or deactivate the alarm?
[10]   A. Actually, I did but I didn't do it. She was
[11] senior so she always did it. Dual control means me
[12] making sure there's no one outside the front door, so if
[13] we go outside, no one is going to try to run in. It's
[14] just a secure measure.
[15]   Q. Do you recall what your security code was?
[16]   A. I don't know. I never used it.
[17]   Q. I believe you testified there was a written
[18] log you would sign?
[19]   A. That's correct.
[20]   Q. As well as activate or deactivating the code?
[21]   A. Correct. Many times when I left, Naomi would
[22] still be there but that was not done under dual control.
[23] She would log out the book herself.
[24]   Q. On those nights you would not sign the log
[25] when you were leaving?

Page 131

[1]   A. No, I couldn't. That had to be done under
[2] affixing the alarm.
[3]   Q. Did you also have to sign this log when you
[4] reported in the morning?
[5]   A. If it was done under dual control, yes.
[6]   Q. Did dual control mean opening the bank; is
[7] that correct?
[8]   A. Dual control means you need two people to do
[9] whatever you have to do. Which means when you go in the
[10] branch you have two people, one to watch the outside and
[11] one to go in and disarm the alarm.
[12]   Q. You would have to follow these dual control
[13] procedures upon opening the branch in the morning?
[14]   A. That's correct.
[15]   Q. Did you ever open the bank in this time
[16] period, from mid December of '97 until mid February of
[17] '98?
[18]   A. I don't recall.
[19]   Q. You don't recall whether you did?
[20]   A. I don't recall whether I did because anyone
[21] could be there. I could have been there. I don't know.
[22]   Q. What was your practice about taking lunch
[23] during this period, mid December of '97 until the end of
[24] February of '98?
[25]   A. That I like to take one.

Page 132

[1]   Q. Did you typically take lunch?
[2]   A. No, I did not.
[3]   Q. Why did you not typically take lunch?
[4]   A. Because I was told that my threshold does not,
[5] you know, allow me to consistently take a lunch daily.
[6]   Q. Did Ms. Lomax tell you this?
[7]   A. Actually, Ms. Lomax — one day I was
[8] attempting to take lunch and she told me to get back on
[9] the floor because my points were not where they're
[10] supposed to be so I should not be allowed a lunch.
[11]   Q. After she told you this, did you take lunch at
[12] any time after that point?
[13]   A. Occasionally if the banking center wasn't
[14] busy, I would just remain on the floor, but many days I
[15] never took lunch.
[16]   Q. You answered the next question I was going to
[17] ask.
[18]       What was the distinguishing factor that
[19] determined when you could take a lunch and when you did
[20] not take a lunch, the volume of business?
[21]   A. Exactly.
[22]   Q. Ms. Mobley, did you ever perform your job
[23] responsibilities from your home after leaving the
[24] branch?
[25]   A. Absolutely not.

EXHIBIT
5