UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-06145-CIV-DIMITROULEAS/JOHNSON

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated,

        Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national association,

        Defendant.
_____/



## PLAINTIFFS' MOTION TO COMPEL DISCOVERY AND INCORPORATED MEMORANDUM OF LAW

COME NOW the Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE, *et al.*, by and through their undersigned counsel, and, pursuant to Local General Rules 7.1.A, 26.1.H.2, and 26.1.I, hereby file this their Motion to Compel Discovery and Incorporated Memorandum of Law, and as grounds therefor state as follows:

1.    As the Court is aware, this is a collective action lawsuit to redress Defendant's failure to properly pay its employees overtime compensation as required under the provisions of the Fair Labor Standards Act, 29 U.S.C. §201, *et seq.*

2.    On or about January 16, 2001, Plaintiffs caused to be served upon Defendant their First Set of Interrogatories.

3.    On or about February 28, 2001, Defendant caused to be served upon



Plaintiffs its Response to Plaintiffs' First Set of Interrogatories.

4.    Included among Plaintiffs' First Set of Interrogatories, and Defendant's

responses thereto, is the following:[1]

### INTERROGATORY NO. 2:

Please state the name, address and telephone number of each consumer banker II, III, or IV, and/or each in-store banker I or II, who worked with Kimberly Drake and/or Roxanna L. Escudero from December 1997 to the date Drake and/or Escudero separated from their employment with the Defendant. For each such consumer banker II, III or IV, or each in-store banker I or II, please specify at which banking center he or she worked from December 1997 to the present (or, if terminated state the date of termination) and state at which branch he or she worked with Drake and/or Escudero.

### DEFENDANT'S RESPONSE TO INTERROGATORY NO. 2:

*NationsBank, by counsel, objects to the foregoing interrogatory on the grounds that it is overbroad (e.g., by including within its scope Instore Bankers who are not proper parties to this action, and by requiring NationsBank to specify the job history of each Consumer Banker beyond that time period when he or she worked with plaintiff(s)), and it seeks information which is neither relevant to the above-captioned action or reasonably likely to lead to the discovery of admissible evidence.*

*Subject to and without waiving this objection, NationsBank agrees to identify the non-exempt Consumer Bankers with whom plaintiffs worked, but only pursuant to a Protective Order that prohibits plaintiff or plaintiffs' counsel from disclosing this information to anyone not a party to this action, and prohibits plaintiff or plaintiffs' counsel from contacting the individuals identified pursuant to the Protective Order without prior leave of court. Authority for NationsBank's position can be found in the "Omnibus Report and Recommendation" ("Perlman Omnibus Report") entered by Magistrate Judge Johnson on July 28, 1999, in Perlman, et al. v. NationsBank, N.A., CASE NO. 98-8805-CIV-DIMITROULEAS. The Perlman Omnibus Report, relying on the record established in Aldred v. Nations Bank of Florida, N.A. and Levine, et al. v. NationsBank, prohibited plaintiffs' counsel from contacting the individuals identified by NationsBank who had worked with the plaintiffs.*

---

[1]    Copies of Plaintiffs' First Set of Interrogatories and NationsBank's corresponding Response thereto are attached hereto as Exhibit "A."

5.    On or about January 16, 2001, Plaintiffs caused to be served upon Defendant

their Second Set of Interrogatories.

6.    On or about February 28, 2001, Defendant caused to be served upon

Plaintiffs its Response to Plaintiffs' Second Set of Interrogatories.

7.    Included among Plaintiffs' Second Set of Interrogatories, and Defendant's

responses thereto, is the following:[2]

## INTERROGATORY NO. 2:

Please state the name, address and telephone number of each consumer banker II, III, or IV, and/or each in-store banker I or II, who worked with Nancy Rojas from December 1997 to the date Rojas separated from their employment with the Defendant. For each such consumer banker II, III or IV, or each in-store banker I or II, please specify at which banking center he or she worked from December 1997 to the present (or, if terminated state the date of termination) and state at which branch he or she worked with Rojas.

## DEFENDANT'S RESPONSE TO INTERROGATORY NO. 2:

NationsBank, by counsel, objects to the foregoing interrogatory on the grounds that it is overbroad (e.g., by including within its scope Instore Bankers who are not proper parties to this action, and by requiring NationsBank to specify the job history of each Consumer Banker beyond that time period when he or she worked with plaintiff(s)), and it seeks information which is neither relevant to the above-captioned action or reasonably likely to lead to the discovery of admissible evidence.

Subject to and without waiving this objection, NationsBank agrees to identify the non-exempt Consumer Bankers with whom plaintiffs worked, but only pursuant to a Protective Order that prohibits plaintiff or plaintiffs' counsel from disclosing this information to anyone not a party to this action, and prohibits plaintiff or plaintiffs' counsel from contacting the individuals identified pursuant to the Protective Order without prior leave of court. Authority for NationsBank's position can be found in the "Omnibus Report and Recommendation" ("Perlman Omnibus Report") entered by Magistrate

---

[2]    Copies of Plaintiffs' Second Set of Interrogatories and NationsBank's corresponding Response thereto are attached hereto as Exhibit "B."

*Judge Johnson on July 28, 1999, in Perlman, et al. v. NationsBank, N.A., CASE NO. 98-8805-CIV-DIMITROULEAS. The Perlman Omnibus Report, relying on the record established in Aldred v. Nations Bank of Florida, N.A. and Levine, et al. v. NationsBank, prohibited plaintiffs' counsel from contacting the individuals identified by NationsBank who had worked with the plaintiffs.*

8.    On or about January 16, 2001, Plaintiffs caused to be served upon Defendant

their Third Set of Interrogatories.

9.    On or about February 28, 2001, Defendant caused to be served upon

Plaintiffs its Response to Plaintiffs' Third Set of Interrogatories.

10.   Included among Plaintiffs' Third Set of Interrogatories, and Defendant's

responses thereto, is the following:[3]

### INTERROGATORY NO. 2:

Please state the name, address and telephone number of each consumer banker II, III, or IV, and/or each in-store banker I or II, who worked with the below-referenced individuals from December 1997 to the present or the date such individual separated from his or her employment with the Defendant. For each such consumer banker II, III or IV, or each in-store banker I or II, please specify at which banking center he or she worked from December 1997 to the present (or, if terminated, state the date of termination) and state at which branch he or she worked with each such individual or individuals.[4]

### DEFENDANT'S RESPONSE TO INTERROGATORY NO. 2:

*NationsBank, by counsel, objects to the foregoing interrogatory on the*

---

[3]    Copies of Plaintiffs' Third Set of Interrogatories and NationsBank's corresponding Response thereto are attached hereto as Exhibit "C."

[4]    The "below-referenced individuals" represented the other opt-in Plaintiffs in this lawsuit. Thus, through this Interrogatory, Plaintiffs are seeking the name, address and telephone number of each consumer banker II, III, or IV/ and/or each in-store banker I or II, who worked with *any* of the opt-in Plaintiffs in this action, other than ROXANNA ESCUDERO, KIMBERLY DRAKE, and NANCY ROJAS, who were the subject of Plaintiffs' First and Second Set of Interrogatories, *supra.*

-4-

*grounds that it imposes an undue burden on NationsBank and its counsel. Researching and identifying a particular employee's banking center manager is a time consuming process, requiring a significant investment of resources. These issues are exacerbated by the number of opt-in plaintiffs about whom plaintiffs are demanding information. NationsBank, by counsel, also objects to the foregoing interrogatory to the extent it seeks information regarding the banking center managers of individuals who no longer are participating in this action. NationsBank, by counsel, also objects to the foregoing interrogatory on the grounds that it is overbroad (e.g., by including within its scope Instore Bankers who are not proper parties to this action, and by requiring NationsBank to specify the job history of each Consumer Banker beyond that time period when he or she worked with plaintiff(s)), and it seeks information which is neither relevant to the above-captioned action or reasonably likely to lead to the discovery of admissible evidence.*

*Subject to and without waiving this objection, NationsBank agrees to identify the non-exempt Consumer Bankers with whom plaintiffs worked, but only pursuant to a Protective Order that prohibits plaintiff or plaintiffs' counsel from disclosing this information to anyone not a party to this action, and prohibits plaintiff or plaintiffs' counsel from contacting the individuals identified pursuant to the Protective Order without prior leave of court. Authority for Defendants' position can be found in the "Omnibus Report and Recommendation" ("Perlman Omnibus Report") entered by Magistrate Judge Johnson on July 28, 1999, in Perlman, et al. v. NationsBank, N.A., CASE NO. 98-8805-CIV-DIMITROULEAS. The Perlman Omnibus Report, relying on the record established in Aldred v. Nations Bank of Florida, N.A. and Levine, et al. v. NationsBank, prohibited plaintiffs' counsel from contacting the individuals identified by NationsBank who had worked with the plaintiffs.*

11.    On or about February 14, 2001, Plaintiffs propounded their Fifth Request for

Production to Defendant.

12.    On or about March 16, 2001, Defendant caused to be served their

Responses to Plaintiffs' Fifth Request for Production.

13.    Included among Plaintiffs' Fifth Request for Production, and Defendant's

Responses thereto, are the following:[5]

---

[5]    Copies of Plaintiffs' Fifth Request for Production and NationsBank's corresponding Response thereto are attached hereto as Exhibit "D.

-5-

## REQUEST FOR PRODUCTION NO. 1:

For any and all pay periods during her employment from December 17, 1997 to the present, all time cards for Naomi Billingsley, employed at the Bankhead Banking Center in the Atlanta, Georgia metropolitan area.

## DEFENDANT'S RESPONSE TO REQUEST NO. 1:

*NationsBank, by counsel, objects to the foregoing document request on the grounds that it seeks information which is neither relevant to the above-captioned action nor reasonably likely to lead to the discovery of admissible evidence. The only time records for Naomi Billingsley to which plaintiffs are entitled are those time records which may exist for the period of time Billingsley worked with plaintiff Angela Mobley. Subject to and without waiving the foregoing objections, see documents ESC-7491 - ESC 7492 produced herewith consisting of payroll registers. NationsBank continues to search for relevant timecards and will supplement its answers when and if they are located.*

## REQUEST FOR PRODUCTION NO. 2:

For the time period from December 17, 1997 to the present, all vault logs or sign-in logs for the Bankhead Banking Center in the Atlanta, Georgia metropolitan area.

## DEFENDANT'S RESPONSE TO REQUEST NO. 2:

*NationsBank, by counsel, objects to the foregoing document request on the grounds that it imposes upon NationsBank and its counsel an undue burden and unreasonable expense. NationsBank, by counsel, also objects to the foregoing document request on the grounds that it seeks information which is neither relevant to the above-captioned action nor reasonably likely to lead to the discovery of admissible information. The records demanded by plaintiffs have, at best, limited relevance to the issue of how much, if any, overtime hours plaintiffs worked during the relevant time period, and the, at best, limited relevance of these records is greatly outweighed by the unreasonable burden plaintiffs seek to impose upon NationsBank. Subject to and without waiving the foregoing objections, NationsBank has been searching for and attempting to gather the "vault logs" requested by the foregoing document request. NationsBank will produce these documents if and when they can be located and collected without unreasonable burden or expense.*

-6-

## REQUEST FOR PRODUCTION NO. 3:

For any and all pay periods during her employment from December 17, 1997 to the present, all computer logs showing times logged on and off for Naomi Billingsley, employed at the Bankhead Banking Center in the Atlanta, Georgia metropolitan area.

## DEFENDANT'S RESPONSE TO REQUEST NO. 3:

*NationsBank, by counsel, objects to the foregoing document request on the grounds that it imposes upon NationsBank and its counsel an undue burden and unreasonable expense. NationsBank, by counsel, also objects to the foregoing document request on the grounds that it seeks information which is neither relevant to the above-captioned action nor reasonably likely to lead to the discovery of admissible information. The records demanded by plaintiffs have, at best, limited relevance to the issue of how much, if any, overtime hours plaintiffs worked during the relevant time period, and the, at best, limited relevance of these records is greatly outweighed by the unreasonable burden plaintiffs seek to impose upon NationsBank.*

## REQUEST FOR PRODUCTION NO. 4:

For any and all pay periods during her employment from December 17, 1997 to the present, all security code entries for Naomi Billingsley at the Bankhead Banking Center in the Atlanta, Georgia metropolitan area.

## DEFENDANT'S RESPONSE TO REQUEST NO. 4:

*NationsBank, by counsel, objects to the foregoing document request on the grounds that it imposes upon NationsBank and its counsel an undue burden and unreasonable expense. NationsBank, by counsel, also objects to the foregoing document request on the grounds that it seeks information which is neither relevant to the above-captioned action nor reasonably likely to lead to the discovery of admissible information. The records demanded by plaintiffs have, at best, limited relevance to the issue of how much, if any, overtime hours plaintiffs worked during the relevant time period, and the, at best, limited relevance of these records is greatly outweighed by the unreasonable burden plaintiffs seek to impose upon NationsBank.*

14.    On or about April 5, 2001, based upon NationsBank's responses to the

above-referenced answers to Interrogatories and Requests for Production, and pursuant

to the good-faith obligation requirement of Local General 26.1.I, Plaintiffs' counsel sent Defendant's counsel correspondence, attached hereto as Exhibit "E," as an attempt to confer with Defendant's counsel in a good faith effort to resolve by agreement the issues raised in the instant Motion.

15.    On or about April 18, 2001, Plaintiffs' counsel again sent Defendants' counsel correspondence, attached hereto as Exhibit "F," as part of the ongoing attempt to resolve the discovery disputes without having to seek this Court's intervention.

16.    Plaintiffs' counsel certifies that the above-described good faith efforts have been made to resolve the issues presented by the instant Motion. However, a resolution to these issues has not occurred despite the good faith efforts of the parties' respective counsel.

17.    As shown the incorporated Memorandum of Law, Plaintiffs are clearly entitled to the discovery in question, *as requested*, and without any of the restrictions or encumbrances upon which Defendant conditions its "willingness" to provide some of the discovery at issue. Plaintiffs would further submit that they are entitled to an award of their reasonable attorneys' fees and costs incurred in this discovery dispute.

## MEMORANDUM OF LAW

### A.    GENERAL DISCOVERY RULES

Discovery is governed basically only by the relevancy standard; that is, information is discoverable if it is relevant or reasonably likely to lead to the discovery of admissible evidence. See, e.g., *Burns v. Thiokol Chemical Corp.*, 483 F.2d 300 (5th Cir. 1973) (keynote to Federal Discovery Rules is all potentially relevant information, and test for

-8-

relevancy of materials to be discovered is not admissibility); *United States v. Wright Motor Company*, 536 F.2d 1090 (5th Cir. 1976) (test of relevancy for purposes of discovery under Rule 26(b)(1) is broader than tests for admissibility at trial so that a party may discover information that is not admissible for trial, if such information will have some probable effect on organization and presentation of moving party's case).[6]

Moreover, while Plaintiffs acknowledge that the relevancy standard for purposes of discovery has changed pursuant to the most recent amendments to the Federal Rules of Civil Procedure,[7] Plaintiffs submit that the requests at issue here are still discoverable.

## B.    THE INTERROGATORIES IN QUESTION [8]

### 1.    Defendant must Be Ordered to Answer Interrogatories Without a Protective Order Limiting Their Applicability

The Interrogatories in question essentially seek the identification of all non-exempt Consumer Bankers and/or In-Store Bankers with whom the Plaintiffs worked. Defendant has indicated a willingness to provide this information subject to a Protective Order that prohibits the Plaintiffs or plaintiffs' counsel from contacting the individuals identified pursuant to the Protective Order without prior leave of court. As authority for this position,

---

[6]    These cases are binding precedent in the Eleventh Circuit under *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

[7]    The amendments to the Federal Rules of Civil Procedure took effect on December 1, 2000. The relevancy standard of Rule 26(b)(1) now allows for discovery regarding any matter, not privileged, that is relevant to the *claim or defense* of any party. *See* Fed. R. Civ. P. 26(b)(1) (amending from "relevant to the *subject matter involved*").

[8]    Defendant's responses to Plaintiffs' First, Second and Third Set of Interrogatories were served unexecuted. Despite Plaintiffs' counsel's requests and Defendant's counsel's willingness to comply (see Exhibits "E" and "F"), Defendant has failed to provide Plaintiffs with an executed jurat for any of the Responses.

-9-

NationsBank cites this Court's July 28, 1999 "Omnibus Report and Recommendation" in Perlman, et al. v. NationsBank, N.A., CASE NO. 98-8805-CIV-DIMITROULEAS.[9]

More recently, this Court rejected Defendant's position in its December 19, 2000 Order in Barnes, et al. v. NationsBank, N.A., CASE NO. 00-6980-CIV-DIMITROULEAS,[10] where this Court directed Defendant to produce discovery no different than that requested by the Interrogatories presently at issue. In its rejection of Defendant's argument, this Court noted that not only are Plaintiffs' counsel already limited with regard to contacting potential witnesses by ethical obligations imposed by the rules governing the Florida Bar, but quoted *Tucker v. Labor Leasing, Inc.*, 155 F.R.D. 687, 690 (M.D. Fla. 1994), for the notion that "Plaintiffs would be hard pressed to prove there are similarly situated employees who desire to join this lawsuit if they can have no contact with any of these employees to inquire about their desires one way or the other."

## 2.    Defendant's Objections that the Interrogatories are Irrelevant, Overly Broad and/or Unduly Burdensome are Without Merit.

Notwithstanding its willingness to provide the information at issue contingent on a Protective Order, NationsBank has also interposed objections based on relevancy, overbreadth, and undue burden.

Plaintiffs would again direct this Court to its December 19, 2000 Order in Barnes, et al. v. NationsBank, N.A., CASE NO. 00-6980-CIV-DIMITROULEAS, which unequivocally rejected Defendant's objections. Specifically, this Court found that the information was "relevant in that it may serve to bolster the Plaintiff's own individual claim by attempting to

---

[9]    A copy of which is attached hereto as Exhibit "G".

[10]    A copy of which is attached hereto as Exhibit "H".

-10-

prove a pattern of practice and might also shed light on the amount of hours the Plaintiff claims to have worked overtime." December 19, 2000 Order in Barnes, et al. v. NationsBank, N.A., CASE NO. 00-6980-CIV-DIMITROULEAS.

As in Barnes, Plaintiffs have narrowly tailored the scope of the discovery at issue, to include the identification of only those Consumer Bankers II, III or IV and/or In-Store Bankers I or II, employed at any of the branches where Plaintiffs worked during any time in the last three years. Quite clearly, and as this Court recognized in Barnes, besides the fact that these individuals may be eligible, and might wish to join in this lawsuit, these individuals may also have knowledge concerning the amount of hours the Plaintiffs claim to have worked overtime and whether Plaintiffs' managers instructed Consumer Bankers II, III or IV and/or In-store Bankers I or II not to record their overtime. See Tucker v. Labor Leasing, Inc., 155 F.R.D. 687 (M.D. Fla. 1994).

Any claim by Defendant that providing the information at issue would be unduly burdensome is belied by the requirements of the Federal Regulations interpreting the FLSA. Pursuant to the Regulations, Defendant is required to maintain, inter alia, the following records:

- Employees' full names;
- Employees' home addresses, including zip codes; and
- The occupation (group designation) in which these employees are engaged.

See 29 C.F.R. §§ 516.2(a)(1)-(2); 516(a)(4). This information must clearly and accurately be recorded by Defendant. 29 C.F.R. §516.1. Further, the required records must be kept for a period of three (3) years. 29 C.F.R. §516.5(a). Thus, no matter how many employees are at issue, Defendant clearly has (or should have) the records which will enable it to easily

-11-

respond to the Plaintiffs' discovery.

## C.    THE REQUESTS FOR PRODUCTION

Each of the individual Requests for Production in question seek documentation relating to Naomi Billingsley, an individual who worked alongside opt-in Plaintiff Angela Mobley at the Bankhead Banking Center in the Atlanta, Georgia metropolitan area. The documents requested with respect to Naomi Billingsley are relevant and discoverable as comparator information with respect to Plaintiff Mobley. At her deposition, Ms. Mobley testified that:[11]

- Ms. Billingsley, like herself, worked hours over forty (40) in any given week without proper overtime compensation. (See pp. 138-39).

- Ms. Billingsley was present at meetings where the banking center manager indicated that Defendant would not pay for overtime hours worked. (See pp. 146-48).

- Due to security measures employed by Defendant, two persons were required to activate and deactivate the banking center alarm; Ms. Billingsley and Ms. Mobley would, together, activate and deactivate the alarm at their banking center. (See pp. 129-31).

### 1.    Billingsley Time Cards (5th Request for Production No. 1)

Defendant has indicated a willingness to produce the documentation in response to Request no. 1, seeking Naomi Billingsley's time cards, but only for the period of time that plaintiff Naomi Billingsley worked alongside Angela Mobley. There is no basis for such a

---

[11]    Angela Mobley's deposition transcript is attached hereto as Exhibit "I."

limitation. All of Ms. Billingsley's time cards for the period of December 17, 1997 to the present are relevant to this litigation, inasmuch as they support Plaintiffs' allegations that their time cards, and the time cards of employees similarly situated, are utterly inaccurate. Indeed, for the period of time that Ms. Billingsley worked alongside Ms. Mobley, Ms. Billingsley's time cards are obviously relevant for direct comparison purposes.[12]  In this same vein, Ms. Billingsley's time cards for any period of time that she did not work alongside Ms. Mobley demonstrate the continuing nature of Defendant's FLSA violations.

## 2.    Vault and Sign-in Logs (5th Request to Produce No. 2)

As reflected above, Defendant, despite its various objections to this request, has indicated that it is "searching for and attempting to gather the "vault logs" requested," and that it "will produce these documents if and when they can be located and collected without unreasonable burden or expense." There is no doubt that Plaintiffs are entitled to the vault logs requested. Indeed, on March 15, 2001, this Court entered an Order in the instant case commanding Defendant to produce similar "vault logs." A copy of this Order is attached hereto as Exhibit "J."

## 3.    Billingsley Computer Logs (5th Request to Produce No. 3)

Just as Plaintiffs are entitled to production of Ms. Billingsley's time cards, they are similarly entitled to production of her computer logs. Again, on the one hand these documents will provide direct comparison evidence to time records and computer logs regarding opt-in Plaintiff Angela Mobley. At the same time, comparing Ms. Billingsley's

_____

[12]    A fact Defendant obviously concedes, inasmuch as it has already agreed to produce Ms. Billingsley's time records for the period she worked alongside Ms. Mobley. (Although Defendant has yet to actually produce these records.)

-13-

time cards with her computer logs will clearly reveal how the time cards are woefully inaccurate, further evidencing Defendant's willful FLSA violations. In its March 15, 2001 Order (Exhibit "J"), this Court, in addition to ordering Defendant to produce "vault logs," similarly ordered Defendant to produce "computer logs."

## 4.  Billingsley Security Code Entries (5th Request to Produce No. 4)

Again, this Court's March 15, 2001 Order (Exhibit "J") already demonstrates the relevant nature of these documents and the propriety of compelling Defendant to produce same. Moreover, and specifically with reference to Angela Mobley, Ms. Mobley testified in her deposition that, when activating and deactivating the banking center alarm with Ms. Billingsley, the two employees utilized Ms. Billingsley's security code. See Exhibit "I," p. 130. Thus, Ms. Billingsley's security code entries provide alternate (and most likely highly reliable) information with respect to hours worked for Plaintiff Angela Mobley, as well as Billingsley herself.

## D.  CONCLUSION

Based on the foregoing, it is clear that an order compelling production of the discovery at issue is appropriate. Moreover, Plaintiffs would submit that they are entitled to an award of their reasonable attorneys' fees and costs incurred in connection with this discovery dispute.

WHEREFORE, Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE, et al., respectfully request that this Honorable Court grant their Motion to Compel Discovery, enter an Order compelling answers to the Interrogatories and Requests for Production at issue in the instant Motion to Compel, award their reasonable attorneys' fee and costs

-14-

incurred in connection with this discovery dispute, and take such further action as it deems

just and proper.

Respectfully submitted,

MUCHNICK, WASSERMAN, DOLIN
& LEVINE, LLP
Attorneys for Plaintiffs
4000 Hollywood Boulevard, Ste 620N
Hollywood, FL 33021
(954) 989-8100 - Broward
(305) 624-9100 - Dade
(954) 989-8700 - Fax

By:

SUSAN L. DOLIN, ESQ.
Fla. Bar No. 708690
E-mail: sldolin@mwdl-law.com
ADAM S. CHOTINER, ESQ.
Fla. Bar No. 0146315
E-mail: aschotiner@mwdl-law.com

-15-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via U.S. Mail this __11th__ day of May, 2001 to: Michael T. Burke, Esq., Johnson, Anselmo et al., 790 East Broward Boulevard, Suite 400, Fort Lauderdale, Florida 33303-0220 and Richard F. Kane, Esq., McGuire, Woods, Battle & Boothe, 3700 NationsBank Plaza, 101 South Tyron Street, Charlotte, NC 28280; and Caryl Boies, Esquire, Boies, Schiller & Flexner, LLP, 2435 Hollywood Blvd., Hollywood, Florida. 33020.

MUCHNICK, WASSERMAN, DOLIN
& LEVINE, LLP
Attorneys for Plaintiffs
4000 Hollywood Boulevard, Ste 620N
Hollywood, FL 33021
(954) 989-8100 - Broward
(305) 624-9100 - Dade
(954) 989-8700 - Fax

By: _____

SUSAN L. DOLIN, ESQ.
Fla. Bar No. 708690
E-mail: sldolin@mwdl-law.com
ADAM S. CHOTINER, ESQ.
Fla. Bar No. 0146315
E-mail: aschotiner@mwdl-law.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 98-8632-CIV-DIMITROULEAS
Magistrate Judge Johnson

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated of themselves
and all others

       Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national
association,

       Defendants.

_____/

## NOTICE OF SERVICE OF
## PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT

COME NOW the Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE ,

et al, by and through their undersigned attorneys, and request that Defendant answer

the following Interrogatories in writing and under oath, as provided by Rule 33 of the

Federal Rules of the United States District Court for the Southern District of Florida.

The answers shall be signed by the person making them and a copy of the answers

shall be served within thirty (30) days from the date of service.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via
U.S. Mail this 16th day of January, 2001 to: Michael T. Burke, Esq., Johnson, Anselmo
et al., 790 East Broward Boulevard, Suite 400, Fort Lauderdale, Florida 33303-0220
and Richard F. Kane, Esq., McGuireWoods, 3700 NationsBank Plaza, Charlotte, NC
28280.

EXHIBIT

A

MUCHNICK WASSERMAN & DOLIN & LEVINE, LLP.
Attorneys for Plaintiffs
4000 Hollywood Boulevard, Suite 620 N
Hollywood, Florida 33021

By: _____

SUSAN L. DOLIN
Fla. Bar No.: 708690
DANIEL R. LEVINE
Fla. Bar No.: 0057861

and

BOIES SCHILLER & FLEXNER, LLP
2435 Hollywood Boulevard
Hollywood, FL  33020

UNITED STATES DISTRICT COUR I
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 98-8632-CIV-DIMITROULEAS
Magistrate Judge Johnson

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated of themselves
and all others

       Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national
association,

       Defendants.

_____/

## PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANT

COME NOW the Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE ,

et al, by and through their undersigned attorneys, and request that Defendant answer

the following Interrogatories in writing and under oath, as provided by Rule 33 of the

Fed. R. Civ. P. within thirty (30) days as follows:

### DEFINITIONS AND INSTRUCTIONS

A.     In answering these Interrogatories, furnish all information available to you,

including information in the possession of your attorneys, their investigators, or any

person acting on your behalf, and not merely information in the possession of your

attorneys, their investigators, or any person acting on your behalf, and not merely

information as is known of your own personal knowledge. If you can not answer a part

of these interrogatories in full, after exercising due diligence to secure the information requested, so state that you are unable to answer the interrogatory fully and answer the remainder as fully as possible, stating whatever information or knowledge you have concerning the unanswered or partially answered portion of the interrogatory

B.    If you object to part of any interrogatory and refuse to answer that part, state your objection, identify the part to which you are objecting, and answer the remaining portion of the interrogatory. If you object to the scope or the time period of any interrogatory, state your objection, identify the scope or time period to which you are objecting and answer the interrogatory for the scope or time period you believe appropriated.

C.    If you need additional space to respond fully to any interrogatory, retype the interrogatory and answer it on a separate page and attach that page to this document.

D.    As used herein, the terms "Defendant", "NATIONSBANK", "you" or "your" mean the party or parties to whom these interrogatories are addressed, including its divisions, departments, subsidiaries, affiliates, predecessors, present or former officers, owners, agents, attorneys, and all other persons acting or purporting to act on its behalf, as well as each partnership in which it is a partner.

E.    As used herein, the terms "NATIONSBANK" and/or "Defendant" mean Defendant, NATIONSBANK.

F.    As used herein, the terms "person", "individual", or "entity" mean any natural person, individual, proprietorship, partnership, corporation, association, organization, joint venture, firm, other business enterprise, governmental body, group of natural persons or other entity.

G.    As used herein, the term, "documents" means all written and graphic

matter, however produced or reproduced, and each and every thing from which

information can be processed, transcribed, transmitted, restored, recorded, or

memorialized in any way, by any means, regardless of technology or form. It includes,

without limitation, correspondence, memoranda, notes, notations, diaries, papers,

books, accounts, newspaper and magazine articles, photographs, notebooks, ledgers,

letters, telegrams, cables, telex messages, facsimiles, contracts, offers, agreements,

reports, objects, tangible things, work papers, transcripts, minutes, reports and

recordings of telephone or other conversations or communications, or of interviews or

conferences, or of other meetings, occurrences or transactions, affidavits, statements,

summaries, opinions, tests, experiments, analysis, evaluations, journals, balance

sheets, income statements, statistical records, desk calendars, appointment books,

lists, tabulations, sound recordings, data processing input or output, microfilms, checks,

statements, receipts, summaries, computer printouts, computer programs, information

kept in computer hard drive, computer tape back-up, CD-ROM, computer floppy

diskettes teletypes, telecopies, invoices, worksheets, printed matter of every kind and

description, graphic and oral records and representations of any kind, and electronic

and mechanical records and representations of any kind and all things included in the

definitions of "writings" and "recordings" as set forth in the Federal Rules of Evidence,

in the actual or constructive possession, custody, care or control of Defendant

including, but not limited to, originals or copies where originals are not available. Any

document with any marks such as initials , comments or notations of any kind is not

deemed to be identical with one without such marks and is to be listed as a separate

document. Where there is any question about whether a tangible item otherwise

described in these requests falls within the definition of "document" such tangible item

shall be listed.

      H.     As used herein, the phrase "all documents" means every document or

group of documents or communication as defined herein that are known to you or that can be located or discovered by reasonably diligent efforts.

I.    As used herein, the term "agreements" shall mean agreements, contracts, arrangements, mutual promises, accords, engagements or undertakings.

J.    As used herein, the term "communications shall mean any oral or written statement, dialogue, colloquy, discussion, conversation, or direct or indirect representation and, also, means any transfer of thoughts or ideas between persons by means of documents and includes any transfer of data from one location to another by electronic similar means.

K.    As used herein, the term "all communications" means each and every communication as above-defined that is known to you or about which you have any information.

L.    As used herein, the term "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope hereof any information (as defined herein) which might otherwise be construed to be outside the scope of this discovery request.

M.    As used herein, the term "any" shall be understood to include and encompass "all" and vice versa.

N.    All words in the present tense include the past tense and all words in the past tense include the present tense.

O.    As used herein, the singular, and the masculine, feminine, and neuter shall include each of the other genders.

P.    As used herein, the term "identify" or "identity" when used with reference to a natural person means:

(1)    the full name and address (or, if the current address is not known,

the last known address) of the person; the full name and address

of each employer, each corporation of which the person is an

officer or director, and each business in which the person is a

principal;

(2)    the person's present  (or, if the present is not known, the last

known) position and the position or positions at the time of the act

to which the interrogatory answer relates;

(3)    each position the person has ever held with you or the date such

positions were held;

(4)    such other information sufficient to provide full identification of the

person;

Q.    As used herein, the term "identify" or "identify" when used with reference

to any entity other than a natural person means:

(1)    the full name of the entity, the type of entity (e.g.,

corporation, partnership, etc.), the address of its principal

place of business, its principal business activity and, if it is a

corporation, the jurisdiction under the laws of which it has

been organized and the date of such organization.

(2)    each of the entities, officers, directors, shareholders, or

other principals;

(3)    any other available information concerning the existence or

an identity of the entity.

R.    As used herein, the term "identify" or "identity" when used with reference

to a document or written communication means:

(1)    its nature (e.g., letter, telegram, memorandum, chart, report or

study) date, author, date and place of preparation, and the name

and address of each addressee;

    (2)    the identity of each signature of the document or communication;

    (3)    the title or heading of the document or communication;

    (4)    its substance;

    (5)    its present (or, if the present is not known, the last known), location and custodian;

    (6)    the identity of each person to whom a copy was sent and each date of its receipt and each date of its transmittal or other disposition by (I) you and (ii) any other person (naming such other person) who, at any time, either received, transmitted or otherwise disposed of such document or communication and each copy thereof;

    (7)    the circumstances of each such receipt and each transmittal or other disposition, including identification of the person from whom received and the person to whom transmitted.

    S.    As used herein, the term "identify" or "identify" when used with reference to an oral communication means:

    (1)    its nature (e.g., telephone call, conversation in person, etc.);

    (2)    its substance;

    (3)    the date and place thereof;

    (4)    the identity and address of each person participating therein, present, during, or witness to any part thereof;

    (5)    a description of each document in which such communication was recorded, described, or referred to.

    T.    As used herein, the term "identify" or "identity" when used with reference to a contract means:

    (1)    the date and place it was made;

(2)     the name and address of each party thereto;

(3)     its terms, including but not limited to, the performance to be

rendered by each party;

(4)     a statement whether the performance was rendered;

(5)     any litigation with reference to said contract.

U.     As used herein, the term "identify or "identity" when used with reference to

an act, action or event means:

(1)     its nature and the sequence of steps in its occurrence;

(2)     the date and time it occurred;

(3)     where it occurred;

(4)     the persons who were involved;

(5)     who or what caused the act, action or event to occur;

(6)     the purposes or reasons for its occurrence.

V.     As used herein, the term "identify" or "identity" when used in any other

context than hereinabove set forth means;

(1)     description of the subject to be identified and specification of the

documents or communications at which the subject is or was

recorded, described, or referred to;

(2)     all other information necessary to fully identify the subject.

W.     As used herein, the term "termination" means any manner of severing the

employment relationship including, but not limited to, voluntary resignation, discharge

for cause, discharge without cause, retirement, layoff, or mutually agreed upon

resignation, discharge for cause, discharge without cause, retirement, layoff, or

mutually agreed upon resignation.

X.     Except as otherwise expressly indicated, responses shall continue to the

date of your answers to these interrogatories.

Y.    In answering such interrogatory, identify each document, communication,

or act:

(1)    relied upon in the preparation of each answer;

(2)    which forms all or part of the basis for that answer;

(3)    which corroborates the answers; or

(4)    the substance of which forms all or part of the answer.

Z.    You may, in lieu of identifying any document or written communication,

attach a true copy of such document or communication as an exhibit to the answers to

these interrogatories, including an explicit reference to the interrogatory to which each

such attached document or written communication relates.

AA.    If all the information furnished in answer to all or part of an

interrogatory is not within the personal knowledge and each person who communicated

to the affiant any part of the information furnished.

AB.    If the answer to all or part of this interrogatory is not presently

known or available, include a statement to that effect, furnish the information known or

available, and respond to the entire interrogatory by supplemental answer, in writing,

under oath, within ten days from the time the entire answer becomes known or

available, and in no event, less than five days prior to trial.

AC.    Whenever, in any answer to any interrogatory, a reference is made

to one or more persons, specify by name the particular person to who reference is

intended.

AD.    As used herein, the term "state" means to set forth fully and

unambiguously each and every fact of which the answering party, or his agent or

representative has knowledge and which is relevant to the answer called for by the

interrogatory.

AE.     As used herein, "relate to" or "relating to" means in any way, directly or indirectly concern, reflect, refer to, constitute, contain, evidence, analyze, memorialize, discuss, show, amend, confirm, endorse, represent, support, qualify, describe, terminate, revoke, pertain to, comment on, negate or relate to or connect in any way, logically or factually, with the matter described in this request.

AF.     As used herein, the term "Complaint" means that Complaint filed in the United States District Court for the Southern District of Florida, served simultaneously with Plaintiff's First Set of Interrogatories to Defendant.

## INTERROGATORIES TO DEFENDANT

1.　　Please provide the name, address and telephone number of each banking center manager under whom Plaintiffs Roxanna L. Escudero and Kimberly Drake worked for Defendant since December 1997 until the date Escudero and/or Drake separated from her employment with Defendant.  For each such banking center manager, specify the branch at which each such banking center manager worked from December 1997 to present, and state at which such branches he or she worked with one or both of the Plaintiffs Escudero and/or Drake.

2.    Please state the name, address, and telephone number of each consumer

banker II, III or IV, and/or each in-store banker I or II, who worked with Kimberly  Drake

and/or Roxanna L. Escudero from December 1997 to the date Drake and/or Escudero

separated from their employment with the Defendant.  For each such consumer banker

II, III or IV, or each such in-store banker I or II, please specify which at which banking

center he or she worked from December 1997 to the present (or, if terminated) state the

date of termination) and state at which branch he or she worked with Drake and/or

Escudero.

_____
REPRESENTATIVE OF
NATIONSBANK

STATE OF _____ )
                          )    §
COUNTY OF _____ )

     BEFORE ME, the undersigned authority, personally appeared _____, who, after being duly sworn according to law, deposes and says that he/she has read the foregoing Answers to Interrogatories and they are true and correct to the best of his/her knowledge and belief.

     Dated:_____, 2001.

                  NOTARY PUBLIC

                 _____
                 (Signature of Notary Public)

                 _____
                 (Print, Type, or Stamp Commissioned Name
                  of Notary Public)

My Commission Expires:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 00-06145-CIV-DIMITROULEAS
Magistrate Judge Johnson

ROXANNA L. ESCUDERO, and          )
KIMBERLY DRAKE, on behalf of      )
themselves and all others similarly )
situated,                         )
                                  )
                Plaintiffs,       )
                                  )
        vs.                       )
                                  )
BANKAMERICA CORPORATION,          )
a foreign corporation d/b/a       )
BANK OF AMERICA CORPORATION,      )
a foreign corporation, f/k/a      )
NATIONSBANK, N.A., a national     )
association,                      )
                                  )
                Defendant.        )

### NationsBank's Responses
### to Plaintiffs' First Set of Interrogatories

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Bank of America

Corporation (f/k/a BankAmerica Corporation) and Bank of America, N.A., (f/k/a

NationsBank, N.A.), which are collectively referred to herein as "Defendants" or

"NationsBank," respond as follows to Plaintiffs' First Set of Interrogatories to Defendant:

### Interrogatories

1.      Please provide the name, address and telephone number of each banking

center manager under whom Plaintiffs Roxanna L. Escudero and Kimberly Drake worked

for Defendant since December 1997 until the date Escudero and/or Drake separated from

her employment with Defendant. For each such banking center manager, specify the branch

at which each such banking center manager worked from December 1997 to present, and

state at which such branches he or she worked with one or both of the Plaintiffs Escudero

and/or Drake.

### Response:

1.  Roxanna L. Escudero

Escudero was employed at the Nob Hill Banking Center from December, 1997 through October 30, 1999. She had the following banking center managers ("BCMs"):

a.  John C. Martinez
c/o Bank of America
Port Everglades Office
901 SE 17th Street Causeway
Ft. Lauderdale, Florida 33316-2152
(954) 527-8507

Mr. Martinez's job history is as follows:

BCM at Nob Hill from 12/97-2/28/99
BCM at BayView Drive from 3/1/99-11/30/99
BCM at McNabb/Unv. from 12/1/99-11/17/00
BCM at Port Everglades from 1/18/00 to present

b.  Helen Mootry
c/o Bank of America
Cypress Creek Office
888 NW 62nd Street
Ft. Lauderdale, Florida 33309-2010
(954) 846-7800

Ms. Mootry's job history is as follows:

BCM at Sawgrass Mills from 12/97-10/15/98
BCM at Sawgrass Office from 10/16/98-3/14/99
BCM at Nob Hill from 3/15/99-6/4/00
BCM at Cypress Creek from 6/5/00 to present

2.    Kimberly Drake

Drake was employed at the Wiles Road Banking Center from December, 1997 through July 15, 1998. Her BCM was:

> Lorraine Ann Roth Jackson
> 718 Apple Tree Lane
> Boca Raton, Florida 33486
> (954) 338-9074

Ms. Jackson's job history is as follows:

> BCM at Wiles Road from 12/97-10/20/98.

Drake was employed at the Rock Island banking center from July 16, 1998 through October 30, 1999. She had the following BCMs at the Rock Island Banking Center:

a.    Cynthia L. Carlton
      c/o Bank of America
      Margate Office
      550 Main Boulevard
      Margate, Florida 33063-4553
      (954) 978-0431

Ms. Carlton's job history is as follows:

> BCM at Rock Island from 11/1/98-12/31/98

b.    Karen Lynn Robins
      c/o Bank of America
      University Drive Office
      1333 South University Drive
      Plantation, Florida 33324
      (954) 474-7384

Ms. Robins' job history is as follows:

> BCM at Pembroke Pines from 12/97-12/31/97
> BCM at West Commercial from 1/1/98-8/31/98
> BCM at Coral Springs from 9/1/98-12/15/98
> BCM at Rock Island from 12/16/98-5/2/99

c.    Nancy L. Parness
      c/o Bank of America
      Rock Island Road Banking Center
      5900 Rock Island Road
      Tamarac, Florida 33319
      (954) 973-8607

      Ms. Parness' job history is as follows:

            BCM at Parkland from 12/97-2/28/98
            BCM at Rock Island from 3/1/98-5/31/99
            BCM at North Powerline from 6/1/99-3/12/00
            BCM at East Oakland Park from 3/13/00-6/4/00
            BCM at Rock Island from 6/5/00 to present

d.    Rodney Sumter
      c/o Bank of America
      Normandy Office
      7770 Normandy Boulevard
      Jacksonville, Florida 32221-6639
      (954) 973-8607

      Mr. Sumter's job history is as follows:

            BCM at Rock Island from 6/1/99-4/30/00
            BCM at Sawgrass Office from 5/1/00-10/9/00
            BCM at Norwood Avenue from 10/10/00-10/15/00
            BCM at Normandy from 10/16/00 to present.

2.    Please state the name, address, and telephone number of each consumer

banker II, III or IV, and/or each instore banker I or II, who worked with Kimberly Drake

and/or Roxanna L. Escudero from December 1997 to the date Drake and/or Escudero

separated from their employment with the Defendant. For each such consumer banker II,

III or IV, or each such in-store banker I or II, please specify at which banking center he or

4

she worked from December 1997 to the present (or, if terminated, state the date of

termination) and state at which branch he or she worked with Drake and/or Escudero.

### Response:

NationsBank, by counsel, objects to the foregoing interrogatory on the grounds that it is overbroad (e.g., by including within its scope Instore Bankers who are not proper parties to this action, and by requiring NationsBank to specify the job history of each Consumer Banker beyond that time period when he or she worked with plaintiff(s)), and it seeks information which is neither relevant to the above-captioned action or reasonably likely to lead to the discovery of admissible evidence.

Subject to and without waiving this objection, NationsBank agrees to identify the non-exempt Consumer Bankers with whom plaintiffs worked, but only pursuant to a Protective Order that prohibits plaintiff or plaintiffs' counsel from disclosing this information to anyone not a party to this action, and prohibits plaintiff or plaintiffs' counsel from contacting the individuals identified pursuant to the Protective Order without prior leave of court. Authority for NationsBank's position can be found in the "Omnibus Report and Recommendation" ("Perlman Omnibus Report") entered by Magistrate Judge Johnson on July 28, 1999, in Perlman, et al. v. NationsBank, N.A., CASE NO. 98-8805-CIV-DIMITROULEAS. The Perlman Omnibus Report, relying on the record established in Aldred v. Nations Bank of Florida, N.A. and Levine, et al. v. NationsBank, prohibited plaintiffs' counsel from contacting the individuals identified by NationsBank who had worked with the plaintiffs.

STATE OF NORTH CAROLINA   )

COUNTY OF MECKLENBURG   )

BEFORE ME, the undersigned authority, personally appeared _____

who, after being duly sworn according to law, deposes and says that he/she is authorized by

Bank of America to make this declaration and that he/she has read the foregoing Answers

to Interrogatories and they are true and correct to the best of his/her knowledge and belief.

Dated this ___ day of March, 2001

_____
Notary Public

My Commission Expires:   _____

6

This the 28th day of February, 2001.

_Richard / Kane_

Richard F. Kane, NC State Bar # 5694
Bruce M. Steen, VA State Bar # 31062
McGuireWoods LLP
3700 Bank of America Plaza
Charlotte, North Carolina 28280
Telephone:   (704) 373-8999
Facsimile:   (704) 373-8990

Michael T. Burke (Fla. Bar No. 338771)
Johnson, Anselmo, Murdoch, Burke
        & George, P.A.
790 East Broward Blvd., Suite 400
P.O. Box 030220
Fort Lauderdale, Florida 33303-0220
Telephone:   (954) 463-0100
Facsimile:   (954) 463-2444

Attorneys for Bank of America Corporation

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been served this

day by U.S. mail, postage prepaid, upon plaintiffs' counsel as listed below:

> Susan L. Dolin, Esq.
> Adam S. Chotiner, Esq.
> Muchnick, Wasserman, Dolin & Levine, LLP
> Presidential Circle Building, Suite 620 North
> 4000 Hollywood Blvd.
> Hollywood, FL 33021
>
> Caryl Boies, Esq.
> Anne E. Hinds, Esq.
> Boies, Schiller & Flexner, LLP
> 2435 Hollywood Boulevard, Suite 200
> Hollywood, FL 33020

This the 28th day of February, 2001.

Richard F. Kane

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 98-8632-CIV-DIMITROULEAS
Magistrate Judge Johnson

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated of themselves
and all others

       Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national
association,

       Defendants.
_____/

## NOTICE OF SERVICE OF
## PLAINTIFFS' SECOND SET OF INTERROGATORIES TO DEFENDANT

$2|19|01$
$DC$

COME NOW the Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE ,

et al, by and through their undersigned attorneys, and request that Defendant answer

the following Interrogatories in writing and under oath, as provided by Rule 33 of the

Federal Rules of the United States District Court for the Southern District of Florida.

The answers shall be signed by the person making them and a copy of the answers

shall be served within thirty (30) days from the date of service.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via
U.S. Mail this 16th day of January, 2001 to: Michael T. Burke, Esq., Johnson, Anselmo
et al., 790 East Broward Boulevard, Suite 400, Fort Lauderdale, Florida 33303-0220
and Richard F. Kane, Esq., McGuireWoods, 3700 NationsBank Plaza, Charlotte, NC
28280.

**EXHIBIT**

B

MUCHNICK WASSERMAN & DOLIN & LEVINE, LLP.
Attorneys for Plaintiffs
4000 Hollywood Boulevard, Suite 620 N
Hollywood, Florida 33021

By: _____

SUSAN L. DOLIN
Fla. Bar No.: 708690
DANIEL R. LEVINE
Fla. Bar No.: 0057861

and

BOIES SCHILLER & FLEXNER, LLP
2435 Hollywood Boulevard
Hollywood, FL 33020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 98-8632-CIV-DIMITROULEAS
Magistrate Judge Johnson

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated of themselves
and all others

      Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national
association,

      Defendants.
_____/

## PLAINTIFFS' SECOND SET OF INTERROGATORIES TO DEFENDANT

COME NOW the Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE ,

et al, by and through their undersigned attorneys, and request that Defendant answer

the following Interrogatories in writing and under oath, as provided by Rule 33 of the

Fed. R. Civ. P. within thirty (30) days as follows:

### DEFINITIONS AND INSTRUCTIONS

A.    In answering these Interrogatories, furnish all information available to you,

including information in the possession of your attorneys, their investigators, or any

person acting on your behalf, and not merely information in the possession of your

attorneys, their investigators, or any person acting on your behalf, and not merely

information as is known of your own personal knowledge. If you can not answer a part

of these interrogatories in full, after exercising due diligence to secure the information requested, so state that you are unable to answer the interrogatory fully and answer the remainder as fully as possible, stating whatever information or knowledge you have concerning the unanswered or partially answered portion of the interrogatory

B.    If you object to part of any interrogatory and refuse to answer that part, state your objection, identify the part to which you are objecting, and answer the remaining portion of the interrogatory. If you object to the scope or the time period of any interrogatory, state your objection, identify the scope or time period to which you are objecting and answer the interrogatory for the scope or time period you believe appropriated.

C.    If you need additional space to respond fully to any interrogatory, retype the interrogatory and answer it on a separate page and attach that page to this document.

D.    As used herein, the terms "Defendant", "NATIONSBANK", "you" or "your" mean the party or parties to whom these interrogatories are addressed, including its divisions, departments, subsidiaries, affiliates, predecessors, present or former officers, owners, agents, attorneys, and all other persons acting or purporting to act on its behalf, as well as each partnership in which it is a partner.

E.    As used herein, the terms "NATIONSBANK" and/or "Defendant" mean Defendant, NATIONSBANK.

F.    As used herein, the terms "person", "individual", or "entity" mean any natural person, individual, proprietorship, partnership, corporation, association, organization, joint venture, firm, other business enterprise, governmental body, group of natural persons or other entity.

G.    As used herein, the term, "documents" means all written and graphic

matter, however produced or reproduced, and each and every thing from which

information can be processed, transcribed, transmitted, restored, recorded, or

memorialized in any way, by any means, regardless of technology or form. It includes,

without limitation, correspondence, memoranda, notes, notations, diaries, papers,

books, accounts, newspaper and magazine articles, photographs, notebooks, ledgers,

letters, telegrams, cables, telex messages, facsimiles, contracts, offers, agreements,

reports, objects, tangible things, work papers, transcripts, minutes, reports and

recordings of telephone or other conversations or communications, or of interviews or

conferences, or of other meetings, occurrences or transactions, affidavits, statements,

summaries, opinions, tests, experiments, analysis, evaluations, journals, balance

sheets, income statements, statistical records, desk calendars, appointment books,

lists, tabulations, sound recordings, data processing input or output, microfilms, checks,

statements, receipts, summaries, computer printouts, computer programs, information

kept in computer hard drive, computer tape back-up, CD-ROM, computer floppy

diskettes teletypes, telecopies, invoices, worksheets, printed matter of every kind and

description, graphic and oral records and representations of any kind, and electronic

and mechanical records and representations of any kind and all things included in the

definitions of "writings" and "recordings" as set forth in the Federal Rules of Evidence,

in the actual or constructive possession, custody, care or control of Defendant

including, but not limited to, originals or copies where originals are not available. Any

document with any marks such as initials , comments or notations of any kind is not

deemed to be identical with one without such marks and is to be listed as a separate

document. Where there is any question about whether a tangible item otherwise

described in these requests falls within the definition of "document" such tangible item

shall be listed.

      H.     As used herein, the phrase "all documents" means every document or

group of documents or communication as defined herein that are known to you or that can be located or discovered by reasonably diligent efforts.

I.    As used herein, the term "agreements" shall mean agreements, contracts, arrangements, mutual promises, accords, engagements or undertakings.

J.    As used herein, the term "communications shall mean any oral or written statement, dialogue, colloquy, discussion, conversation, or direct or indirect representation and, also, means any transfer of thoughts or ideas between persons by means of documents and includes any transfer of data from one location to another by electronic similar means.

K.    As used herein, the term "all communications" means each and every communication as above-defined that is known to you or about which you have any information.

L.    As used herein, the term "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope hereof any information (as defined herein) which might otherwise be construed to be outside the scope of this discovery request.

M.    As used herein, the term "any" shall be understood to include and encompass "all" and vice versa.

N.    All words in the present tense include the past tense and all words in the past tense include the present tense.

O.    As used herein, the singular, and the masculine, feminine, and neuter shall include each of the other genders.

P.    As used herein, the term "identify" or "identity" when used with reference to a natural person means:

(1)    the full name and address (or, if the current address is not known,

the last known address) of the person; the full name and address

of each employer, each corporation of which the person is an

officer or director, and each business in which the person is a

principal;

(2)    the person's present  (or, if the present is not known, the last

known) position and the position or positions at the time of the act

to which the interrogatory answer relates;

(3)    each position the person has ever held with you or the date such

positions were held;

(4)    such other information sufficient to provide full identification of the

person;

Q.    As used herein, the term "identify" or "identify" when used with reference

to any entity other than a natural person means:

(1)    the full name of the entity, the type of entity (e.g.,

corporation, partnership, etc.), the address of its principal

place of business, its principal business activity and, if it is a

corporation, the jurisdiction under the laws of which it has

been organized and the date of such organization.

(2)    each of the entities, officers, directors, shareholders, or

other principals;

(3)    any other available information concerning the existence or

an identity of the entity.

R.    As used herein, the term "identify" or "identity" when used with reference

to a document or written communication means:

(1)    its nature (e.g., letter, telegram, memorandum, chart, report or

study) date, author, date and place of preparation, and the name

and address of each addressee;

    (2)    the identity of each signature of the document or communication;

    (3)    the title or heading of the document or communication;

    (4)    its substance;

    (5)    its present (or, if the present is not known, the last known), location and custodian;

    (6)    the identity of each person to whom a copy was sent and each date of its receipt and each date of its transmittal or other disposition by (I) you and (ii) any other person (naming such other person) who, at any time, either received, transmitted or otherwise disposed of such document or communication and each copy thereof;

    (7)    the circumstances of each such receipt and each transmittal or other disposition, including identification of the person from whom received and the person to whom transmitted.

    S.    As used herein, the term "identify" or "identify" when used with reference to an oral communication means:

    (1)    its nature (e.g., telephone call, conversation in person, etc.);

    (2)    its substance;

    (3)    the date and place thereof;

    (4)    the identity and address of each person participating therein, present, during, or witness to any part thereof;

    (5)    a description of each document in which such communication was recorded, described, or referred to.

    T.    As used herein, the term "identify" or "identity" when used with reference to a contract means:

    (1)    the date and place it was made;

     (2)    the name and address of each party thereto;

     (3)    its terms, including but not limited to, the performance to be

            rendered by each party;

     (4)    a statement whether the performance was rendered;

     (5)    any litigation with reference to said contract.

U.    As used herein, the term "identify or "identity" when used with reference to

an act, action or event means:

     (1)    its nature and the sequence of steps in its occurrence;

     (2)    the date and time it occurred;

     (3)    where it occurred;

     (4)    the persons who were involved;

     (5)    who or what caused the act, action or event to occur;

     (6)    the purposes or reasons for its occurrence.

V.    As used herein, the term "identify" or "identity" when used in any other

context than hereinabove set forth means;

     (1)    description of the subject to be identified and specification of the

            documents or communications at which the subject is or was

            recorded, described, or referred to;

     (2)    all other information necessary to fully identify the subject.

W.    As used herein, the term "termination" means any manner of severing the

employment relationship including, but not limited to, voluntary resignation, discharge

for cause, discharge without cause, retirement, layoff, or mutually agreed upon

resignation, discharge for cause, discharge without cause, retirement, layoff, or

mutually agreed upon resignation.


X.    Except as otherwise expressly indicated, responses shall continue to the

date of your answers to these interrogatories.

Y.     In answering such interrogatory, identify each document, communication,

or act:

(1)     relied upon in the preparation of each answer;

(2)     which forms all or part of the basis for that answer;

(3)     which corroborates the answers; or

(4)     the substance of which forms all or part of the answer.

Z.     You may, in lieu of identifying any document or written communication, attach a true copy of such document or communication as an exhibit to the answers to these interrogatories, including an explicit reference to the interrogatory to which each such attached document or written communication relates.

AA.     If all the information furnished in answer to all or part of an interrogatory is not within the personal knowledge and each person who communicated to the affiant any part of the information furnished.

AB.     If the answer to all or part of this interrogatory is not presently known or available, include a statement to that effect, furnish the information known or available, and respond to the entire interrogatory by supplemental answer, in writing, under oath, within ten days from the time the entire answer becomes known or available, and in no event, less than five days prior to trial.

AC.     Whenever, in any answer to any interrogatory, a reference is made to one or more persons, specify by name the particular person to who reference is intended.

AD.     As used herein, the term "state" means to set forth fully and unambiguously each and every fact of which the answering party, or his agent or representative has knowledge and which is relevant to the answer called for by the interrogatory.

AE.    As used herein, "relate to" or "relating to" means in any way,

directly or indirectly concern, reflect, refer to, constitute, contain, evidence, analyze,

memorialize, discuss, show, amend, confirm, endorse, represent, support, qualify,

describe, terminate, revoke, pertain to, comment on, negate or relate to or connect in

any way, logically or factually, with the matter described in this request.

AF.    As used herein, the term "Complaint" means that Complaint filed in

the United States District Court for the Southern District of Florida, served

simultaneously with Plaintiff's First Set of Interrogatories to Defendant.

2.     Please state the name, address, and telephone number of each consumer

banker II, III or IV, and/or each in-store banker I or II, who worked with Nancy Rojas

from December 1997 to the date Rojas separated from their employment with the

Defendant. For each such consumer banker II, III or IV, or each such in-store banker I

or II, please specify which at which banking center he or she worked from December

1997 to the present (or, if terminated) state the date of termination) and state at which

branch he or she worked with Rojas.

_____
REPRESENTATIVE OF
NATIONSBANK

STATE OF _____ )
                                          )     §
COUNTY OF_____ )

     BEFORE ME, the undersigned authority, personally appeared _____,
who, after being duly sworn according to law, deposes and says that he/she has read
the foregoing Answers to Interrogatories and they are true and correct to the best of
his/her knowledge and belief.

     Dated:_____, 2001.

NOTARY PUBLIC

_____
(Signature of Notary Public)

_____
(Print, Type, or Stamp Commissioned Name
of Notary Public)

My Commission Expires:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 00-06145-CIV-DIMITROULEAS
Magistrate Judge Johnson

ROXANNA L. ESCUDERO, and          )
KIMBERLY DRAKE, on behalf of      )
themselves and all others similarly )
situated,                          )
                                   )
            Plaintiffs,            )
                                   )
    vs.                            )
                                   )
BANKAMERICA CORPORATION,           )
a foreign corporation d/b/a        )
BANK OF AMERICA CORPORATION,       )
a foreign corporation, f/k/a       )
NATIONSBANK, N.A., a national      )
association,                       )
                                   )
            Defendant.             )

### NationsBank's Responses
### to Plaintiffs' Second Set of Interrogatories

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Bank of America

Corporation (f/k/a BankAmerica Corporation) and Bank of America, N.A., (f/k/a

NationsBank, N.A.), which are collectively referred to herein as "Defendants" or

"NationsBank," respond as follows to Plaintiffs' Second Set of Interrogatories to

Defendant:

### Interrogatories

1.    Please provide the name, address and telephone number of each banking

center manager under whom Nancy Rojas worked for Defendant since December 1997 until

the date Rojas separated from her employment with Defendant. For each such banking

center manager, specify the branch at which each such banking center manager worked

from December 1997 to present, and state at which such branches he or she worked with

Rojas.

### Response:

Nancy Rojas was employed at the Ormond Town Square Banking Center
from September 1, 1999 through February 21, 2000. Her banking center manager
("BCM") at the Ormond Town Square Banking Center were:

Sylvia G. Laborde
c/o Bank of America
Ormond By The Sea Office
1280 Ocean Shore Boulevard
Ormond Beach, Florida 32176-3620
(904) 441-3559

Ms. Laborde's job history is as follows:

BCM at Ormond Town Square from 5/2/98-11/30/99
BCM at Ormond-by-the-Sea from 12/1/99-present

Jacqueline M. Leonard
c/o Bank of America
Ormond Town Square
1454 West Granada Boulevard
Ormond Beach, Florida 32174
(904) 615-9816

Ms. Leonard's job history is as follows:

BCM at East Granada from 12/97-3/15/98
BCM at Nova from 3/16/98-11/30/99
BCM at Ormond Town Square from 12/1/99 - present

Escudero , et al., v. Bank of America
Case No. 00-06145-CIV- DIMITROULEAS/JOHNSON

2.   Please state the name, address, and telephone number of each consumer

banker II, III or IV and/or each instore banker I or II, who worked with Nancy Rojas from

December 1997 to the date Rojas separated from their employment with the Defendant.

For each such consumer banker II, III or IV, or each such in-store banker I or II, please

specify at which banking center he or she worked from December 1997 to the present (or, if

terminated, state the date of termination) and state at which branch he or she worked with

Rojas.

### Response:

NationsBank, by counsel, objects to the foregoing interrogatory on the
grounds that it is overbroad (e.g., by including within its scope Instore Bankers who
are not proper parties to this action, and by requiring NationsBank to specify the job
history of each Consumer Banker beyond that time period when he or she worked
with plaintiff(s)), and it seeks information which is neither relevant to the above-
captioned action or reasonably likely to lead to the discovery of admissible evidence.

Subject to and without waiving this objection, NationsBank agrees to
identify the non-exempt Consumer Bankers with whom plaintiffs worked, but only
pursuant to a Protective Order that prohibits plaintiff or plaintiffs' counsel from
disclosing this information to anyone not a party to this action, and prohibits plaintiff
or plaintiffs' counsel from contacting the individuals identified pursuant to the
Protective Order without prior leave of court. Authority for NationsBank's position
can be found in the "Omnibus Report and Recommendation" ("Perlman Omnibus
Report") entered by Magistrate Judge Johnson on July 28, 1999, in Perlman, et al.
v. NationsBank, N.A., CASE NO. 98-8805-CIV-DIMITROULEAS. The Perlman
Omnibus Report, relying on the record established in Aldred v. Nations Bank of
Florida, N.A. and Levine, et al. v. NationsBank, prohibited plaintiffs' counsel from
contacting the individuals identified by NationsBank who had worked with the
plaintiffs.

_____

STATE OF NORTH CAROLINA     )

COUNTY OF MECKLENBURG     )

BEFORE ME, the undersigned authority, personally appeared _____

who, after being duly sworn according to law, deposes and says that he/she is authorized by

Bank of America to make this declaration and that he/she has read the foregoing Answers

to Interrogatories and they are true and correct to the best of his/her knowledge and belief.

Dated this ___ day of March, 2001

.

_____
Notary Public

My Commission Expires:     _____

4

This the 28th day of February 28, 2001.

Richard F. Kane, NC State Bar # 5694
Bruce M. Steen, VA State Bar # 31062
McGuireWoods LLP
3700 Bank of America Plaza
Charlotte, North Carolina 28280
Telephone:   (704) 373-8999
Facsimile:    (704) 373-8990

Michael T. Burke (Fla. Bar No. 338771)
Johnson, Anselmo, Murdoch, Burke
    & George, P.A.
790 East Broward Blvd., Suite 400
P.O. Box 030220
Fort Lauderdale, Florida 33303-0220
Telephone:   (954) 463-0100
Facsimile:    (954) 463-2444


Attorneys for Bank of America Corporation

5

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing has been served this

day by U.S. mail, postage prepaid, upon plaintiffs' counsel as listed below:

> Susan L. Dolin, Esq.
> Adam S. Chotiner, Esq.
> Muchnick, Wasserman, Dolin & Levine, LLP
> Presidential Circle Building, Suite 620 North
> 4000 Hollywood Blvd.
> Hollywood, FL 33021

> Caryl Boies, Esq.
> Anne E. Hinds, Esq.
> Boies, Schiller & Flexner, LLP
> 2435 Hollywood Boulevard, Suite 200
> Hollywood, FL 33020

This the 28th day of February, 2001.

Richard F. Kane

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 98-8632-CIV-DIMITROULEAS
Magistrate Judge Johnson

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated of themselves
and all others

     Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national
association,

     Defendants.

_____/

## NOTICE OF SERVICE OF
## PLAINTIFFS' THIRD SET OF INTERROGATORIES TO DEFENDANT

COME NOW the Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE ,

et al, by and through their undersigned attorneys, and request that Defendant answer

the following Interrogatories in writing and under oath, as provided by Rule 33 of the

Federal Rules of the United States District Court for the Southern District of Florida.

The answers shall be signed by the person making them and a copy of the answers

shall be served within thirty (30) days from the date of service.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via
U.S. Mail this 16th day of January, 2001 to: Michael T. Burke, Esq., Johnson, Anselmo
et al., 790 East Broward Boulevard, Suite 400, Fort Lauderdale, Florida 33303-0220
and Richard F. Kane, Esq., McGuireWoods, 3700 NationsBank Plaza, Charlotte, NC
28280.

**EXHIBIT**

C

MUCHNICK WASSERMAN & DOLIN & LEVINE, LLP.
Attorneys for Plaintiffs
4000 Hollywood Boulevard, Suite 620 N
Hollywood, Florida 33021

By: _____

SUSAN L. DOLIN
Fla. Bar No.: 708690
DANIEL R. LEVINE
Fla. Bar No.: 0057861

and

BOIES SCHILLER & FLEXNER, LLP
2435 Hollywood Boulevard
Hollywood, FL 33020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 98-8632-CIV-DIMITROULEAS
Magistrate Judge Johnson

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated of themselves
and all others

       Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national
association,

       Defendants.

_____/

## PLAINTIFFS' THIRD SET OF INTERROGATORIES TO DEFENDANT

COME NOW the Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE ,

et al, by and through their undersigned attorneys, and request that Defendant answer

the following Interrogatories in writing and under oath, as provided by Rule 33 of the

Fed. R. Civ. P. within thirty (30) days as follows:

### DEFINITIONS AND INSTRUCTIONS

A.    In answering these Interrogatories, furnish all information available to you,

including information in the possession of your attorneys, their investigators, or any

person acting on your behalf, and not merely information in the possession of your

attorneys, their investigators, or any person acting on your behalf, and not merely

information as is known of your own personal knowledge. If you can not answer a part

of these interrogatories in full, after exercising due diligence to secure the information
requested, so state that you are unable to answer the interrogatory fully and answer the
remainder as fully as possible, stating whatever information or knowledge you have
concerning the unanswered or partially answered portion of the interrogatory

B.     If you object to part of any interrogatory and refuse to answer that part,
state your objection, identify the part to which you are objecting, and answer the
remaining portion of the interrogatory. If you object to the scope or the time period of
any interrogatory, state your objection, identify the scope or time period to which you
are objecting and answer the interrogatory for the scope or time period you believe
appropriated.

C.     If you need additional space to respond fully to any interrogatory, retype
the interrogatory and answer it on a separate page and attach that page to this
document.

D.     As used herein, the terms "Defendant", "NATIONSBANK", "you" or "your"
mean the party or parties to whom these interrogatories are addressed, including its
divisions, departments, subsidiaries, affiliates, predecessors, present or former officers,
owners, agents, attorneys, and all other persons acting or purporting to act on its
behalf, as well as each partnership in which it is a partner.

E.     As used herein, the terms "NATIONSBANK" and/or "Defendant" mean
Defendant, NATIONSBANK.

F.     As used herein, the terms "person", "individual", or "entity" mean any
natural person, individual, proprietorship, partnership, corporation, association,
organization, joint venture, firm, other business enterprise, governmental body, group of
natural persons or other entity.

G.     As used herein, the term, "documents" means all written and graphic

matter, however produced or reproduced, and each and every thing from which

information can be processed, transcribed, transmitted, restored, recorded, or

memorialized in any way, by any means, regardless of technology or form. It includes,

without limitation, correspondence, memoranda, notes, notations, diaries, papers,

books, accounts, newspaper and magazine articles, photographs, notebooks, ledgers,

letters, telegrams, cables, telex messages, facsimiles, contracts, offers, agreements,

reports, objects, tangible things, work papers, transcripts, minutes, reports and

recordings of telephone or other conversations or communications, or of interviews or

conferences, or of other meetings, occurrences or transactions, affidavits, statements,

summaries, opinions, tests, experiments, analysis, evaluations, journals, balance

sheets, income statements, statistical records, desk calendars, appointment books,

lists, tabulations, sound recordings, data processing input or output, microfilms, checks,

statements, receipts, summaries, computer printouts, computer programs, information

kept in computer hard drive, computer tape back-up, CD-ROM, computer floppy

diskettes teletypes, telecopies, invoices, worksheets, printed matter of every kind and

description, graphic and oral records and representations of any kind, and electronic

and mechanical records and representations of any kind and all things included in the

definitions of "writings" and "recordings" as set forth in the Federal Rules of Evidence,

in the actual or constructive possession, custody, care or control of Defendant

including, but not limited to, originals or copies where originals are not available. Any

document with any marks such as initials , comments or notations of any kind is not

deemed to be identical with one without such marks and is to be listed as a separate

document. Where there is any question about whether a tangible item otherwise

described in these requests falls within the definition of "document" such tangible item

shall be listed.

H.     As used herein, the phrase "all documents" means every document or

group of documents or communication as defined herein that are known to you or that

can be located or discovered by reasonably diligent efforts.

    I.     As used herein, the term "agreements" shall mean agreements, contracts, arrangements, mutual promises, accords, engagements or undertakings.

    J.     As used herein, the term "communications shall mean any oral or written statement, dialogue, colloquy, discussion, conversation, or direct or indirect representation and, also, means any transfer of thoughts or ideas between persons by means of documents and includes any transfer of data from one location to another by electronic similar means.

    K.     As used herein, the term "all communications" means each and every communication as above-defined that is known to you or about which you have any information.

    L.     As used herein, the term "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope hereof any information (as defined herein) which might otherwise be construed to be outside the scope of this discovery request.

    M.     As used herein, the term "any" shall be understood to include and encompass "all" and vice versa.

    N.     All words in the present tense include the past tense and all words in the past tense include the present tense.

    O.     As used herein, the singular, and the masculine, feminine, and neuter shall include each of the other genders.

    P.     As used herein, the term "identify" or "identity" when used with reference to a natural person means:

        (1)    the full name and address (or, if the current address is not known,

the last known address) of the person; the full name and address

of each employer, each corporation of which the person is an

officer or director, and each business in which the person is a

principal;

(2)    the person's present  (or, if the present is not known, the last

known) position and the position or positions at the time of the act

to which the interrogatory answer relates;

(3)    each position the person has ever held with you or the date such

positions were held;

(4)    such other information sufficient to provide full identification of the

person;

Q.    As used herein, the term "identify" or "identify" when used with reference

to any entity other than a natural person means:

(1)    the full name of the entity, the type of entity (e.g.,

corporation, partnership, etc.), the address of its principal

place of business, its principal business activity and, if it is a

corporation, the jurisdiction under the laws of which it has

been organized and the date of such organization.

(2)    each of the entities, officers, directors, shareholders, or

other principals;

(3)    any other available information concerning the existence or

an identity of the entity.

R.    As used herein, the term "identify" or "identity" when used with reference

to a document or written communication means:

(1)    its nature (e.g., letter, telegram, memorandum, chart, report or

study) date, author, date and place of preparation, and the name

and address of each addressee;

    (2)    the identity of each signature of the document or communication;

    (3)    the title or heading of the document or communication;

    (4)    its substance;

    (5)    its present (or, if the present is not known, the last known), location and custodian;

    (6)    the identity of each person to whom a copy was sent and each date of its receipt and each date of its transmittal or other disposition by (I) you and (ii) any other person (naming such other person) who, at any time, either received, transmitted or otherwise disposed of such document or communication and each copy thereof;

    (7)    the circumstances of each such receipt and each transmittal or other disposition, including identification of the person from whom received and the person to whom transmitted.

    S.    As used herein, the term "identify" or "identify" when used with reference to an oral communication means:

    (1)    its nature (e.g., telephone call, conversation in person, etc.);

    (2)    its substance;

    (3)    the date and place thereof;

    (4)    the identity and address of each person participating therein, present, during, or witness to any part thereof;

    (5)    a description of each document in which such communication was recorded, described, or referred to.

    T.    As used herein, the term "identify" or "identity" when used with reference to a contract means:

    (1)    the date and place it was made;

(2)    the name and address of each party thereto;

      (3)    its terms, including but not limited to, the performance to be

rendered by each party;

      (4)    a statement whether the performance was rendered;

      (5)    any litigation with reference to said contract.

U.    As used herein, the term "identify or "identity" when used with reference to

an act, action or event means:

      (1)    its nature and the sequence of steps in its occurrence;

      (2)    the date and time it occurred;

      (3)    where it occurred;

      (4)    the persons who were involved;

      (5)    who or what caused the act, action or event to occur;

      (6)    the purposes or reasons for its occurrence.

V.    As used herein, the term "identify" or "identity" when used in any other

context than hereinabove set forth means;

      (1)    description of the subject to be identified and specification of the

documents or communications at which the subject is or was

recorded, described, or referred to;

      (2)    all other information necessary to fully identify the subject.

W.    As used herein, the term "termination" means any manner of severing the

employment relationship including, but not limited to, voluntary resignation, discharge

for cause, discharge without cause, retirement, layoff, or mutually agreed upon

resignation, discharge for cause, discharge without cause, retirement, layoff, or

mutually agreed upon resignation.

X.    Except as otherwise expressly indicated, responses shall continue to the

date of your answers to these interrogatories.

    Y.    In answering such interrogatory, identify each document, communication,

or act:

        (1)    relied upon in the preparation of each answer;

        (2)    which forms all or part of the basis for that answer;

        (3)    which corroborates the answers; or

        (4)    the substance of which forms all or part of the answer.

    Z.    You may, in lieu of identifying any document or written communication, attach a true copy of such document or communication as an exhibit to the answers to these interrogatories, including an explicit reference to the interrogatory to which each such attached document or written communication relates.

    AA.    If all the information furnished in answer to all or part of an interrogatory is not within the personal knowledge and each person who communicated to the affiant any part of the information furnished.

    AB.    If the answer to all or part of this interrogatory is not presently known or available, include a statement to that effect, furnish the information known or available, and respond to the entire interrogatory by supplemental answer, in writing, under oath, within ten days from the time the entire answer becomes known or available, and in no event, less than five days prior to trial.

    AC.    Whenever, in any answer to any interrogatory, a reference is made to one or more persons, specify by name the particular person to who reference is intended.

    AD.    As used herein, the term "state" means to set forth fully and unambiguously each and every fact of which the answering party, or his agent or representative has knowledge and which is relevant to the answer called for by the interrogatory.

AE.    As used herein, "relate to" or "relating to" means in any way, directly or indirectly concern, reflect, refer to, constitute, contain, evidence, analyze, memorialize, discuss, show, amend, confirm, endorse, represent, support, qualify, describe, terminate, revoke, pertain to, comment on, negate or relate to or connect in any way, logically or factually, with the matter described in this request.

AF.    As used herein, the term "Complaint" means that Complaint filed in the United States District Court for the Southern District of Florida, served simultaneously with Plaintiff's First Set of Interrogatories to Defendant.

## INTERROGATORIES TO DEFENDANT

1.      Please provide the name, address and telephone number of each banking center manager under whom the following individuals worked for Defendant since December 1997 until the present or the date such individual separated from his or her employment with Defendant. For each such banking center manager, specify the branch at which each such banking center manager worked from December 1997 to present, and state at which such branches he or she worked with the named individual or individuals.

2.      Please state the name, address, and telephone number of each consumer banker II, III or IV, and/or each in-store banker I or II, who worked with the below-referenced individuals from December 1997 to the present or the date such individual separated from his or her employment with the Defendant. For each such consumer banker II, III or IV, or each such in-store banker I or II, please specify which at which banking center he or she worked from December 1997 to the present (or, if terminated, state the date of termination) and state at which branch he or she worked with each such individual or individuals.

Elke G. Adams
Deborah J. Agnew
Tempy Aguilar-Demarco
Kathy Foster Andrews
Annette B. Armstrong
Marilyn Barnes
Michelle A. Barnett
Carrie H. Barnette
Eloise M. Batts
Margaret A. Buchanan
Henry David Calvillo
Bryan K. Crowder
Suzanne Czwojdak
Stephanie Dantos
Candice M. Davis-Dunn
Juan Carlos Delvalle
Donna M. Dickerson
Dianne D. Dismukes
Laurie K. DuPont
Debra Elias
Mary Rose Estrada
Barbara Fleming
Linda H. Grant
Karen G. Greene
Joyce A. Hardy
Alex L. Harris
Rodney Hensley
Jennifer Hilbers
Mary Howard
Deana B. Justice
Elizabeth Arnold Langley
Tracie R. Lappin-Blitch
Peggy H. Lee
Philip M. Lee, Jr.
Danielle L. Magan
Janet E. Meier
Jacqueline Mintz
Lillian Moreno
Patricia B. Murray
Anita Parial
Guilbert M. Parker
Nettie Parks
Dayton J. Pehl
David Perlmutter
Jennie C. Pumphrey
Susie S. Reynolds
Steven K. Richardson
Melanie E. Rogers
Theresa Sutton Rubinfeld

Joseph A. Sierra
Joann Skinner
Leslie Slater Hill
William D. Smith
Fabiola Stewart
Kathleen M. Stuchbery-Martinez
Jeffrey Scott Taylor
Sheri Thomas
Ron Valdez
Samuel D. Washington
Barbara W. Wells

_____

REPRESENTATIVE OF
NATIONSBANK

STATE OF _____ )
                          )   §
COUNTY OF_____ )

BEFORE ME, the undersigned authority, personally appeared _____, who, after being duly sworn according to law, deposes and says that he/she has read the foregoing Answers to Interrogatories and they are true and correct to the best of his/her knowledge and belief.

Dated:_____, 2001.

NOTARY PUBLIC

_____
(Signature of Notary Public)

_____
(Print, Type, or Stamp Commissioned Name
of Notary Public)

My Commission Expires:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 00-06145-CIV-DIMITROULEAS
Magistrate Judge Johnson

ROXANNA L. ESCUDERO, and          )
KIMBERLY DRAKE, on behalf of       )
themselves and all others similarly )
situated,                          )
                                   )
        Plaintiffs,                )
                                   )
    vs.                            )
                                   )
BANKAMERICA CORPORATION,           )
a foreign corporation d/b/a        )
BANK OF AMERICA CORPORATION,       )
a foreign corporation, f/k/a       )
NATIONSBANK, N.A., a national      )
association,                       )
                                   )
        Defendant.                 )

## NationsBank's Responses
## to Plaintiffs' Third Set of Interrogatories

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Bank of America

Corporation (f/k/a BankAmerica Corporation) and Bank of America, N.A., (f/k/a

NationsBank, N.A.), which are collectively referred to herein as "Defendants" or

"NationsBank," respond as follows to Plaintiffs' Second Set of Interrogatories to

Defendant:

### Interrogatories

1.    Please provide the name, address and telephone number of each banking

center manager under whom the following individuals worked for Defendant since

December 1997 until the present or the date such individual separated from his or her

employment with Defendant. For each such banking center manager, specify the branch at

which each such banking center manager worked from December 1997 to present, and state

at which such branches he or she worked with the named individual or individuals.

### Response:

NationsBank, by counsel, objects to the foregoing interrogatory on the
grounds that it imposes an undue burden on NationsBank and its counsel.
Researching and identifying a particular employee's banking center manager is a time
consuming process, requiring a significant investment of resources. These issues are
exacerbated by the number of opt-in plaintiffs about whom plaintiffs are demanding
information. NationsBank, by counsel, also objects to the foregoing interrogatory
to the extent it seeks information regarding the banking center managers of
individuals who no longer are participating in this action. Subject to and without
waiving the foregoing objections, NationsBank is attempting to locate the
information responsive to this interrogatory and will supplement its response if and
when such information becomes available.

2.    Please state the name, address, and telephone number of each consumer

banker II, III or IV and/or each instore banker I or II, who worked with the below-

referenced individuals from December 1997 to the present or the date such individual

separated from his or her employment with the Defendant. For each such consumer banker

II, III or IV, or each such in-store banker I or II, please specify at which banking center he

or she worked from December 1997 to the present (or, if terminated, state the date of

termination) and state at which branch he or she worked with each such individual or

individuals.

### Response:

NationsBank, by counsel, objects to the foregoing interrogatory on the
grounds that it imposes an undue burden on NationsBank and its counsel.

2

Researching and identifying a particular employee's banking center manager is a time consuming process, requiring a significant investment of resources. These issues are exacerbated by the number of opt-in plaintiffs about whom plaintiffs are demanding information. NationsBank, by counsel, also objects to the foregoing interrogatory to the extent it seeks information regarding the banking center managers of individuals who no longer are participating in this action. NationsBank, by counsel, also objects to the foregoing interrogatory on the grounds that it is overbroad (e.g., by including within its scope Instore Bankers who are not proper parties to this action, and by requiring NationsBank to specify the job history of each Consumer Banker beyond that time period when he or she worked with plaintiff(s)), and it seeks information which is neither relevant to the above-captioned action or reasonably likely to lead to the discovery of admissible evidence.

Subject to and without waiving this objection, NationsBank agrees to identify the non-exempt Consumer Bankers with whom plaintiffs worked, but only pursuant to a Protective Order that prohibits plaintiff or plaintiffs' counsel from disclosing this information to anyone not a party to this action, and prohibits plaintiff or plaintiffs' counsel from contacting the individuals identified pursuant to the Protective Order without prior leave of court. Authority for Defendants' position can be found in the "Omnibus Report and Recommendation" ("Perlman Omnibus Report") entered by Magistrate Judge Johnson on July 28, 1999, in Perlman, et al. v. NationsBank, N.A., CASE NO. 98-8805-CIV-DIMITROULEAS. The Perlman Omnibus Report, relying on the record established in Aldred v. Nations Bank of Florida, N.A. and Levine, et al. v. NationsBank, prohibited plaintiffs' counsel from contacting the individuals identified by NationsBank who had worked with the plaintiffs.

STATE OF NORTH CAROLINA    )

COUNTY OF MECKLENBURG    )

BEFORE ME, the undersigned authority, personally appeared _____

who, after being duly sworn according to law, deposes and says that he/she is authorized by

Bank of America to make this declaration and that he/she has read the foregoing Answers

to Interrogatories and they are true and correct to the best of his/her knowledge and belief.

Dated this ___ day of March, 2001

.

_____
Notary Public

My Commission Expires:    _____

4

This the 28th day of February 28, 2001.

_Richard F. Kane_

Richard F. Kane, NC State Bar # 5694
Bruce M. Steen, VA State Bar # 31062
McGuireWoods LLP
3700 Bank of America Plaza
Charlotte, North Carolina 28280
Telephone:    (704) 373-8999
Facsimile:    (704) 373-8990

Michael T. Burke (Fla. Bar No. 338771)
Johnson, Anselmo, Murdoch, Burke
    & George, P.A.
790 East Broward Blvd., Suite 400
P.O. Box 030220
Fort Lauderdale, Florida 33303-0220
Telephone:    (954) 463-0100
Facsimile:    (954) 463-2444

Attorneys for Bank of America Corporation

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been served this

day by U.S. mail, postage prepaid, upon plaintiffs' counsel as listed below:

> Susan L. Dolin, Esq.
> Adam S. Chotiner, Esq.
> Muchnick, Wasserman, Dolin & Levine, LLP
> Presidential Circle Building, Suite 620 North
> 4000 Hollywood Blvd.
> Hollywood, FL 33021

> Caryl Boies, Esq.
> Anne E. Hinds, Esq.
> Boies, Schiller & Flexner, LLP
> 2435 Hollywood Boulevard, Suite 200
> Hollywood, FL 33020

This the 28th day of February, 2001.

Richard F. Kane

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 98-8632-CIV-DIMITROULEAS
Magistrate Judge Johnson

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others
similarly situated of themselves
and all others

Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national
association,

Defendants.
_____/

## PLAINTIFFS' FIFTH REQUEST FOR PRODUCTION TO DEFENDANT

COME NOW the Plaintiffs, ROXANNA L. ESCUDERO, and KIMBERLY DRAKE, et

al., by and through their undersigned counsel, and pursuant to Rule 34, Federal Rules of

Civil Procedure, and Local Rule 26.1 of the Local General Rules of the United States

District Court for the Southern District of Florida, hereby requests that Defendant produce

and make available for inspection and copying all documents in its possession, custody or

control as more fully described in the specifications below. The documents produced

pursuant to this request are to be made available for inspection and copying at the offices

of Muchnick, Wasserman, Dolin & Levine, 4000 Hollywood Boulevard, Suite 620-North,

Hollywood, Florida 33021 within thirty (30) days from the date of service.



## DEFINITIONS AND INSTRUCTIONS

In interpreting each part of this document request, the following definitions and instructions shall apply:

A. As used herein, the term "document" means all written and graphic matter, however produced or reproduced, and each and every thing from which information can be processed, transcribed, transmitted, restored, recorded, or memorialized in any way, by any means, regardless of technology or form. It includes, without limitation, correspondence, memoranda, notes notations, diaries, papers, books, account, newspaper and magazine articles, photographs, notebooks, ledgers, letters, telegrams, cables, telex messages, facsimiles, contracts, offers, agreements, reports, objects, tangible things, work papers, transcripts, minutes, reports and recordings of telephone or other conversations or communications, or of interviews or conferences, or of other meetings, occurrences or transactions, affidavits, statements, summaries, opinions, tests, experiments, analysis, evaluations, journals, balance sheets, income statements, statistical records, desk calendars, appointment books, lists, tabulations, sound recordings, data processing input or output, microfilms, checks, statements, receipts, summaries, computer printouts, computer programs, information kept in computer hard drive, computer tape back-up, CD-ROM, computer floppy diskettes, teletypes, telecopies, invoices, worksheets, printed matter of every kind and description, graphic and oral records and representations of any kind, and electronic and mechanical records and representations of any kind and all things included in the definitions of "writings" and "recordings" as set forth in the Federal Rules of Evidence, in the actual or constructive possession, custody, care or control of Defendant including, but not limited to, originals or copies where originals are not available. Any

document with any marks such as initials, comments or notations of any kind is not deemed to be identical with one without such marks and is to be produced as a separate document. Where there is any question about whether a tangible item otherwise described in these requests falls within the definition of "document" such tangible item shall be produced.

B.    As used herein, the term "relate to" or "relating to" means in any way, directly or indirectly concern, reflect, refer to, constitute, contain, evidence, analyze, memorialize, discuss, show, amend, confirm, endorse, represent, support, qualify, describe, terminate, revoke, pertain to, comment on, negate or relate to or connect in any way, logically or factually, with the matter described in this request.

C.    As used herein, the term "and" as well as "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope hereof any information (as defined herein) which might otherwise be construed to be outside the scope of this discovery request.

D.    As used herein, the term "any" shall be understood to include and encompass "all" and vice versa.

E.    Whenever appropriate herein, the masculine form of a word shall be interpreted as feminine, and vice versa.

F.    As used herein, the term "information" shall be expansively construed and shall include, but not be limited to, facts, data, opinions, images, impressions, concepts and formulae.

G.    As used herein, the term "communications" shall mean any oral or written statement, dialogue, colloquy, discussion, conversation, or direct or indirect

representation and, also means any transfer of thoughts or ideas between persons by means of documents and includes any transfer of data from one location to another by electronic or similar means.

H.   As used herein, the term "all communications" means each and every communication as above-defined that is known to you or about which you have any information.

I.   As used herein, the term "agreements" shall mean agreements, contracts, arrangements, mutual promises, accords, engagements or undertakings.

J.   If this request, read literally, requires the production of a part or portion of a document, production of the entire document is requested.

K.   The singular includes the plural and the plural includes the singular.

L.   All words in the present tense include the past tense and all words in the past tense include the present tense.

M.   This request shall be deemed continuing so as to require prompt, further and supplemental production if Defendant locates or obtains possession, custody or control of additional responsive documents at any time prior to trial herein to the extent and in the manner prescribed by the Federal Rules of Civil Procedure and any and all other rules of the court having jurisdiction over this matter.

N.   Your attention is directed to Local Rule 26.1.G.6 and its sub-parts which provide, in pertinent part, that:

Where an objection is made to any document request under Fed.R.Civ.P. 34, the objection shall state with specificity all grounds.

Any ground not stated in an objection within the time provided by the Federal Rules

of Civil Procedure, or any extensions thereof, shall be waived.

Where a claim of privilege is asserted in objecting to any document demand, or sub-part thereof, and an answer is not provided on the basis of such assertion, the attorney asserting the privilege shall in the objection to the documents demand, or sub-part thereof, identify the nature of the privilege (including work product) which is being claimed and if the privilege is being asserted in connection with a claim or defense governed by state law, indicate that state's privilege rule being invoked; and the following information shall be provided in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged information:

(1) the type of document; (2) general subject matter of the document; (3) the date of the document; (4) such other information as is sufficient to identify the document for a subpoena duces tecum, including, where appropriate, the author of the document, the addressee of the document, and where not apparent, the relationship of the author and addressee to each other.

O.    If you object to part of any request to produce and refuse to answer that request, state your objection, identify the part to which you are objecting, and answer the remaining portion of the request. If you object to the scope or the time period of any request, state your objection, identify the scope or time period to which you are objecting and answer the request for the scope or time period you believe appropriate.

P.    If any document requested herein was at one time in existence, but has been lost, discarded, destroyed or purged, identify each document as completely as possible, and state the type of document, the date or approximate date it was lost, discarded, destroyed or purged; the circumstances and manner in which it was lost,

discarded, destroyed or purged; the reason or reasons for disposing of the documents; the identity of persons having knowledge of the contents of the documents; the identity of all persons believed at any time to have had a copy of the document or to have ever seen the document; and the identity of the persons authorizing or aware of the loss, discard, destruction or purging of the document.

Q.    Any response to these requests shall set forth the request in full before such response.

R.    Your attention is directed to Rule 34(b) of the Federal Rules of Civil Procedure, which provides that any party who produces documents shall produce them as they are kept in the usual course of business and shall organize and label them to correspond with the categories of each numbered request hereof.

S.    As used herein, the term "termination" means any manner of severing the employment relationship including, but not limited to, voluntary resignation, discharge for cause, discharge without cause, retirement, layoff, or mutually agreed upon resignation.

T.    As used herein, the terms "person", "individual", or "entity" mean any natural person, individual, proprietorship, partnership, corporation, association, organization, joint venture, firm, other business enterprise, governmental body, group of natural persons or other entity.

U.    Each request herein for a document or documents to be produced contemplates production of a document in its entirety, without abbreviation or expurgation.

V.    If one or more responses to this document request would require duplication of a document previously produced by Defendant in response to a prior enumerated request herein, Defendant may refer to that document in a manner identifying

it with particularity as to the specific portion, page, paragraph, and line thereof, or make and submit a copy of a document designating the particular portion thereof to which Plaintiff makes later reference.

W.    As used herein, the terms "Defendant", NATIONSBANK, "you" or "your" mean the party or parties to whom this Request is addressed, including its divisions, departments, subsidiaries, affiliates, predecessors, present or former officers, owners, agents, attorneys, and all other persons acting or purporting to act on its behalf, as well as each partnership in which it is a partnership in which it is a partner.

X.    As used herein, the terms ESCUDERO and DRAKE and/or "Plaintiffs" mean Plaintiffs, ROXANNA L. ESCUDERO and KIMBERLY DRAKE.

Y.    As used herein, the term "Complaint" means that Complaint filed in the United States District Court for the Southern District of Florida.

## SPECIFIC DOCUMENTS REQUESTED

1.    For any and all pay periods during her employment from December 17, 1997 to the present, all time cards for Naomi Billingsley, employed at the Bankhead Banking Center in the Atlanta, Georgia metropolitan area.

2.    For the time period from December 17, 1997 to the present, all vault logs or sign-in logs for the Bankhead Banking Center in the Atlanta, Georgia metropolitan area.

3.    For any and all pay periods during her employment from December 17, 1997 to the present, all computer logs showing times logged on and logged off for Naomi Billingsley, employed at the Bankhead Banking Center in the Atlanta, Georgia metropolitan area.

4.     For any and all pay periods during her employment from December

17, 1997 to the present, all security code entries for Naomi Billingsley at the Bankhead

Banking Center in the Atlanta, Georgia metropolitan area.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via U.S.

Mail and facsimile this 14th day of February, 2001 to: Michael T. Burke, Esq., Johnson,

Anselmo et al., 790 East Broward Boulevard, Suite 400, Fort Lauderdale, Florida 33303-

0220 and Richard F. Kane, Esq., McGuireWoods, 3700 NationsBank Plaza, 101 South

Tyron Street, Charlotte, NC 28280; and Caryl Boies, Esquire, Boies, Schiller & Flexner,

LLP, 2435 Hollywood Blvd., Hollywood, Florida 33020

Respectfully submitted,

MUCHNICK WASSERMAN, DOLIN &
LEVINE
Attorneys for Plaintiffs
4000 Hollywood Boulevard
Suite 620 North
Hollywood, Florida 33021
(954) 989-8100 / (305) 624-9100
(954) 989-8700 Facsimile

By: _____

SUSAN L. DOLIN, ESQ., FBN 708690
e-mail: sldolin@mwdl-law.com
DANIEL R. LEVINE, ESQ., FBN 0057861
e-mail: drlevine@mwdl-law.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 00-06145-CIV-DIMITROULEAS
Magistrate Judge Johnson

| | |
|---|---|
| ROXANNA L. ESCUDERO, and | ) |
| KIMBERLY DRAKE, on behalf of | ) |
| themselves and all others similarly | ) |
| situated, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| BANKAMERICA CORPORATION, | ) |
| a foreign corporation d/b/a | ) |
| BANK OF AMERICA CORPORATION, | ) |
| a foreign corporation, f/k/a | ) |
| NATIONSBANK, N.A., a national | ) |
| association, | ) |
| | ) |
| Defendant | ) |

## NationsBank's Responses
## to Plaintiffs' Fifth Request for Production

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Bank of America

Corporation (f/k/a BankAmerica Corporation) and Bank of America, N.A., (f/k/a

NationsBank, N.A.), which are collectively referred to herein as "defendants" or

"NationsBank," respond as follows to Plaintiffs' Fifth Request for Production to Defendant:

### Document Requests

1.    For any and all pay periods during her employment from December 17,

1997 to the present, all time cards for Naomi Billingsley, employed at the Bankhead

Banking Center in the Atlanta, Georgia metropolitan area.

#### Response:

NationsBank, by counsel, objects to the foregoing document request on the
grounds that it seeks information which is neither relevant to the above-captioned
action nor reasonably likely to lead to the discovery of admissible evidence. The
only time records for Naomi Billingsley to which plaintiffs are entitled are those
time records which may exist for the period of time Billingsley worked with
plaintiff Angela Mobley. Subject to and without waiving the foregoing objections,
see documents ESC 7491 - ESC 7492 produced herewith consisting of payroll
registers. NationsBank continues to search for relevant timecards and will
supplement its answers when and if they are located.

2.    For the time period from December 17, 1997 to the present, all vault logs or

sign-in logs for the Bankhead Banking Center in the Atlanta, Georgia metropolitan area.

#### Response:

NationsBank, by counsel, objects to the foregoing document request on the
grounds that it imposes upon NationsBank and its counsel an undue burden and
unreasonable expense. NationsBank, by counsel, also objects to the foregoing
document request on the grounds that it seeks information which is neither relevant
to the above-captioned action nor reasonably likely to lead to the discovery of
admissible information. The records demanded by plaintiffs have, at best, limited
relevance to the issue of how much, if any, overtime hours plaintiffs worked during
the relevant time period, and the, at best, limited relevance of these records is
greatly outweighed by the unreasonable burden plaintiffs seek to impose upon
NationsBank. Subject to and without waiving the foregoing objections,
NationsBank has been searching for and attempting to gather the "vault logs"
requested by the foregoing document request. NationsBank will produce these
documents if and when they can be located and collected without unreasonable
burden or expense.

3.    For any and all pay periods during her employment from December 17,

1997 to the present, all computer logs showing times logged on and logged off for Naomi

2

Billingsley, employed at the Bankhead Banking Center in the Atlanta, Georgia

metropolitan area.

### Response:

NationsBank, by counsel, objects to the foregoing document request on the grounds that it imposes upon NationsBank and its counsel an undue burden and unreasonable expense. NationsBank, by counsel, also objects to the foregoing document request on the grounds that it seeks information which is neither relevant to the above-captioned action nor reasonably likely to lead to the discovery of admissible information. The records demanded by plaintiffs have, at best, limited relevance to the issue of how much, if any, overtime hours plaintiffs worked during the relevant time period, and the, at best, limited relevance of these records is greatly outweighed by the unreasonable burden plaintiffs seek to impose upon NationsBank.

4.    For any and all pay periods during her employment from December 17,

1997 to the present, all security code entries for Naomi Billingsley at the Bankhead

Banking Center in the Atlanta, Georgia metropolitan area.

### Response:

NationsBank, by counsel, objects to the foregoing document request on the grounds that it imposes upon NationsBank and its counsel an undue burden and unreasonable expense. NationsBank, by counsel, also objects to the foregoing document request on the grounds that it seeks information which is neither relevant to the above-captioned action nor reasonably likely to lead to the discovery of admissible information. The records demanded by plaintiffs have, at best, limited relevance to the issue of how much, if any, overtime hours plaintiffs worked during the relevant time period, and the, at best, limited relevance of these records is greatly outweighed by the unreasonable burden plaintiffs seek to impose upon NationsBank.

This the 16th day of March, 2001.

Richard F. Kane, NC State Bar # 5694
Bruce M. Steen, VA State Bar # 31062
McGuireWoods LLP
3700 Bank of America Plaza
Charlotte, North Carolina 28280
Telephone:   (704) 373-8999
Facsimile:   (704) 373-8990

Michael T. Burke (Fla. Bar No. 338771)
Johnson, Anselmo, Murdoch, Burke
      & George, P.A.
790 East Broward Blvd., Suite 400
P.O. Box 030220
Fort Lauderdale, Florida 33303-0220
Telephone:   (954) 463-0100
Facsimile:   (954) 463-2444

Attorneys for Bank of America Corporation

Escudero , et al., v. Bank of America
Case No. 00-06145-CIV-DIMITROULEAS/JOHNSON

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing has been served this

day by U.S. mail, postage prepaid, upon plaintiffs' counsel as listed below:

Susan L. Dolin, Esq.
Adam S. Chotiner, Esq.
Muchnick, Wasserman, Dolin & Levine, LLP
Presidential Circle Building, Suite 620 North
4000 Hollywood Blvd.
Hollywood, FL 33021

Caryl Boies, Esq.
Anne E. Hinds, Esq.
Boies, Schiller & Flexner, LLP
2435 Hollywood Boulevard, Suite 200
Hollywood, FL 33020

This the 16th day of March, 2001.

Richard F. Kane

**MUCHNICK**
**WASSERMAN**
**DOLIN &**
**LEVINE, LLP**
Attorneys At Law

Sanford L. Muchnick, P.A. *
Jeffrey P. Wasserman, P.A. *
Susan L. Dolin, P.A. ** †
Daniel R. Levine, P.A.

Adam S. Chotiner
Elissa S. Hulnick
Ruthlyn B. Rubin ***
  of Counsel
Merle Litman (1926-1977)

* Certified Family Law Mediator
† Florida Bar Board Certified Labor
& Employment Lawyer
** Also Admitted Ohio Bar
*** Also Admitted New Jersey Bar

April 5, 2001

**Via U.S. Mail and Facsimile (704)373-8828**

Dick Kane, Esq.
McGuire Woods Battle & Booth
3700 NationsBank Plaza
101 South Tryon Street
Charlotte, NC 28280

### Re: *Roxanna Escudero, et al. v. BankAmerica Corporation*

Dear Dick:

I write in connection with NationsBank's Responses to Plaintiffs' First, Second, and Third set of Interrogatories, as well as NationsBank's Responses to Plaintiffs' Fifth Request for Production. This letter shall constitute my good faith effort to confer with you in an attempt to resolve issues raised by the foregoing discovery responses prior to seeking the Court's intervention.

As an initial matter, I note that the Responses to Interrogatories were served unexecuted. Please provide an executed jurat for each of the Responses.

As you know, the Interrogatories essentially seek the identification of all non-exempt consumer bankers with whom the Plaintiffs worked. Each of NationsBank's responses indicate a willingness to provide this information, but only subject to a protective order which would prohibit the Plaintiffs or their counsel from contacting these individuals. As support for this position, you cite Magistrate Judge Johnson's July 28, 1999 "Omnibus Report and Recommendation" in the Perlman case. I have little doubt that we will end up agreeing-to-disagree on this matter, but I will note that, much more recently, Judge Johnson rejected this position in her December 19, 2000 Order in the Barnes case. If I do not hear from you otherwise within five (5) days of the date of this letter, I will assume that your position has not changed, and will seek appropriate relief from the Court.

With regard to NationsBank's Responses to Plaintiffs' Fifth Request for Production, and specifically with regard to request number one (1), I am uncertain as to your position regarding same. Are you in fact agreeing to produce Ms. Billingsley's time cards notwithstanding your objections? If so, please advise as to the status of your client's search for the time cards.

Reply to:

☑ Hollywood Office • Presidential Circle
4000 Hollywood Boulevard • Suite 620 North • Hollywood, Florida 33021
Broward (954) 989-8100 • Dade (305) 624-9100 • Fax (954) 989-8700

☐ Boca Raton Off
2255 Glades Road • Suite 234
Palm Beach (561) 981-8882 • (561) 989-0054 (Holly

Website: mwdl-law.com • E-mail: attorneys@mwdl-law.com

**EXHIBIT**
E

Dick Kane, Esq.
April 5, 2001
Page Two

With regard to Request for Production on numbers two (2), three (3), and four (4), I suggest that you supplement the responses within five (5) days and agree to produce the requested documentation. *See* Magistrate Judge Johnson's March 15, 2001 Order in this case, wherein Judge Johnson granted Plaintiffs' Motion to Compel in connection with the same types of documents and referred to same as "highly relevant and material information." Otherwise I will file a Motion to Compel in order to obtain these documents.

Thank you for your attention to this matter.

Very truly yours,

Adam S. Chotiner, Esquire
For the Firm

ASC/gr

# MUCHNICK
# WASSERMAN
# DOLIN &
# LEVINE, LLP

Attorneys At Law

Jeffrey P. Wasserman, P.A. •
Susan L. Dolin, P.A. ** †
Daniel R. Levine, P.A.

Adam S. Chotiner
Elissa S. Hulnick
Robin L. Morganroth
Ruthlyn B. Rubin ***
of Counsel
Merle Litman (1926-1977)

* Certified Family Law Mediator
† Florida Bar Board Certified Labor
& Employment Lawyer
** Also Admitted Ohio Bar
*** Also Admitted New Jersey Bar

April 18, 2001

**Via U.S. Mail & Facsimile (704) 373-8957**

Richard Kane, Esq.
McGuire Woods Battle & Booth
3700 NationsBank Plaza
101 South Tryon Street
Charlotte, NC 28280

### Re: *Roxanna Escudero, et al. v. BankAmerica Corporation*

Dear Dick:

In accordance with our conversation following the scheduling conference, I write to memorialize our understanding with respect to the outstanding discovery issues at this point.

As an initial matter, this will confirm that, pursuant to a voice mail message left for me by Mark Langdon, you have no objection to an additional two week extension of time for the Plaintiffs to respond to NationsBank's First Set of Interrogatories and First Request for Production of Documents, up to and including Tuesday, May 1, 2001.

Next, with respect to NationsBank's Responses to Plaintiffs' First, Second, and Third set of Interrogatories, you have indicated that you will be arranging to have an executed jurat provided for each of these responses. As you know, each of these interrogatories essentially seek the identification of all non-exempt consumers bankers with whom the Plaintiffs worked. You have indicated that you would be willing to provide this information but only if we agreed to a Protective Order prohibiting the Plaintiffs or their counsel from contacting the individuals, and only for the relevant time period for each particular Plaintiff. (The Interrogatory seeks the identification of the non-exempt consumer bankers from December 1997 to the present.) As always, I certainly appreciate your willingness to try and avoid getting the Court involved, but in this instance, like I mentioned at the settlement conference, it looks like we are going to have to agree-to-disagree. (Especially in light of what appears to be conflicting Orders from Magistrate Judge Johnson in the Perlman case and in the Barnes case.) Accordingly, we will file a Motion to Compel on this issue.

With regard to NationsBank's Responses to Plaintiffs' Fifth Request for Production, my understanding is that you have agreed to produce the documents specified in request numbers one through four, but only for the period of time that Ms. Billingsley worked with Angela Mobley. However, my position is that we are entitled to the requested documentation for the specified time period, to-wit, December, 1997 to the present. Again,

Reply to:

Hollywood Office • Presidential Circle
4000 Hollywood Boulevard • Suite 620 North • Hollywood, Florida 33021
Broward (954) 989-8100 • Dade (305) 624-9100 • Fax (954) 989-8700

□ Boca Raton Of
2255 Glades Road • Suite 234
Palm Beach (561) 981-8882 • (561) 989-0054 (Holl

Website. mwdl-law com • E-mail: attorneys@mwdl-law.com

**EXHIBIT**

F

53

Richard Kane, Esq.
April 18, 2001
Page Two

we can agree-to-disagree and I will simply file a Motion to Compel with the Court.

If I do not hear otherwise from you by next Monday, April 23, 2001, I will assume that my understanding as reflected above is correct and will proceed accordingly. If I have misstated your position, or if you wish to further discuss these discovery issues, then please let me know by next Monday.

Thank you for your attention to these matters, and again thank you for your professional courtesy in connection with the extension of time.

Very truly yours,

Adam S. Chotiner, Esquire
For the Firm

ASC/gr

cc:    Anne Hinds, Esq.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**CASE NO. 98-8805-CIV-DIMITROULEAS**

MARLA PERLMAN, et. al.,

    Plaintiffs,

vs.

NATIONSBANK, N.A..
a national association,

    Defendant.

_____/

### OMNIBUS REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court on Plaintiffs' Motion to Compel Discovery (D.E. #14) and NationsBank's alternative motion for Court supervision of communications with potential opt-in Plaintiffs (D.E. #17). These matters were referred to the undersigned United States Magistrate by the Honorable William P. Dimitrouleas, United States District Judge for the Southern District of Florida, and are now ripe for judicial review. For the following reasons, the Plaintiffs' motion and Defendant's Motion are granted in part and denied in part, as more specifically set forth herein.

This is a lawsuit arising under the Fair Labor Standards Act (hereinafter the "FLSA") to recover unpaid overtime compensation. Plaintiffs served their First Set of Interrogatories upon Defendant on February 17, 1999. Defendant timely responded to these Interrogatories on March 19, 1999, objecting in part to a request for certain employment information. The request made by the Plaintiffs was limited in scope to three years preceding the filing of the Complaint and limited in location to the locations at which the Plaintiffs were employed. Defendant objects arguing the discovery sought is overbroad and irrelevant. Defendant further objects, claiming the real reason



EXHIBIT
G



the information is being requested is to be able to advise other In-Store Bankers of the pending litigation and invite them to join as opt-in Plaintiffs. According to Defendant, "[t]his attempt to engage in unmonitored and unchecked solicitation in an effort to expand the scope of this litigation should not be permitted." Def's. response in opposition, p. 4.

This court finds the request as framed to be neither overbroad nor irrelevant. The requsest is sufficiently limited in time to three (3) years preceding the filing of the Complaint and narrowly limited in scope to the locations at which the Plaintiffs were employed. The information requested is relevant in that it may serve to bolster a Plaintiff's own individual claim by attempting to prove a pattern or practice and might also serve to shed light on the amount of hours the Plaintiffs claim to have worked overtime.

Notwithstanding the foregoing and considering the record established in companion cases in the District captioned Juliet Aldred v. NationsBank of Florida. N.A., Case No. 97-7547-CIV-DIMITROULEAS and Levine et. al. v. NationsBank, N.A., Case No. 98-6306-CIV-DIMITROULEAS the undersigned agrees with NationsBank that with the discovery of the information, neither Plaintiffs nor their counsel are permitted to contact any of the individuals identified without prior leave of court.

In accordance with the with the above and foregoing, it is hereby

**ORDERED AND ADJUDGED** that Plaintiffs' Motion to Compel Discovery (D.E. #14) is **GRANTED** as provided for herein and Defendant's alternative Motion for Court Supervision of Communications with potential opt-in Plaintiffs (D.E. #17) is **GRANTED** as provided for herein. Defendant is ordered to produce the discovery subject to this order within fifteen (15) days from the date hereof. Neither Plaintiffs nor their counsel are permitted to contact any of the individuals

identified without prior leave of this Court. Plaintiff's request for sanctions is denied.

**DONE AND ORDERED** July 28, 1999 in Chambers, at West Palm Beach, Florida.

LINNEA R. JOHNSON
UNITED STATES MAGISTRATE JUDGE

CC:    The Honorable William P. Dimitroulcas
       Susan L. Dolan, Esq.
       Daniel R. Levine, Esq.
       Michael T. Burke, Esq.
       Richard F. Kane, Esq.
       John M. Smith, Esq.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 00-6980-CIV-DIMITROULEAS/JOHNSON

GENEVEVE BARNES, etc.,

Plaintiff,

vs

BANK OF AMERICA, N.A., etc.,

Defendant.

_____/

FILED by _____ D.C.

DEC 19 2000

CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## ORDER

**THIS CAUSE** is before the Court on Plaintiff's Motion to Compel Discovery and *Incorporated Memorandum of Law (Docket Entry No. 17)* and *Motion for Protective Order* (Docket Entry No. 18).

This Court has reviewed the pleadings incident to this matter and is otherwise duly advised in the premises. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Plaintiff's Motion to Compel is **GRANTED** and Defendant's Motion for Protective Order is **DENIED**. This Court finds the request as framed to be neither overbroad nor irrelevant. The request is sufficiently limited in time to three (3) years preceding the filing of the Complaint and narrowly limited in scope to only the locations at which the Plaintiff was employed. The information is relevant in that it may serve to bolster the Plaintiff's own individual claim by attempting to prove a pattern of practice and might also shed light on the amount of hours the Plaintiff claims to have worked overtime.

Defendant requests that if this Court grants Plaintiff the discovery she seeks, the



EXHIBIT
H



Court should prohibit Plaintiff and her counsel from contacting any of the persons identified by Defendant without prior leave of Court. This request is denied. As a preliminary matter, this Court notes that Plaintiff's counsel are already limited with respect to contacting potential witnesses due to ethical obligations imposed by the rules governing the Florida Bar. Furthermore, as noted by the District Court in Tucker v. Labor Leasing, Inc., 155 F.R.D. 687 (M.D. Fla. 1994), when confronted with the same issue: "Plaintiffs would be hard pressed to prove there are similarly situated employees who desire to join this lawsuit [as required by Dybach vs. State of Florida Dept. of Corrections, 942 F.2d 1562 (11th Cir. 1991)] if they can have no contact with any of these employees to inquire about their desires one way or the other." Id. At 690. Defendant is hereby ordered to produce the subject discovery within ten (10) days from the date hereof.

**DONE AND ORDERED** on December 19, 2000, in Chambers, at West Palm Beach, Florida.

LINNEA R. JOHNSON
CHIEF UNITED STATES MAGISTRATE JUDGE

CC:    The Honorable William P. Dimitrouleas
       Caryl Boies, Esquire
       Anne Hinds, Esquire
       Michael T. Burke, Esquire
       Susan L. Dolin, Esquire
       Richard Kane, Esquire

## Page 1

[1]      UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF FLORIDA

[2]
     CASE NO. 00-6145-CIV-DIMITROULEAS

[3]
ROXANNA L. ESCUDERO, and     )
[4] KIMBERLY DRAKE, on behalf of   )
themselves and all others similary )
[5] situated,             )

[6]     Plaintiff's      )

[7]   vs.             )

[8] BANKAMERICA CORPORATION,   )
a foreign corporation d/b/a   )
[9] BANK OF AMERICA CORPORATION,  )
a foreign corporation, f/k/a   )
[10] NATIONSBANK, N.A., a national )
association,          )
[11]               )
     Defendant,     )
[12] ─────────────────────────)

[13]
        337 East Las Olas Boulevard
[14]        Fort Lauderdale, Florida
        February 9, 2001
[15]       10:20 a.m. - 2:25 p.m.

[16]

APPEARANCES:
[17]
MUCHNICK, WASSERMAN, DOLIN & LEVINE, LLP
[18] BY: SUSAN DOLIN, ESQ.
Attorneys for the Plaintiffs
[19]
MCGUIRE, WOODS, BATTLE & BOOTHE, LLP
[20] BY: J. MARK LANGDON, ESQ.
Attorneys for the Defendant
[21]

[22]      * * *

[23]     DEPOSITION

[24]     OF

[25]    ANGELA MOBLEY

## Page 2

[1]     I N D E X

[2] WITNESS: ANGELA MOBLEY

[3]           PAGE
Direct Examination
[4] By Mr. Langdon      4

[5] Cross-Examination
By Ms. Dolin       164
[6]
Redirect Examination
[7] By Mr. Langdon      166

[8] Recross-Examination
By Ms. Dolin       167
[9]

[10]    CERTIFIED QUESTIONS

[11]  Page 98 Line 13 through Page 101 Line 13

[12]

[13]     E X H I B I T S

Defendant's Exhibit No. 1    PAGE 19
[14] (Notice of Deposition)

[15] Defendant's Exhibit No. 2    PAGE 21
(7-page Planner Calendar)
[16]
Defendant's Exhibit No. 3    PAGE 52
[17] (Payroll Register Bate Stamped ESC-413)

[18] Defendant's Exhibit No. 4    PAGE 59
(2-page Time Card for 1/16/98 through
[19] 1/31/98)

[20] Defendant's Exhibit No. 5    PAGE 74
(2-page Time Card for 12/16/97 through
[21] 12/31/97)

[22] Defendant's Exhibit No. 6    PAGE 93
(9-page Bank of America's First Requests
[23] for Admissions to Plaintiff Angela Mobley)

[24]

[25]

## Page 3

[1]    E X H I B I T S continued

[2] Defendant's Exhibit No. 7    PAGE 94
(2-page Plaintiff Angela Mobley's Reply to
[3] Bank of America's First Requests for
Admissions)
[4]
Defendant's Exhibit No. 8    PAGE 97
[5] (2-page Consent to Become Party Plaintiff)

[6] Defendant's Exhibit No. 9    PAGE 144
(1-page Affidavit of Angela Mobley)
[7]
Defendant's Exhibit No. 10   PAGE 153
[8] (2-page Corrected Affidavit of Angela
Mobley)
[9]
Defendant's Exhibit No. 11   PAGE 155
[10] (Time Card for 1/16/98 through 1/31/98)

[11] Defendant's Exhibit No. 12   PAGE 157
(Time Card for 2/1/98 through 2/5/98)
[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

## Page 4

[1]    Deposition of ANGELA MOBLEY, a witness of

[2] lawful age, taken by the Defendant for the purpose of

[3] discovery and for use as evidence in the above-entitled

[4] matter, wherein ROXANNA L. ESCUDERO, and KIMBERLY DRAKE,

[5] on behalf of themselves and all others similary situated

[6] are the Plaintiffs and BANKAMERICA CORPORATION, a

[7] foreign corporation d/b/a BANK OF AMERICA CORPORATION, a

[8] foreign corporation, f/k/a NATIONSBANK, N.A., a national

[9] association is the Defendant pending in the United

[10] States District Court, Southern District of Florida,

[11] Pursuant to notice heretofore filed, before RUTH STUCK,

[12] Registered Professional Reporter and Notary Public in

[13] and for the State of Florida at Large, taken at 337 East

[14] Las Olas Boulevard, Fort Lauderdale, County of Broward,

[15] State of Florida, on the 9th day of February, 2001,

[16] commencing at 10:20 o'clock a.m.

[17]    * * *

[18] THEREUPON:

[19]    ANGELA MOBLEY

[20] a witness of lawful age, being called as a witness

[21] by the Defendant, having been first duly sworn,

[22] testified as follows:

[23]    DIRECT EXAMINATION

[24] BY MR. LANGDON:

[25]  Q.  Please state your name for the record.

EXHIBIT

Page 5

[ 1]   A.  Angela A. Mobley.

[ 2]   Q.  Ms. Mobley, we previously introduced ourselves

[ 3]  to each other.  My name is Mark Langdon.  I'm an

[ 4]  attorney with McGuire, Woods.  My firm is defending the

[ 5]  bank in this action that's been brought by Ms. Escudero

[ 6]  and Ms. Drake.  I understand you have joined as a

[ 7]  plaintiff in this action; is that correct?

[ 8]   A.  That's correct.

[ 9]   Q.  Have you ever participated in a deposition

[10]  before?

[11]   A.  I'm familiar with mediation processes, so I'm

[12]  not sure if it's similar.

[13]   Q.  How are you familiar with the mediation

[14]  process?

[15]   A.  I actually used to work for a company where I

[16]  represented them to resolve civil disputes, and I would

[17]  be responsible for the entire process.

[18]   Q.  Have you participated in proceedings like

[19]  we're going to have here today where an attorney has an

[20]  opportunity to ask you a series of questions about

[21]  things while the court reporter transcribes everything

[22]  that's going on?

[23]   A.  No, I have not.

[24]   Q.  I'm sure Ms. Dolin has explained to you what

[25]  we're going to do here today, but I would like to give

Page 6

[ 1]  you a couple of ground rules that will make the process

[ 2]  easier for all of us.  You understand you've been placed

[ 3]  under oath and your testimony is being transcribed and

[ 4]  you're under an obligation to be truthful just as you

[ 5]  would before a judge and jury?  Do you understand that?

[ 6]   A.  I do.

[ 7]   Q.  If at any time today you don't understand one

[ 8]  of my questions, please let me know, ask me to clarify

[ 9]  or rephrase it and I'll be glad to do so.

[10]   A.  Okay.

[11]   Q.  I've had a lot of comments on my accent while

[12]  I've been down here.  You being from Georgia may be more

[13]  familiar with my accent.  If you do not understand me,

[14]  please let me know.  If you do not let me know that you

[15]  don't understand or do not ask me to rephrase it, I'm

[16]  going to assume you do understand the question and your

[17]  answer is responsive thereto.

[18]   A.  Okay.

[19]   Q.  Be sure when I ask you a question that you try

[20]  to answer audibly yes or no with whatever explanation

[21]  you want to offer.  It's hard for the court reporter to

[22]  get a nod of the head.  So if you can just remember to

[23]  do that, I would appreciate that as well.

[24]   A.  Okay.

[25]   Q.  One thing that helps everybody here today is

Page 7

[ 1]  if you will try to wait until I finish my question

[ 2]  before you begin your answer.  It prevents a

[ 3]  staccato-type transcript and will ensure that you

[ 4]  understand my question or that you better understand my

[ 5]  question before you start.  And I'll try to afford you

[ 6]  the same courtesy.  I'll let you finish your answer

[ 7]  before I ask another question.  Is that fair?

[ 8]   A.  That's fair.

[ 9]   Q.  Are you taking any kind of medication here

[10]  today that would affect your ability to testify

[11]  truthfully to the questions I ask you?

[12]   A.  No, sir.

[13]   Q.  Are you on any kind of medication that you

[14]  think may affect your ability to recall events of

[15]  several years ago?

[16]   A.  No, sir.

[17]   Q.  Under any kind of emotional distress or any

[18]  other reason that might affect your ability to

[19]  participate in this deposition and testify truthfully

[20]  today?

[21]   A.  No, sir.

[22]   Q.  Ms. Mobley, are you married?

[23]   A.  Yes.

[24]   Q.  To whom are you married?

[25]   A.  Carl Mobley.

Page 8

[ 1]   Q.  And when did you marry Carl?

[ 2]   A.  1986.

[ 3]   Q.  What was your maiden name prior to marrying

[ 4]  Carl?

[ 5]   A.  Angela Jones.

[ 6]   Q.  Have you ever been known by any nicknames or

[ 7]  pet names other than Angela?

[ 8]   A.  Angie.

[ 9]   Q.  What is your current address, Ms. Mobley?

[10]   A.  6815 Smoke Ridge Drive, College Park, Georgia,

[11]  30349.

[12]   Q.  How long have you lived at the Smoke Ridge

[13]  Drive address?

[14]   A.  Approximately five years.

[15]   Q.  Were you living at that address at the time

[16]  you worked for NationsBank or at least a portion of the

[17]  time you worked for NationsBank?

[18]   A.  Yes, I was.

[19]   Q.  When did you begin your employment with

[20]  NationsBank?

[21]   A.  I want to say it was early June or late June

[22]  of 1996 -- I'm sorry, '97.

[23]   Q.  It would be '97?

[24]   A.  Uh-huh.

[25]   Q.  So would it be fair to say you lived at the

Page 9

[1] Smoke Ridge address for your entire tenure with

[2] NationsBank?

[3]    A.   Definitely.

[4]    Q.   Is that address for a residence, an apartment,

[5] a condo?

[6]    A.   A residence.

[7]    Q.   And do you own that residence or are you

[8] paying a mortgage to own it in the future?

[9]    A.   I'm paying a mortgage to own it in the future.

[10]   Q.   Are you on the title to the residence?

[11]   A.   Yes, sir.

[12]   Q.   Is your husband also on the title?

[13]   A.   Yes, sir.

[14]   Q.   Other than your husband, did anyone live with

[15] you at the Smoke Ridge Drive address during your

[16] employment tenure with NationsBank?

[17]   A.   Sure, my daughter.

[18]   Q.   How old is your daughter?

[19]   A.   Currently she's 12.

[20]   Q.   And what is your daughter's name?

[21]   A.   Jasmine, J-A-S-M-I-N-E.

[22]   Q.   Ms. Mobley, what is your date of birth?

[23]   A.   January 12, 1967.

[24]   Q.   And your Social Security number is?

[25]   A.   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.

Page 10

[1]    Q.   Have you ever reported any income under

[2] another Social Security number other than the one you

[3] just indicated?

[4]    A.   No, sir, I have not.

[5]    Q.   Ms. Mobley, have you ever been convicted of

[6] any criminal offense?

[7]    A.   No, sir.

[8]    Q.   Have you ever been arrested for any charge?

[9]    A.   No, sir.

[10]   Q.   Have you ever filed bankruptcy proceedings?

[11]   A.   Yes, I have.

[12]   Q.   When did you file for bankruptcy?

[13]   A.   1999.

[14]   Q.   And do you recall under what chapter you filed

[15] for bankruptcy? Was it a personal bankruptcy?

[16]   A.   It was personal.

[17]   Q.   And did you file the petition in Georgia, I

[18] take it?

[19]   A.   Yes.

[20]   Q.   Ms. Mobley, excluding this lawsuit, have you

[21] ever been involved in a lawsuit whether it be as a

[22] witness or a party? And, again, excluding this lawsuit.

[23] I'm talking about other lawsuits.

[24]   A.   Personally?

[25]   Q.   Yes.

Page 11

[1]        MS. DOLIN: You're including other NationsBank

[2] lawsuits?

[3]        MR. LANGDON: That's correct.

[4]        THE WITNESS: Yes. Let me make sure I

[5] understand. Are you saying that besides this one?

[6] When you say lawsuit, that could be like a car

[7] accident. That could be anything.

[8] BY MR. LANGDON:

[9]    Q.   I want to know all about it so let's break it

[10] down.

[11]       Excluding this lawsuit, have you ever been a

[12] party to a lawsuit against NationsBank, not including

[13] this one?

[14]   A.   Against NationsBank?

[15]   Q.   Yes.

[16]   A.   I'm currently in another one.

[17]   Q.   What lawsuit is that? Would that be the

[18] Levine lawsuit?

[19]   A.   That would be Levine, that's correct.

[20]   Q.   Did you join that lawsuit as a plaintiff?

[21]   A.   Yes, sir, I did.

[22]   Q.   What is your understanding as to whether that

[23] lawsuit is still active or not?

[24]   A.   My understanding is that it's settled.

[25]   Q.   Have you received your portion of the

Page 12

[1] settlement?

[2]    A.   No, sir, I have not.

[3]    Q.   And is the Levine lawsuit the only lawsuit

[4] that you've participated in as a plaintiff against

[5] NationsBank other than this one?

[6]    A.   That's correct.

[7]    Q.   Now, let's talk about other lawsuits that's

[8] related to NationsBank. Have you been a witness or

[9] party in any other type of lawsuit?

[10]   A.   One other, but my understanding is that's

[11] privileged information that I cannot discuss it.

[12]   Q.   Well, you're under an obligation here today,

[13] just so we understand, to answer the questions unless

[14] Ms. Dolin, your attorney, instructs you not to.

[15]       MS. DOLIN: Can I go counsel with her about

[16] the privilege issue?

[17]       MR. LANGDON: If that's what you're only going

[18] to talk about, the privilege issue, that's fine.

[19]       We're on a short break.

[20]       (A recess was had.)

[21] BY MR. LANGDON:

[22]   Q.   Ms. Mobley, we're back on the record after a

[23] short break for Ms. Dolin to speak to you about the

[24] nature of the attorney/client privilege. And let me

[25] preface this question by telling you that I'm not trying

Page 13

[1] to be overly evasive into your personal affairs, but I

[2] just want to know the circumstances of any other

[3] lawsuits that you've been involved in. So with that

[4] said, let me put my question back on the table.

[5]        Excluding any lawsuit that you've been

[6] involved in with NationsBank, have there been other

[7] lawsuits that you've been involved in in the past?

[8]    A. Yes, sir, there was one other.

[9]    Q. What did that lawsuit relate to?

[10]       MS. DOLIN: Now you can give the general

[11] subject matter and that's all but no names.

[12]       THE WITNESS: Okay. Yes, I was in one other.

[13] It was a racial discrimination case.

[14] BY MR. LANGDON:

[15]    Q. When were you involved in this lawsuit?

[16]    A. The year?

[17]       MS. DOLIN: You can give the year.

[18]       THE WITNESS: That was 2000, last year.

[19]       MS. DOLIN: When?

[20]       THE WITNESS: Last year.

[21] BY MR. LANGDON:

[22]    Q. Did you file this charge of discrimination

[23] against a former employer?

[24]       MS. DOLIN: I'm going to object and instruct

[25] her not to answer. And let me tell you why. The

Page 14

[1] matter is covered by a confidentiality agreement,

[2] so that without a court order – and I'm

[3] assuming – I haven't seen it, but I'm assuming

[4] it's got the standard confidentiality unless by

[5] compulsion of the Court she's not permitted to

[6] speak about it, either the terms of the settlement

[7] or the terms of the lawsuit.

[8]       MR. LANGDON: Fair enough.

[9]       MS. DOLIN: And I haven't seen the agreement,

[10] so if you get a court record, then we'll have to

[11] take a look at the agreement. If the Court compels

[12] her to answer, well, then that's one thing.

[13]       MR. LANGDON: Fair enough.

[14]       MS. DOLIN: But on her own she can't.

[15]       MR. LANGDON: That will be an issue Ms. Dolin

[16] and I deal with down the line. I understand at

[17] this point and I will refrain from asking you

[18] further questions.

[19]       MS. DOLIN: We're not trying to stop you from

[20] asking. She's just stuck.

[21]       MR. LANGDON: I understand.

[22] BY MR. LANGDON:

[23]    Q. Other than this instant lawsuit, the Levine

[24] lawsuit and the general nature of the lawsuit you just

[25] testified to, have there been any other lawsuits that

Page 15

[1] you've been involved in?

[2]    A. No, sir.

[3]    Q. Let me back up and ask you one or two more

[4] questions about your bankruptcy. Do you recall in what

[5] court that you filed your petition for bankruptcy?

[6]    A. No, I don't recall.

[7]    Q. Do you recall whether you filed that in

[8] federal court?

[9]    A. Actually, I really don't recall.

[10]    Q. You don't recall any of the details?

[11]    A. No.

[12]    Q. Ms. Mobley, I believe you testified earlier

[13] that you have one daughter?

[14]    A. That's correct.

[15]    Q. She is currently 12 years of age?

[16]    A. Yes.

[17]    Q. That would have made her at the time you

[18] started work with NationsBank approximately –

[19]    A. Eight.

[20]    Q. Eight?

[21]    A. Yes.

[22]    Q. Did you have an arrangement for your daughter

[23] for after school care at that time?

[24]    A. Actually at that time I was the arrangement.

[25]    Q. Explain it to me. And as we're going through

Page 16

[1] here today and I ask you a question, if you feel like

[2] answering yes or no, that's fine. If you feel like

[3] offering an explanation, that's fine too subject to Ms.

[4] Dolin instructing you not to answer some other type of

[5] privilege. But I don't want to restrict you in any way

[6] from offering an explanation if that's what you want to

[7] do.

[8]       And my next question was, what do you mean by

[9] you were the arrangement for child care?

[10]    A. My daughter – at the time that I started

[11] NationsBank the following year, I had enrolled my

[12] daughter in a private school. At that time I was

[13] supposed to get her by between 6:00 or 6:30. I'm not

[14] really sure of the exact hours. At that time was also

[15] paying some additional for after school care.

[16]       I've actually found complications when I was

[17] actually at the banking center a lot longer than

[18] anticipated, which means my husband at the time – he

[19] was a truck driver – and it was just reasonably

[20] difficult. So it was just me trying to balance back and

[21] forth with him to get her. So it was just really

[22] difficult for us at that time.

[23]    Q. So if I understand your testimony correctly,

[24] initially you had placed your daughter in private

[25] school?

Page 17

[1]   A.   That's correct.

[2]   Q.   At the time she started or at the time you

[3]   started with NationsBank; is that correct?

[4]   A.   That's correct. And I was under the

[5]   assumption I would be able to get her prior to the cut

[6]   off every day.

[7]   Q.   What was the cut off of that private school?

[8]   A.   It was between 6:00 and 6:30 and the private

[9]   schools close. But I know it was between 6:00 and 6:30.

[10]   Q.   Were there times while your daughter was

[11]   enrolled in private school that you could not make it to

[12]   school by the cut-off period?

[13]   A.   Many times. And many times I ended up paying

[14]   late charges.

[15]   Q.   Do you have any receipt or any other

[16]   documentation of these late charges?

[17]   A.   I could possibly dig. I don't have anything

[18]   here with me, but I'm almost certain that I don't. That

[19]   was quite a few years ago.

[20]   Q.   And as I understand your testimony, at some

[21]   time after you enrolled your daughter in private school

[22]   because of the fact that there was several times you

[23]   could not get there to pick her up by the 6:30 cut off,

[24]   you had to pull her out of that school; is that correct?

[25]   A.   No, we finished the year. But during that

Page 18

[1]   year, I ended up paying late charges a number of times

[2]   and just juggling back and forth with my husband having

[3]   to come off of his job early to get my daughter -- to

[4]   get our daughter rather.

[5]   Q.   Did you hire anyone else to provide after

[6]   school care say after the 6:30 cut off at school?

[7]   A.   That wasn't an option available.

[8]   Q.   It was something you and your husband juggled

[9]   together?

[10]   A.   That's correct.

[11]   Q.   What was your husband's schedule during this

[12]   time period?

[13]   A.   He had no schedule. He was a driver for a

[14]   local vendor that required his day ended when he

[15]   completed all of his stops, which means he could work 10

[16]   to 15 to a number of hours a day.

[17]   Q.   For whom did he drive during that time period?

[18]   A.   Premium Beverage.

[19]   Q.   Premium Beverage?

[20]   A.   I'm sorry, no. Let me back up. He was

[21]   actually working for Brinks.

[22]   Q.   Brinks the armored car?

[23]   A.   That's correct. They're courier drivers,

[24]   which means they have a number of stops every day, and

[25]   that's just kind of difficult for him to break his

Page 19

[1]   schedule.

[2]   Q.   Were there any times, Ms. Mobley, during your

[3]   employment with NationsBank that you had to arrange for

[4]   someone other than your husband to pick up your daughter

[5]   from school?

[6]   A.   I had no other arrangements, sir.

[7]   Q.   Ms. Mobley, I'm going to ask the court

[8]   reporter to mark the first document I'll hand you as

[9]   Defendant's Exhibit 1 and then ask you to take a

[10]   look at that, please, ma'am.

[11]   (Thereupon, document marked as Defendant's

[12]   Exhibit Number 1 for identification.)

[13] BY MR. LANGDON:

[14]   Q.   Ms. Mobley, the court reporter has handed you

[15]   what's been marked as Defendant's Exhibit Number 1. And

[16]   I would ask you to take your time and please review that

[17]   document.

[18]   A.   Can I ask a question or just read through it

[19]   first?

[20]   Q.   Let me ask you a few questions. And if you

[21]   have something that you would like to explain, I'll be

[22]   glad to permit you to do so.

[23]   A.   Let me finish reading it then.

[24]   Q.   Sure. I'm sorry. I didn't mean to interrupt

[25]   you.

Page 20

[1]   Are you finished reading the document, Ms.

[2]   Mobley?

[3]   A.   Yes.

[4]   Q.   Have you seen that document that's been marked

[5]   as Defendant's Exhibit 1 before today?

[6]   A.   No, sir, I have not.

[7]   Q.   How did you learn of your obligation to come

[8]   here today and participate in this deposition?

[9]   A.   By my contact of Susan Dolin's office.

[10]   Q.   And were you aware that you were under the

[11]   obligation, according to that notice of deposition, to

[12]   bring all documentation that you had in your possession

[13]   which related to the number of hours you worked for

[14]   NationsBank, I think in this instance, 1997, mid

[15]   December of 1997 through the end of February, 1998; is

[16]   that correct?

[17]   A.   That is correct. And, yes, sir, I was

[18]   informed to bring those documents.

[19]   Q.   Did you look for those documents?

[20]   A.   Yes.

[21]   Q.   And did you bring such documents with you

[22]   today?

[23]   A.   Yes, sir.

[24]   Q.   Ms. Dolin was gracious enough to provide me

[25]   with a copy of these documents before we began the

Page 21

[1] deposition here today. What I'd like to do at this time

[2] is go over the documentation you brought with you and

[3] get you to explain to me what it is. This is going to

[4] throw off our exhibit stickers maybe a little or, I

[5] guess, add to them. I'm going to hand the court

[6] reporter the first copy of the documents that you have

[7] and ask her to mark that as Defendant's Exhibit Number

[8] 2.

[9]        (Thereupon, document marked as Defendant's

[10]      Exhibit Number 2 for identification.)

[11] BY MR. LANGDON:

[12]     Q.  Ms. Mobley, I'm going to hand you now what

[13] I've marked as Defendant's Exhibit Number 2 and ask you

[14] to please review that, ma'am. I think it's been

[15] transposed; is that correct, Ms. Mobley?

[16]     A.  Yes.

[17]        MR. LANGDON: The court reporter can mark a

[18] sticker on the first page.

[19] BY MR. LANGDON:

[20]     Q.  Ms. Mobley, the court reporter has handed you

[21] what's been marked as Defendant's Exhibit Number 2.

[22] When the document was originally handed to you, the

[23] pages were transposed, so we've switched those around.

[24] What I'd like for you to do is take a look at

[25] Defendant's Exhibit Number 2 and please explain to me

Page 22

[1] what that document represents.

[2]     A.  This Exhibit Number 2 represents a planner

[3] calendar that I used to maintain in my – or actually

[4] that I do maintain in my possession of just some of the

[5] events that may have taken place either in my personal

[6] life or my work life. And this was just my planner that

[7] I used to just jot down things of critical urgency or

[8] just reminders for myself.

[9]     Q.  Do you have the original pages of what's been

[10] marked as Defendant's Exhibit Number 2 before you?

[11]     A.  Yes, sir.

[12]     Q.  Then would you mind if I refer to the actual

[13] exhibit so we can discuss some of the handwritten

[14] notations you have on there?

[15]     A.  Yes.

[16]        MS. DOLIN: She's going to work off the

[17] original because it's easier to read.

[18]        THE WITNESS: That's fine. You can go ahead.

[19] BY MR. LANGDON:

[20]     Q.  Looking at the first page of Defendant's

[21] Exhibit Number 2, Ms. Mobley, it appears to be a

[22] calendar page for the month of December. Do you know

[23] what year – would that be in 1997?

[24]     A.  That is correct.

[25]     Q.  If you could kind of explain to me how your

Page 23

[1] calendar is laid out. It looks like –

[2]     A.  If you take them apart and put them together,

[3] it looks like a monthly calendar.

[4]     Q.  If I took the two pages and set them side by

[5] side, it would represent a full month calendar; is that

[6] correct?

[7]     A.  That is correct.

[8]     Q.  Looking at this first page Ms. Mobley, it

[9] appears that you have Monday, December 1st, circled; is

[10] that correct?

[11]     A.  Yes.

[12]     Q.  Do you recall why you would have that

[13] particular date circled?

[14]     A.  Because I even jot down my cycle in my book.

[15]        MS. DOLIN: I think you don't want to go

[16] there.

[17] BY MR. LANGDON:

[18]     Q.  I understand. Okay. I don't think that is

[19] necessary for today's purposes. We'll move on to the

[20] next entry.

[21]        Going to the second page, I guess the second

[22] page, moving over to Sunday the 2nd. I'm going to hand

[23] this exhibit back to you because it appears that what I

[24] have may not match up to what you have there before you.

[25]        Ms. Mobley, we're back on the record after

Page 24

[1] straightening out Defendant's Exhibit Number 2.

[2] Defendant's Exhibit Number 2 were calendar pages copied

[3] from your own personal calendar; is that correct?

[4]     A.  That's correct.

[5]     Q.  And they were transposed and there were some

[6] pages included in which there was no information,

[7] correct?

[8]     A.  That's correct.

[9]     Q.  Again, with your permission, I'm going to look

[10] at Defendant's Exhibit Number 2 while you look at the

[11] original?

[12]     A.  Yes.

[13]     Q.  Looking at the first page for December, the

[14] first handwritten note I see is for the date of the 8th;

[15] is that correct?

[16]     A.  That is correct.

[17]     Q.  On the first page. I know that the actual

[18] second page is on the other side?

[19]     A.  That's correct.

[20]     Q.  Or the next page rather. Could you read that

[21] for me, please.

[22]     A.  Sure. It says, Bankhead association meeting

[23] at seven o'clock – that will be p.m. – at BFI.

[24]     Q.  And to what does this Bankhead associates

[25] meeting refer to?

## Page 25

[ 1]    A.   I actually was an employee of the Bankhead

[ 2]  NationsBank branch. Within that community was a

[ 3]  community of a lot of elderly people, financially

[ 4]  under-privileged people. There was an association

[ 5]  within that community that worked to either try to kind

[ 6]  of rejuvenate the community to do things to bring

[ 7]  business back into the community. Not only that it was

[ 8]  a 99 percent black community and I was -- the business

[ 9]  establishments were black as well.

[10]         So their concern was to kind of foster growth

[11]  to kind of keep people in the community for their goods

[12]  and services. My branch manager at that time, Tamara

[13]  Lomax, assigned me to attend these monthly meetings at

[14]  the Bankhead association which was held the first Monday

[15]  of every month at seven o'clock at BFI. And BFI is the

[16]  garbage people.

[17]    Q.   The garbage folks?

[18]    A.   Right. They had very large facilities, so all

[19]  the representatives from businesses within that little

[20]  realm would come and partake and do whatever. And so I

[21]  was there to actually share and kind of give them

[22]  information for NationsBank for their lending needs for

[23]  whatever their needs were.

[24]    Q.   So if I understand your testimony correctly,

[25]  the Bankhead association was a neighborhood association

## Page 26

[ 1]  comprised of folks living in the neighborhood, business

[ 2]  representatives in the neighborhood, that met for the

[ 3]  purposes of community rehabilitation; would that be an

[ 4]  accurate summary?

[ 5]    A.   That would be inaccurate. It was a business

[ 6]  association. It was established, through my

[ 7]  understanding, through the state of Georgia. But there

[ 8]  are several different organizations such as that, but

[ 9]  ours was to our community so we could see funding come

[10]  back to our community.

[11]    Q.   So the actual association was not an

[12]  organization created by NationsBank?

[13]    A.   That is correct.

[14]    Q.   And I believe you testified that your branch

[15]  manager, Tamara Lomax, assigned you to attend these

[16]  meetings every month?

[17]    A.   That is correct. They all started at seven

[18]  o'clock p.m. and ended at nine o'clock or about that

[19]  time.

[20]    Q.   What frequency would be meetings be held?

[21]    A.   Monthly. That's unless there was some other

[22]  activity associated with it. For example, we had

[23]  parades. We had all sorts of activities so if the

[24]  meeting -- if in a meeting there was an activity derived

[25]  from it, then if my presence was needed, I would partake

## Page 27

[ 1]  in it.

[ 2]    Q.   And, again, what was your purpose in attending

[ 3]  these meetings on behalf of NationsBank?

[ 4]    A.   To thrive the business. To make the business

[ 5]  grow, to get more loans, to get business loans, to get

[ 6]  construction loans.

[ 7]    Q.   Client development?

[ 8]    A.   That's correct.

[ 9]    Q.   Was there a particular day of the week that

[10]  these Bankhead association meetings were scheduled?

[11]    A.   Mondays.

[12]    Q.   It was always Monday?

[13]    A.   It was.

[14]    Q.   Was it such a situation the first day of every

[15]  month?

[16]    A.   That is correct.

[17]    Q.   Moving over to the handwritten entry on the

[18]  9th of December, could you read that for me, please.

[19]    A.   Just says consumer banker holiday. I have no

[20]  idea what that means.

[21]    Q.   Do you recall whether December 9th of 1997

[22]  was, in fact, a holiday for consumer bankers?

[23]    A.   No.

[24]    Q.   Continuing on this page moving down to the

[25]  handwritten entry for December 15th, could you read

## Page 28

[ 1]  that, please.

[ 2]    A.   The 15th is a combination of things. That's

[ 3]  MLK day, if I'm not mistaken -- am I seeing that right?

[ 4]    Q.   Yes, or it should be. Then there's a friend of ours who

[ 5]  had had a stroke. His name was Scott. It was his

[ 6]  birthday that day as well.

[ 7]    Q.   Moving over to the entry for December 17th,

[ 8]  could you read that for me, please.

[ 9]    A.   CB forum at eight o'clock at the Plaza, bring

[10]  wrapped present.

[11]    Q.   Would that be 8 a.m. or --

[12]    A.   8 a.m.

[13]    Q.   What's the CB forum?

[14]    A.   I don't recall. The CB forum -- I was a

[15]  consumer banker and CB forum would be a meeting that we

[16]  kind of get together to bounce off ideas or ways to

[17]  boost points. It was just sort of a motivational

[18]  meeting that if I was struggling building points, I

[19]  might learn something from another senior CB banker.

[20]  Not only that, there were managers and directors that

[21]  may have presented marketing tools that might help us

[22]  strategize.

[23]    Q.   Was this meeting actually sponsored by

[24]  NationsBank?

[25]    A.   That is correct.

Page 29

[1]  Q. Was only NationsBank personnel the folks who

[2]  attended?

[3]  A. Yes, sir.

[4]  Q. Do you recall whether you actually attended

[5]  the CB forum on the 18th of December, 1997?

[6]  A. Those were mandatory meetings.

[7]  Q. How long did they typically last?

[8]  A. Not long because the branches had to be open

[9]  at 9:00. So maybe about 30 minutes to be specific, 30

[10] to 45 minutes.

[11]  Q. My question was, again, was this a meeting

[12] that was regularly scheduled?

[13]  A. Yes. I don't recall the frequency. I mean,

[14] because we were CB's, the CB's -- let me actually

[15] elaborate on CB. A CB is actually a loan officer. And

[16] a loan officer is responsible for every type of account

[17] from a safe deposit box to a mortgage loan or

[18] construction loan, building loan or whatever. So these

[19] were the forums where we discuss all types of marketing.

[20] So it's just a kind of open forum.

[21]  Q. I believe you said that the meetings were

[22] mandatory for you?

[23]  A. That's correct.

[24]  Q. Did Ms. Lomax require you to attend?

[25]  A. Because I was new, I'm sure, yes. For me it

Page 30

[1]  was required my presence be there.

[2]  Q. Moving down to the page for December 29th.

[3]  Could you read that for me, please.

[4]  A. The 29th?

[5]  Q. Yes, at the bottom of the page.

[6]  A. It just says 5:00 to 7:00. I don't know what

[7]  that means.

[8]  Q. Do you have any idea what that reference is

[9]  to?

[10]  A. Huh-uh.

[11]  Q. Moving to the next block over for December

[12] 30th, could you read that, please.

[13]  A. Yes. It says from 10:00 to 12:00, then it

[14] says -- I'm assuming this is 10 a.m. to 12 a.m., then it

[15] says Georgia State University. Then below that it says

[16] 3:30 Scott Wise.

[17]  Q. What does the reference to Georgia State

[18] University mean?

[19]  A. It could be a couple of things. It could have

[20] meant my orientation. It could have been me meeting

[21] with counsel. I'm now a student at Georgia State

[22] University.

[23]  Q. Were you enrolled at Georgia State University

[24] in December of --

[25]  A. I was in the process of enrolling.

Page 31

[1]  Q. What would have been your first semester of

[2]  enrolling at Georgia State University?

[3]  A. January of 1998.

[4]  Q. And then the next entry 3:30, I believe you

[5]  said, it's Scott Wise?

[6]  A. Right. This was our friend Scott Wise. He

[7]  had actually had a stroke and we actually met out to

[8]  kind of help him and his wife go to the therapist. He

[9]  had a stroke and he was partially paralyzed on one side

[10] of his body. It was just a friends of ours.

[11]  Q. The two references for December 30th, do you

[12] recall whether the 30 was a day in which your branch was

[13] open for business?

[14]  A. It was definitely open.

[15]  Q. Were you permitted to take personal leave, I

[16] guess, to accomplish these two errands, for lack of a

[17] better word?

[18]  A. Actually, according to my records, I called in

[19] sick that day.

[20]  Q. Let's flip to the second page of Defendant's

[21] Exhibit Number 2 and go over the handwritten notes

[22] thereon. I believe the first one is for December 18?

[23]  A. That's correct.

[24]  Q. And what is that note, Ms. Mobley?

[25]  A. Call night. Call night means that after the

Page 32

[1]  branches are closed, that we have -- there's a report

[2]  that's generated by either the branch manager or maybe

[3]  someone from corporate to say that within your region

[4]  you have X number of customers and these are the

[5]  different products and services that they have. My

[6]  responsibility would have been to take that list and

[7]  determine opportunities for sales for NationsBank.

[8]  Q. Was it an organized meeting on which these

[9]  call nights were held?

[10]  A. No. That just really meant that you were to

[11] stay at your branch late that night and take on -- you

[12] could take on anywhere from 10 to 20 customers just

[13] depending and just make your calls.

[14]  Q. Were these cold calls or were they a list of

[15] folks who had made inquiry of the banks for a specific

[16] product or service?

[17]  A. That is correct. Those are a list of

[18] customers that were existing with us.

[19]  Q. And, again, your purpose for calling these

[20] existing customers would be to create additional sales?

[21]  A. That's correct.

[22]  Q. When would you conduct your calls on this

[23] list?

[24]  A. The 26th at 8 p.m. At certain times it

[25] depended. The list was always really long for our

Page 33

[1] little region but, you know, it will just really depend.

[2] If I honestly had to — I couldn't stay there all night

[3] many times. And if I had to do 10 customers, I would do

[4] 10. If I had to do 20, I would do just enough customers

[5] to get some customers called up and to meet my

[6] obligation, you know, for the day.

[7]      Q.   Were these call nights, again, regularly

[8] scheduled?

[9]      A.   If I'm not mistaken, they were scheduling the

[10] branch managers so I'm not really sure. But I know it's

[11] something common among the banking industry. Most

[12] branches did it to boost their sales.

[13]      Q.   The next entry is on, I believe, Saturday,

[14] December 20th. And what does that note say, Ms. Mobley?

[15]      A.   It says Green Briar.

[16]      Q.   What does Green Briar refer to?

[17]      A.   It is a NationsBank banking center that wasn't

[18] far from me. And on occasions, we had to rotate working

[19] out different branches to kind of build relationships.

[20] And most Saturdays every single branch is not open full

[21] service. So if I were actually working at Green Briar

[22] and a person may not live in the Green Briar area, I

[23] might notice their address is maybe closer to my banking

[24] center. That would be an opportunity for me to, you

[25] know, create a sale or to encourage that customer to

Page 34

[1] come back to see me during the next business day for

[2] other service.

[3]      Q.   What was your primary branch to which you were

[4] assigned?

[5]      A.   I was assigned to the Bankhead branch.

[6]      Q.   And Green Briar, I take it, is a separate

[7] branch in another part of the Atlanta area?

[8]      A.   That is correct. It's a full service Saturday

[9] branch.

[10]      Q.   Was Bankhead open on Saturdays?

[11]      A.   Our drive through was only open. The teller

[12] services were only open. No lending or customer service

[13] issues.

[14]      Q.   And from the period of, I guess, mid December,

[15] 1997 until your resignation to the end of February of

[16] 1998, how many Saturdays did you work as a consumer

[17] banker, I take it, at the Green Briar branch?

[18]      A.   That's correct, would have been at Green

[19] Briar.

[20]      Q.   Would have always been at Green Briar when you

[21] worked at Green Briar?

[22]      A.   As far as I can recall, yes.

[23]      Q.   Were you required to work at Green Briar every

[24] Saturday?

[25]      A.   No, I was not required to work there every

Page 35

[1] Saturday. No, I was not.

[2]      Q.   I think you mentioned something about a

[3] rotation?

[4]      A.   Right. If there was a schedule published and

[5] at any time if the banking center does not have a

[6] certain number of CB's to support that branch, they may

[7] call and say, Angela, can you work with me Saturday.

[8] And at that time it would be for me. That would be my

[9] discretion.

[10]      Q.   Could you refuse at that time to work if you

[11] had other plans for a Saturday?

[12]      A.   If it was not mandatory.

[13]      Q.   There were times when it was mandatory?

[14]      A.   That's correct.

[15]      Q.   What are the distinguishing factors between

[16] the time it was mandatory and the time it was voluntary?

[17]      A.   If I'm not mistaken, I believe we had to work

[18] at least one Saturday per month. That's from my

[19] recollection. Beyond that —

[20]      Q.   If you wanted to volunteer for additional

[21] Saturdays after your one mandatory Saturday per month,

[22] you could at your discretion; is that fair?

[23]      A.   That's correct.

[24]      Q.   At the very bottom of the second page of

[25] Defendant's Exhibit Number 2, Ms. Mobley, it looks like

Page 36

[1] some notation in parens that has been scratched through.

[2] Do you recall what that may be?

[3]      A.   No. It just gives some debts. And I really

[4] don't recall what they were for. It looks like it's

[5] date specific. But it looks like it says 12 something.

[6]           MS. DOLIN:  If you don't know, don't guess.

[7]           THE WITNESS:  Okay.

[8] BY MR. LANGDON:

[9]      Q.   Let's flip to the third page of Defendant's

[10] Exhibit Number 2. And I believe it is a calendar page

[11] for a portion of January. And if you were looking at a

[12] two-page calendar, it would be the left page; is that

[13] correct?

[14]      A.   That is correct.

[15]      Q.   Looks like the first entry is for January

[16] 12th?

[17]      A.   That's correct.

[18]      Q.   Could you read that, please, ma'am.

[19]      A.   Birthday. That's my birthday.

[20]      Q.   The next entry is January 19th. And what does

[21] that entry refer to?

[22]      A.   Holiday. The banking center was closed.

[23]      Q.   Was that for the Martin Luther King holiday

[24] that year?

[25]      A.   That is correct.

-CFARRAR-EB v. BANKAA... Document 214 ... ELSD Docket 05/15/2001 Pag

ROXANNA ESCUDERO, etc. vs. BANKAA...    CASE NO. 09-05145...
DATE OF DEPO.: 2/9/01    DEPONENT: ANGELA MOBLEY

**Page 37**

[1] Q. Then the next block beside that you have some

[2] handwritten notes in the January 20th block?

[3] A. Yes.

[4] Q. Could you read those, please.

[5] A. It says take Jas to doctor. I was out that

[6] day. So I made a note I had to take my daughter to the

[7] doctor. I was out of work that day.

[8] Q. When you had to take a day off from work, what

[9] type of time would that be classified as, vacation,

[10] personal time?

[11] A. Well, can I take a moment to elaborate on that

[12] for you?

[13] Q. Yes.

[14] A. Time I took had to be sick time because my

[15] branch manager explained to me that my points did not

[16] permit for me to take vacation time.

[17] Q. If I understand your testimony correctly, Ms.

[18] Lomax informed you that – well, strike that. Let me

[19] ask –

[20] A. I'll try to state it for you.

[21] MS. DOLIN: Let him ask the questions.

[22] BY MR. LANGDON:

[23] Q. Let me ask the question.

[24] As I understand your testimony, did Ms. Lomax

[25] prevent you from taking vacation because of performance

**Page 38**

[1] issues?

[2] A. That is correct.

[3] Q. You mentioned points. How would you

[4] accumulate points and for what? Answer that question

[5] first.

[6] A. That was my job. Our job, we were sales

[7] people. Outside of service to customers, our goal was,

[8] once again, to get these loans. Each loan was worth

[9] maybe two points or one point, regardless of the amount

[10] of time you put into getting the loan. I'm not sure if

[11] earlier I explained that our community that we worked in

[12] was not a thriving financial community. So to get

[13] loans was just – it wasn't common, let's put it that

[14] way.

[15] You could take a million applications and you

[16] might get one or two approvals, you know. So it just

[17] wasn't a common area to get loans from. The concern was

[18] initially my deposit points were wonderful, but because

[19] they had moved from the deposit points to loan points

[20] and my loan points were not maybe where she had

[21] projected or desired that they be first of the year, I

[22] was told that I could not take vacation. I could not

[23] request vacation because my points were not at

[24] threshold.

[25] Q. Who instructed you that you could not take

**Page 39**

[1] vacation because your points were not at threshold?

[2] A. Tamara Lomax.

[3] Q. Did you complain about Mrs. Lomax's

[4] restriction of vacation to anyone associated at the

[5] bank?

[6] A. For the vacation, no.

[7] Q. Did you understand NationsBank policy to be

[8] that you were entitled to vacation –

[9] A. That is correct.

[10] Q. – on a certain basis?

[11] A. Uh-huh. As a matter of fact, it was January

[12] that you pass out the calendar to select your vacation

[13] for the upcoming year. And if I'm not mistaken, my

[14] recollection is that January rolled around and my

[15] calendar was going around and I was refused.

[16] Q. Was it a situation where Ms. Lomax did not

[17] allow you to review the calendar to take vacation?

[18] A. No. Actually, I had an opportunity to review

[19] the calendar. And not only that, I may have even

[20] requested, put my name down, on that calendar to take

[21] some time. But she advised me I would not be eligible

[22] for any time unless my points are at threshold.

[23] Q. She is the one employed by NationsBank who

[24] advised you could not take vacation because your

[25] points were not at threshold?

**Page 40**

[1] A. Yes, she was.

[2] Q. Let me ask this, Ms. Mobley, while we're on

[3] the subject. In the performance of your job duties for

[4] NationsBank, were you restricted to a certain

[5] geographical area in trying to, as you say, accumulate

[6] points or sell products?

[7] MS. DOLIN: Object to form.

[8] THE WITNESS: When you say geographical area,

[9] our banking center was in a community. Our

[10] customers come into the branch. Our goal was to

[11] get every person that comes in the branch to

[12] expound on whatever services they have.

[13] So if you were a deposit only customer, in the

[14] eyes of NationsBank you are a potential loan

[15] candidate, which means that I actually need to look

[16] through your customer information and determine if,

[17] in fact, you may be eligible to apply for a car

[18] loan, mortgage loan, first or second, it doesn't

[19] matter. But any time a customer comes into the

[20] branch, my responsibility is to really know what

[21] this customer has and sell them.

[22] BY MR. LANGDON:

[23] Q. Did NationsBank have any rule or prohibition

[24] against you going to another community to attempt to

[25] sell products to customers? For instance, your branch

Page 41

[ 1]  was located in the Bankhead community, correct?

[ 2]    A.   That's correct.

[ 3]    Q.   Just pulling another community in Atlanta off

[ 4]  the top of my head, were you prohibited from going to

[ 5]  the Buckhead community to try to meet customers and sell

[ 6]  products to customers?

[ 7]        MS. DOLIN:  Object to form.

[ 8]        MR. LANGDON:  What's wrong with the form?

[ 9]        THE WITNESS:  The region --

[10]        MS. DOLIN:  Hold on.  The form is was she

[11]  prohibited from going.  Going is a broad term.

[12]  How?  Going to a branch there?  Walking the street

[13]  with a sandwich board saying come buy a loan from

[14]  me?  What do you mean?

[15] BY MR. LANGDON:

[16]    Q.   Let me see if I can clear it up for you, Ms.

[17]  Mobley.

[18]        Was there any restriction or rule that

[19]  NationsBank had that prevented you from trying to

[20]  recruit customers for products in any other neighborhood

[21]  other than the Bankhead community?

[22]        MS. DOLIN:  Again, object to form.  The

[23]  question is -- there's no foundation for the

[24]  question.

[25]        MR. LANGDON:  I understand your objection.

Page 43

[ 1]  live outside of that community to deal with her?

[ 2]        MS. DOLIN:  Objection, no foundation.

[ 3]        You can answer.

[ 4]        THE WITNESS:  No, there was no restriction.

[ 5]  Customers could do that.  But keep in mind that our

[ 6]  banking center was not in an affluent neighborhood.

[ 7]  So even if I had affluent friends, it would

[ 8]  inconvenience them to come into the city and wait

[ 9]  on those lines for the service that we were.

[10]  We were a very limited, resourceful banking

[11]  center.  So it would almost be unfair to assume

[12]  that they would do that in many instances.

[13] BY MR. LANGDON:

[14]    Q    I understand.  But there was no restriction

[15]  that prevented that, correct?

[16]    A.   There was no restriction.

[17]    Q.   Let's return back to the document we were

[18]  looking at.  I believe the next entry is January --

[19]    A.   Can I back up for a moment?

[20]    Q.   Yes.

[21]    A.   That's an interesting question you asked

[22]  because the restriction would have been that that had to

[23]  be done after hours.  Again, if I did that to build that

[24]  rapport, that would be done after hours.  There was no

[25]  leaving that banking center during the day to build

Page 42

[ 1] BY MR. LANGDON:

[ 2]    Q.   If you understand the question, you're

[ 3]  entitled to answer it.

[ 4]        MS. DOLIN:  I'm going to object on the lack of

[ 5]  foundation.

[ 6]        THE WITNESS:  I understand it.  I could work.

[ 7]  There was no restriction.  However, it would defeat

[ 8]  the banking center's purpose.  The goal is bring

[ 9]  the business back to the banking center, not for me

[10]  to educate you and you go to your Buckhead branch.

[11]  I would defeat the purpose.

[12]        So if I come to you and if I'm in Buckhead,

[13]  you're going to go to the closest banking center

[14]  near you and say, hey, this young lady told me I

[15]  could get this loan.

[16] BY MR. LANGDON:

[17]    Q.   Was part of your job to attempt to develop a

[18]  personal rapport with your banking customers?

[19]    A.   Personal in the fact that where they needed

[20]  services, I would know their situation thoroughly and be

[21]  able to provide the service.

[22]    Q.   Was there any rule or restriction that

[23]  NationsBank would keep a customer say you developed in

[24]  another community from saying, I really like Ms. Mobley,

[25]  I want to go to the Bankhead community even though I

Page 44

[ 1]  those relationships.

[ 2]    Q.   Who restricted you to the banking center, the

[ 3]  Bankhead banking center, during the day?

[ 4]    A.   That's NationsBank.  When you're assigned to a

[ 5]  branch, you work for that branch.

[ 6]    Q.   You are not permitted to go outside the branch

[ 7]  during the day to call on potential customers?

[ 8]    A.   During the day, no.

[ 9]    Q.   You had to be at the branch the entire day?

[10]    A.   That is correct.

[11]    Q.   And that is, as you testified, a NationsBank

[12]  policy, to your understanding?

[13]    A.   I don't know if it's a policy.  As you're

[14]  assigned to each branch, my responsibility and my

[15]  obligation is to that branch, that banking center.  So,

[16]  no, I would not go outside of that community to build

[17]  relationships to allow people to go to other banking

[18]  centers.

[19]    Q.   I understand.  But my question is, during the

[20]  day, could you leave your branch and go out in the

[21]  Bankhead community to develop customers?

[22]    A.   Not during the day, no, sir.  In the evening,

[23]  I sure could.

[24]    Q.   Well -- strike that.

[25]    A.   Actually that's what the Bankhead business

Page 45

[1] association meetings are.

[2]    Q.  Let me ask you this, did you understand that

[3] prohibition against leaving the banking center during

[4] the day to developing customers in your own banking

[5] center community to be a corporate NationsBank policy or

[6] was that imposed upon you by Ms. Lomax?

[7]    A.  Well, according to Ms. Lomax, we had to be

[8] there every day all day.  So if I were to leave, that

[9] would be some ground for some sort of personal, maybe

[10] conflict, with my hours.  Because when I leave, she

[11] doesn't know where I'm going.  But when I leave -- I

[12] mean, when I'm there, I'm working.  I'm there.  If that

[13] were the case, I would do that over the phone.

[14]    Q.  Did you ever ask Ms. Lomax whether you could

[15] leave during the day to go out into the community to try

[16] to develop customers?

[17]    A.  Actually we talked many times about having --

[18] there was a school down the street from the branch and

[19] what we talked about was maybe building some sort of

[20] relationship with the schools to start first-time

[21] savings accounts for children but, of course, it was

[22] recommended that that be done after hours.

[23]    Q.  She told you do not attempt to do that until

[24] after banking center hours?

[25]    A.  She told me that that would be done on my

Page 46

[1] time.

[2]    Q.  That was her specific words?

[3]    A.  I don't recall.  In a nutshell, yes, that

[4] would be on my time.

[5]    Q.  Let's go to the entry for January 26th.  If

[6] you will read that for me, please, Ms. Mobley.

[7]    A.  January 26th, take car in for service at 7:30

[8] a.m. and then I have from 8:30 to 5:00.  I took my car

[9] in probably for oil change and was probably out of

[10] there.

[11]    Q.  Do you know what the reference 8:30 to 5:00

[12] is?

[13]    A.  Yes, those were my hours that I was recording

[14] for my time sheet.  I think maybe it was shortly after

[15] this time that we may have gone or before this, right in

[16] this area, that we started to go on the time sheets.

[17] And I was recording the hours every day.  So when my

[18] time sheet would arrive, I would just actually take

[19] these numbers and record them on the time sheet.

[20]    Q.  We'll go into this later.  Let's get through

[21] these documents first because that raises another line

[22] of questioning.

[23]       The entry for January 27th, if you could read

[24] that.

[25]    A.  It's 8:30 to 5:00.

Page 47

[1]    Q.  What does that refer?

[2]    A.  Hours for the day, compensated hours for the

[3] day.

[4]    Q.  I'm going to flip to the fourth page of

[5] Defendant's Exhibit Number 2.  And if you're looking at

[6] that page in a calendar, Ms. Mobley, would it be the

[7] right-hand page for the month of the January?

[8]    A.  That is correct.

[9]    Q.  The first entry is January 15th?

[10]    A.  That is correct.

[11]    Q.  If you could read that entry, please.

[12]    A.  From 8:00 to 6:50.  Those would be related to

[13] compensated hours for the day.

[14]    Q.  The next entry for January 16th, if you could

[15] read that, please.

[16]    A.  Says from 8:30 to 1:00, but I must have gotten

[17] sidetracked after lunch.

[18]    Q.  What were your typical hours on Friday?

[19]    A.  From 8 a.m. to about 7 p.m.

[20]    Q.  And this reference only says 8:30 to 1:00.  Do

[21] you recall some event transpiring specifically on

[22] January 16th of 1998 that ended your working day at one

[23] o'clock?

[24]    A.  No, Fridays were just basically horrific at a

[25] banking center.  Fridays are paydays.  And, I mean, to

Page 48

[1] say that we were always swamped -- we were always over

[2] swamped on Fridays for limited staff for a number of

[3] reasons.  So to say that -- I couldn't just actually sit

[4] here and record because on Fridays I spent more time

[5] handling customer service issues on the floor versus at

[6] my desk, you know, handling customers so to speak.

[7]    Q.  The entry for January 21st, if could you read

[8] that.

[9]    A.  8:30 to 5:00, which would be compensated

[10] hours.

[11]    Q.  The entry for the 22nd?

[12]    A.  8:30 to 5:00.

[13]    Q.  Again, does that refer to compensated hours?

[14]    A.  That is correct.

[15]    Q.  And then Friday, January 23rd, if you could

[16] read the entry on that date?

[17]    A.  From 8:30 to 1:00.  But that was Fridays so we

[18] were just really busy on Fridays.

[19]    Q.  Did you -- strike that.

[20]       Was it your practice to record your hours on

[21] this calendar and then transfer them over to the

[22] timecard?

[23]    A.  That is correct.

[24]    Q.  The references on the calendar to the various

[25] hours would be derived from where?  What would you look

Page 49

[ 1]  at to determine these hours?

[ 2]      A.  The starting hours would be the actual

[ 3]  starting hours. The ending hours would be hours that I

[ 4]  was either told by Tamara Lomax that I should be signed

[ 5]  out as of each day.

[ 6]      Q.  Did you make these entries on these calendar

[ 7]  pages daily or would you enter the entries in advance?

[ 8]      A.  For the times they wouldn't be entered in

[ 9]  advance unless it was lunch. There were many days

[10]  that -- perfect example is Fridays. I truly may have

[11]  signed out or here reference one o'clock because I

[12]  didn't always bank at NationsBank, but I couldn't even

[13]  leave to go to my own branch to do my own banking. So

[14]  that was an attempt -- maybe I made an attempt on my

[15]  lunch break, which I could not go because Fridays we

[16]  were always swamped at branches.

[17]      Q.  Was it your practice to record these times at

[18]  the beginning of the day or at the end of the day?

[19]      A.  Pretty much at the end of the day.

[20]      Q.  Let's flip to, I believe, the fifth page of

[21]  Exhibit Number 2. And at the very top outside of a date

[22]  block it looks like a name and phone number. Could you

[23]  read that, please.

[24]      A.  It says, Nate, (404)276-1266. And actually

[25]  that was a customer. So that was just maybe Monday I

Page 50

[ 1]  had to call a follow up something with that customer.

[ 2]      Q.  The entry for Monday, February 2nd, if you

[ 3]  could read that, please, ma'am.

[ 4]      A.  Mandatory meeting after work.

[ 5]      Q.  Do you recall what this meeting concerned?

[ 6]      A.  I don't recall.

[ 7]      Q.  Do you recall whether it was a work-related

[ 8]  meeting or a meeting related to some other function?

[ 9]      A.  I'm sure it was work related, was mandatory

[10]  after work.

[11]      Q.  Do you recall that specifically that it was an

[12]  after-work meeting related to work?

[13]      A.  I'm sure I would not put that there if that's

[14]  what it was.

[15]      Q.  The next entry on this page appears to be

[16]  February 17th?

[17]      A.  Uh-huh.

[18]      Q.  And if you could read that entry, please.

[19]      A.  That would be from 8:30 to six o'clock.

[20]      Q.  And, again, does that refer to hours?

[21]      A.  That's correct.

[22]      Q.  Let's flip to the sixth page of Defendant's

[23]  Exhibit Number 2. And, again, if you're looking at the

[24]  calendar for the month of February, it would be the

[25]  right-hand page, correct?

Page 51

[ 1]      A.  That's correct.

[ 2]      Q.  First entry is for February 18th. If you

[ 3]  could read that, please.

[ 4]      A.  8:30.

[ 5]      Q.  To what does that refer?

[ 6]      A.  I arrived at 8:30.

[ 7]      Q.  And then you have an entry for February 21st?

[ 8]      A.  Uh-huh.

[ 9]      Q.  If you could read that.

[10]      A.  Work.

[11]      Q.  And then there was an entry made for February

[12]  26th that looks like it's been scratched through. Can

[13]  you make heads or tails of that?

[14]      A.  I am not able to.

[15]      MS. DOLIN: Don't guess. If you can read it,

[16]  fine.

[17]      THE WITNESS: I can't.

[18] BY MR. LANGDON:

[19]      Q.  And turn to the last page of the exhibit.

[20]  It appears to be the left-hand side of a calendar page

[21]  for March, correct?

[22]      A.  That's correct.

[23]      Q.  And there's no entries thereon?

[24]      A.  No entries.

[25]      Q.  If I understood your testimony correctly

Page 52

[ 1]  earlier, you had resigned from your employment with

[ 2]  NationsBank prior to March of '98; is that correct?

[ 3]      A.  That's correct.

[ 4]      Q.  The next exhibit that you brought with you

[ 5]  this morning is a one-page document that I'm going to

[ 6]  hand to the court reporter and ask her to mark as

[ 7]  Defendant's Exhibit Number 3, I believe.

[ 8]      MS. DOLIN: This is Bate stamped BSC-413. Is

[ 9]  that the one?

[10]      MR. LANGDON: Yes.

[11]      (Thereupon, document marked as Defendant's

[12]  Exhibit Number 3 for identification.)

[13] BY MR. LANGDON:

[14]      Q.  I'm going to hand you, Ms. Mobley, what's been

[15]  marked as Defendant's Exhibit Number 3 and ask you to

[16]  take a look at that, please.

[17]      A.  Okay.

[18]      Q.  If I could borrow the actual exhibit back

[19]  because I believe you have the original document you

[20]  produced in front of you, correct?

[21]      A.  Yes.

[22]      Q.  I'll refer to the exhibit while you refer to

[23]  the original. Do you recognize this document?

[24]      A.  Yes, it's actually pay stubs.

[25]      Q.  Are these the form of pay stubs that you

| Page 53 | Page 54 |
|---|---|
| [1] received from NationsBank when you received your | [1] BY MR. LANGDON: |
| [2] paychecks? | [2]  Q.  I'm not asking you for any conversation you |
| [3]  A.  To be honest, I mean, I've not pulled my pay | [3] had with counsel. Let me ask you this and stop right |
| [4] stubs to see exactly what they look like. I don't have | [4] there. |
| [5] a discrepancy with the formatting of them and what my | [5]  How did you get the document? |
| [6] deductions are. They look like my standard pay stubs. | [6]  A.  This document was received on behalf of – |
| [7]  Q.  Do you know when you came into possession of | [7]  MS. DOLIN:  Did it come in the mail?  Did a |
| [8] this document, the ones that's been marked as | [8] horse bring it?  Did the Saint Bernard with the |
| [9] Defendant's Exhibit Number 3? | [9] barrel around his neck bring it? |
| [10]  A.  When I came into it? | [10]  THE WITNESS:  Okay. |
| [11]  Q.  Yes. | [11] BY MR. LANGDON: |
| [12]  A.  I want to say it was last fall, maybe.  I | [12]  Q.  It came to you in the mail? |
| [13] don't recall specifically. | [13]  A.  Yes. |
| [14]  Q.  And do you know what the reference at the | [14]  Q.  We're walking a fine line but who sent the |
| [15] bottom of ESC-413 refers to? | [15] document to you? |
| [16]  A.  No, I don't. | [16]  MS. DOLIN:  Let me think about that for a |
| [17]  Q.  Do you recall whether you received this | [17] second. |
| [18] document before or after you joined into this lawsuit | [18]  MR. LANGDON:  Just the identification of the |
| [19] filed by Ms. Escudero and Ms. Drake? | [19] person or entity that sent the document to you is |
| [20]  A.  After I joined into it. | [20] all I want to know. |
| [21]  Q.  How did you receive this document? | [21]  MS. DOLIN:  You can answer that question. |
| [22]  MS. DOLIN:  Hold on a second.  To the extent | [22]  THE WITNESS:  Okay.  To be quite honest with |
| [23] that you can answer it without getting into any | [23] you, I'm trying to think.  Either I may have |
| [24] conversations between your counsel and you, you can | [24] received it from your office – Susan Dolin's |
| [25] answer it. | [25] office. |

| Page 55 | Page 56 |
|---|---|
| [1] BY MR. LANGDON: | [1] that at the very top of the page dated 1/15/98. |
| [2]  Q.  You mean Ms. Dolin's office? | [2]  A.  Yes. |
| [3]  A.  Right.  I believe I received it from her. | [3]  Q.  Does that pay stub indicate that you recorded |
| [4]  Q.  Let's look at the actual content of the | [4] overtime in, I guess, a pay period preceding that date? |
| [5] document, Ms. Mobley.  And I believe you testified | [5]  MS. DOLIN:  Object to form. |
| [6] earlier it appears to be pay stubs? | [6]  THE WITNESS:  It indicates that I was – I |
| [7]  A.  Yes. | [7] guess.  I don't know.  I mean, to say it indicates, |
| [8]  Q.  And would it be fair to say they appear to be | [8] I don't know. |
| [9] pay stubs beginning with the first pay period, January | [9] BY MR. LANGDON: |
| [10] 15th of '98, and running through the last period on this | [10]  Q.  Let me ask you this – |
| [11] document of March 13, 1998? | [11]  A.  I'm sorry.  It indicates that I was |
| [12]  A.  That's correct. | [12] compensated for overtime.  That's what it does indicate. |
| [13]  Q.  Do these pay stubs indicate that you recorded | [13]  Q.  And how would you receive compensation for |
| [14] overtime – let me back up. | [14] overtime?  Would you have to record that overtime first |
| [15]  Are these pay stubs for you, Ms. Mobley?  Does | [15] on a timecard? |
| [16] your name appear on this document? | [16]  A.  How I received this overtime compensation? |
| [17]  A.  Sorry.  Let me just look.  Yes. | [17]  Q.  Yes. |
| [18]  Q.  If you will look at the left-hand side of the | [18]  A.  Right, I recorded it on my time sheet.  I had |
| [19] page for each pay stub. | [19] to complete a time sheet. |
| [20]  A.  My name's on each one, yeah. | [20]  Q.  If you recorded overtime on your time sheet, |
| [21]  Q.  There's a number directly under your name on | [21] would NationsBank, in turn, pay you for the overtime you |
| [22] each pay 156709587.  Is that your Social Security | [22] actually recorded? |
| [23] number? | [23]  A.  They would pay me for the time that was |
| [24]  A.  Yes, it is. | [24] recorded, yes. |
| [25]  Q.  The first pay stub, if you will take a look at | [25]  Q.  Do you contend in this lawsuit, Ms. Mobley, |

Page 57

[ 1] that NationsBank did not pay you for overtime that you

[ 2] actually recorded?

[ 3]    A.    That is correct.

[ 4]    MS. DOLIN: Listen to the question very

[ 5] carefully.

[ 6] BY MR. LANGDON:

[ 7]    Q.    Let me ask it again.

[ 8]    Is it your contention in this lawsuit that

[ 9] NationsBank failed to pay you for overtime that you did

[10] record on your time sheet?

[11]    A.    No. They paid me for time that was recorded

[12] on my time sheet.

[13]    Q.    Would it be fair to say that if you recorded

[14] overtime you were paid by NationsBank for that time?

[15]    A.    That's correct.

[16]    Q.    And I understand the nature of the allegation,

[17] but that's just a specific question.

[18]    A.    Yes.

[19]    Q.    Well, if you will look at that first pay stub

[20] again -- for lack of a better word -- do you see the

[21] first block to the right of your name, the entry for

[22] overtime?

[23]    A.    Overtime, yes.

[24]    Q.    And what number appears beside that word

[25] overtime?

Page 58

[ 1]    A.    14.

[ 2]    Q.    Let's go to the third pay stub on the sheet,

[ 3] Ms. Mobley, dated 2/13/98. And, again, does your name

[ 4] appear on that pay stub?

[ 5]    A.    Yes, it does.

[ 6]    Q.    And if you will look again to the first block

[ 7] to the right under the earnings grid by your name. Does

[ 8] it also have an entry for overtime?

[ 9]    A.    Yes.

[10]    Q.    What's the entry beside overtime there?

[11]    A.    Overtime entry is 15.50.

[12]    Q.    And let's go down to the fourth pay stub dated

[13] 2/27/98. Again, looking at the first block under the

[14] earnings column to the right of your name, is there an

[15] entry for overtime there?

[16]    A.    Yes, and it is 15.75.

[17]    Q.    Ms. Mobley, did you receive a paycheck after

[18] the date of your termination for the time you worked

[19] from, I guess, your last pay period through your

[20] resignation?

[21]    A.    Yes, I did.

[22]    Q.    If you will look down at this last pay stub

[23] dated 3/13/98, again, the first block under the earnings

[24] column. If you will look -- well, strike that.

[25]    Actually, it will be the third block under the

Page 59

[ 1] earnings column beside the entry overtime. What number

[ 2] appears there?

[ 3]    A.    I'm sorry. Which one?

[ 4]    Q.    Very last pay stub dated 3/13/98.

[ 5]    A.    It has no current unit in overtime. It has

[ 6] year to date.

[ 7]    Q.    What is the entry under the year-to-date

[ 8] units?

[ 9]    A.    Year-to-date units are 49.25.

[10]    Q.    I'm going to hand you now another document

[11] that you brought with you today that I'll ask the court

[12] reporter to mark as Defendant's Exhibit Number 4.

[13]    (Thereupon, document marked as Defendant's

[14] Exhibit Number 4 for identification.)

[15] BY MR. LANGDON:

[16]    Q.    Ms. Mobley, I'm going to hand you now what's

[17] been marked as Defendant's Exhibit Number 4 and ask you

[18] to take at a look at that, please.

[19]    A.    Okay.

[20]    Q.    Have you had a chance to review the document?

[21]    A.    Yes.

[22]    Q.    Again, with your permission, I'm going to look

[23] at the actual exhibit because I believe you have a

[24] photocopy of the original document in front of you?

[25]    A.    Yes.

Page 60

[ 1]    Q.    What is this document, Ms. Mobley?

[ 2]    A.    This document is actually a time sheet, a time

[ 3] sheet for the period of January 16th through January 31,

[ 4] 1998.

[ 5]    Q.    And do you recognize this time sheet to be a

[ 6] timecard that was utilized by NationsBank during your

[ 7] employment tenure with it?

[ 8]    A.    Tenure?

[ 9]    Q.    That was a convoluted question. Let me ask it

[10] again.

[11]    Does this appear to be the timecard

[12] NationsBank used while you worked for the bank?

[13]    A.    This was the timecard that was used when they

[14] mandated that we use timecards.

[15]    Q.    When did they mandate that the timecards would

[16] be used?

[17]    A.    I want to say it was either the very first of

[18] January or late December, but I believe it was more so

[19] January.

[20]    Q.    This is the format of the timecard that

[21] NationsBank provided you for recordation of your time?

[22]    A.    That is correct.

[23]    Q.    I'd like to verify some of the information

[24] entered on this time sheet. If you will look at the

[25] very top of the time sheet, they have blocks that look

Page 61

[1]   like they correspond to specific dates of the month. Is
[2]   that a fair assessment, at the very top?
[3]       A.   At the very top? I'm not sure which way
[4]   you're looking at the top.
[5]       Q.   If you will look at the top of the time sheet,
[6]   it appears to have blocks at the very top that
[7]   corresponds to a specific date of the month; is that a
[8]   fair assessment?
[9]       A.   Yes.
[10]      Q.   And there appears to be time entries recorded
[11]  in those blocks for a specific date, correct?
[12]      A.   That is correct.
[13]      Q.   If you will look at the very – if you're
[14]  looking at the docket, it would be the right-hand bottom
[15]  corner of the document?
[16]      A.   Yes.
[17]      Q.   Under the block employee; do you see that?
[18]  You'll see initials at the very bottom of the timecard?
[19]      A.   Yes.
[20]      Q.   Are those your initials under the employee
[21]  block?
[22]      A.   Yes.
[23]      Q.   And whose initials are beside yours under the
[24]  supervisor block?
[25]      A.   I have no idea.

Page 62

[1]       Q.   Once you started filling out timecards, to
[2]   whom would you turn those timecards in?
[3]       A.   Either my banking center branch manager or a
[4]   senior CB at the branch or if we had an acting manager
[5]   there at the time. So it would have been either
[6]   whomever, whoever, was there to collect them.
[7]       Q.   Who was your normal branch manager?
[8]       A.   Tamara Lomax.
[9]       Q.   And then do you recall who the head CB would
[10]  have been at Bankhead branch during your tenure?
[11]      A.   Yes, Naomi Billingsly.
[12]      Q.   When you mentioned something about an acting
[13]  manager, explain to me what you mean by an acting
[14]  manager.
[15]      A.   If our branch manager was on vacation, we
[16]  would have a branch manager sometimes. They're
[17]  floaters. They could come back and forth depending on
[18]  what the needs were.
[19]      Q.   Do you recall whether any acting managers were
[20]  actually supervising the Bankhead branch during your
[21]  tenure there?
[22]      A.   During her vacation, yes.
[23]      Q.   Did Ms. Lomax take any vacation from December
[24]  17th of '97 through your resignation at the end of
[25]  February of '98; do you recall?

Page 63

[1]       A.   That I don't recall.
[2]       Q.   Let's go back to the document. What was your
[3]   practice in filling out this document?
[4]       A.   The document was received maybe a week or –
[5]   within maybe three to five days prior to us actually
[6]   completing them or before the cut off. So if our next
[7]   pay period cut off is – if our cut offs were the 15th
[8]   of each month, I believe maybe by the 10th or the 12th
[9]   we would receive our time sheets and we would complete
[10]  them.
[11]           I think maybe the last time we received them
[12]  way in advance like at the end of – prior to cut off,
[13]  so maybe we got two at once to complete. But we would
[14]  get them just beforehand and we would just fill in other
[15]  times here and turn them over to either a senior CB or
[16]  to the branch manager to sign.
[17]      Q.   Is it a fair assessment to say that this
[18]  timecard looks like it tracks time for Friday, January
[19]  16th of 1998, through Saturday, January 31st of 1998?
[20]      A.   It would be fair to say that it indicates
[21]  times from January 16th through January 23rd.
[22]      Q.   If you will flip on the back and look at that.
[23]  Was the timecard two sided?
[24]      A.   I don't recall.
[25]      Q.   And you testified that you would receive this

Page 64

[1]   timecard towards the end of the period for which it was
[2]   intended to be filled out?
[3]       A.   That's correct.
[4]       Q.   Did that procedure change at any point during
[5]   your tenure with the bank from December through February
[6]   of '98?
[7]       A.   The only thing that changes is we received
[8]   them a little earlier.
[9]       Q.   When you say you received them earlier, would
[10]  you receive them at the beginning of the pay period for
[11]  which the card was intended to track?
[12]      A.   Right, so we could begin to log our times
[13]  daily.
[14]      Q.   Do you recall when that switch was made?
[15]      A.   I have no idea.
[16]      Q.   Would it have been – given the fact we're
[17]  dealing with a fairly short window here, December of '97
[18]  to the end of February of '98, do you recall whether it
[19]  was closer to the end of your tenure with the bank or
[20]  back in December that the switch was made?
[21]      A.   It had to be closer to – probably maybe the
[22]  end of January, so maybe about February. But I know that
[23]  last couple seems like we had them in advance.
[24]      Q.   Prior to this switch being made where you
[25]  would receive a card in advance of the pay period for

Page 65

[ 1] which it was intended to track, how would you go about

[ 2] tracking your time so you could then transfer it on to

[ 3] the timecard once you received it?

[ 4]    A.   Well, actually I did not have to really track

[ 5] my time with the exception of Fridays.  At that time my

[ 6] branch manager, which was Tamara Lomax, actually

[ 7] explained to me she was not compensating me for overtime

[ 8] and I should be logged out every day by 5:00.

[ 9]    Q.   Let's talk about that a little bit because

[10] that's something I intended to discuss later on in your

[11] deposition today but we can get into that now.

[12]         How did Ms. Lomax inform you that you would

[13] only be compensated for 40 hours a week?

[14]    A.   Because my threshold was not where it was

[15] supposed to be, she was not willing to pay me overtime.

[16]    Q.   When did you have this conversation wherein

[17] she told you because your threshold -- and I take that

[18] to be related to performance, correct?

[19]    A.   Correct.

[20]    Q.   -- that your threshold was not where they

[21] should be so you were not entitled to overtime?

[22]    A.   That would be when we started the timecards.

[23]    Q.   Your recollection as to when that was is?

[24]    A.   Late December or early January.  So when we

[25] started time sheets, the issue was overtime.  And her

Page 66

[ 1] explanation to me was she didn't feel it was necessary

[ 2] to compensate me overtime because my threshold was not

[ 3] where it should have been.

[ 4]    Q.   Was this a private conversation between only

[ 5] you and Ms. Lomax?

[ 6]    A.   I don't recall.

[ 7]    Q.   What did she tell you in this conversation as

[ 8] to how you were then to handle your overtime?

[ 9]    A.   There was no other option.  She would actually

[10] explain to me that you should be signed out by 5:00.  So

[11] that means each day on my time sheet I had to be signed

[12] out by 5:00.  Or say it it was -- the first week of the

[13] month is a perfect example.  That's a very busy, hectic

[14] week.

[15]         So she may say, well, you should be complete

[16] this week by 5:30, regardless of what time I was

[17] actually done.  She indicated to me that my time should

[18] not reflect a minute over 5:30 or five o'clock, whatever

[19] it was at that time.

[20]    Q.   Did she specifically tell you that because of

[21] your threshold levels you were not permitted to record

[22] overtime?

[23]    A.   Yes.

[24]    Q.   She said that in that many words, that because

[25] of your threshold levels, Ms. Mobley, you cannot record

Page 67

[ 1] overtime?

[ 2]    A.   Because of my threshold levels that she would

[ 3] not allow me to work for hours longer than she

[ 4] indicated, which would be five o'clock or 5:30.  But a

[ 5] senior branch manager was not allowed to stay and be

[ 6] compensated because her threshold was always higher.

[ 7]    Q.   The senior branch manager?

[ 8]    A.   I mean the senior CB.

[ 9]    Q.   That was Ms. Billingsly?

[10]    A.   Yes.

[11]    Q.   Did Ms. Lomax ever say to you you are to sign

[12] out at 5:00 every day regardless of whether you worked

[13] longer or not?

[14]    A.   Yes, uh-huh.  She indicated to me either -- I

[15] want to say maybe weekly and it depended on how the week

[16] was.  She would indicate to me, you should be done this

[17] week by five o'clock.

[18]    Q.   Did Ms. Lomax set your schedule on a weekly

[19] basis?

[20]    A.   Pretty much after the time sheets, yes.

[21]    Q.   Did she set the schedules of other branch

[22] personnel on a weekly schedule?

[23]    A.   Actually she set all our schedules before the

[24] time sheets.  We had to be in at eight o'clock.  After

[25] the time sheets it changed to 8:30.

Page 68

[ 1]    Q.   When would she distribute the schedule she had

[ 2] created for the week?

[ 3]    A.   There was no schedule.

[ 4]    Q.   When would you be informed what your schedule

[ 5] was going to be for the week?

[ 6]    A.   Once the time sheet process started, we were

[ 7] told that our hours would change from 8:00 to 8:30.

[ 8]    Q.   I understand that.  But at what point in the

[ 9] week would she come to you and say, Ms. Mobley, your

[10] schedule for this week will be as follows?

[11]    A.   She never told me that.  What she would

[12] explain is that as of this week, you should be done

[13] every day by 5:00.  So that meant to me I need to be

[14] signed out by 5:00.

[15]    Q.   And the term she used was, this week you

[16] should be done every day by 5:00?

[17]    A.   Uh-huh.  And actually to elaborate a little

[18] further, I should be done this week by 5:00, but I still

[19] need to get my threshold up.  So whatever that means to

[20] you, you know, that's what I needed to do.

[21]    Q.   Did she specifically say to you, Ms. Mobley,

[22] you should be done every day this week by 5:00, and if

[23] you work longer than that, you are not to record that

[24] time?

[25]    A.   That I will not be paid for it, uh-huh.

Page 69

[1]  Q.  Ms. Lomax told you that if you worked overtime

[2]  in a given week you would not be paid for it?  She

[3]  specifically told you that?

[4]  A.  No.  She specifically told me that the times

[5]  after she's guesstimated to me to sign out, that I'll

[6]  not be paid beyond that.

[7]  Q.  Did Ms. Lomax announce this policy to you in a

[8]  meeting or was it in a private context?

[9]  A.  That I don't recall.  Our branch is a fairly

[10]  small branch.  And, I mean, I feel confident saying it

[11]  was privately.

[12]  Q.  Going back to the time sheet, Ms. Mobley,

[13]  would it be fair to say that you would enter the daily

[14]  times in the top section of the time sheet, the times

[15]  where -- let's look at Friday the 16th, for example.  Do

[16]  you see that block?

[17]  A.  Yes.

[18]  Q.  Under the first in section, there's an entry

[19]  of eight o'clock, correct?

[20]  A.  That's correct.

[21]  Q.  What does that represent?

[22]  A.  My start time was eight o'clock.

[23]  Q.  And then the first out column is the entry of

[24]  one o'clock, correct?

[25]  A.  That is correct.

Page 70

[1]  Q.  What does that represent?

[2]  A.  Lunch break from 1:00 to 1:30.

[3]  Q.  So the third column, the end column, where you

[4]  have -- I'm sorry, where 1:30 is represented would be

[5]  the time that you returned from lunch?

[6]  A.  That is correct.

[7]  Q.  And then in the last out column there's an

[8]  entry for seven o'clock, I believe?

[9]  A.  That's correct.

[10]  Q.  And what would that time represent?

[11]  A.  Ending day.

[12]  THE COURT:  Let's take a break and change

[13]  paper.

[14]  (A recess was had.)

[15] BY MR. LANGDON:

[16]  Q.  Ms. Mobley, we're back on the record after a

[17]  short break.  We were discussing Defendant's Exhibit

[18]  Number 4 which appears to be a timecard you completed

[19]  for the period Friday, January 16th, through Saturday,

[20]  January 31st; is that fair?

[21]  A.  That's correct.

[22]  MS. DOLIN:  I'm going to object to form.  She

[23]  completed -- you've established she completed the

[24]  top part.

[25]  MR. LANGDON:  All right.  I'll see if I can

Page 71

[1]  clean that up as we go along.

[2] BY MR. LANGDON:

[3]  Q.  I believe you testified earlier that at least

[4]  when you would have received this timecard in early

[5]  January, it's your belief that the practice was you

[6]  would see the timecard towards the end of the period; is

[7]  that correct?

[8]  A.  That's correct.

[9]  Q.  How would you record your time then so that

[10]  you could transfer it on to the timecard once you

[11]  received it for the days prior to your receipt of the

[12]  card?

[13]  A.  I actually jotted down in my planner which is

[14]  some of the prior exhibits that you saw but keyed in

[15]  mine.  It didn't take a lot to recall that for the most

[16]  part standardly I was there between 8:30 and 5:00.  The

[17]  only difference I tried to do is recall when I did or

[18]  did not take a lunch.  So it was many times I did not or

[19]  was not able to take a lunch.

[20]  Q.  You make notes daily as to your report time

[21]  and lunchtime and your in time, whether it be the in

[22]  time that Ms. Lomax told you or the end time which you

[23]  claim you actually left?

[24]  A.  Actually, no, I would put the time she told me

[25]  to record.

Page 72

[1]  Q.  Looking at this first block at the top of the

[2]  timecard both for the period Friday, January 16th,

[3]  through Friday, January 23rd, and then on the second

[4]  page of my exhibit, the backside of which you have there

[5]  Saturday, January 24th, through Saturday, January 31st,

[6]  is that your handwriting, the numerical entries?

[7]  A.  That is my handwriting.

[8]  MS. DOLIN:  Which?  You're talking about the

[9]  hours?

[10]  THE WITNESS:  Yes.

[11]  MR. LANGDON:  Yes, and the individual date

[12]  blocks at the top of the card.

[13]  MS. DOLIN:  That's Page 2 of that exhibit; is

[14]  that what you're talking about?

[15]  MR. LANGDON:  Yes.

[16] BY MR. LANGDON:

[17]  Q.  Let's move down to the next block of

[18]  information going back to Page 1.  And there are entries

[19]  in what appear to be like a running total for the two

[20]  weeks.  Do you see those?

[21]  A.  Yes.

[22]  MS. DOLIN:  Just the plain numbers?

[23]  MR. LANGDON:  Right.

[24]  MS. DOLIN:  Just so we can clear this up, you

[25]  got a date that says 1/98, 16F, 17S, 18S, 19M, and

Page 73

[ 1]    then under that you got the numbers. Those are the

[ 2]    numbers you're talking about?

[ 3]        MR. LANGDON: Right. That is the row of

[ 4]    information that I'm talking about.

[ 5]        MS. DOLIN: Okay.

[ 6] BY MR. LANGDON:

[ 7]    Q. Ms. Mobley, is that your handwriting in that

[ 8]    row of information -- for lack of a better word --

[ 9]    starting off with the 32 and running all the way to the

[10]    last entry of 4 under 31S?

[11]    A. I don't recall filling this out. And to me it

[12]    doesn't look like my handwriting.

[13]    Q. Is it your practice to fill out that portion

[14]    of the timecard when you completed it?

[15]    A. Not that I'm aware of. I'm just aware of

[16]    completing my hours and initialing it.

[17]    Q. Do you recall specifically to whom you would

[18]    turn your timecards in to around this period, early

[19]    January, 1998?

[20]    A. Once again, that would be the senior CB or the

[21]    branch manager. I'm not certain of who would complete

[22]    the rest of this. I have no idea.

[23]    Q. But if I understand your testimony, it was

[24]    only your practice to complete the top portion of the

[25]    timecard for the daily time entries; is that correct?

Page 74

[ 1]    A. That is correct and to initial it.

[ 2]    Q. When you initialed the timecard, Ms. Mobley,

[ 3]    would the information down in the second row beginning

[ 4]    with 32 running through all the way to 4 under 31S,

[ 5]    would that information, to your recollection, be on the

[ 6]    timecard at that point?

[ 7]    A. I don't recall.

[ 8]    Q. And, again, just for record purposes, if you

[ 9]    will look at the actual third row of blocks, do you see

[10]    where under 18S the notation 7.0 appears?

[11]    A. Yes.

[12]    Q. If you move on down to 25S the notation of 8.5

[13]    appears?

[14]    A. Yes.

[15]    Q. Is that your handwriting?

[16]    A. No.

[17]    Q. Do you know whose handwriting that is?

[18]    A. I have no idea.

[19]    Q. I'm going to hand you the last exhibit that

[20]    you brought with you today that I'll ask the court

[21]    reporter to mark as Defendant's Exhibit Number 5.

[22]        (Thereupon, document marked as Defendant's

[23]    Exhibit Number 5 for identification.)

[24] BY MR. LANGDON:

[25]    Q. I'm handing you what's now been marked as

Page 75

[ 1] Defendant's Exhibit Number 5. If you will take a look

[ 2] at that, please, ma'am.

[ 3]        Have you had a chance to review document?

[ 4]    A. Yes, sir.

[ 5]    Q. And, again, you have been kind enough to let

[ 6] me actually use the exhibit because you have a photocopy

[ 7] there in front of you. What is this document, Ms.

[ 8] Mobley?

[ 9]    A. A time sheet.

[10]    Q. And would it be a fair assessment to say it

[11] appears to be the time sheet for the period December 16,

[12] 1997 through December 31st of 1997?

[13]    A. That is correct.

[14]    Q. Does this refresh your recollection as to when

[15] timecards were actually required by NationsBank for

[16] consumer bankers to complete?

[17]    A. Yes.

[18]    Q. Would it be fair to say that some time in mid

[19] December of 1997 is when timecards were provided to

[20] consumer bankers to complete?

[21]    A. Yes.

[22]    Q. And, again, similar to the questioning that we

[23] went through with the prior exhibit, the information at

[24] the very top of the timecard on both pages completed for

[25] the specific dates, is that your handwriting?

Page 76

[ 1]    A. That is my handwriting.

[ 2]    Q. And then moving down to the first row in the

[ 3] block of information that's entitled regular hours split

[ 4] carry over beginning with 12/97 through 31W; is that

[ 5] your handwriting?

[ 6]    A. No, it is not.

[ 7]    Q. Do you recognize that handwriting?

[ 8]    A. No, sir, I do not.

[ 9]    Q. Again, under the employee block, do your

[10] initials appear at the bottom right --

[11]    A. Yes.

[12]    Q. -- portion of the timecard?

[13]    A. Yes.

[14]    Q. Do you recognize the initials under the

[15] supervisor's block?

[16]    A. Actually, no, I don't.

[17]    Q. Since we're on timecards, Ms. Mobley, I want

[18] to ask you just a few questions. I'll go ahead and

[19] finish this line of questioning so I do not have to go

[20] back to it.

[21]        Was it your practice to record your daily

[22] times on the timecard in pencil or pen?

[23]    A. That I don't recall.

[24]    Q. When the timecards were distributed to you,

[25]    whether it be initially as you've testified, towards the

Page 77

[ 1]    end of the period for which they are intended to track,

[ 2]    or once it changed over in February, towards the

[ 3]    beginning of that period, who distributed the cards to

[ 4]    you?

[ 5]    A.    Tamara Lomax.

[ 6]    Q.    Once a switch had been made so that you

[ 7]    received the timecard towards the beginning of the

[ 8]    period for which it was intended to track, was it your

[ 9]    practice to record your time daily at that point?

[10]    A.    It was my practice to record the time daily

[11]    that I was told to record.

[12]    Q.    I understand.

[13]        MS. DOLIN:    On the card you're talking about?

[14]        MR. LANGDON:    Exactly.

[15]    BY MR. LANGDON:

[16]    Q.    Would you record that directly on the card at

[17]    that point or would you still continue in your practice

[18]    of recording it in your calendar and then transferring

[19]    it over at a later time?

[20]    A.    That I really don't recall.

[21]    Q.    Were employees at the Bankhead center required

[22]    to punch any time kind of clock for the time when they

[23]    recorded or left the branch?

[24]    A.    If I'm not mistaken, the tellers may have had

[25]    a punch clock.  The CB's did not have a punch clock.

Page 78

[ 1]    Q.    The CB's were not required to punch a clock?

[ 2]    A.    That's correct.

[ 3]    Q.    And I understand based upon your testimony it

[ 4]    was not your practice to total your hours daily; is that

[ 5]    correct?  It was only your practice just to write in the

[ 6]    start time, any lunch period that you may have taken and

[ 7]    the ending time, whether it be -- well, strike that.

[ 8]        The ending time that Ms. Lomax told you to

[ 9]    record, is that a fair assessment of your testimony?

[10]    A.    That's correct.

[11]    Q.    Once Ms. Lomax told you that you were -- well,

[12]    strike that.

[13]        Once Ms. Lomax implemented the policy that you

[14]    were not going to be able to record your time past a

[15]    certain time every day for a week, did you complain

[16]    about that policy to anyone?

[17]    A.    No.

[18]        MS. DOLIN:    Objection.

[19]        THE WITNESS:    I didn't complain.

[20]    BY MR. LANGDON:

[21]    Q.    Did you mention the policy to any of your

[22]    co-workers?

[23]    A.    It was discussed heavily amongst the CB's.

[24]    Q.    Who were the CB's with whom you worked at that

[25]    time?

Page 79

[ 1]    A.    Naomi Billingsly.  But at that time too I

[ 2]    started with CB training.  It wasn't uncommon that CB's

[ 3]    would get together and say, hey, are you doing this at

[ 4]    your branch?  We're having to do this stuff at our

[ 5]    branch.  Are you guys doing this too?  It was just to

[ 6]    kind of make sure things were consistent across the

[ 7]    board.

[ 8]    Q.    When did you start your employment with

[ 9]    NationsBank?

[10]    A.    June of '97.

[11]    Q.    How long did your CB training last?

[12]    A.    Maybe two months.  I'm not really sure.  Maybe

[13]    six to eight weeks.

[14]    Q.    So the end of August at the latest, you would

[15]    have completed your CB training approximately at an

[16]    eight-week period?

[17]    A.    Training was more than that.  Training

[18]    meant -- when you first start at a banking center, I was

[19]    trained at a totally different branch than I actually

[20]    worked.  I went through a formal training that was at a

[21]    lab site, we called it.  And then after that when you go

[22]    in the floor, I worked at two different branches before

[23]    I was actually permanently assigned to the Bankhead

[24]    location.

[25]    Q.    At what branch did you begin what you call

Page 80

[ 1]    your lab work or formal training?

[ 2]    A.    Midtown.

[ 3]    Q.    Do you recall --

[ 4]    A.    I believe it was called Midtown.  It was

[ 5]    downtown.

[ 6]    Q.    Do you recall who the banking center manager

[ 7]    was for the Midtown branch during your training period?

[ 8]    A.    I have no idea.

[ 9]    Q.    You say then after completing your formal

[10]    training or lab work, as you refer to it, at Midtown you

[11]    transferred to another branch; is that correct?

[12]    A.    At that time once I completed Midtown then I

[13]    actually moved on to the Green Briar branch.

[14]    Q.    And how long did you work at the Green Briar

[15]    branch?

[16]    A.    Probably anywhere from maybe one to two

[17]    months, if that long.  And even during that period there

[18]    was transitioning back and forth.  So maybe when I first

[19]    went to Green Briar I worked the entire week at Green

[20]    Briar, then the next week I might work four days at

[21]    Green Briar and one day and Bankhead, and then the next

[22]    week three days at Green Briar and two days at Bankhead.

[23]    It was weaning off of.

[24]    Q.    You were weaning off Green Briar over to

[25]    Bankhead; is that it?

Page 81

[ 1]    A.  Right, at the same time weaning on to the

[ 2] floor permanently.

[ 3]    Q.  Who was your banking center manager at the

[ 4] Green Briar branch?

[ 5]    A.  Joy Gibson.

[ 6]    Q.  And did you train under any consumer bankers

[ 7] at the Green Briar branch?

[ 8]    A.  Connie.  I just remember her first name was

[ 9] Connie.

[10]    Q.  Do you recall who the CSM or customer service

[11] manager was at the Green Briar branch?

[12]    A.  No, I don't.  Actually Connie was a CB and Joy

[13] was the branch manager.  I spent most of my training

[14] directly with Joy.  While I was at Green Briar we had a

[15] lot of tests and paperwork we had to complete.  So

[16] initially it was me actually sitting in front of a

[17] terminal going through the paperwork testing on the

[18] system.  And then when I was done, I would sit on the

[19] floor for a few minutes to see different transactions.

[20]    Q.  Sort of like an apprentice-type of program?

[21]    A.  Exactly.

[22]    Q.  At what point in your tenure were you actually

[23] released to go on the floor and begin attempting sales

[24] to customers?

[25]    A.  Actually started back in June.  It starts when

Page 82

[ 1] you get started.

[ 2]    Q.  What point in your tenure then were you

[ 3] basically released from your training so that your

[ 4] full-time responsibilities were to go out and try to

[ 5] attempt to sell banking products to customers?

[ 6]    A.  If I'm not mistaken, I want to say it was

[ 7] October, October or November.

[ 8]    Q.  Do you recall the names of any of the tellers

[ 9] with whom you worked at the Green Briar branch?

[10]    A.  Green Briar?

[11]    Q.  Yes.

[12]    A.  No.

[13]    Q.  You mentioned that you were — while you were

[14] working at Green Briar, you were also transitioning over

[15] to Bankhead?

[16]    A.  Yes.

[17]    Q.  During this transition phase, who was the

[18] branch manager at Bankhead?

[19]    A.  Initially there was no branch manager at

[20] Bankhead.

[21]    Q.  Who was then responsible for supervising the

[22] Bankhead?

[23]    A.  Naomi Billingsly.

[24]    Q.  And she was —

[25]    A.  She was a senior CB.

Page 83

[ 1]    Q.  At what point did Ms. Lomax come on board at

[ 2] Bankhead as the banking center manager?

[ 3]    A.  If I'm not mistaken, it was about within two

[ 4] weeks to a month before I actually permanently came

[ 5] over  So she wasn't there much longer before I actually

[ 6] started.

[ 7]    Q.  When did you permanently transition over to

[ 8] Bankhead?

[ 9]    A.  I don't recall.  It was in October.  She came

[10] over just before me.

[11]    Q.  Would it be fair to say that — strike that.

[12]        You say Ms. Lomax was assigned to Bankhead

[13] before you actually began your permanent assignment

[14] there?

[15]    A.  I would imagine so because she actually

[16] started just a matter of weeks before me.  In my

[17] training there were times that you would always go back

[18] and forth to your permanent location.  So I always knew

[19] that Bankhead was my permanent location.  And sometimes

[20] my assignment would take me to my permanent location.

[21] Initially we had no branch manager.  But by the time

[22] fall — we were into the fall and I was actually

[23] wrapping up my training, I mean, I recall that she was

[24] actually coming on board.

[25]    Q.  Let me see if I can condense this for us so we

Page 84

[ 1] don't spin our wheels.

[ 2]        During your work at the Bankhead center, did

[ 3] you work for any other branch manager other than Ms.

[ 4] Lomax?

[ 5]    A.  Only on Saturdays when I was actually

[ 6] responsible for going to Green Briar.  So when you're

[ 7] working at another branch your management is that

[ 8] banking center's manager.

[ 9]    Q.  So during the week in your performance of your

[10] duties at Bankhead, Ms. Lomax would have been the only

[11] banking center manager with whom you dealt during your

[12] tenure with that branch; is that correct?

[13]    A.  That's correct.

[14]    Q.  When you would work on Saturdays it was at the

[15] Green Briar, right?

[16]    A.  That's correct.

[17]    Q.  Well — strike that.

[18]        During your work on Saturdays at Green Briar,

[19] was Joy Gibson still your banking center manager?

[20]    A.  That's correct.

[21]    Q.  And she remained your banking center manager

[22] for your work at Green Briar for the tenure of your

[23] employment; is that correct?

[24]    A.  That is correct.  But even because I was —

[25] the only difference with working Saturdays in another

Page 85

[1] banking center is that the points that I get actually
[2] come to me, but they roll up under the Green Briar
[3] branch. So if there was an issue or concern it would be
[4] addressed to Joy, but then Joy would actually share back
[5] to Tamara if there was anything like that.
[6] Q. During your performance of your duties at the
[7] Bankhead branch, did you work with a customer service
[8] manager at any point?
[9] A. Yes, but I don't recall her name.
[10] Q. Do you recall any of the tellers with whom you
[11] worked at the Bankhead center?
[12] A. I can see their faces but -- one girl's name
[13] was Felicia. I don't recall their names.
[14] Q. Is Felicia the only name you can recall?
[15] A. Yes. I can see them. I'll probably think of
[16] them as we go along.
[17] Q. Did you at any time, Ms. Mobley, complain to
[18] Ms. Gibson about the overtime policy that Ms. Lomax had
[19] implemented for you?
[20] A. No, sir.
[21] Q. At the time Ms. Lomax implemented this
[22] overtime policy for you, were you aware of Bank of
[23] America's general policy towards overtime?
[24] A. My understanding is when it started that it
[25] did start across the board. That it was a company-wide

Page 86

[1] policy that we go to time sheets.
[2] Q. Let me ask you this, was it your understanding
[3] at the time that Ms. Lomax implemented this overtime
[4] policy for you that that policy was consistent with
[5] NationsBank corporate policy with respect to recording
[6] and paying associates for overtime -- well, not
[7] associates, consumer bankers for overtime?
[8] A. I'm not sure if I understand what you're
[9] asking. I guess what I hear you asking is did I --
[10] MS. DOLIN: If you don't understand, he'll
[11] rephrase it for you.
[12] BY MR. LANGDON:
[13] Q. Did you understand NationsBank as a
[14] corporation so have a different overtime policy than
[15] that that was implemented for you by Ms. Lomax?
[16] A. No, I was not aware of that.
[17] Q. Did you receive a copy of an associate
[18] handbook upon commencement of your job responsibility
[19] for NationsBank?
[20] A. Yes.
[21] Q. Looking at Exhibit Numbers 4 and 5, Ms.
[22] Mobley, how did you obtain a copy of these timecards?
[23] A. Honestly I don't recall.
[24] Q. Because you brought with you today Exhibits 4
[25] and 5?

Page 87

[1] A. That is correct.
[2] Q. And you don't recall how you came into
[3] possession of these?
[4] A. No, sir, I don't.
[5] Q. Was it your practice during your tenure with
[6] NationsBank to make a copy of your timecard before you
[7] turned it in?
[8] A. I want to say honestly that that's very
[9] possible because I do keep paper, you know.
[10] Q. Are you a person that tends to document and
[11] save paper?
[12] A. I save paper, yes.
[13] Q. I'm going to go back to where we were. I'm
[14] finished with going over the documents that you brought
[15] so I'm going to go back to where we were. And having
[16] done that, I've cut through a lot of the stuff I
[17] intended to ask you later, but it's kind of taking a few
[18] steps back to get back on track.
[19] We reviewed the documents that you brought
[20] with you today. Other than to look at those documents,
[21] did you look at any other type of documentation in
[22] preparation for your deposition testimony here today?
[23] Q. Did I look at any other documentation?
[24] Q. Yes.
[25] MS. DOLIN: To prepare for your depo?

Page 88

[1] BY MR. LANGDON:
[2] Q. Right, to prepare for the deposition?
[3] A. Yes.
[4] Q. What documents did you review to prepare for
[5] your deposition here today?
[6] A. Well, actually I looked over all my calendars
[7] and just really trying to see if I could find anything
[8] more associated to the time that I actually spent in the
[9] banking center. It was a little difficult but I guess
[10] what I tried to find more so was a situation where I
[11] found myself in the banking center for long periods of
[12] time.
[13] Q. Were you able to find any documentation of
[14] your time spent working for NationsBank other than what
[15] you brought with you here today?
[16] A. I'm not sure if I can answer that.
[17] Q. Unless there's an objection --
[18] MS. DOLIN: Well, can you answer without
[19] disclosing any discussions that you and I had? The
[20] answer is yes or no.
[21] THE WITNESS: Yes.
[22] BY MR. LANGDON:
[23] Q. What other documentation did you review in
[24] relation to the time you spent working at NationsBank
[25] other than what you brought here with you today.

Page 89

[1]    A. I have some performance threshold

[2] documentation that was distributed through the banking

[3] center.

[4]    Q. What do you mean by performance threshold

[5] documentation?

[6]    A. Just to see where my points were. Just

[7] documentation she would pass out to say these were your

[8] points and things like that.

[9]    MS. DOLIN: Can we go off the record for a

[10] second?

[11]    MR. LANGDON: Yes.

[12]    (Discussion off the record.)

[13] BY MR. LANGDON:

[14]    Q. We took a short break, Ms. Mobley, to clear up

[15] the nature of documentation that you were requested to

[16] bring with you today. I understand you have other

[17] documentation in your possession that related to your

[18] job with NationsBank, correct?

[19]    A. That is correct.

[20]    Q. If you could tell me what that documentation

[21] is, please. I understand you have mentioned performance

[22] threshold materials?

[23]    A. That is correct.

[24]    Q. What other types of documentation do you have?

[25]    A. That's the majority of it. Performance

Page 90

[1] thresholds, statistics that will show what my points

[2] were, how I ranked in the ending year, just CB

[3] performance documentation.

[4]    Q. Are these documents related solely to your

[5] performance?

[6]    A. Yes.

[7]    Q. Do they reflect the performance of any other

[8] consumer bankers employed by NationsBank at that time?

[9]    A. Actually they will reflect other banking

[10] centers.

[11]    Q. Just your specific banking center, Bankhead?

[12]    A. That's correct.

[13]    Q. So if I understand you correctly, the

[14] documents would reflect your performance and Ms.

[15] Billingsly's performance?

[16]    A. That is correct.

[17]    Q. Were there any other CB's that worked at

[18] Bankhead at that time whose performance would be

[19] reflected on those documents?

[20]    A. We had no other CB's.

[21]    Q. You said the performance materials were the

[22] majority of what you had. Can you think of any other

[23] document that you have in your possession related to

[24] your employment at NationsBank outside of that general

[25] category of performance-related materials?

Page 91

[1]    A. No, sir.

[2]    MS. DOLIN: I'll represent to you, counsel,

[3] the other stuff that she has is privileged

[4] communication between counsel and herself.

[5] BY MR. LANGDON:

[6]    Q. The performance information we just discussed,

[7] who distributed that information to you?

[8]    A. Tamara Lomax.

[9]    Q. And did she distribute that information to you

[10] as a part of your job responsibilities for NationsBank?

[11]    A. She distributed it for many different reasons,

[12] but primarily to boost the sales, to kind of — sort of

[13] a motivational tool to keep you getting those points up.

[14]    Q. Did you keep that information for yourself

[15] personally after your termination — I'm sorry, after

[16] your resignation from NationsBank?

[17]    A. Yes, because there are comments on them and

[18] the documents were specific to me. She would make

[19] notes — she may make a copy of a document, but she

[20] would give Naomi hers and put whatever Naomi was doing

[21] on hers. And she would say, Angela, this is where you

[22] are; these are some things you can do to boost your

[23] points. Any time she gave me documents, it was specific

[24] to me, her comments were.

[25]    Q. Did you ask for Ms. Lomax's permission to keep

Page 92

[1] that documentation after you resigned from NationsBank?

[2]    MS. DOLIN: Object to form.

[3]    You can answer.

[4]    THE WITNESS: That was for me. That was for

[5]    my personal records.

[6] BY MR. LANGDON:

[7]    Q. The question is, did you ask her for

[8] permission to keep that information on you personally

[9] after your resignation from NationsBank?

[10]    MS. DOLIN: Same objection.

[11]    You can answer yes or no.

[12]    THE WITNESS: Did I ask her? No, I did not.

[13] BY MR. LANGDON:

[14]    Q. Did you ask — let me back up.

[15]    Does the information you have in your

[16] possession related to performance also contain

[17] information related to Ms. Billingsly's performance?

[18]    A. Yes.

[19]    Q. Did you ask Ms. Billingsly whether you could

[20] keep that information upon your resignation from

[21] NationsBank?

[22]    MS. DOLIN: Object to form.

[23]    You can answer yes or no.

[24]    THE WITNESS: No, I did not.

[25] BY MR. LANGDON:

Page 93

[1]   Q.   In preparation for your testimony here today,

[2]   Ms. Mobley, did you review the complaint that has been

[3]   filed in this action by Ms. Escudero and Ms. Drake?

[4]   A.   Yes, I have.

[5]   Q.   Did you review the complaint specifically for

[6]   this deposition or have you reviewed that complaint in

[7]   the past at some point?

[8]   A.   Reviewed it in the past.

[9]   Q.   Do you adopt the allegations of the complaint

[10]  as your own?  In other words, do the allegations

[11]  contained in the complaint represent the claim that you

[12]  have against NationsBank?

[13]  A.   Yes, they do, yes.

[14]  Q.   I'm going to hand you what I'm going to ask

[15]  the court reporter to mark as Defendant's Exhibit Number

[16]  6.

[17]         MR. LANGDON:  Ms. Dolin, this is just the

[18]  request for admissions to your firm, not the

[19]  answers.  The answers were on a separate document.

[20]  I'll follow up with those shortly.

[21]         (Thereupon, document marked as Defendant's

[22]  Exhibit Number 6 for identification.)

[23] BY MR. LANGDON:

[24]  Q.   Ms. Mobley, I'm going to hand you what's been

[25]  marked as Defendant's Exhibit Number 6 and ask you to

Page 94

[1]  review that, please, ma'am.

[2]         Have you had a chance to review that, Ms.

[3]  Mobley?

[4]   A.   Yes.

[5]   Q.   Have you seen that document before today?

[6]   A.   Yes, I have.

[7]   Q.   And do you recognize that document to be

[8]  requests for admission that we tendered to you for

[9]  answer through your attorney, Ms. Dolin?

[10]  A.   Yes.

[11]  Q.   I'm going to hand you now what I'll ask the

[12]  court reporter to mark as Defendant's Exhibit Number 7.

[13]         (Thereupon, document marked as Defendant's

[14]  Exhibit Number 7 for identification.)

[15] BY MR. LANGDON:

[16]  Q.   I'm going to hand you now what's been marked

[17]  as Defendant's Exhibit Number 7 and ask you to take a

[18]  look at that, please.

[19]  A.   May I refer back to this?

[20]  Q.   Yes, you may refer back to Defendant's Number

[21]  6.  Please feel free to do so.

[22]         Have you had an opportunity to look at

[23]  Defendant's Number 7?

[24]  A.   Yes.

[25]  Q.   Do you recognize this document?

Page 95

[1]   A.   Yes.

[2]   Q.   Is it fair to say that this document contains

[3]  the answers to the requests for admissions that we

[4]  tendered to you in Defendant's Exhibit Number 6?

[5]   A.   Yes.

[6]   Q.   And are those answers listed on Defendant's

[7]  Exhibit Number 7 still accurate and truthful to your

[8]  knowledge as we sit here today?

[9]   A.   Yes.

[10]  Q.   Did you have an opportunity to -- well, strike

[11]  that.

[12]         Did you review your answers to NationsBank's

[13]  requests for admission in preparation for your testimony

[14]  here today?

[15]  A.   In preparation for today?

[16]  Q.   Yes.

[17]  A.   No, I have not.

[18]  Q.   Did you review either one of the two

[19]  affidavits that you have tendered to the court in this

[20]  action in preparation for your testimony here today?

[21]  A.   No, I have not.

[22]  Q.   Other than the documentation that you brought

[23]  with you and I believe the documentation you mentioned

[24]  that relates to your performance with NationsBank that

[25]  was not requested in the notice of deposition, have you

Page 96

[1]  looked at any other documentation in preparation for

[2]  your testimony here today?

[3]   A.   No, I have not.

[4]   Q.   We spent a lot of time, Ms. Mobley, going over

[5]  the calendar pages and timecards that you brought with

[6]  you here today.  Other than that information, did you

[7]  maintain any other kind of diary or log concerning your

[8]  employment with NationsBank?

[9]   A.   No, I did not.

[10]  Q.   In preparation for your testimony here today,

[11]  did you speak with anyone other than Ms. Dolin or any

[12]  attorney with her firm?

[13]  A.   No, I have not.

[14]  Q.   Have you at any time discussed this lawsuit

[15]  with someone who you know to also be a plaintiff in this

[16]  lawsuit?

[17]  A.   No, I have not.

[18]  Q.   Have you discussed this lawsuit with anyone

[19]  other than Ms. Dolin and the attorneys in her firm and

[20]  any associated firms with Ms. Dolin's firm?

[21]  A.   My husband.  He would probably want to know

[22]  where I am today.

[23]  Q.   I was going to ask you what did you discuss

[24]  about this action with your husband?

[25]         MS. DOLIN:  Object to form.  That's

**Page 97**

[ 1]     privileged. That's husband/wife privilege.

[ 2] BY MR. LANGDON:

[ 3]     Q.  Have you done anything else in preparation for

[ 4] your testimony here today? We've covered a lot of

[ 5] ground, but is there anything else you did to prepare

[ 6] for your deposition here today that we've not talked

[ 7] about?

[ 8]     A.  No.

[ 9]     Q.  I'm going to hand you now, Ms. Mobley, a

[10] document that I'll ask the court reporter to mark as

[11] Defendant's Exhibit Number 8, please.

[12]          (Thereupon, document marked as Defendant's

[13]      Exhibit Number 8 for identification.)

[14] BY MR. LANGDON:

[15]     Q.  I'm going to hand you now, Ms. Mobley, a

[16] document that I've asked the court reporter to mark as

[17] Defendant's Exhibit Number 8 and get you to please look

[18] at that, please.

[19]          Have you had an opportunity to look at the

[20] document?

[21]     A.  Yes.

[22]     Q.  Do you recognize that document?

[23]     A.  Yes.

[24]     Q.  Is it fair to say that this document is your

[25] consent to join this lawsuit filed by Ms. Escudero and

**Page 98**

[ 1] Ms. Drake?

[ 2]     A.  Yes.

[ 3]     Q.  And does your name -- or actually, strike

[ 4] that.

[ 5]          Does your signature appear on the second page

[ 6] of the document?

[ 7]     A.  Yes, it does.

[ 8]     Q.  And in the date line, is that your handwriting

[ 9] that indicates 5/18?

[10]     A.  Yes, it is.

[11]     Q.  Is that the date you signed this document?

[12]     A.  Yes, it is.

[13]     Q.  Ms. Mobley, how did you decide to retain Ms.

[14] Dolin's firm to represent you in this action?

[15]          MS. DOLIN:  If you can answer this without

[16]      getting into what was done or said between you and

[17]      counsel, answer it. If you cannot, then you're

[18]      instructed not to answer.

[19]          THE WITNESS:  I cannot.

[20] BY MR. LANGDON:

[21]     Q.  You're going to listen to your counsel's

[22] advice on this?

[23]     A.  Yes.

[24]          MS. DOLIN:  Based on attorney/client privilege

[25]      I'm instructing her not to answer.

**Page 99**

[ 1]          MR. LANGDON:  Ms. Court Reporter, if you can

[ 2] mark this entire line of questioning to Ms. Dolin

[ 3] and I can find it by easy access so we can discuss

[ 4] this later.

[ 5] BY MR. LANGDON:

[ 6]     Q.  How did you hear about the lawsuit filed by

[ 7] Ms. Escudero and Ms. Drake?

[ 8]          MS. DOLIN:  To the extent you can answer

[ 9]      without involving any conversations or

[10]      communication between yourself and counsel, you can

[11]      answer. If you can't, then you can't answer.

[12]          THE WITNESS:  I cannot.

[13]          MS. DOLIN:  Object on the grounds of

[14]      attorney/client privilege and instruct her not to

[15]      answer.

[16] BY MR. LANGDON:

[17]     Q.  Ms. Mobley, were you aware that Ms. Drake and

[18] Ms. Escudero had filed a lawsuit prior to you joining

[19] the lawsuit in May of 2000, I believe?

[20]          MS. DOLIN:  I'm sorry, can you repeat that?

[21] BY MR. LANGDON:

[22]     Q.  Were you aware that Ms. Escudero and Ms. Drake

[23] had filed a lawsuit prior to you joining the lawsuit in

[24] May of 2000?

[25]          MS. DOLIN:  I'm going to object to the form of

**Page 100**

[ 1] that. That's a nonsense question.

[ 2] BY MR. LANGDON:

[ 3]     Q.  Let me ask you this, when did you learn that

[ 4] Ms. Escudero and Ms. Drake had filed a lawsuit?

[ 5]          MS. DOLIN:  That you can answer.

[ 6]          THE WITNESS:  When?

[ 7] BY MR. LANGDON:

[ 8]     Q.  When?

[ 9]     A.  When I received my complaint to become a

[10] party.

[11]     Q.  Is that the first answer you had that a

[12] lawsuit had been filed by Ms. Drake and Ms. Escudero?

[13]     A.  Yes.

[14]     Q.  How did you learn about the involvement of Ms.

[15] Dolin's law firm in this action?

[16]          MS. DOLIN:  To the extent that you can answer

[17]      without revealing any communications between

[18]      yourself and counsel, you can answer. If you

[19]      can't, then you cannot answer.

[20]          THE WITNESS:  I cannot answer.

[21]          MS. DOLIN:  Object and instruct the witness

[22]      not to answer on the basis of attorney/client

[23]      privilege.

[24]          Mark this as a running objection and running

[25]      certification of this line of questioning for

Page 101

future reference.

BY MR. LANGDON:

Q. Ms. Mobley, what's your understanding of your potential obligation to pay the fees of Ms. Dolin's firm for representing you in this action?

MS. DOLIN: To the extent that you can answer without involving communications between yourself and counsel, you can answer. If you can't, then you can't answer.

THE WITNESS: I cannot answer.

MS. DOLIN: Objection and instruct the witness not to answer on the basis of attorney/client privilege.

BY MR. LANGDON:

Q. Did you have an opportunity to review this consent to become a party plaintiff before you signed it?

A. Yes.

Q. To your knowledge, does this consent contain any indication as to your obligation to pay the fees of Ms. Dolin's firm for your representation in this action?

A. Does it contain -- I'm sorry. Let me look back because it actually says it right here.

MS. DOLIN: You can answer that.

THE WITNESS: Can you ask your question again?

Page 102

BY MR. LANGDON:

Q. I believe you testified that you read this consent to become a party plaintiff in this action before you signed it?

A. Yes.

Q. Does this document contain any information related to your potential obligation to pay the fees of Ms. Dolin's firm for that firm's representation of you in this action?

MS. DOLIN: Objection. The document speaks for itself.

You can answer.

THE WITNESS: Okay.

MS. DOLIN: Limit your answer to what's in the document, not to any communication you had with counsel.

THE WITNESS: Okay. I mean, all I can say is I understand the document. The document clearly points out what my obligation is.

BY MR. LANGDON:

Q. Tell me then your understanding of what your obligation is based upon your review of the document.

MS. DOLIN: Objection. The document speaks for itself.

THE WITNESS: I have no obligation.

Page 103

BY MR. LANGDON:

Q. You have no obligation to pay the fees of Ms. Dolin's firm for her representation of you in this action at all, is that your understanding, based upon your review of this document?

A. Based upon my review of this document, that is my understanding.

Q. Let me ask you this question, what is your understanding of your potential obligation to pay the costs incurred by Ms. Dolin's firm for her representation of you in this action?

MS. DOLIN: Based on the document?

BY MR. LANGDON:

Q. Based on the document or your understanding otherwise and to the extent you can answer that without me seeking information protected by the attorney/client privilege.

A. Which I cannot answer.

Q. Again, did you have an opportunity to review this document before you signed it?

A. Yes.

Q. And does this document contain any information related to your potential obligation for the fees or the costs incurred by Ms. Dolin's firm for its representation of you in this action?

Page 104

MS. DOLIN: Object to form. The document speaks for itself.

You can answer.

THE WITNESS: If I'm not mistaken, you asked the same question.

BY MR. LANGDON:

Q. The first question I asked you was as to fees. This question is related as to costs.

MS. DOLIN: I missed that question.

MR. LANGDON: Ms. Mobley said she thought she had already answered my question that is pending. And I said my first question related to your fees and this question relates to the costs incurred by your firm.

MS. DOLIN: Again, to the extent you can answer without getting into communication between yourself and counsel, you can answer. If you have an understanding from the document, I'm going to object. The document speaks for itself.

If you can answer that, answer it. If you cannot answer without getting into communication between yourself and counsel, then you can't answer.

THE WITNESS: Okay. I understand my obligation based on that.

Page 105

[ 1] BY MR. LANGDON:

[ 2]     Q.  What is your understanding based upon this

[ 3]  document as to your potential obligation to be

[ 4]  responsible for the costs incurred by Ms. Dolin's firm

[ 5]  for their representation of you in this action?

[ 6]     A.  My understanding is that I have no obligation.

[ 7]     Q.  What's your understanding, Ms. Mobley, of your

[ 8]  potential obligation to be responsible for the costs

[ 9]  incurred by NationsBank in defending this action should

[10]  you not prevail?

[11]     A.  That I cannot answer.

[12]     Q.  You have no understanding as to what that

[13]  obligation may be; is that a fair summary of your

[14]  understanding?

[15]         MS. DOLIN:  Again, to the extent you can

[16]  answer without involving communications between you

[17]  and counsel, you can answer; otherwise, you cannot

[18]  answer.

[19]         THE WITNESS:  I cannot answer.

[20]         MS. DOLIN:  Object on the basis of

[21]  attorney/client privilege and instruct her not to

[22]  answer.

[23]         Let's go off the record.

[24]         (Discussion off the record.)

[25]  BY MR. LANGDON:

Page 106

[ 1]     Q.  We're back on the record, Ms. Mobley.

[ 2]         Have you attended any meetings with anyone

[ 3]  else who you understand to be a plaintiff in this action

[ 4]  as well wherein your attorneys were not present?

[ 5]     A.  No, I have not.

[ 6]     Q.  We're going to shift gears a little bit.

[ 7]         Are you currently employed?

[ 8]     A.  Yes.

[ 9]     Q.  With whom are you employed?

[10]     A.  BellSouth Long Distance.

[11]     Q.  And when did you accept employment with

[12]  BellSouth Long Distance?

[13]     A.  July of 2000.

[14]     Q.  What's your position with BellSouth Long

[15]  Distance?

[16]     A.  Accounting specialist.

[17]     Q.  And who is your supervisor at BellSouth?

[18]     A.  Diane Foa.

[19]     Q.  Could you spell that last name?

[20]     A.  F-O-A.

[21]     Q.  Between your resignation from NationsBank at

[22]  the end of February, 2000 and your acceptance of any

[23]  position with BellSouth Long Distance in July of 2000,

[24]  did you work for anyone in that period?

[25]     A.  Yes, I've worked for British Telecom.

Page 107

[ 1]     Q.  How long did you work for British Telecom?

[ 2]     A.  I believe I started in April of 1998.

[ 3]     Q.  I think I asked you a convoluted question.

[ 4]         After your resignation from NationsBank in

[ 5]  February of 2000, did you work for anyone between the

[ 6]  end of February, 2000 and again your job with BellSouth

[ 7]  in July of 2000?

[ 8]     A.  Yes, I did.

[ 9]     Q.  Would that have been British Telecom?

[10]     A.  That's correct.  I think you may have said

[11]  1998 and that's where I got confused.

[12]     Q.  Would it have been you may have begun your

[13]  employment with British Telecom in April of 2000?

[14]     A.  No, because I ended my employment with — 2000

[15]  was this last year.

[16]     Q.  You're correct.  All right.

[17]         MS. DOLIN:  I'm going to object to this whole

[18]  line of questioning based on relevancy.

[19]  BY MR. LANGDON:

[20]     Q.  Let me start over because I was confused.  I

[21]  mixed up my dates.

[22]         You resigned from NationsBank at the end of

[23]  February, 1998, correct?

[24]     A.  Yes.

[25]     Q.  For whom did you next work after your

Page 108

[ 1]  resignation from NationsBank at the end of February,

[ 2]  1998?

[ 3]     A.  I mean, I've worked — I temped a couple of

[ 4]  assignments until I actually took on a permanent one at

[ 5]  British Telecom.  British Telecom was a temp assignment

[ 6]  as well and turned permanent.

[ 7]     Q.  What temporary agent were you registered to

[ 8]  obtain your temporary employment before the British

[ 9]  Telecom job?

[10]     A.  Quite a few.  Accountants on Call, David C.

[11]  Cooper, Acsys, A-C-S-Y-S.

[12]     Q.  Were those agencies in the Atlanta area?

[13]     A.  Yes.

[14]     Q.  And then I understand you secured a permanent

[15]  position with British Telecom in April of 1998?

[16]     A.  Yes.

[17]     Q.  Approximately?

[18]     A.  Yes.

[19]     Q.  How long did you work for British Telecom?

[20]     A.  Prior to just starting at BellSouth.

[21]     Q.  So you had a seamless transition.  You went

[22]  from British Telecom straight to BellSouth?

[23]     A.  No, I took a month off.

[24]     Q.  But there was no intervening employer; is that

[25]  correct?

| Page 109 | Page 110 |
|---|---|
| [1]  A.  No. | [1]  A.  Yes. |
| [2]  Q.  Who was your supervisor at British Telecom? | [2]  Q.  Then once you finished your formal training, |
| [3]  A.  Diane Foa. | [3]  you went to the Green Briar branch for continued |
| [4]  Q.  Did you know Ms. Foa from British Telecom to | [4]  training and transitioning over to the Bankhead branch; |
| [5]  BellSouth Long Distance? | [5]  is that correct? |
| [6]  A.  Actually, no.  She left quite awhile | [6]  A.  That's correct. |
| [7]  beforehand, and I basically was waiting for a position | [7]  Q.  And then eventually permanently transitioned |
| [8]  to open up.  And once it opened up, she called me and | [8]  over to the Bankhead branch? |
| [9]  offered it to me and I was crazy not to jump on it. | [9]  A.  That's correct. |
| [10]  Q.  What was your position with British Telecom? | [10]  Q.  Did you work for any other branches during |
| [11]  A.  I think it was billing lead something, | [11]  your tenure at NationsBank? |
| [12]  supervisor in the billing department. | [12]  A.  No, I did not. |
| [13]  Q.  And how were you paid at British Telecom, | [13]  Q.  Ms. Mobley, describe your working relationship |
| [14]  salary, hourly or another basis? | [14]  with Joy Gibson.  Did you guys get along? |
| [15]  A.  Salary. | [15]  A.  We had a very decent relationship, yes. |
| [16]  Q.  And how are you paid at BellSouth Long | [16]  Q.  Did you ever have any complaints about Ms. |
| [17]  Distance? | [17]  Gibson that you voiced to another employee or any of Ms. |
| [18]  A.  Salary. | [18]  Gibson's supervisors? |
| [19]  Q.  When you accepted your position with | [19]  A.  No.  I mean, I don't think I would have |
| [20]  NationsBank in June of 1997, what level consumer banker | [20]  discussed it with Joy because I respect the banking |
| [21]  were you hired as? | [21]  management relationship.  There were many topics that |
| [22]  A.  Four. | [22]  the CB's may have discussed among themselves. |
| [23]  Q.  And we've gone over a lot of this, but just to | [23]  Q.  Would it be fair to say you did not register |
| [24]  recap, you worked -- you did your training, your formal | [24]  any formal complaints against Ms. Gibson? |
| [25]  training, at the Midtown branch in Atlanta, correct? | [25]  A.  That is correct. |

| Page 111 | Page 112 |
|---|---|
| [1]  Q.  Did you ever register any formal complaint | [1]  even if they weren't compensating me, to at least offer |
| [2]  against Ms. Lomax? | [2]  me some comp time so I could go and register and come |
| [3]  A.  Yes. | [3]  right back.  According to Tamara Lomas there was no flex |
| [4]  Q.  What was the nature of the formal complaint | [4]  time or comp time. |
| [5]  you registered against Ms. Lomax? | [5]  Q.  And so did you complain about the vault card |
| [6]  A.  The nature of the complaint was that I had to | [6]  procedure or about her refusal to let you go register |
| [7]  work very late one evening to conduct a safe deposit box | [7]  for a class or both? |
| [8]  audit where I was there until almost 9:30 at night when | [8]  A.  I complained about the excessive hours that it |
| [9]  the process was supposed to be done under dual control, | [9]  took me to do that by myself and there was no comp time |
| [10]  which I had never done before in my life.  I stayed very | [10]  offered in lieu of that.  And not only that, when I |
| [11]  late trying to get it done.  And a couple of days later | [11]  started, when we were going through training, we were |
| [12]  I was supposed to register for a class, which she would | [12]  required to work some Saturdays.  And the one thing -- |
| [13]  not allow me to go to. | [13]  because NationsBank has a training facility somewhere in |
| [14]  Q.  Why wouldn't she allow you to go register for | [14]  Georgia.  I forgot where it was. |
| [15]  the class? | [15]  But the one thing the lady told us at |
| [16]  A.  Because I was -- that was Tamara.  That was | [16]  training, she said, write your hours down and any hours |
| [17]  just her.  That was her banking management style.  If my | [17]  over, let your manager know so you can get comp time for |
| [18]  threshold was where she wanted it to be, I could have | [18]  them.  So my thought at least was if she didn't want to |
| [19]  gone to register. | [19]  allow me comp for the safe deposit box audit, at least |
| [20]  Q.  Was her prohibition against you going to | [20]  she could allow me to use my comp time for my training |
| [21]  register for the class a consequence of the vault card | [21]  lab sessions and I would have had plenty of time to take |
| [22]  procedure you just testified to? | [22]  to go register for class. |
| [23]  A.  I would say no because when I originally | [23]  Q.  So when you were trained in your formal |
| [24]  addressed the concern to Tamara, I explained to her that | [24]  training with NationsBank, you were instructed to write |
| [25]  I had worked all those nights, all those hours prior | [25]  down all the time you spend performing your job duties |

## Page 113

[1] and bring that to the attention of your manager?

[2]    A. For the lab session only.

[3]    Q. For the lab session only?

[4]    A. Because lab session was not at a bank

[5] facility. It was at a training facility, which is not a

[6] banking center. It's just some corporate office where

[7] all they do is just trained. So we spent a week or two

[8] out there. But for the Saturdays specifically we were

[9] told to take those hours back to our branch manager and

[10] let them know what they were and allow us comp time for

[11] them or flex time.

[12]    Q. The branch manager to whom you were relaying

[13] these hours on Saturday to, was that the Midtown branch

[14] manager or branch manager to whom you were assigned when

[15] you go out to either Green Briar or Bankhead branch?

[16]    A. It was specific to my permanent branch.

[17]    Q. When you underwent your formal training, Ms.

[18] Mobley, at the Midtown center, were you instructed on

[19] how to record your time?

[20]    A. No, I was not.

[21]    Q. Did you receive any instruction that you would

[22] record all the time you worked --

[23]    A. No, I did not.

[24]    Q. -- in your job responsibilities?

[25]    A. No.

## Page 114

[1]    Q. Were you provided any written materials that

[2] addressed whether you should record all the time you

[3] worked on behalf of the bank?

[4]    A. Not that I'm aware of.

[5]    Q. When you registered this complaint about Ms.

[6] Lomax, did you complain to her or did you complain to

[7] her supervisor?

[8]    A. Initially I complained to her and I actually

[9] contacted the HR, human resources director.

[10]    Q. What was her response when you registered your

[11] complaint to Ms. Lomax?

[12]    A. I don't really recall what her response was.

[13] Actually when I initially called HR, that was not my

[14] only issue. My concern was that we were not allowed --

[15] I was not allowed to take a lunch time. I was not

[16] allowed to use what was my flex time or comp time.

[17] There was a mandatory meeting one of the

[18] Saturdays which we weren't compensated for, and I

[19] requested that Tamara at least provide lunch. She felt

[20] that was an issue, that I should have not asked for

[21] lunch. So those are the things that I kind of brought

[22] to the HR director's attention.

[23]    Q. Kind of take you back a little bit though.

[24] The question was, what was Mrs. Lomax's response when

[25] you complained to her initially?

## Page 115

[1]    A. That wasn't your question.

[2]    MS. DOLIN: I'm going to object to the form.

[3] It was asked and answered. She said she didn't

[4] recall.

[5] BY MR. LANGDON:

[6]    Q. You said you didn't recall what Ms. Lomax's

[7] response was?

[8]    A. Your question was what was the response of the

[9] HR director.

[10]    MR. LANGDON: Can we go back and read that

[11] question to make sure, because I was under the

[12] impression I asked what Ms. Lomax's response was.

[13]    MS. DOLIN: You did the first time. She said

[14] she didn't recall. But go ahead and read it back.

[15]    (Requested question was read back by the court

[16] reporter.)

[17] BY MR. LANGDON:

[18]    Q. We were trying to address your response to the

[19] question that I had asked about when you first

[20] complained to Mrs. Lomax, what was her response

[21] initially. And I believe your testimony is, I don't

[22] recall what her response was?

[23]    A. I don't recall the response of the HR person.

[24]    Q. I'm wanting to know what Mrs. Lomax's response

[25] was when you complained to her initially about it?

## Page 116

[1]    A. She was furious.

[2]    Q. What did she say to you that indicated she was

[3] furious in your impression?

[4]    A. Just her concern. Her response to me was, you

[5] know, if my points had been where she had anticipated,

[6] then that would have been an easier request for her to,

[7] you know, allow me to go register or whatever.

[8] But her response was that because my threshold

[9] was not where it was supposed to be, then she could not

[10] allow me to go to register.

[11]    Q. Did you also complain to Ms. Lomax about

[12] having to perform this vault procedure by yourself?

[13]    A. I don't recall that I complained to her. I

[14] mean, just for the record, it was traumatizing. I was

[15] there very late. I was very stressed. I had never done

[16] it. So when I was there, I was there just frustrating

[17] and basically in tears. I did not know what to expect.

[18]    Q. And I understand your testimony that after you

[19] complained initially to Ms. Lomax, you then registered a

[20] complaint with Bank of America or NationsBank human

[21] resource department?

[22]    A. That's correct.

[23]    Q. When did you do that, if you recall?

[24]    A. Within a few days or within the same week. I

[25] don't remember a specific day.

Page 117

[1]  Q.  Would it have been December -- January or

[2]  December of '97, January of '98 or February of '98?

[3]  A.  December, '97.

[4]  Q.  What complaints did you relay to HR about Ms.

[5]  Lomax?

[6]  A.  The complaint of me not -- her not allowing me

[7]  to take lunch because my points weren't where they were

[8]  supposed to be, her not allowing me to go register for

[9]  class when I had put in all of those hours prior to

[10]  that. And then too at that time we always worked really

[11]  long Fridays. So Fridays were always from 8:00 to 7:00

[12]  and beyond because we're just open extra hours.

[13]  So in addition to all of those hours, I wasn't

[14]  allowed any comp. So my concern was with all this time

[15]  I'm putting in there, it should be at least some

[16]  consideration for me to go register for class, you know,

[17]  but there wasn't. And so that was the complaint that I

[18]  addressed with HR.

[19]  Q.  What was HR's response to your complaint?

[20]  A.  Well, she asked me what were my points like.

[21]  To recall specifically, I don't. She also talked about

[22]  were there different things I could do to help get my

[23]  points up, which wasn't the issue.

[24]  Q.  Do you recall the name of the HR person to

[25]  whom you spoke?

Page 118

[1]  A.  No, but I'm sure if you said it, I would know

[2]  it.

[3]  Q.  Do you recall whether that person was

[4]  stationed in Florida or -- I'm sorry, in Florida,

[5]  Georgia or perhaps North Carolina?

[6]  A.  I do know that she was stationed in Georgia,

[7]  and I do know that her and Tamara were alumni buddies

[8]  and they were both Delta's.

[9]  Q.  How do you know this or how did you know that?

[10]  A.  Because after my counsel with HR, I was

[11]  written up by Tamara.

[12]  Q.  How did this complaint process with HR work?

[13]  Did you call this lady at HR and voice your complaints

[14]  about Ms. Lomax?

[15]  A.  Yes. And actually when I first started,

[16]  because I was CB-4 which is considered a high-level CB,

[17]  I had an office. We all had our own office. It could

[18]  be very discreet where I was actually able to close my

[19]  door and talk with this person. It wasn't until after

[20]  that or maybe it was either within the same day or the

[21]  following day that Tamara actually came back to me with

[22]  her concerns.

[23]  And then after that my performance -- my

[24]  thresholds were an issue. And my complaint -- I'll tell

[25]  you too, my complaint to HR was that they looked at the

Page 119

[1]  banking center that had 200 to 300 points per month with

[2]  one CB. They wanted the same points from each CB fully

[3]  staffed.

[4]  Q.  When you say they looked at the banking center

[5]  that had one CB who was earning 200 to 300, was it

[6]  specifically a branch they would compare you to?

[7]  A.  No, it was our Bankhead branch. Used to have,

[8]  let's say on average, 200 points. Well, Naomi was the

[9]  only CB there. So if you bring in another CB, that's

[10]  going to diffuse those points. So to say that you're

[11]  going to get 200 and 300 -- and, plus, Tamara's there,

[12]  which means she's taking all the loan customers, so

[13]  she's going to get 200 too. That doesn't work.

[14]  You're still in the same community with the

[15]  same restrictions to whatever your loan abilities are,

[16]  but they wanted 200 points from each person or some

[17]  excessive amount of points that was very difficult to

[18]  achieve.

[19]  Q.  Is Ms. Lomax also involved in the selling of

[20]  banking products to customers?

[21]  A.  Yes, she was.

[22]  Q.  Was that a primary responsibility of hers, to

[23]  your knowledge, or a peripheral responsibility on top of

[24]  her actual management of the banking center?

[25]  A.  That was totally optional, I believe. That

Page 120

[1]  was something she did just to prove that it could be

[2]  done but it wasn't a requirement.

[3]  Q.  Did Ms. Lomax and you have -- well, strike

[4]  that.

[5]  Did Ms. Lomax, quote, unquote, write you up

[6]  for performance issues during your work for her?

[7]  A.  Yes.

[8]  Q.  Do you recall how many times?

[9]  A.  I'm going to say twice, as I recall.

[10]  Q.  So two actual written conferences, I believe,

[11]  is the proper term?

[12]  A.  That's correct.

[13]  Q.  And each time were the conferences, Ms.

[14]  Mobley, related solely to performance issues?

[15]  A.  To thresholds, that's correct. I'm sorry, and

[16]  the other one was the safe deposit box.

[17]  Q.  Was that a separate conference or that was

[18]  combined with one of the two?

[19]  A.  That was just one and the other one was

[20]  threshold.

[21]  Q.  So to your recollection, two written

[22]  conferences, one about performance threshold and the

[23]  other about the vault issue that we discussed?

[24]  A.  Right. But they came immediately after my

[25]  call to HR.

Page 121

[1]  Q.  They were immediately after your call to HR?

[2]  A.  Yes.

[3]  Q.  Within how many days; do you recall?

[4]  A.  First one was probably the next day or the

[5]  same day.

[6]  Q.  And then how long after the first conference

[7]  did the second conference occur?

[8]  A.  I want to say within a month because the

[9]  thresholds are monitored daily.

[10]  Q.  So the order of conferences would have been

[11]  about the vault issue first and then about performance

[12]  threshold second; is that fair?

[13]  A.  That's correct.

[14]  Q.  Other than this one complaint to HR that we've

[15]  discussed, did you complain to HR about Ms. Lomax at any

[16]  other time?

[17]  A.  I learned not to.

[18]  Q.  Let's switch gears a little bit.

[19]      With respect to the Bankhead center, what was

[20]  that center's hours of retail operation?

[21]  A.  Retail would be -- I think we officially

[22]  opened our doors at 8:55 a.m. and closed at 4:00

[23]  officially. However, it's whenever you were done with

[24]  the last customer. So doors are locked at 4:00 --

[25]  rather 4:05.

Page 122

[1]  Q.  But if you had customers you were working

[2]  with, you would work until you finish with that

[3]  customer?

[4]  A.  That's correct.  And no one was allowed to

[5]  leave before the last customer left the branch.

[6]  Q.  Were the hours for the drive-thru teller

[7]  station any different than the hours you just described?

[8]  A.  Not that I'm aware of.  But actually -- I'm

[9]  sorry.  They were because they had Saturday hours, so

[10]  the drive-thru was a little different.

[11]  Q.  So the drive-thru was open on Saturdays, but

[12]  the actual lobby of the bank would not have been open on

[13]  Saturdays at the Bankhead center?

[14]  A.  That's correct.

[15]  Q.  What were the hours of operation at the Green

[16]  Briar branch, retail operation?

[17]  A.  From what I can recall, it would have been --

[18]  I'm sorry.  Fridays are from -- let me back up a little

[19]  bit.  Monday through Thursday at the Bankhead branch

[20]  were officially opening the door at 8:55 a.m. and

[21]  closing at 4:05, and no one leaves until the last

[22]  customer has left the banking center.

[23]      Fridays the banking center opened at 8:55 a.m,

[24]  and sometimes we would open a little earlier because

[25]  it's Fridays, it's payday, and the banking center closed

Page 123

[1]  at 6:00 p.m.  However, Fridays were just really long

[2]  days, and you wouldn't get your last customer out of

[3]  there until a half an hour because the lines are long.

[4]  You just don't tell people to leave.

[5]  Q.  So 8:55 to 4:00 officially Monday through --

[6]  A.  4:05.

[7]  Q.  4:05 Monday through Thursday?

[8]  A.  Yes.

[9]  Q.  8:55 until 6:00?

[10]  A.  6:05.

[11]  Q.  6:05 officially on Fridays?

[12]  A.  Yes, on Fridays.

[13]  Q.  Now to the Green Briar center.  I understand

[14]  that after your permanent transition over to Bankhead,

[15]  your work at Green Briar would have been on Saturdays;

[16]  is that correct?

[17]  A.  That's correct.

[18]  Q.  What were the hours of operation retail-wise

[19]  on Saturdays at the Green Briar branch?

[20]  A.  The Monday through Friday is the same across

[21]  the board for all full-service branches.  Saturdays, if

[22]  I'm not mistaken, officially it's 9 a.m. to 12:00.

[23]  Q.  Did you have a scheduled reporting time each

[24]  morning from December, 1997 until your resignation at

[25]  the end of February, 1998?

Page 124

[1]  A.  Prior to timecards, all CB's had to be --

[2]  well, we had to be at our banking center at 8 a.m.

[3]  Q.  And the branch did not open until 8:55; is

[4]  that correct?

[5]  A.  That's correct, because we were supposed to do

[6]  paperwork and get everything ready and all that other

[7]  stuff.  We would have to be there at 8 a.m.

[8]  Q.  Was that requirement imposed by Ms. Lomax?

[9]  A.  That's correct.  I mean, I don't know.

[10]  Different banking centers maybe had different things.

[11]  Q.  But for your specific banking center it was 8

[12]  a.m.?

[13]  A.  Exactly.  Now, when the time sheets were

[14]  implemented, it changed from 8 a.m. to 8:30.

[15]  Q.  And that was your schedule reporting time?

[16]  A.  That's correct, unless it was Fridays.

[17]  Fridays we always had to be in at 8 a.m.

[18]  Q.  When the schedule was adjusted to an 8:30

[19]  report time, did you ever -- well, strike that.

[20]      Did you typically report earlier than that or

[21]  did you report at 8:30?

[22]  A.  From what I can recall, I did report earlier

[23]  but I would just do my time.

[24]  Q.  Typically how early would you get to the

[25]  branch before your scheduled start time of 8:30?

Page 125

[ 1]    A.    Between 8:00 and 8:30.

[ 2]    Q.    And then as I understand your testimony, you

[ 3]  were instructed by Ms. Lomax that you had to record five

[ 4]  o'clock as your end time every day; is that correct?

[ 5]    A.    Unless she said differently. There are some

[ 6]  times it was five o'clock and some times when it was

[ 7]  5:30.

[ 8]    Q.    How did she go about determining?

[ 9]    A.    Volume of the banking center, certain times of

[10]  the month. The first couple of weeks of a month are

[11]  always going to be a lot heavier. Your volume is going

[12]  to be greater and you get all your customer service

[13]  issues the first or second week.

[14]    Q.    Would she come and tell you the ending time

[15]  she wanted you to report on a daily basis?

[16]    A.    That I don't recall. I just do remember her

[17]  saying that you should be done this week by 8:30 or – I

[18]  mean, 5:30 or you should be done this week by 5:00.

[19]    Q.    Is it your recollection she would base her end

[20]  time on a weekly basis?

[21]    A.    She would base it on just her not wanting to

[22]  pay overtime.

[23]    Q.    But she would inform you as to the time that

[24]  you should report as ending on a weekly basis; is that

[25]  fair?

Page 126

[ 1]    A.    No, because even initially she may come to

[ 2]  me – let's say if I was there until 6:00 or 6:30, she

[ 3]  could actually walk past my desk and say you should have

[ 4]  been signed out by 5:30 or 5:00. I'm not going to pay

[ 5]  you to this hour.

[ 6]    Q.    You recall her, for instance, specifically

[ 7]  where she would come by and say it's 6:30, you should

[ 8]  have been done at 5:00, I'm not going to pay you for

[ 9]  this extra time?

[10]    A.    That is correct.

[11]    Q.    Approximately how many times do you recall

[12]  engaging in conversations with her in that regard?

[13]    A.    Not many because that's when shortly after she

[14]  would just come and say you should be signed out by 5:00

[15]  or you should be signed out by 5:30.

[16]    Q.    What I'm trying to understand is, would she

[17]  come to you and say for this week you should be signed

[18]  out by 5:00 or would she come to you on a more sporadic

[19]  basis and say you should be signed off for the next few

[20]  days at five o'clock? I'm just trying to get an idea of

[21]  what frequency she would come to you and say you should

[22]  be signed out by 5:00 or whatever?

[23]    A.    I think she based it on what she felt my

[24]  customer volume was. If she was looking at the

[25]  threshold volume and she saw some, you know, that I had

Page 127

[ 1]  a heavy agenda that week with lots of loans then, yeah,

[ 2]  I don't know what triggered her to come by to say to do

[ 3]  whatever. The assumption to me is either the volume of

[ 4]  the business –

[ 5]        MS. DOLIN: Don't assume. If you don't know,

[ 6]    you don't know.

[ 7] BY MR. LANGDON:

[ 8]    Q.    Did you know whether your volume of business

[ 9]  was somehow scheduled so she could look at it and see

[10]  what you had on your plate for the next week?

[11]    A.    Yes.

[12]    Q.    How did they go about tracking that?

[13]    A.    Loans. Whenever you have a loan in the pipe,

[14]  you know, a certain type of loan is going to take a long

[15]  time to get documents, to get credit cards, to get what

[16]  you need to close a loan. Not only that, you've got to

[17]  get appraisals. There's lots of things you have to get

[18]  done just to close one loan. So if you got two or three

[19]  loans pending, I mean, it could take you a good amount

[20]  of time.

[21]    Q.    Would she require that you advise her say on

[22]  Thursday or Friday of one week, Ms. Lomax, I've got

[23]  seven loans pending, I'm going to have to work on next

[24]  week so she could monitor it that way or did you enter

[25]  information in a computer by which she could track?

Page 128

[ 1]    A.    The computer tracks everything, yes.

[ 2]    Q.    Ms. Lomax, was your schedule ever adjusted

[ 3]  as –

[ 4]    A.    Ms. Mobley.

[ 5]    Q.    I apologize. I mean no offense.

[ 6]    A.    No problem.

[ 7]    Q.    Ms. Mobley, was your schedule ever adjusted as

[ 8]  the week progressed based on the amount of time you were

[ 9]  putting in that particular week?

[10]    A.    That I don't recall.

[11]    Q.    Did Ms. Lomax maintain any type of policy

[12]  where she asked her associates to come to her mid week

[13]  and report their expectation that they may be working

[14]  additional hours or extra hours over 40 in a given week?

[15]    A.    No, she didn't.

[16]    Q.    Going back to the point of reference of mid

[17]  December, '97 until your resignation at the end of

[18]  February of '98, what was your typical time that you

[19]  left the branch, you actually left the branch Monday

[20]  through Thursday?

[21]    A.    Anywhere from between 5:00 and 6:30, sometimes

[22]  later. If there was an issue that she needed to talk to

[23]  me about regarding my thresholds, she would always save

[24]  that for after work. You know, not to say necessarily a

[25]  conference of performance issue, but anything, whether

## Page 129

[ 1]  it's tools for improvement, marketing tools that were

[ 2]  accessible to us, whatever, that would always be done

[ 3]  after hours. So to really be specific, that's really

[ 4]  hard to determine.

[ 5]      Q.  What is the latest time you recall leaving the

[ 6]  bank after work during that time period?

[ 7]      A.  9:30.

[ 8]      Q.  When you left at 9:30 on this particular

[ 9]  occasion, were you the last employee in the bank?

[10]     A.  If I'm not mistaken, Naomi and I signed out

[11]  dual control.

[12]     Q.  When you say signed out, what did you have to

[13]  do to sign out?

[14]     A.  There's a log that's kept in each banking

[15]  center with a carbon copy that tells you what time you

[16]  arrive and what time you leave. Most times that should

[17]  be done under dual control. If it's not, that's

[18]  something else. But there are many nights that I was

[19]  there that Naomi and I were there together and she we

[20]  would both sign the log out because one person should

[21]  actually guard the door while the other person affixes

[22]  the alarm. So once the alarm is set, there's so much

[23]  time in between you leaving that you have to allow it to

[24]  set before you actually leave.

[25]     Q.  And the standard procedure is to have two

## Page 130

[ 1]  people following this process?

[ 2]     A.  That is correct.

[ 3]     Q.  Now, on the nights you worked so late, would

[ 4]  Ms. Billingsly typically be there so you could comply

[ 5]  with this procedure?

[ 6]     A.  I had no security access so she had to close

[ 7]  the branch.

[ 8]     Q.  So you had no security codes by which to

[ 9]  activate or deactivate the alarm?

[10]     A.  Actually, I did but I didn't do it. She was

[11]  senior so she always did it. Dual control means me

[12]  making sure there's no one outside the front door, so if

[13]  we go outside, no one is going to try to run in. It's

[14]  just a secure measure.

[15]     Q.  Do you recall what your security code was?

[16]     A.  I don't know. I never used it.

[17]     Q.  I believe you testified there was a written

[18]  log you would sign?

[19]     A.  That's correct.

[20]     Q.  As well as activate or deactivating the code?

[21]     A.  Correct. Many times when I left, Naomi would

[22]  still be there but that was not done under dual control.

[23]  She would log out the book herself.

[24]     Q.  On those nights you would not sign the log

[25]  when you were leaving?

## Page 131

[ 1]     A.  No, I couldn't. That had to be done under

[ 2]  affixing the alarm.

[ 3]     Q.  Did you also have to sign this log when you

[ 4]  reported in the morning?

[ 5]     A.  If it was done under dual control, yes.

[ 6]     Q.  Did dual control mean opening the bank; is

[ 7]  that correct?

[ 8]     A.  Dual control means you need two people to do

[ 9]  whatever you have to do. Which means when you go in the

[10]  branch you have two people, one to watch the outside and

[11]  one to go in and disarm the alarm.

[12]     Q.  You would have to follow these dual control

[13]  procedures upon opening the branch in the morning?

[14]     A.  That's correct.

[15]     Q.  Did you ever open the bank in this time

[16]  period, from mid December of '97 until mid February of

[17]  '98?

[18]     A.  I don't recall.

[19]     Q.  You don't recall whether you did?

[20]     A.  I don't recall whether I did because anyone

[21]  could be there. I could have been there. I don't know.

[22]     Q.  What was your practice about taking lunch

[23]  during this period, mid December of '97 until the end of

[24]  February of '98?

[25]     A.  That I like to take one.

## Page 132

[ 1]     Q.  Did you typically take lunch?

[ 2]     A.  No, I did not.

[ 3]     Q.  Why did you not typically take lunch?

[ 4]     A.  Because I was told that my threshold does not,

[ 5]  you know, allow me to consistently take a lunch daily.

[ 6]     Q.  Did Ms. Lomax tell you this?

[ 7]     A.  Actually, Ms. Lomax – one day I was

[ 8]  attempting to take lunch and she told me to get back on

[ 9]  the floor because my points were not where they're

[10]  supposed to be so I should not be allowed a lunch.

[11]     Q.  After she told you this, did you take lunch at

[12]  any time after that point?

[13]     A.  Occasionally if the banking center wasn't

[14]  busy, I would just remain on the floor, but many days I

[15]  never took lunch.

[16]     Q.  You answered the next question I was going to

[17]  ask.

[18]         What was the distinguishing factor that

[19]  determined when you could take a lunch and when you did

[20]  not take a lunch, the volume of business?

[21]     A.  Exactly.

[22]     Q.  Ms. Mobley, did you ever perform your job

[23]  responsibilities from your home after leaving the

[24]  branch?

[25]     A.  Absolutely not.

Page 133

[ 1]   Q.   You're the type of person that finishes their

[ 2]  work at the branch and then goes home?

[ 3]   A.   For that, yes.

[ 4]   Q.   Did you ever take any customer records or bank

[ 5]  records home with you to work on in the evenings after

[ 6]  you left the branch?

[ 7]   A.   Actually there was some material that we had

[ 8]  to read over occasionally and that had to be done on our

[ 9]  own time. There were occasions we had to ride or just

[10]  familiarize ourselves with some processes on our own

[11]  time, yes.

[12]   Q.   What type of materials are you referring to?

[13]   A.   Security measures, marketing material. That's

[14]  the most I can think of.

[15]   Q.   Did you ever work on customer-related work

[16]  from your home?

[17]   A.   No, I did not.

[18]   Q.   With respect to your call nights that we

[19]  discussed early in the deposition, how frequently were

[20]  they scheduled during this period of December, '97 to

[21]  the end of February of '98?

[22]   A.   Not often because I was new to that. So that

[23]  wasn't something that I really partook in a lot. Not to

[24]  say that it didn't happen. There were many call nights

[25]  and I know that Naomi stayed and did all that.

Page 134

[ 1]   Q.   Did your branch regularly hold branch

[ 2]  meetings?

[ 3]   A.   Yes. We had a weekly meeting every Friday

[ 4]  morning at eight o'clock. We had one mandatory Saturday

[ 5]  meeting to clean the branch. And occasionally we had

[ 6]  mandatory evening meetings. But the evening meetings

[ 7]  would be along the lines of marketing, security.

[ 8]  Security is just a really big thing for the banking

[ 9]  centers. That's really it.

[10]   Q.   So would it be fair to say that the branch

[11]  meetings on Friday mornings were a regularly scheduled

[12]  meeting?

[13]   A.   That is correct.

[14]   Q.   But the Saturday meeting you mentioned and the

[15]  meeting you would have in the evenings to discuss

[16]  products, there was no set schedule to those, correct?

[17]   A.   Correct, they were random.

[18]   Q.   Ms. Mobley, during the time period December,

[19]  '97 until the end of February of '98, how many hours on

[20]  the average did you put in at work for NationsBank?

[21]        MS. DOLIN:   Can you repeat that? I didn't get

[22]  the time frame.

[23]        MR. LANGDON:   Yes.

[24] BY MR. LANGDON:

[25]   Q.   From the time period of mid December of '97

Page 135

[ 1]  until the end of February of '98 when you resigned, how

[ 2]  many hours on average did you work for NationsBank by

[ 3]  your calculation?

[ 4]   A.   Say between 50 and 55.

[ 5]   Q.   And on what do you base that calculation, the

[ 6]  50 to 55 hours a week?

[ 7]        MS. DOLIN:   Per week, right?

[ 8]        MR. LANODON:   Per week.

[ 9]        THE WITNESS:   That's based on me getting there

[10]  prior to my scheduled times and staying after her

[11]  requested time, whether it be 5:00 or 5:30, to

[12]  actually do my paperwork. This was really

[13]  difficult during the day to do your paperwork and

[14]  handle customers at the same time.

[15] BY MR. LANGDON:

[16]   Q.   Did you document your actual report time and

[17]  your actual end time in any way?

[18]   A.   I did not.

[19]        MR. LANGDON:   Let's take a break.

[20]        (A recess was had.)

[21] BY MR. LANGDON:

[22]   Q.   Before we left out on a quick break, we were

[23]  talking about the hours that you typically put in, the

[24]  actual hours you typically put in week in and week out

[25]  from mid December of 1997 to February of '98. You

Page 136

[ 1]  stated that to be 50 to 55?

[ 2]   A.   That's correct.

[ 3]   Q.   I believe you also testified that you did not

[ 4]  record the actual report time and the actual end time to

[ 5]  your day during that period. On what then do you base

[ 6]  your estimate that you were working 50 to 55 hours a week

[ 7]  during that period?

[ 8]   A.   I struggled trying to get my daughter. So,

[ 9]  no, I did not document my times, but I know there are

[10]  many times within every single week that my husband had

[11]  to rearrange his schedule to get our daughter.

[12]   Q.   Her scheduled pick-up time was 6:30 at the

[13]  latest, correct?

[14]   A.   That's correct.

[15]   Q.   Were there times during this period where you

[16]  were actually able to leave and pick up your daughter by

[17]  6:30?

[18]   A.   Yes, there were. But in my average of the 10

[19]  to 15 hours each week, that also included the Bankhead

[20]  association meetings, any additional community work that

[21]  just was not included in our regular time. The

[22]  community work could have meant come in on a Saturday

[23]  and kind of make sure that teller process was, you know,

[24]  that they didn't need anyone to help them void slips or

[25]  whatever. Whatever it was, that's what I counted.

## Page 137

[ 1]       But also I guess the issue for me was that I

[ 2]  really loved what I did. I enjoyed helping people. And

[ 3]  it was difficult for me to kick from service person to

[ 4]  salesperson. And I knew that I had to get the paperwork

[ 5]  done. To me that meant if I had to get it done, I had

[ 6]  to utilize whatever my own resources were to ensure I

[ 7]  was in compliance getting all of their forms submitted

[ 8]  to security or whomever to, you know, not cause a

[ 9]  problem for a customer.

[10]     Q. When you refer to your own resources, are you

[11]  referring to your own time resources?

[12]     A. That is correct.

[13]     Q. You mentioned early in the deposition that Ms.

[14]  Lomax required you to attend the Bankhead association

[15]  meetings; is that correct?

[16]     A. That's correct.

[17]     Q. You also mentioned just now coming by on

[18]  Saturday morning and checking on teller issues or things

[19]  like that?

[20]     A. Right.

[21]     Q. Did Ms. Lomax require you to do that as well?

[22]     A. I think I was asked to do that maybe once, but

[23]  a perfect example is the Bankhead business association,

[24]  there was a parade in the community and this was like

[25]  from 8 a.m. to whatever, you know, the parade starts

## Page 138

[ 1]  pretty early. But it was required that I have presence

[ 2]  in that parade, that I partake in it. So, no, I did not

[ 3]  walk the whole ten miles but I had to take -- I was

[ 4]  there. I actually seen some key people that day to make

[ 5]  my presence known before going home.

[ 6]     Q. When did Ms. Lomax instruct you that she

[ 7]  wanted you to participate in this Bankhead association?

[ 8]     A. That I don't really recall.

[ 9]     Q. Is it just correct that you're under a

[10]  standing order from Ms. Lomax to participate in the

[11]  Bankhead association meetings and events no matter when

[12]  they were scheduled?

[13]     A. That is correct.

[14]     Q. Ms. Mobley, did you ever complain to anyone

[15]  about Ms. Lomax's role that you could not record

[16]  overtime you were working?

[17]     A. I'm sure it was discussed between Naomi and I.

[18]  Naomi and I talked. We were really close.

[19]     Q. Do you specifically recall discussing that

[20]  with --

[21]     A. Yeah.

[22]     Q. Was Ms. Billingsly under a similar role?

[23]     A. Similar in the fact that her hours were

[24]  reduced but not reduced to what mine were. She was a

[25]  senior person and she had been in that banking center

## Page 139

[ 1]  for 20 years. Naomi was the thriving force behind the

[ 2]  business relationship in that banking center. So what

[ 3]  she did not want to do was, you know, dissolve that.

[ 4]  She did not want to interfere with all of those sales.

[ 5]     Q. Ms. Billingsly did not?

[ 6]     A. No, Tamara did not want to cause a conflict

[ 7]  there.

[ 8]     Q. Did Ms. Billingsly ever indicate to you what

[ 9]  her hour restrictions were?

[10]     A. No. But I know they were earlier because

[11]  Naomi -- it's interesting because we talked about this

[12]  dual control log. And, you know, on average Naomi

[13]  possibly stayed there until 7:00 or eight o'clock every

[14]  night. I could actually go in the log myself. I would

[15]  say, hey, Naomi, you were here until 7:00 or eight

[16]  o'clock last night. That was just common for her.

[17]     Q. Did she ever complain to you that she was

[18]  working hours --

[19]     A. Her concern was to meet those goals, and she

[20]  did what it took to meet those goals.

[21]     Q. Let me finish my question.

[22]     Did Ms. Billingsly ever complain to you that

[23]  she was having to work hours over 40 per week which she

[24]  could not record?

[25]     A. No.

## Page 140

[ 1]     Q. Did she complain to you she was having to

[ 2]  work hours over 40 per week for which she did not

[ 3]  receive compensation from NationsBank?

[ 4]     A. No, not that I can recall.

[ 5]     Q. Did you ever complain to anyone about having

[ 6]  to work hours over 40 per week?

[ 7]     A. I complained to Tamara.

[ 8]     Q. Did you complain to anyone else in addition to

[ 9]  Ms. Lomax?

[10]     A. That was me complaining to the HR director

[11]  when I mentioned it to her.

[12]     Q. You made a complaint about having to work

[13]  hours in excess of 40 to Ms. Lomax, to the HR person

[14]  that we discussed?

[15]     A. That's correct.

[16]     Q. To anyone else?

[17]     A. No.

[18]     Q. Did you complain to anyone about having to

[19]  work hours in excess of 40 for which you were not

[20]  receiving any compensation?

[21]     A. I do recall complaining to Tamara specifically

[22]  in the event for Saturday that she made a mandatory

[23]  meeting for us to come and clean the branch, and my

[24]  statement to her was, if you're not going to compensate

[25]  us, at least provide lunch, and that was an issue.

**Page 141**

[1] Q. And what was her response?

[2] A. I should not dare ask for lunch.

[3] Q. Did you two have this conversation in public

[4] among other branch employees or in private?

[5] A. In private.

[6] Q. Ms. Mobley, did you think it was fair that you

[7] had to work hours in excess of 40 for which you could

[8] not record?

[9] MS. DOLIN: Object to form.

[10] You can answer.

[11] THE WITNESS: No, I didn't think it was fair.

[12] BY MR. LANGDON:

[13] Q. Do you think it was fair you were having to

[14] work hours in excess of 40 per week for which you were

[15] not receiving compensation?

[16] MS. DOLIN: Object to form.

[17] You can answer.

[18] THE WITNESS: Ask the question again. I'm

[19] sorry.

[20] BY MR. LANGDON:

[21] Q. Did you think it was fair at the time that you

[22] were having to work hours in excess of 40 per week for

[23] which you were not receiving compensation?

[24] A. No, I did not think it was fair.

[25] Q. Did you take any vacation during the period

**Page 142**

[1] from mid December, '97 to the end of February of '98?

[2] A. No, I did not. Why? Because my threshold did

[3] not meet the standards.

[4] Q. You testified earlier that Ms. Lomax would not

[5] let you take vacation because you had not met your

[6] performance threshold?

[7] A. That is correct.

[8] Q. Did you take any sick days?

[9] A. Yes, I did.

[10] Q. During that period?

[11] A. Yes.

[12] Q. Do you recall how many sick days you took from

[13] mid December of '97 until the end of February of '98?

[14] A. I do recall two days.

[15] Q. Did you take any what I'm going to call

[16] personal grievance days during that period for a death

[17] in the family or some other reason?

[18] A. No, I did not.

[19] Q. Ms. Mobley, during the period from the end of

[20] December of '97 until the end of February of '98, were

[21] you aware of Bank of America's policy requiring you to

[22] accurately record your time worked for the bank on your

[23] timecard?

[24] A. Was I aware of the policy?

[25] Q. Yes.

**Page 143**

[1] A. I was not aware of the policy. I was made

[2] aware that we had to begin completing time sheets.

[3] Q. So you were not aware that Bank of America

[4] maintained the policy that you were required to

[5] accurately report all the time you worked for the bank

[6] on your timecard?

[7] A. I guess my understanding is that's the

[8] understanding of a time sheet. But that was superseded

[9] by Tamara's restricting that.

[10] Q. But my question is, were you aware of the

[11] bank's corporate policy which required you to accurately

[12] record all the time you worked on behalf of the bank on

[13] your timecard?

[14] A. Yes.

[15] Q. Were you aware of the bank's corporate policy

[16] that required it to pay all employees for the time they

[17] actually worked on behalf of the bank?

[18] A. Actually, no, I was not.

[19] Q. You were not aware of that policy at the time?

[20] A. No.

[21] Q. Were you aware of Bank of America's policy,

[22] corporate policy, during your employment tenure from

[23] December, '97 until February of '98 that required an

[24] associate to seek approval of overtime before working

[25] it?

**Page 144**

[1] A. No, I was not aware of that. But I was aware

[2] that when we worked on Saturdays future Saturday hours

[3] had to be approved prior to, you know, consent to work

[4] on a Saturday. In other words, if someone called me I

[5] could no longer just say yes. I would have to go to my

[6] banking center manager first and let her know, get her

[7] approval and then go back to the banking center.

[8] Q. Would you have sought that approval from Ms.

[9] Lomax?

[10] A. Yes, I had to.

[11] Q. How many times did you request to work on

[12] Saturdays?

[13] A. Only after this time sheet process starts.

[14] Q. That started -- I think we've been able to

[15] establish -- mid December of '97?

[16] A. Yes, that's correct.

[17] Q. Again, shifting gears. I'm going to hand you

[18] now what I'm going to ask the court reporter to mark as

[19] Defendant's Exhibit Number 9.

[20] (Thereupon, document marked as Defendant's

[21] Exhibit Number 9 for identification.)

[22] BY MR. LANGDON:

[23] Q. Ms. Mobley, I'm going to hand you what's been

[24] marked as Defendant's Exhibit Number 9, please, and ask

[25] you to take a look at that.

Page 145

[1]        Have you had an opportunity to review Exhibit

[2] Number 9?

[3]     A.  Yes.

[4]     Q.  What is that exhibit, to your knowledge?

[5]     A.  This is an affidavit of me indicating hours

[6] worked at the Bankhead branch.

[7]     Q.  An affidavit in relation to this lawsuit filed

[8] by Ms. Escudero and Ms. Drake?

[9]     A.  That is correct.

[10]    Q.  And does your name -- does your signature

[11] appear on the second page?

[12]    A.  Yes, it is.

[13]    Q.  And did you sign this document before a notary

[14] public?

[15]    A.  Yes, I did.

[16]    Q.  Did you understand at the time you were

[17] signing this document that it was a sworn document to be

[18] true to the best of your knowledge?

[19]    A.  To the best of my knowledge, yes.

[20]    Q.  If you will look at Paragraph 4, Ms. Mobley,

[21] last sentence, in Paragraph 4, your first affidavit you

[22] testified that as a result of instructions relayed to

[23] you by Ms. Lomax, you only recorded 40 hours on your

[24] timecard each week even though you worked 40 hours; is

[25] that correct?

Page 146

[1]     A.  Yes.

[2]        MS. DOLIN:  Worked more than 40?

[3]        MR. LANGDON:  More than 40 hours, right.  I'm

[4] sorry.

[5] BY MR. LANGDON:

[6]     Q.  In information that you filled out on the time

[7] sheets that we discussed, Exhibits 4 and 5, I believe

[8] earlier, did you indicate times that would add up to

[9] greater than 40 hours on any timecard?

[10]    A.  Yes.

[11]        MS. DOLIN:  You can look at the time sheets if

[12] you need to.

[13] BY MR. LANGDON:

[14]    Q.  If you will look at Paragraph 5, Paragraph 5

[15] states, During branch meetings with employees, Tamara

[16] Lomax would reiterate that NationsBank would not pay for

[17] overtime work, regardless of whether it was worked, and

[18] that we were not to record overtime hours worked on our

[19] time records.  Do you see that paragraph?

[20]    A.  Yes.

[21]    Q.  Do you recall actual meetings wherein Ms.

[22] Lomax made this statement?

[23]    A.  I recall that when the -- I recall that, I

[24] recall that she would not pay us beyond our banking

[25] center branch hours.  So actually the 40 hours should

Page 147

[1] really be banking center, but I took that for banking

[2] center hours.

[3]     Q.  And based upon this paragraph, she informed

[4] you of that during branch meetings; is that correct?

[5]     A.  Initially when the time sheets first rolled

[6] out, that's correct, that we would not be compensated

[7] for overtime.

[8]     Q.  Do you recall who all was present at this

[9] meeting?

[10]    A.  It would have been just myself and Naomi.

[11]    Q.  Do you recall whether at any subsequent

[12] meetings Ms. Lomax actually reiterated that NationsBank

[13] would not pay for overtime work and that it was not to

[14] be recorded?

[15]    A.  That was something that she discussed with me

[16] in meetings with me. I can't say what she discussed in

[17] meetings with Naomi.

[18]    Q.  But is it your testimony that she indicated

[19] that overtime would not be paid regardless if it would

[20] be -- whether it was worked, and that it was not to be

[21] recorded in only one branch meeting or more than one

[22] branch meeting?

[23]    A.  I'd say it would be more than one branch

[24] meeting because that affected our tellers too. So it

[25] would be across the boards. When it was discussed

Page 148

[1] initially, it affected everybody.

[2]     Q.  Do you specifically recall more than one

[3] meeting at which Ms. Lomax instructed the bank personnel

[4] that there would be no overtime pay for hours worked in

[5] excess of 40 and that you should not record overtime

[6] hours?

[7]     A.  I do recall there were meetings in addition to

[8] the meeting with Naomi. And there are meetings with

[9] tellers -- at least one I could specifically recall --

[10] where the overtime issue was addressed. And she had

[11] requested that the tellers, the specific tellers, we

[12] were all getting, I guess, excessive hours initially and

[13] that she wanted those overtime hours to be reduced. So

[14] it was brought up to the attention that there was the

[15] issue of overtime and that the numbers were just too

[16] high.

[17]    Q.  Who were these specific tellers that you

[18] recall being at this meeting where she may have

[19] mentioned overtime issues?

[20]    A.  That just would have been the tellers on staff

[21] at that time. I don't recall their names.

[22]    Q.  Ms. Mobley, did you at some point after the

[23] submission of your first affidavit to the court submit a

[24] second affidavit?

[25]    A.  Yes.

**Page 149**

[ 1]   Q.   What prompted you to submit a second affidavit

[ 2]   to the court?

[ 3]       MS. DOLIN: If you can answer that without

[ 4]   disclosing any communications between you and your

[ 5]   counsel, you can answer it. To the extent that you

[ 6]   cannot answer it without disclosing communication

[ 7]   between you and your counsel, you're instructed not

[ 8]   to answer it.

[ 9]       THE WITNESS: I can answer it because it was

[10]   not -- it was not as specific as it needed to be

[11]   and that some conflict was found in the amount of

[12]   hours that I indicated.

[13] BY MR. LANGDON:

[14]   Q.   How did you realize some conflict was found in

[15]   the amount of hours you indicated?

[16]       MS. DOLIN: Same instruction.

[17]       THE WITNESS: How did I realize that?

[18] BY MR. LANGDON:

[19]   Q.   Yes.

[20]   A.   Recollection of whatever that earlier document

[21]   was, the ESC --

[22]   Q.   What's been marked as Defendant's Exhibit

[23]   Number 3?

[24]   A.   That's correct, ESC-413.

[25]   Q.   When did you realize that not all the

**Page 150**

[ 1]   information had been contained in your first affidavit

[ 2]   based upon your review of what's been marked as

[ 3]   Defendant's Exhibit Number 3?

[ 4]       MS. DOLIN: If you can give a date, give a

[ 5]   date.

[ 6]       THE WITNESS: I don't recall a date.

[ 7] BY MR. LANGDON:

[ 8]   Q.   Approximately when did you realize based on

[ 9]   the facts that you submitted your first affidavit on

[10]   July 14th of, I believe, that's 2000 and did not submit

[11]   your second affidavit to the court which I will show you

[12]   in just a moment until October 26th of 2000?

[13]       MS. DOLIN: If you can give an approximate

[14]   date, you can do that.

[15]       THE WITNESS: I guess it would have been

[16]   October, between September and October. And

[17]   initially, this one, I did not have enough

[18]   information to determine what my total hours were.

[19]   So when I saw this here affidavit was actually signed and

[20]   me actually analyzing what my hours were that I

[21]   actually did work, I forgot about the overtime.

[22]       MS. DOLIN: Let the record reflect she's

[23]   referring to Exhibit 9.

[24] BY MR. LANGDON:

[25]   Q.   She's referring to Exhibit 9.

**Page 151**

[ 1]   You said you did not have all the information?

[ 2]   A.   Right. I didn't recall what my time sheets

[ 3]   were that I signed at that time.

[ 4]   Q.   What did you review in the preparation of

[ 5]   Exhibit Number 9 to be able to testify to the matters

[ 6]   contained therein?

[ 7]   A.   Just an average of hours that I worked.

[ 8]   Q.   Did you review any documentation to prepare

[ 9]   this document or was it based on your personal

[10]   recollection?

[11]   A.   This one here?

[12]   Q.   The first affidavit, Exhibit Number 9?

[13]   A.   Right. That was on my personal recollection.

[14]   Q.   You didn't review anything in preparation of

[15]   this document?

[16]   A.   No, I did not.

[17]   Q.   How did you prepare the document, Ms. Mobley?

[18]   Did you write down these paragraphs and submit them to

[19]   someone or did you relay this information to someone

[20]   over the phone?

[21]       MS. DOLIN: To the extent you can answer that

[22]   without getting into communications between you and

[23]   counsel, you can answer it. If you cannot do so,

[24]   then you're instructed not to answer.

[25]       THE WITNESS: It was in writing.

**Page 152**

[ 1] BY MR. LANGDON:

[ 2]   Q.   So you submitted the contents of this

[ 3]   affidavit in writing to your attorneys?

[ 4]   A.   That is correct.

[ 5]   Q.   Did you have an opportunity to review the

[ 6]   documents and make any revisions you desired thereto

[ 7]   before you signed it?

[ 8]   A.   Initially --

[ 9]       MS. DOLIN: To the extent you can answer it

[10]   without getting into communications between you and

[11]   counsel, you can answer it.

[12]       THE WITNESS: I don't recall.

[13] BY MR. LANGDON:

[14]   Q.   You don't recall whether you had an

[15]   opportunity to review to make any revisions you desired

[16]   before you signed it or you don't recall whether you

[17]   made any revisions to it?

[18]   A.   I don't recall whether I made revisions.

[19]   Q.   But did you, in fact, have the opportunity to

[20]   do so if you wanted to before you signed the document?

[21]   A.   Did I? Yes.

[22]   Q.   Did you make any revisions?

[23]       MS. DOLIN: Objection, asked and answered.

[24]   She said she didn't recall.

[25] BY MR. LANGDON:

## Page 153

[ 1]    Q.   Is that your testimony, you don't recall

[ 2] whether you made any revision to the document before you

[ 3] signed it?

[ 4]    A.   I don't recall, right.

[ 5]    Q.   I'm going to hand you now, Ms. Mobley, an

[ 6] exhibit that I'll ask the court reporter to mark as

[ 7] Defendant's Exhibit Number 10, I believe.

[ 8]        (Thereupon, document marked as Defendant's

[ 9]    Exhibit Number 10 for identification.)

[10] BY MR. LANGDON:

[11]    Q.   Ms. Mobley, I'm going to hand you what's been

[12] marked as Defendant's Exhibit 10 and ask you to take a

[13] look at that, please.

[14]        Have you had an opportunity to review Exhibit

[15] Number 10?

[16]    A.   Yes.

[17]    Q.   What is that document, Ms. Mobley?

[18]    A.   A corrected affidavit in the Escudero case.

[19]    Q.   It's your corrected affidavit?

[20]    A.   Yes.

[21]    Q.   Does your signature appear on the second page

[22] of that document?

[23]    A.   Yes.

[24]    Q.   Did you sign it before a notary public?

[25]    A.   Yes, I did.

## Page 154

[ 1]    Q.   What information did you acquire, Ms. Mobley,

[ 2] between the time you filled out your first affidavit

[ 3] that has been marked as Exhibit Number 9 and your

[ 4] completion of the affidavit marked as Exhibit Number 10

[ 5] that allowed you to be able to have information that in

[ 6] your opinion, as I stated, a corrected affidavit?

[ 7]        MS. DOLIN:  To the extent you can answer that

[ 8]    without getting into communications between

[ 9]    yourself and your legal counsel, you can answer.

[10]        THE WITNESS:  That would have been the ESC-413

[11]    exhibit.

[12] BY MR. LANGDON:

[13]    Q.   That's Exhibit Number 3.

[14]        Did you have in your possession, Ms. Mobley,

[15] at the time you completed your first affidavit

[16] Defendant's Exhibit Number 2, your personal calendar

[17] pages?

[18]    A.   Yes.

[19]    Q.   Defendant's Exhibit Number 5, copy of the

[20] timecard?

[21]    A.   Yes.

[22]    Q.   Defendant's Exhibit Number 4, a copy of a

[23] second timecard?

[24]    A.   Yes.

[25]    Q.   So the only document that you received after

## Page 155

[ 1] the completion of your first affidavit which prompted

[ 2] you to complete a second affidavit was Defendant's

[ 3] Exhibit Number 3; is that correct?

[ 4]    A.   Yeah.

[ 5]    Q.   I believe you testified earlier that you had

[ 6] registered for a class at Georgia State?

[ 7]    A.   That's correct.

[ 8]    Q.   It would have been for the spring semester of

[ 9] 1998?

[10]    A.   That's correct.

[11]    Q.   What class was that?

[12]    A.   A pre-algebra course.

[13]    Q.   You actually enrolled in that course?

[14]    A.   Yes.

[15]    Q.   Did you complete the course?

[16]    A.   Yes.

[17]    Q.   Did the professor maintain any kind of

[18] attendance log for the students in the course?

[19]    A.   No.

[20]    Q.   Ms. Mobley, I'm going to hand the court

[21] reporter now a document that I'll ask her to mark as

[22] Defendant's Exhibit Number 11.

[23]        (Thereupon, document marked as Defendant's

[24]    Exhibit Number 2 for identification.)

[25] BY MR. LANGDON:

## Page 156

[ 1]    Q.   Ms. Mobley, I'm going to hand you what's been

[ 2] marked as Defendant's Exhibit Number 11 and ask you to

[ 3] take a look at that, please.

[ 4]        MS. DOLIN:  It's already been marked.

[ 5]        MR. LANGDON:  It has been?  Apparently my

[ 6]    timecard is duplicative of one that Ms. Mobley

[ 7]    brought.

[ 8]        THE WITNESS:  The difference is this actually

[ 9]    has in-put dates, I guess the dates they were keyed

[10]    in the system or whatever.

[11]        MS. DOLIN:  This thing, this whatever stamp

[12]    means.

[13] BY MR. LANGDON:

[14]    Q.   Well, since it is somewhat different, let's

[15] just put that on the record.  I've handed you what's

[16] been marked as Defendant's Exhibit Number 11.  Do you

[17] recognize that document?

[18]    A.   Yes.

[19]    Q.   And do you recognize that document to be a

[20] duplicate timecard of what we discussed earlier in the

[21] deposition marked as Defendant's Exhibit Number 4?

[22]    A.   Yes.

[23]    Q.   The difference in Defendant's Exhibit Number

[24] 11 and Number 4 is there's an in-put stamp on that

[25] exhibit, correct?

Page 157

[ 1]    A.    Correct.

[ 2]          MS. DOLIN: The second page is different.

[ 3]          THE WITNESS: Has January and February. You

[ 4]    have January 16th through January 31st and February

[ 5]    1st through February 15th.

[ 6]          MS. DOLIN: You have two different timecards.

[ 7]    I see why. Your 11 is two different timecards.

[ 8]          MR. LANGDON: They're copied front and back.

[ 9]          MS. DOLIN: One is the same. There's another

[10]    one that's different.

[11] BY MR. LANGDON:

[12]    Q.    What's been marked as Defendant's Exhibit

[13]    Number 11 is, in fact, a duplicate of the timecard we

[14]    discussed, Defendant's Exhibit 4; is that correct?

[15]    A.    That's correct.

[16]    Q.    Now, let me hand you what I'll ask the court

[17]    reporter to mark as Defendant's Exhibit Number 12.

[18]          (Thereupon, document marked as Defendant's

[19]    Exhibit Number 12 for identification.)

[20] BY MR. LANGDON:

[21]    Q.    I'm going to hand you now, Ms. Mobley, what

[22]    has been marked as Defendant's Exhibit Number 12 and ask

[23]    you to look at that, please.

[24]          Have you had a chance to look at it?

[25]    A.    Yes.

Page 158

[ 1]    Q.    What does that document appear to be, Ms.

[ 2] Mobley?

[ 3]    A.    It's a time sheet for the period of February

[ 4]    the 1st of 1998 through February 15, 1998.

[ 5]    Q.    And similar to the discussion we had about the

[ 6]    timecards previously marked as Defendant's Exhibit

[ 7]    Number 4 and Number 5, does the actual entry of time in

[ 8]    the top blocks of the timecards represent information

[ 9]    that you filled in on this timecard?

[10]    A.    That's correct.

[11]    Q.    Is that your handwriting?

[12]    A.    That's my handwriting.

[13]    Q.    Then going down to the entries in the block

[14]    just below the actual date specific blocks where it's

[15]    beginning with 40 under 02/98 and runs through a slash

[16]    in the column for 15S, is that your handwriting?

[17]    A.    My initials, yes.

[18]    Q.    I was going to ask you that question too.

[19]    Your initials appear in the employee block on the

[20]    timecard?

[21]    A.    That's correct.

[22]    Q.    Do you recognize the initials that appear in

[23]    the supervisor block?

[24]    A.    No, with the exception they look like all the

[25]    others.

Page 159

[ 1]    Q.    Going back up to the information contained in

[ 2]    the running weekly totals, it appears to be, by my

[ 3]    perception, beginning under the block that says 2/98

[ 4]    running in a row across to a slash, a back slash,

[ 5]    contained in the block for 15S, do you see the

[ 6]    information I'm referring to?

[ 7]    A.    Yes.

[ 8]    Q.    Is that your handwriting?

[ 9]    A.    No, it's not.

[10]    Q.    Is the handwriting in the row underneath the

[11]    row we just discussed your handwriting?

[12]    A.    No, it's not.

[13]    Q.    The 9.75, the 4 and the 2?

[14]    A.    No.

[15]    Q.    If you will flip to the back, Ms. Mobley,

[16]    Defendant's Exhibit Number 12, do you see the entries

[17]    under the weekly totals, week two, 40; week three, 40?

[18]    A.    Yes.

[19]    Q.    Then underneath that 4 and 2?

[20]    A.    Yes.

[21]    Q.    Is that your handwriting?

[22]    A.    That looks like it could be my handwriting.

[23]    Q.    Let me go back to Defendant's Exhibit Number 4

[24]    and flip to the second page and again ask you --

[25]          MS. DOLIN: Wait a minute. Okay, got it.

Page 160

[ 1] BY MR. LANGDON:

[ 2]    Q.    On the second page of that document, do you

[ 3]    see under week one and week two of that timecard 40 and

[ 4]    40?

[ 5]    A.    Yes.

[ 6]    Q.    Then underneath 7 and 8.5?

[ 7]    A.    Yes.

[ 8]    Q.    Is that your handwriting?

[ 9]    A.    That looks like it could be mine.

[10]    Q.    And then the last one, if we can flip back to

[11]    Exhibit Number 5 again, referring to the second page in

[12]    the same spot on this timecard, the entry under week one

[13]    and week two, 40 and 40; do you see that?

[14]    A.    Yes.

[15]    Q.    And then underneath that the entries 8-1/2

[16]    5-1/2?

[17]    A.    Yes.

[18]    Q.    Does that appear to be your handwriting?

[19]    A.    No.

[20]    Q.    That does not appear to be your handwriting?

[21]    A.    No.

[22]    Q.    Do you know whose handwriting that is?

[23]    A.    No, I have no idea.

[24]    Q.    What I'd like to do now is discuss the

[25]    circumstances of your resignation. I understand you

Page 161

[ 1] resigned from NationsBank employ at the end of February,

[ 2] 2000?

[ 3]    A.    That's correct.

[ 4]    Q.    What specific date did you resign?

[ 5]    A.    The 26th, I believe.

[ 6]    Q.    Why did you resign from NationsBank's employ?

[ 7]    A.    Because I was constantly -- I didn't want to

[ 8] use the word harass, but there was always an issue about

[ 9] me not meeting my threshold. And that was just ever

[10] since the initial -- I contacted HR. Ever since I

[11] contacted HR, it didn't matter what I did.

[12]    Q.    How did you go about resigning from your

[13] employment with NationsBank?

[14]    A.    I actually came to the banking center and gave

[15] Tamara notice that I was resigning effective that day,

[16] immediately. And she actually called me into her office

[17] and had me sit on the phone -- I mean, I sat while she

[18] called HR and while they talked. I never heard the

[19] conversation.

[20]        But she did explain to me that she was not

[21] going to pay me for the prior Saturday that I worked

[22] while she was on the phone with them. And I told her

[23] she cannot do that. I actually worked those hours at

[24] that banking center; she had to pay me. But she argued

[25] and, I guess, you know, within minutes of her conversing

Page 162

[ 1] with HR, they told her that she could not do that.

[ 2]    Q.    Were you, in fact, paid for those hours?

[ 3]    A.    I was, in fact, paid in the end, yes, I was.

[ 4] But she just had me sit there, which I don't know why I

[ 5] did. But I sat there waiting for her to get done with

[ 6] HR, and that's pretty much all I remember. You know, I

[ 7] cleaned out my desk and I left.

[ 8]    Q.    Did you work for NationsBank at any point

[ 9] after February 26, 1998?

[10]    A.    Absolutely not.

[11]    Q.    Ms. Mobley, based upon the timecards that

[12] we've reviewed today and the summary of pay stubs that

[13] we reviewed, Exhibit Number 3, did you, in fact, record

[14] overtime during your employment with NationsBank from

[15] December of '97 until the end of February of '98?

[16]    A.    Did I record overtime?

[17]    Q.    Yes.

[18]    A.    Yes.

[19]    Q.    Were you, in fact, paid for the overtime you

[20] recorded on your timecards from December of '97 to '98,

[21] end of February of '98?

[22]    A.    Mid December.

[23]    Q.    Mid December to February?

[24]    A.    Yes.

[25]    Q.    If you recorded the time, you were, in fact,

Page 163

[ 1] paid for that time; is that correct?

[ 2]    A.    That is correct.

[ 3]    Q.    Ms. Mobley, has your testimony here today been

[ 4] complete and truthful to the best of your ability?

[ 5]    A.    Yes.

[ 6]    Q.    Are you aware of any inaccurate or untruthful

[ 7] answers that you have provided in response to any of my

[ 8] questions?

[ 9]        MS. DOLIN:    Object to form.

[10]        You can answer.

[11]        THE WITNESS:    Not that I have inaccurate

[12]    answers. The only concern was about the affidavit

[13]    here where it was not as specific. So I don't know

[14]    if you're saying -- that would be my only concern.

[15]    This was stated initially, but then the corrected

[16]    affidavit was more specific to the actual event.

[17] BY MR. LANGDON:

[18]    Q.    At the time you tendered the first affidavit

[19] that's been marked as Defendant's Exhibit Number 9, you

[20] swore to that testimony, is that correct, before a

[21] notary public?

[22]    A.    That is correct.

[23]    Q.    And you also swore to that testimony provided

[24] in the affidavit form through your second affidavit

[25] marked as Defendant's Exhibit Number 10; is that

Page 164

[ 1] correct?

[ 2]    A.    That's correct.

[ 3]        MR. LANGDON:    Ms. Mobley, that is all the

[ 4]    questions I have for you. I appreciate your time

[ 5]    this morning.

[ 6]        MS. DOLIN:    I just have a couple of questions

[ 7]    to just kind of clear something up.

[ 8]            CROSS-EXAMINATION

[ 9] BY MS. DOLIN:

[10]    Q.    The log that you talked about, Ms. Mobley,

[11] that dual control log, did that have a name?

[12]    A.    It was the dual control log.

[13]    Q.    That's what they called it?

[14]    A.    Yes.

[15]    Q.    Just so the record is clear, go back to

[16] Exhibit Number 4 for a minute and look at Page 2.

[17] There's a column here that said weekly worksheet to

[18] calculate exception of hours.

[19]        Now, under week one and two there's a 40 and

[20] 40. Those 40's are your writing?

[21]    A.    They look accurate.

[22]    Q.    What about the overtime hours 7 and 8.5; is

[23] that your writing?

[24]    A.    That looks like it's my writing.

[25]    Q.    It does?

Page 165

[ 1]   A.   Uh-huh, yes.

[ 2]   Q.   And on Page 2, again, you have 40 and 40 and

[ 3]   then 8-1/2 and 5-1/2?

[ 4]   A.   That doesn't look like my handwriting.

[ 5]   Q.   Which doesn't?

[ 6]   A.   The 8-1/2 because mine, it's a curve to the

[ 7]   left. These curve to the right.

[ 8]   Q.   So the 8-1/2 is not yours?

[ 9]   A.   Right. 8-1/2 and 5-1/2 doesn't look like

[10]   mine.

[11]   Q.   But the 40's are?

[12]   A.   I wouldn't just fill out portions of a

[13]   section. I would fill out the entire section.

[14]   Q.   So that's not yours. And then the last time

[15]   sheet we have, Number 11, again, the same thing on the

[16]   back of Number 11, 40 and 40 and 7 and 8.5, is that your

[17]   handwriting?

[18]   A.   Looks like it could be my handwriting.

[19]   Q.   Are you positive?

[20]   A.   No, I'm not.

[21]   Q.   Let me ask you this, back on Number 5 -- I'm

[22]   sorry, on 4 where you identified it as your handwriting,

[23]   where you said you thought it could be?

[24]   A.   Right, it could be.

[25]   Q.   Are you positive that it is?

Page 166

[ 1]   A.   No.

[ 2]   Q.   You don't know whether it is or not?

[ 3]   A.   No. But, I mean, it could be and it may not

[ 4]   be.

[ 5]   Q.   And on Number 12, the back of 12 where you

[ 6]   have that section 40, 40 and then overtime 4 and 2, is

[ 7]   that your handwriting?

[ 8]   A.   That doesn't look like my handwriting.

[ 9]   Q.   That does not look like your handwriting?

[10]   A.   No.

[11]   Q.   Is it your testimony, Ms. Mobley, these

[12]   timecards are not accurate?

[13]   A.   That's correct.

[14]        MS. DOLIN: Nothing further. Thank you.

[15]        REDIRECT EXAMINATION

[16]   BY MR. LANGDON:

[17]   Q.   Let me just ask one follow-up question in

[18]   reference to Exhibit Numbers 4, 5 and, I believe, 11 on

[19]   which Ms. Dolin just asked you questions, Ms. Mobley.

[20]        The entries at the very top on each timecard

[21]   for the specific dates, does that appear to be your

[22]   handwriting on the top of each timecard?

[23]   A.   The top is my handwriting. The hours

[24]   completed each day, that's my handwriting.

[25]   Q.   So the hours completed each day on Exhibit

Page 167

[ 1]   Number 5 is your handwriting?

[ 2]   A.   That's correct and the first column.

[ 3]   Q.   In the first column?

[ 4]   A.   Yes.

[ 5]   Q.   For each specific date?

[ 6]   A.   That's correct.

[ 7]        MS. DOLIN: In and out information.

[ 8]        MR. LANGDON: The in and out information.

[ 9]   BY MR. LANGDON:

[10]   Q.   The hours logged for in-out logs for the top

[11]   of the timecard on Defendant's Exhibit No. 4 appear to

[12]   be your handwriting, correct?

[13]   A.   That's correct.

[14]   Q.   Did you recognize it as your handwriting?

[15]   A.   That's my handwriting.

[16]   Q.   At the top of both pages of Exhibit 5?

[17]   A.   That's correct.

[18]   Q.   Finally on Exhibit Number 11, the times

[19]   recorded for in-out blocks at the top of the timecard on

[20]   the front and back, is that your handwriting?

[21]   A.   That is my handwriting.

[22]        MR. LANGDON: That's all the questions I have.

[23]        RECROSS-EXAMINATION

[24]   BY MS. DOLIN:

[25]   Q.   Let me ask you something, is that dual control

Page 168

[ 1]   log known by any other name?

[ 2]   A.   It could be the branch opening log or

[ 3]   something to do with the branch opening.

[ 4]   Q.   Could it be called a vault log?

[ 5]   A.   No.

[ 6]   Q.   That's something else?

[ 7]   A.   No.

[ 8]        MR. LANGDON: Read or waive.

[ 9]        MS. DOLIN: We'll read and take a copy.

[10]        MR. LANGDON: I'll order it.

[11]        (Thereupon, the deposition was concluded at

[12]   2:25 o'clock p.m.)

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

**Page 169**

[ 1]

[ 2]                CERTIFICATE OF OATH

[ 3]

[ 4] STATE OF FLORIDA    )
     COUNTY OF BROWARD    )
[ 5]

[ 6]      I, the undersigned authority, certify that
[ 7] ANGELA MOBLEY, personally appeared before me
     and was duly sworn.
[ 8]

[ 9]      WITNESS, my hand and official seal this 20th
     day of February, 2001.
[10]

[11]

[12]

[13]

[14]                  _____
                     Ruth Stuck, R.P.R.
                     Notary Public - State of Florida
[15]                 My Commission Expires:

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

**Page 170**

[ 1]

[ 2]        REPORTER'S DEPOSITION CERTIFICATE

[ 3]

[ 4] STATE OF FLORIDA    )
     COUNTY OF BROWARD    )
[ 5]

[ 6]      I, Ruth Stuck, Registered Professional Reporter,
[ 7] certify that I was authorized to and did stenographically
     report the deposition of ANGELA MOBLEY, that a
     review of the transcript was requested; and that the
[ 8] transcript is a true and complete record of my
     stenographic notes.
[ 9]      I further certify that I am not a relative, employee,
[10] attorney, or counsel of any of the parties, nor am I a
     relative or employee of any of the parties' attorney or
[11] counsel connected with the action, nor am I financially
     interested in the action.
[12]      DATED this 20th day of February, 2001.
[13]

[14]

[15]

[16]                  _____
                     Ruth Stuck, R.P.R.
[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

**Page 171**

[ 1]            DOWNTOWN REPORTING
               337 East Las Olas Boulevard
[ 2]          Fort Lauderdale, Florida  33301
                    (954) 522-3376
[ 3]

[ 4]              February 20, 2001

[ 5] MUCHNICK, WASSERMAN, DOLIN & LEVINE, LLP
     ATTN: SUSAN DOLIN, ESQ.
[ 6] 4000 Hollywood Boulevard
     Suite 620 North
[ 7] Hollywood, FL  33021

[ 8] RE: ROXANNA ESCUDERO, et al. vs. BANKAMERICA CORPORATION

[ 9] Dear MS. DOLIN:

[10] Attached please find your copy of the deposition of
     ANGELA MOBLEY, which was taken in the above-styled
[11] cause on February 9, 2001.  Also attached are forms of
     Affidavit and Errata Sheet to be completed by the
[12] deponent when reading your copy of the deposition.
     These forms are self-explanatory.
[13]      Please have the witness complete these forms and
[14] return them to our office by March 20, 2001 for
     inclusion in the original transcript.
[15]      Thank you for your cooperation.
[16]      Sincerely,
[17]

[18]      _____
         Ruth Stuck, R.P.R.
[19]
     cc: Clerk of Court
[20]     J. Mark Langdon, Esq.

[21]

[22]

[23]

[24]

[25]

**Page 172**

[ 1]                 AFFIDAVIT

[ 2] STATE OF FLORIDA    )
     COUNTY OF BROWARD    )
[ 3]
         I, ANGELA MOBLEY, being first duly sworn,
[ 4] do hereby acknowledge that I did read a true and
     certified copy of my deposition which was taken
[ 5] in the case of ROXANNA ESCUDERO, et al. vs.
     BANKAMERICA CORPORATION taken on February 9, 2001,
[ 6] and the changes I desire to make are as indicated on
     the attached Errata Sheet.
[ 7]

[ 8]      Done and signed this _____ day _____, 2001.

[ 9]                  _____
                     ANGELA MOBLEY
[10]

[11]               CERTIFICATE
[12]
     STATE OF FLORIDA    )
[13]                     ) SS.
     COUNTY OF BROWARD    )
[14]
         Before me personally appeared _____
[15] to me well known and known to me to be the person
     described in and who executed the foregoing instrument
[16] and acknowledged to and before me that he executed the
     said instrument in the capacity and for the purpose
[17] therein expressed.

[18]      Witness my hand and official seal, this _____ day
     of _____, 2001.
[19]

[20]                  _____
                     Notary Public
[21]
     Commission Expires:
[22]

[23]

[24]

[25]

Page 173

[1]

[2]

[3]           TO BE EXECUTED BY THE NOTARY

[4]         IF THE DEPONENT DOES NOT SIGN:

[5]

[6] I hereby certify that a letter with reference to

[7] reading and signing deposition was mailed to the

[8] attorney on February 20, 2001, and that:

[9]

[10]

[11] ( )  Witness refused to sign, giving the following
          reason:

[12]

[13]

[14]
[15]  ( )  Neither the witness nor his attorney has
          responded to request to read and sign.

[16]

[17]

[18]

[19]

[20] _____
          DATE          Ruth Stock, RPR
[21]                 Notary Public, State of Florida
                     My Commission Expires:
[22]

[23]

[24]

[25]

Page 174

[1]           E R R A T A   S H E E T

[2] STATE OF FLORIDA)

[3] COUNTY OF BROWARD)

[4]        I, ANGELA MOBLEY, the undersigned deponent,

[5] have this date read the foregoing pages of my deposition

[6] numbered 1 through 174, and with the suggestions noted

[7] below, if any, these constitute a true and accurate

[8] transcription of my deposition given on the 8th day of

[9] February, 2001, at the time and place state therein.

[10] PAGE NUMBER      LINE NUMBER      SUGGESTION/REASON

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22] _____
                   Ruth Stock
[23]

[24]

[25]

**&**

& 1/17, 1/19, 171/5

**,**

'97 8/22, 8/23, 62/24, 64/17, 79/10, 117/2, 117/3, 128/17, 131/16, 131/23, 133/20, 134/19, 134/25, 142/1, 142/13, 142/20, 143/23, 144/15, 162/15, 162/20
'98 52/2, 55/10, 62/25, 64/6, 64/18, 117/2, 128/18, 131/17, 131/24, 133/21, 134/19, 135/1, 135/25, 142/1, 142/13, 142/20, 143/23, 162/15, 162/20, 162/21

**\***

**·**

· 1/22, 4/17

**0**

00-6145-CIV-DIMITROULEAS 1/2
02/98 158/15

**1**

1 2/13, 19/9, 19/12, 19/15, 20/5, 72/18
1/15/98 56/1
1/16/98 2/18, 3/10
1/31/98 2/19, 3/10
1/98 72/25
10 3/7, 18/15, 30/14, 32/12, 33/3, 33/4, 136/18, 153/7, 153/9, 153/12, 153/15, 154/4, 163/25
101 2/11
10:00 30/13
10:20 1/15, 4/16
10th 63/8
11 3/9, 155/22, 156/2, 156/16, 156/24, 157/7, 157/13, 165/15, 165/16, 166/18, 167/18
12 3/11, 9/19, 9/23, 15/15, 30/14, 36/5, 157/17, 157/19, 157/22, 159/16, 166/5
12/16/97 2/20
12/31/97 2/21
12/97 76/4
12:00 30/13, 123/22
12th 36/16, 63/8
13 2/11, 85/11
14 58/1
144 3/6
14th 150/10
15 18/16, 136/19, 158/4
15.50 58/11
15.75 58/16
153 3/7
155 3/9
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 9/25
156709587 55/22
157 3/11
15S 158/16, 159/5
15th 27/25, 28/2, 47/9, 55/10, 63/7, 157/5
16 75/11
164 2/5
166 2/7
167 2/8
16F 72/25
16th 47/14, 47/22, 60/3, 63/19, 63/21, 69/15, 70/19, 72/2, 157/4
17S 72/25
17th 28/7, 50/16, 62/24
18 31/22
18S 72/25, 74/10
18th 29/5, 51/2
19 2/13
1967 9/23
1986 8/2
1996 8/22
1997 20/14, 20/15, 22/23, 27/21, 29/5, 34/15, 75/12, 75/19, 109/20, 123/24, 135/25
1998 20/15, 31/3, 34/16, 47/22, 55/5, 60/4, 63/19, 73/19, 107/2, 107/11, 107/23, 108/2, 108/15, 123/25, 155/9, 158/4, 162/9
1999 10/13
19M 72/25
19th 36/20
1:00 47/16, 47/20, 48/17, 70/2
1:30 70/4
1st 23/9, 157/5, 158/4

**2**

2 2/15, 21/8, 21/10, 21/13, 21/21, 21/25, 22/2, 22/10, 22/21, 24/1, 24/2, 24/10, 31/21, 35/25, 36/10, 47/5, 49/21, 50/23, 72/13, 154/16, 155/24, 159/13, 159/19, 164/16, 165/2, 166/6
2-page 2/18, 2/20, 3/2, 3/5, 3/6, 3/8
2/1/98 3/11
2/13/98 58/3
2/27/98 58/13
2/5/98 3/11
2/98 159/3
20 32/12, 33/4, 139/1, 171/4, 171/14, 173/8
200 119/1, 119/5, 119/8, 119/11, 119/13, 119/16
2000 13/18, 99/19, 99/24, 106/13, 106/22, 106/23, 107/5, 107/6, 107/7, 107/13, 107/14, 150/10, 150/12, 161/2
2001 1/14, 4/15, 169/9, 170/12, 171/4, 171/11, 171/14, 172/5, 172/8, 172/18, 173/8
20th 33/14, 37/2, 169/9, 170/12
21 2/15
21st 48/7, 51/7
22nd 48/11
23rd 48/15, 63/21, 72/3
24th 72/5
25S 74/12
26 162/9
26th 32/24, 46/5, 46/7, 51/12, 150/12, 161/5
278-1266 49/24
27th 46/23
29th 30/2, 30/4
2:25 1/15, 168/12
2nd 23/22, 50/2

**3**

3 2/16, 52/7, 52/12, 52/15, 53/9, 149/23, 150/3, 154/13, 155/3, 162/13
3/13/98 58/23, 59/4
30 29/9, 31/12
300 119/1, 119/5, 119/11
30349 8/11
30th 30/2, 31/11
31 60/3
31S 73/10, 74/4
31st 63/19, 70/20, 72/5, 75/12, 157/4
31W 76/4
32 73/9, 74/4
33021 171/7
33301 171/2
337 1/13, 4/13, 171/1
3:30 30/16, 31/4

**4**

4 2/4, 2/18, 59/12, 59/14, 59/17, 70/18, 73/10, 74/4, 86/21, 86/24, 145/20, 145/21, 146/7, 154/22, 156/21, 156/24, 157/14, 158/7, 159/13, 159/19, 159/23, 164/16, 165/22, 166/6, 166/18, 167/11
40 65/13, 128/14, 139/23, 140/2, 140/6, 140/13, 140/19, 141/7, 141/14, 141/22, 145/23, 145/24, 146/2, 146/5, 146/9, 146/25, 148/5, 158/15, 159/17, 160/3, 160/4, 160/13, 164/19, 164/20, 165/2, 165/16, 166/6
40's 164/20, 165/11
4000 171/6
404 49/24
45 29/10
49.25 59/9
4:00 121/22, 121/24, 123/5
4:05 121/25, 122/21, 123/6, 123/7

**5**

5 2/20, 74/21, 74/23, 75/1, 86/21, 86/25, 146/7, 146/14, 154/19, 158/7, 160/11, 165/21, 166/18, 167/1, 167/16
5-1/2 160/16, 165/3, 165/9
5/18 98/9
50 135/4, 135/6, 136/1, 136/6
52 2/16
522-3376 171/2
55 135/4, 135/6, 136/1, 136/6
59 2/18
5:00 30/6, 46/8, 46/11, 46/25, 48/9, 48/12, 65/8, 66/10, 66/12, 67/12, 68/13, 68/14, 68/16, 68/18, 68/22, 71/16, 121/18, 126/4, 126/8, 126/14, 126/18, 126/22, 128/21, 135/11
5:30 66/16, 66/18, 67/4, 125/7, 125/18, 126/4, 126/15, 135/11

**6**

6 2/22, 93/16, 93/22, 93/25, 94/21, 95/4
620 171/6
6815 8/10
6:00 16/13, 17/8, 17/9, 123/1, 123/9, 126/2
6:05 123/10, 123/11
6:30 16/13, 17/8, 17/9, 17/23, 18/6, 126/2, 126/7, 128/21, 136/12, 136/17
6:50 47/12

**7**

7 3/2, 47/19, 94/12, 94/14, 94/17, 94/23, 95/7, 160/6, 164/22, 165/16
7-page 2/15
7.0 74/10
74 2/20
7:00 30/6, 117/11, 139/13, 139/15
7:30 46/7

**8**

8 3/4, 28/11, 28/12, 32/24, 47/19, 97/11, 97/13, 97/17, 124/2, 124/7, 124/11, 124/14, 124/17, 137/25
8-1/2 160/15, 165/3, 165/6, 165/8, 165/9
8.5 74/12, 160/6, 164/22, 165/16
8:00 47/12, 68/7, 117/11, 125/1
8:30 46/8, 46/11, 46/25, 47/16, 47/20, 48/9, 48/12, 48/17, 50/19, 51/4, 51/6, 67/25, 68/7, 71/16, 124/14, 124/18, 124/21, 124/25, 125/1, 125/17
8:55 121/22, 122/20, 122/23, 123/5, 123/9, 124/3
8th 24/14

**9**

9 1/14, 3/6, 123/22, 144/19, 144/21, 144/24, 145/2, 150/23, 150/25, 151/5, 151/12, 154/3, 163/19, 171/11, 172/5
9-page 2/22
9.75 159/13
93 2/22
94 3/2
954 171/2
97 3/4
98 2/11
99 25/8
9:00 29/9
9:30 111/8, 129/7, 129/8
9th 4/15, 27/18, 27/21

**A**

A-C-S-Y-S 108/11
a.m 1/15, 4/16, 28/11, 28/12, 30/14, 46/8, 47/19, 121/22, 122/20, 122/23, 123/22, 124/2, 124/7, 124/12, 124/14, 124/17, 137/25
abilities 119/15
ability 7/10, 7/14, 7/18, 163/4
above-entitled 4/3
above-styled 171/10
accent 6/11, 6/13
accept 106/11
acceptance 106/22
accepted 109/19
access 99/3, 130/6
accessible 129/2
accident 11/7
accomplish 31/16
account 29/16
Accountants 108/10
Accounting 106/16
accounts 45/21
accumulate 38/4, 40/5
accurate 26/4, 95/7, 164/21, 166/12
accurately 142/22, 143/5, 143/11
achieve 119/18
acquire 154/1
Acsys 108/11
acting 62/4, 62/12, 62/13, 62/19
action 5/5, 5/7, 93/3, 95/20, 96/24, 98/14, 100/15, 101/5, 101/21, 102/3, 102/9, 103/4, 103/11, 103/25, 105/5, 105/9, 106/3, 170/11
activate 130/9, 130/20
active 11/23
activities 26/23
activity 26/22, 26/24
add 21/5, 146/8
address 8/9, 8/13, 8/15, 9/1, 9/4, 9/15, 33/23, 115/18
addressed 85/4, 111/24, 114/2, 117/18, 148/10

admission 94/8, 95/13
Admissions 2/23, 3/3, 93/18, 95/3
adopt 93/9
advance 49/7, 49/9, 63/12, 64/23, 64/25
advice 98/22
advise 127/21
advised 39/21, 39/24
affairs 13/1
affect 7/10, 7/14, 7/18
affected 147/24, 148/1
Affidavit 3/6, 3/8, 145/5, 145/7, 145/21, 148/23, 148/24, 149/1, 150/1, 150/9, 150/11, 150/19, 151/12, 152/3, 153/18, 153/19, 154/2, 154/4, 154/6, 154/15, 155/1, 155/2, 163/12, 163/16, 163/18, 163/24, 171/11, 172/1
affidavits 95/19
affixes 129/21
affixing 131/2
affluent 43/6, 43/7
afford 7/5
after-work 50/12
age 4/2, 4/20, 15/15
agencies 108/12
agenda 127/1
agent 108/7
agreement 14/1, 14/9, 14/11
al 171/8, 172/5
alarm 129/22, 130/9, 131/2, 131/11
allegation 57/16
allegations 93/9, 93/10
allow 39/17, 44/17, 67/3, 111/13, 111/14, 112/19, 112/20, 113/10, 116/7, 116/10, 129/23, 132/5
allowed 67/5, 114/14, 114/15, 114/16, 117/14, 122/4, 132/10, 154/5
allowing 117/6, 117/8
alumni 118/7
AMERICA 1/9, 4/7, 116/20, 143/3
America's 2/22, 3/3, 85/23, 142/21, 143/21
amount 38/9, 119/17, 127/19, 128/8, 149/11, 149/15
analyzing 150/20
ANGELA 1/25, 2/2, 2/23, 3/2, 3/6, 3/8, 4/1, 4/19, 5/1, 8/5, 8/7, 35/7, 91/21, 169/7, 170/7, 171/10, 172/3, 172/9, 174/4
Angie 8/8
announce 69/7
answer 6/17, 6/20, 7/2, 7/6, 12/13, 13/25, 14/12, 16/4, 38/4, 42/3, 43/3, 53/23, 53/25, 54/21, 88/16, 88/18, 88/20, 92/3, 92/11, 92/23, 94/9, 98/15, 98/17, 98/18, 98/25, 99/8, 99/11, 99/15, 100/5, 100/11, 100/16, 100/18, 100/19, 100/20, 100/22, 101/6, 101/8, 101/9, 101/10, 101/12, 101/24, 102/12, 102/14, 103/15, 103/18, 104/3, 104/16, 104/17, 104/20, 104/21, 104/23, 105/11, 105/16, 105/17, 105/18, 105/19, 105/22, 141/10, 141/17, 149/3, 149/5, 149/6, 149/8, 149/9, 151/21, 151/23, 151/24, 152/9, 152/21, 154/7, 154/9, 163/10
answered 104/11, 115/3, 132/16, 152/23
answering 16/2
answers 93/19, 95/3, 95/6, 95/12, 163/7, 163/12
anticipated 16/18, 116/5
apartment 9/4
apologize 128/5
APPEARANCES 1/16
applications 38/15
apply 40/17
appraisals 127/17
appreciate 6/23, 164/4
apprentice-type 81/22
approval 143/24, 144/7, 144/8
approvals 38/16
approved 144/3
approximate 150/13
April 107/2, 107/13, 108/15
area 33/22, 34/7, 38/17, 40/5, 40/8, 46/16, 108/12
argued 161/24
armored 18/22
arrange 19/3
arrangement 15/22, 15/24, 16/9
arrangements 19/16
arrested 10/8
arrive 46/18, 129/16
arrived 51/6
assessment 61/2, 61/8, 63/17, 75/10, 78/9
assigned 25/13, 26/15, 34/4, 34/5, 44/4, 44/14, 79/23, 83/12, 113/14
assignment 83/13, 83/20, 108/5
assignments 108/4
associate 86/17, 143/24
associated 26/22, 39/4, 88/8, 96/20
associates 24/24, 86/6, 86/7, 128/12
association 1/10, 4/9, 24/22, 25/4, 25/14, 25/25,

admission 94/8, 95/13
138/7, 138/11
assumption 17/5, 127/3
Atlanta 34/7, 41/3, 108/12, 109/25
Attached 171/10, 171/11, 172/6
attempt 40/24, 42/17, 45/23, 49/14, 82/5
attempting 81/23, 132/8
attend 25/13, 26/15, 29/24, 137/14
attendance 135/18
attended 29/2, 29/4, 106/2
attending 27/2
attention 113/1, 114/22, 148/14
ATTN 171/5
attorney 5/4, 5/19, 12/14, 94/9, 96/12, 170/10, 173/8, 173/14
attorney/client 12/24, 98/24, 99/14, 100/22, 101/12, 103/16, 105/21
Attorneys 1/18, 1/20, 96/19, 106/4, 152/3
audibly 6/20
audit 111/8, 112/19
August 79/14
authority 169/6
authorized 170/6
available 18/7
average 119/8, 134/20, 135/2, 136/18, 139/12, 151/7

B

backside 72/4
balance 16/20
BANK 1/9, 2/22, 3/3, 4/7, 5/5, 39/5, 49/12, 60/12, 64/5, 64/19, 85/22, 113/4, 116/20, 122/12, 129/6, 129/9, 131/6, 131/15, 133/4, 142/21, 142/22, 143/3, 143/5, 143/12, 143/17, 143/21, 148/3
bank's 143/11, 143/15
BANKAMERICA 1/8, 4/6, 171/8, 172/5
banker 27/19, 28/15, 28/19, 34/17, 109/20
bankers 27/22, 75/16, 75/20, 81/6, 86/7, 90/8
Bankhead 24/22, 24/24, 25/1, 25/14, 25/25, 27/10, 34/5, 34/10, 41/1, 41/21, 42/25, 44/3, 44/21, 44/25, 62/10, 62/20, 77/21, 79/23, 80/21, 80/22, 80/25, 82/15, 82/18, 82/20, 82/22, 83/2, 83/8, 83/12, 83/19, 84/2, 84/10, 85/7, 85/11, 90/11, 90/18, 110/4, 110/8, 113/15, 119/7, 121/19, 122/13, 122/19, 123/14, 136/19, 137/14, 137/23, 138/7, 138/11, 145/6
banking 16/17, 33/11, 33/17, 33/23, 35/5, 36/22, 40/9, 42/8, 42/9, 42/13, 42/18, 43/6, 43/10, 43/25, 44/2, 44/3, 44/6, 44/15, 44/17, 45/3, 45/4, 45/24, 47/25, 49/13, 62/3, 79/18, 80/6, 81/3, 82/5, 83/2, 84/8, 84/11, 84/19, 84/21, 85/1, 88/9, 88/11, 89/2, 90/9, 90/11, 110/20, 111/17, 113/6, 119/1, 119/4, 119/20, 119/24, 122/22, 122/23, 122/25, 124/2, 124/10, 124/11, 125/9, 129/14, 132/13, 134/8, 138/25, 139/2, 144/6, 144/7, 146/24, 147/1, 161/14, 161/24
bankruptcy 10/10, 10/12, 10/15, 15/4, 15/5
banks 32/15
barrel 54/9
base 125/19, 125/21, 135/5, 136/5
based 78/3, 98/24, 102/22, 103/4, 103/6, 103/12, 103/14, 104/25, 105/2, 107/18, 126/23, 128/8, 135/9, 147/3, 150/2, 150/8, 151/9, 162/11
basis 39/10, 67/19, 100/22, 101/12, 105/20, 109/14, 125/15, 125/20, 125/24, 126/19
Bate 2/17, 52/8
BATTLE 1/19
belief 71/5
BellSouth 106/10, 106/12, 106/14, 106/17, 106/23, 107/6, 108/20, 108/22, 109/5, 109/16
Bernard 54/8
Beverage 18/18, 18/19
BF1 24/23, 25/15
blg 134/8
billing 109/11, 109/12
Billingsly 62/11, 79/1, 82/23
Billingsly's 90/15
birth 9/22
birthday 138/6, 36/19
bit 65/9, 106/6, 114/23, 121/18, 122/19
black 25/8, 25/9
block 30/11, 37/1, 37/2, 49/22, 57/21, 58/6, 58/13, 58/23, 58/25, 61/17, 61/21, 61/24, 69/16, 72/1, 72/17, 76/3, 76/9, 76/15, 158/13, 158/19, 158/23, 159/3, 159/5
blocks 60/25, 61/6, 61/11, 72/12, 74/9, 158/8, 158/14, 167/19
board 41/13, 79/7, 83/1, 83/24, 85/25, 123/21
boards 147/25
body 31/10
book 23/14, 130/23
boost 28/17, 33/12, 91/12, 91/22
BOOTHE 1/19
borrow 52/18

Boulevard 1/13, 4/14, 171/1, 171/6
bounce 28/16
box 29/17, 111/7, 112/19, 120/16
branch 25/2, 25/12, 26/14, 31/12, 32/2, 32/11, 33/10, 33/20, 34/3, 34/5, 34/7, 34/9, 34/17, 35/6, 37/15, 40/10, 40/11, 40/20, 40/25, 41/12, 42/10, 44/5, 44/6, 44/9, 44/14, 44/15, 44/20, 45/18, 49/13, 62/3, 62/4, 62/7, 62/10, 62/15, 62/16, 63/10, 65/6, 67/5, 67/7, 67/21, 69/9, 69/10, 73/21, 77/23, 79/4, 79/5, 79/19, 79/25, 80/7, 80/11, 80/13, 80/15, 81/4, 81/7, 81/11, 81/13, 82/9, 82/18, 82/19, 83/21, 84/3, 84/7, 84/12, 85/3, 85/7, 109/25, 110/3, 110/4, 110/8, 113/9, 113/12, 113/13, 113/14, 113/15, 113/16, 119/6, 119/7, 122/5, 122/16, 122/19, 123/19, 124/3, 124/25, 128/19, 130/7, 131/10, 131/13, 132/24, 133/7, 133/6, 134/1, 134/5, 134/10, 140/23, 141/4, 145/6, 146/15, 146/25, 147/4, 147/21, 147/22, 147/23, 168/2, 168/3
branches 29/8, 32/1, 33/12, 33/19, 49/16, 79/22, 110/10, 123/21
break 11/9, 12/19, 12/23, 18/25, 49/15, 70/2, 70/12, 70/17, 89/14, 135/19, 135/22
Briar 33/15, 33/16, 33/21, 33/22, 34/6, 34/17, 34/19, 34/20, 34/23, 80/13, 80/14, 80/19, 80/20, 80/21, 80/22, 80/24, 81/4, 81/7, 81/11, 81/14, 82/9, 82/10, 82/14, 84/6, 84/15, 84/18, 84/22, 85/2, 110/3, 113/15, 122/16, 123/13, 123/15, 123/19
bring 20/12, 20/18, 20/21, 25/6, 28/9, 42/8, 54/8, 54/9, 89/16, 113/1, 119/9
Brinks 18/21, 18/22
British 106/25, 107/1, 107/9, 107/13, 108/5, 108/8, 108/15, 108/19, 108/22, 109/2, 109/4, 109/10, 109/13
broad 41/11
brought 5/5, 21/2, 52/4, 59/11, 74/20, 86/24, 87/14, 87/19, 88/15, 88/25, 95/22, 96/5, 114/21, 148/14, 156/7
Broward 4/14, 169/4, 170/4, 172/2, 172/13, 174/3
Buckhead 41/5, 42/10, 42/12
buddies 118/7
build 33/19, 43/23, 43/25, 44/16
building 28/18, 29/18, 45/19
business 25/7, 25/8, 26/11, 26/5, 27/4, 27/5, 31/13, 34/1, 42/9, 44/25, 127/4, 127/8, 132/20, 137/23, 139/2
businesses 25/19
busy 48/18, 66/13, 132/14
buy 41/13

C

calculate 164/18
calculation 135/3, 135/5
Calendar 2/15, 22/3, 22/22, 23/1, 23/3, 23/5, 24/2, 24/3, 36/10, 36/12, 39/12, 39/15, 39/17, 39/19, 39/20, 47/6, 48/21, 48/24, 49/6, 50/24, 51/20, 77/18, 96/5, 154/16
calendars 88/6
Call 31/25, 32/9, 33/7, 35/7, 44/7, 50/1, 79/25, 108/10, 118/13, 120/25, 121/1, 133/18, 133/24, 142/15
calls 32/13, 32/14, 32/22
came 53/7, 53/10, 54/12, 83/4, 83/9, 87/2, 118/21, 120/24, 161/14
candidate 40/15
capacity 172/16
car 11/6, 18/22, 40/17, 46/7, 46/8
carbon 129/15
Card 2/18, 2/20, 3/10, 3/11, 64/11, 64/25, 71/12, 72/12, 77/13, 77/16, 111/21, 112/5
cards 77/3, 127/15
care 15/23, 16/9, 16/15, 18/6
carefully 57/5
Carl 7/25, 8/1, 8/4
Carolina 118/5
carry 76/4
CASE 1/2, 13/13, 45/13, 153/18, 172/5
category 90/25
CB 28/9, 28/13, 28/14, 28/15, 28/19, 29/5, 29/15, 62/4, 62/9, 63/15, 67/8, 73/20, 79/2, 79/11, 79/15, 81/12, 82/25, 90/2, 118/16, 119/2, 119/5, 119/9
CB's 29/14, 35/6, 77/25, 78/1, 78/23, 78/24, 79/2, 90/17, 90/20, 110/22, 124/1
CB-4 118/16
cc 171/19
center 16/17, 33/17, 33/24, 35/5, 36/22, 40/9, 42/9, 42/13, 43/6, 43/11, 43/25, 44/2, 44/3, 44/15, 45/3, 45/4, 45/24, 47/25, 62/3, 77/21, 79/18, 80/6, 81/3, 83/2, 84/2, 84/11, 84/19, 84/21, 85/1, 85/11, 88/9, 88/11, 89/3, 90/11, 113/6, 113/18, 119/1, 119/4, 119/24, 121/19, 122/3, 122/22, 122/23, 122/25, 123/13, 124/2, 124/11, 125/9, 129/15,

147/2, 161/14, 161/24
center's 42/8, 84/8, 121/20
centers 44/18, 90/10, 124/10, 134/9
CERTIFICATE 169/2, 170/2, 172/11
certification 100/25
CERTIFIED 2/10, 172/4
certify 169/6, 170/6, 170/9, 173/6
chance 59/20, 75/3, 94/2, 157/24
change 46/9, 64/4, 68/7, 70/12
changed 67/25, 77/2, 124/14
changes 64/7, 172/6
chapter 10/14
charge 10/8, 13/22
charges 17/14, 17/16, 18/1
checking 137/18
child 16/9
children 45/21
circled 23/9, 23/13
circumstances 13/2, 160/25
city 43/8
civil 5/16
claim 71/23, 93/11
clarify 6/8
class 111/12, 111/15, 111/21, 112/7, 112/22,
117/9, 117/16, 155/6, 155/11
classified 37/9
clean 71/1, 134/5, 140/23
cleaned 62/14
clear 41/16, 72/24, 89/14, 164/7, 164/15
clearly 102/18
Clerk 171/19
Client 2/7
clock 77/22, 77/25, 78/1
close 17/9, 118/18, 127/16, 127/18, 130/6, 138/18
closed 32/1, 36/22, 121/22, 122/25
closer 33/23, 64/19, 64/21
closest 42/13
closing 122/12
co-workers 78/22
code 130/15, 130/20
codes 130/8
cold 32/14
collect 62/6
College 8/10
column 58/14, 58/24, 59/1, 69/23, 70/3, 70/7,
158/16, 164/17, 167/2, 167/3
combination 28/2
combined 120/18
commencing 4/16
comments 6/11, 91/17, 91/24
Commission 169/15, 172/21, 173/21
common 33/11, 38/13, 38/17, 139/16
communication 91/4, 99/10, 102/15, 104/16,
104/21, 149/6
communications 100/17, 101/7, 105/16, 149/4,
151/22, 152/10, 154/8
community 25/2, 25/3, 25/5, 25/6, 25/7, 25/8,
25/11, 26/3, 26/9, 26/10, 38/11, 38/12, 40/9, 40/24,
41/1, 41/3, 41/5, 41/21, 42/24, 42/25, 43/1, 44/16,
44/21, 45/5, 45/15, 119/14, 134/20, 136/22, 137/24
comp 112/2, 112/4, 112/9, 112/17, 112/19, 112/20,
113/10, 114/16, 117/14
company 5/15
company-wide 85/25
compare 119/6
compels 14/11
compensate 66/2, 140/24
compensated 47/2, 47/13, 48/9, 48/13, 56/12,
65/13, 67/6, 114/18, 147/6
compensating 65/7, 112/1
compensation 56/13, 56/16, 140/3, 140/20,
141/15, 141/23
complain 39/3, 78/15, 78/19, 85/17, 112/5, 114/6,
116/11, 121/5, 138/14, 139/17, 139/22, 140/1,
140/5, 140/8, 140/18
complained 112/8, 114/8, 114/25, 115/20, 115/25,
116/13, 116/19, 140/7
complaining 140/10, 140/21
complaint 93/5, 93/6, 93/9, 93/11, 100/9,
111/1, 111/4, 111/6, 114/5, 114/11, 116/20, 117/6,
117/17, 117/19, 118/12, 118/24, 118/25, 121/14,
140/12
complaints 110/6, 110/24, 117/4, 118/13
complete 56/19, 63/9, 63/13, 66/15, 73/21, 73/24,
75/16, 75/20, 81/15, 155/2, 155/15, 163/4, 170/8,
171/13
completed 18/15, 70/18, 70/23, 73/14, 75/24,
79/15, 80/12, 154/15, 166/24, 166/25, 171/11
completing 63/6, 73/16, 80/9, 143/2
completion 154/4, 155/1
compliance 137/7

comply 130/4
comprised 26/1
compulsion 14/8
computer 127/25, 128/1
concern 25/10, 38/17, 85/3, 111/24, 114/14,
116/4, 117/14, 139/19, 163/12, 163/14
concerned 50/5
concerns 118/22
concluded 168/11
condense 83/25
condo 9/5
conduct 32/22, 111/7
conference 120/17, 121/6, 121/7, 128/25
conferences 120/10, 120/13, 120/22, 121/10
confident 69/10
confidentiality 14/1, 14/4
conflict 45/10, 139/6, 149/11, 149/14
confused 107/11, 107/20
connected 170/11
Connie 81/8, 81/9, 81/12
Consent 3/5, 97/25, 101/16, 101/19, 102/3, 144/3
consequence 111/21
consideration 117/16
consistent 79/6, 86/4
consistently 132/5
construction 27/6, 29/18
consumer 27/19, 27/22, 28/15, 34/16, 75/16,
75/20, 81/6, 86/7, 90/8, 109/20
contact 20/9
contacted 114/9, 161/10, 161/11
contain 92/6, 101/19, 101/22, 102/6, 103/22
contained 93/11, 150/1, 151/6, 159/1, 159/5
contains 95/2
contend 56/25
content 55/4
contention 57/8
contents 152/2
context 69/8
continue 77/17
Continuing 27/24
control 111/9, 129/11, 129/17, 130/11, 130/22,
131/5, 131/6, 131/8, 131/12, 139/12, 164/11, 164/12,
167/25
conversation 54/2, 65/16, 66/4, 66/7, 141/3,
161/19
conversations 53/24, 99/9, 126/12
conversing 16/5
convicted 10/5
convoluted 60/9, 107/3
Cooper 108/11
cooperation 171/15
copied 24/2, 157/8
COPORATION 4/7
copy 20/25, 21/6, 86/17, 86/22, 87/6, 91/19,
129/15, 154/19, 154/22, 168/9, 171/10, 171/12, 172/4
corner 61/15
corporate 32/3, 45/5, 86/5, 113/6, 143/11,
143/15, 143/22
CORPORATION 1/8, 1/9, 4/6, 4/7, 4/8, 86/14,
171/8, 172/5
correct 5/7, 5/8, 11/3, 11/19, 12/6, 15/14, 17/1,
17/3, 17/4, 17/24, 18/10, 18/23, 20/16, 20/17, 21/15,
22/14, 23/6, 23/7, 23/10, 24/3, 24/4, 24/7, 24/8,
24/15, 24/16, 24/19, 26/13, 26/17, 27/8, 27/16,
28/25, 29/23, 31/23, 32/17, 32/21, 34/8, 34/18,
35/14, 35/23, 36/13, 36/14, 36/17, 36/25, 38/2, 39/9,
41/1, 41/2, 43/15, 44/10, 47/8, 47/10, 48/14, 48/23,
50/21, 50/25, 51/1, 51/21, 51/22, 52/2, 52/3, 52/20,
55/12, 57/3, 57/5, 60/22, 61/11, 61/12, 64/3, 65/18,
65/19, 69/19, 69/20, 69/24, 69/25, 70/6, 70/9, 70/21,
71/7, 71/8, 73/25, 74/1, 75/13, 78/2, 78/5, 78/10,
80/11, 84/12, 84/13, 84/16, 84/20, 84/23, 84/24,
87/1, 89/18, 89/19, 89/23, 90/12, 90/16, 107/10,
107/16, 107/23, 108/25, 109/25, 110/5, 110/6, 110/9,
110/25, 116/22, 120/12, 120/15, 121/13, 122/14,
122/14, 123/16, 123/17, 124/4, 124/5, 124/9, 124/16,
125/4, 126/10, 130/2, 130/19, 130/21, 131/7, 131/14,
134/13, 134/16, 134/17, 136/2, 136/13, 136/14,
137/12, 137/15, 137/16, 138/13, 140/15, 142/7,
144/16, 145/9, 145/25, 147/4, 147/6, 149/24, 152/4,
155/3, 155/7, 155/10, 156/25, 157/1, 157/14, 157/15,
158/10, 158/21, 161/3, 163/1, 163/2, 163/20, 163/22,
164/1, 164/2, 166/13, 167/2, 167/6, 167/12, 167/13,
167/17
Corrected 3/8, 153/18, 153/19, 154/6, 163/15
correctly 16/23, 25/24, 37/17, 51/25, 90/13
correspond 61/1
corresponds 61/7
costs 103/10, 103/24, 104/8, 104/13, 105/4, 105/8
counsel 12/15, 30/21, 53/24, 54/3, 91/2, 91/4,
98/17, 99/10, 100/18, 101/8, 102/16, 104/17, 104/22,

170/10, 170/11
counsel's 98/21
counted 136/25
County 4/14, 169/4, 170/4, 172/2, 172/13, 174/3
couple 6/1, 30/19, 64/23, 108/3, 111/11, 125/10,
164/6
courier 18/23
course 45/21, 155/12, 155/13, 155/15, 155/18
COURT 1/1, 4/10, 5/21, 6/21, 14/2, 14/5, 14/10,
14/11, 15/5, 15/8, 19/7, 19/14, 21/5, 21/17, 21/20,
52/6, 59/11, 70/12, 74/20, 93/15, 94/12, 95/19,
97/10, 97/16, 115/15, 144/18, 148/23, 149/2, 150/11,
153/6, 155/20, 157/16, 171/19
courtesy 7/6
covered 14/1, 97/4
crazy 109/9
create 32/20, 33/25
created 26/12, 68/2
credit 127/15
criminal 10/6
critical 22/7
Cross-Examination 2/5, 164/8
CSM 81/10
Currently 9/19, 11/16, 15/15, 106/7
curve 165/6, 165/7
customer 33/25, 34/12, 40/13, 40/16, 40/19,
40/21, 42/23, 48/5, 49/25, 50/1, 81/10, 85/7, 121/24,
122/3, 122/5, 122/22, 123/2, 125/12, 126/24, 133/4,
137/9
customer-related 133/15
customers 32/4, 32/12, 32/18, 32/20, 33/3, 33/4,
33/5, 38/7, 40/10, 40/25, 41/5, 41/6, 41/20, 42/18,
43/5, 44/7, 44/21, 45/4, 45/16, 48/6, 81/24, 82/5,
119/12, 119/20, 122/1, 135/14
cut 17/5, 17/7, 17/23, 18/6, 63/6, 63/7, 63/12,
87/16
cut-off 17/12
cycle 23/14

## D

d/b/a 1/8, 4/7
daily 49/7, 64/13, 69/13, 71/20, 73/25, 76/21,
77/9, 77/10, 78/4, 121/9, 125/15, 132/5
dare 141/2
date 9/22, 23/13, 24/14, 36/5, 48/16, 49/21, 56/4,
58/18, 59/6, 61/7, 61/11, 72/11, 72/25, 98/8, 98/11,
150/4, 150/5, 150/6, 150/14, 158/14, 161/4, 167/5,
173/20, 174/5
dated 56/1, 58/3, 58/12, 58/23, 59/4, 170/12
dates 61/1, 75/25, 107/21, 156/9, 166/21
daughter 9/17, 9/18, 15/13, 15/22, 16/10, 16/12,
16/24, 17/10, 17/21, 18/3, 18/14, 19/4, 37/6, 136/8,
136/11, 136/16
daughter's 9/20
David 108/10
day 4/15, 17/6, 18/14, 18/16, 18/24, 27/9, 27/14,
28/3, 28/6, 31/12, 31/19, 33/6, 34/1, 37/6, 37/7,
37/8, 43/25, 44/3, 44/7, 44/8, 44/9, 44/20, 44/22,
45/4, 45/8, 45/15, 46/17, 47/2, 47/3, 47/13, 47/22,
49/5, 49/18, 49/19, 65/8, 66/11, 67/12, 68/13, 68/16,
68/22, 70/11, 78/15, 80/21, 116/25, 118/10, 118/21,
121/4, 121/5, 125/4, 132/7, 135/13, 136/5, 138/4,
161/15, 166/24, 166/25, 169/9, 170/12, 172/8, 172/18
days 49/9, 63/5, 71/11, 80/20, 80/22, 111/11,
116/24, 121/3, 123/2, 126/20, 132/14, 142/8, 142/12,
142/14, 142/16
deactivate 130/9
deactivating 130/20
deal 14/16, 43/1
dealing 64/17
dealt 84/11
death 142/16
debts 36/3
December 20/15, 22/22, 23/9, 24/13, 27/18,
27/21, 27/25, 28/7, 29/5, 30/2, 30/11, 30/24, 31/11,
31/22, 33/14, 34/14, 60/18, 62/23, 64/5, 64/17,
64/20, 65/24, 75/11, 75/12, 75/19, 117/1, 117/2,
117/3, 123/24, 128/11, 131/16, 131/23, 133/20,
134/18, 134/25, 135/25, 142/1, 142/13, 142/20,
143/23, 144/15, 162/15, 162/20, 162/22, 162/23
decent 110/15
decide 98/13
deductions 53/6
defeat 42/7, 42/11
Defendant 1/11, 1/20, 4/2, 4/9, 4/21
Defendant's 2/13, 2/15, 2/16, 2/18, 2/20, 2/22,
3/2, 3/4, 3/6, 3/7, 3/9, 3/11, 19/9, 19/11, 19/15,
20/5, 21/7, 21/9, 21/13, 21/21, 21/25, 22/10, 22/20,
24/1, 24/2, 24/10, 31/20, 35/25, 36/9, 47/5, 50/22,
52/7, 52/11, 52/15, 53/9, 59/12, 59/13, 59/17, 70/17,
74/21, 74/22, 75/1, 93/15, 93/21, 93/25, 94/12,

97/17, 144/19, 144/20, 144/24, 149/22, 150/3, 153/7,
153/8, 153/12, 154/16, 154/19, 154/22, 155/2,
155/22, 155/23, 156/2, 156/16, 156/21, 156/23,
157/12, 157/14, 157/17, 157/18, 157/22, 158/6,
159/16, 159/23, 163/19, 163/25, 167/11
defending 5/4, 105/9
Delta's 118/8
department 109/12, 116/21
depend 33/1
depended 32/25, 67/15
depo 87/25
deponent 171/12, 173/4, 174/4
deposit 29/17, 38/18, 38/19, 40/13, 111/7, 112/19,
120/16
DEPOSITION 1/23, 2/14, 4/1, 5/9, 7/19, 20/8,
20/11, 21/1, 65/11, 87/22, 88/2, 88/5, 93/6, 95/25,
97/6, 133/19, 137/13, 156/21, 168/11, 170/2, 170/7,
171/10, 171/12, 172/4, 173/7, 174/5
derived 26/24, 48/25
describe 110/13
described 122/7, 172/15
desire 172/6
desired 38/21, 152/6, 152/15
desk 48/6, 126/3, 162/7
details 15/10
determine 32/7, 40/16, 49/1, 129/4, 150/18
determined 132/19
determining 125/8
develop 42/17, 44/21, 45/16
developed 42/23
developing 45/4
development 27/7
Diane 106/18, 109/3
diary 96/7
difference 71/17, 84/25, 156/8, 156/23
difficult 16/20, 16/22, 18/25, 88/9, 119/17,
135/13, 137/3
diffuse 119/10
dig 17/17
Direct 2/3, 4/23
director 114/9, 115/9, 140/10
director's 114/22
directors 28/20
disarm 131/11
disclosing 88/19, 149/4, 149/6
discovery 4/3
discreet 118/18
discrepancy 53/5
discretion 35/9, 35/22
discrimination 13/13, 13/22
discuss 12/11, 22/13, 29/19, 65/10, 96/23, 99/3,
134/15, 160/24
discussed 78/23, 91/6, 96/14, 96/18, 110/20,
110/22, 120/23, 121/15, 133/19, 138/17, 140/14,
146/7, 147/15, 147/16, 147/25, 156/20, 157/14,
159/11
discussing 70/17, 138/19
Discussion 89/12, 105/24, 158/5
discussions 88/19
disputes 5/16
dissolve 139/3
Distance 106/10, 106/12, 106/15, 106/23, 109/5,
109/17
distinguishing 35/15, 132/18
distress 7/17
distribute 68/1, 91/9
distributed 76/24, 77/3, 89/2, 91/7, 91/11
DISTRICT 1/1, 4/10
docket 61/14
doctor 37/5, 37/7
document 19/8, 19/11, 19/17, 20/1, 20/4, 21/9,
21/22, 22/1, 43/17, 52/5, 52/11, 52/19, 52/23, 53/8,
53/18, 53/21, 54/5, 54/6, 54/15, 54/19, 55/5, 55/11,
55/16, 59/10, 59/13, 59/20, 59/24, 60/1, 60/2, 61/15,
63/2, 63/3, 63/4, 74/22, 75/3, 75/7, 87/10, 90/23,
91/19, 93/19, 93/21, 94/5, 94/7, 94/13, 94/25, 95/2,
97/10, 97/12, 97/16, 97/20, 97/22, 97/24, 98/6,
98/11, 102/6, 102/10, 102/15, 102/18, 102/22,
102/23, 103/5, 103/6, 103/12, 103/14, 103/20,
103/22, 104/1, 104/18, 104/19, 105/3, 135/16, 136/9,
144/20, 145/13, 145/17, 149/20, 151/9, 151/15,
151/17, 152/20, 153/2, 153/8, 153/17, 153/22,
154/25, 155/21, 155/23, 156/17, 156/19, 157/18,
158/1, 160/2
documentation 17/16, 20/12, 21/2, 87/21, 87/23,
88/13, 88/23, 89/2, 89/5, 89/7, 89/15, 89/17, 89/20,
89/24, 90/3, 92/1, 95/22, 95/23, 96/1, 151/8
documents 20/18, 20/19, 20/21, 20/25, 21/6,
46/21, 87/14, 87/19, 87/20, 88/4, 90/4, 90/14, 90/19,
91/18, 91/23, 127/15, 152/6
doesn't 40/18, 45/11, 73/12, 119/13, 165/4, 165/5,
165/9, 166/8

Dolin 1/8, 2/16, 3/13, 8/1
Dolin's 20/9, 54/24, 98/14, 100/15, 103/3
door 118/19, 122/20, 129/21, 130/12
doors 121/22, 121/24
downtown 80/5, 171/1
DRAKE 1/4, 4/4
Drive 8/10, 8/13, 9/15, 18/17, 34/11
drive-thru 122/6, 122/10, 122/11
driver 16/19, 18/13
drivers 18/23
dual 111/9, 129/11, 129/17, 130/11, 130/22, 131/5,
131/6, 131/8, 131/12, 139/12, 164/11, 164/12, 167/25
duplicate 156/20, 157/13
duplicative 156/6
during 9/15, 17/25, 18/11, 18/17, 19/2, 34/1,
43/25, 44/3, 44/7, 44/8, 44/19, 44/22, 45/3, 45/15,
60/6, 62/10, 62/20, 62/22, 64/4, 80/7, 80/17, 82/17,
84/2, 84/9, 84/11, 84/18, 85/6, 87/5, 110/10, 120/6,
129/6, 131/23, 133/20, 134/18, 135/13, 136/5, 136/7,
136/15, 141/25, 142/10, 142/16, 142/19, 143/22,
146/15, 147/4, 162/14
duties 40/3, 84/10, 85/6, 112/25

### E

earning 119/5
earnings 58/7, 58/14, 58/23, 59/1
easier 6/2, 22/17, 116/6
East 1/13, 4/13, 171/1
easy 99/3
educate 42/10
effective 161/15
Eight 15/19, 15/20, 28/9, 67/24, 69/19, 69/22,
79/13, 134/4, 139/13, 139/15
eight-week 79/16
elaborate 29/15, 37/11, 68/17
elderly 25/3
eligible 39/21, 40/17
emotional 7/17
employ 161/1, 161/6
employed 39/23, 90/8, 106/7, 106/9
employee 21/1, 61/17, 61/20, 76/9, 110/17, 129/9,
158/19, 170/9, 170/10
employees 77/21, 141/4, 143/16, 146/15
employer 13/23, 108/24
employment 8/19, 9/16, 19/3, 52/1, 60/7, 79/8,
84/23, 90/24, 96/8, 106/11, 107/13, 107/14, 108/8,
143/22, 161/13, 162/14
encourage 33/25
end 20/15, 34/15, 49/18, 49/19, 62/24, 63/12,
64/1, 64/18, 64/19, 64/22, 70/3, 71/6, 71/22, 77/1,
79/14, 106/22, 107/6, 107/22, 108/1, 123/25, 125/4,
125/19, 128/17, 131/23, 133/21, 134/19, 135/1,
135/17, 136/4, 142/1, 142/13, 142/19, 142/20, 161/1,
162/3, 162/15, 162/21
ended 17/13, 18/1, 18/14, 26/18, 47/22, 107/14
ending 49/3, 70/11, 78/7, 78/8, 90/2, 125/14,
125/24
engaging 126/12
enjoyed 137/2
enrolled 16/11, 17/11, 17/21, 30/23, 155/13
enrolling 30/25, 31/2
ensure 7/3, 137/6
enter 49/7, 69/13, 127/24
entered 49/8, 60/24
entitled 39/8, 42/3, 65/21, 76/3
entity 54/19
entries 49/6, 49/7, 51/23, 51/24, 61/10, 72/6,
72/18, 73/25, 158/13, 159/16, 160/15, 166/20
entry 23/20, 27/17, 27/25, 28/7, 31/4, 33/13,
36/15, 36/20, 36/21, 43/18, 46/5, 46/23, 47/9, 47/11,
47/14, 48/7, 48/11, 48/16, 50/2, 50/15, 50/18, 51/2,
51/7, 51/11, 57/21, 58/8, 58/10, 58/11, 58/15, 59/1,
59/7, 69/18, 69/23, 70/8, 73/10, 158/7, 160/12
errands 31/16
Errata 171/11, 172/6
ESC 149/21
ESC-413 2/17, 52/8, 53/15, 149/24, 154/10
ESCUDERO 1/3, 4/4, 153/18, 171/8, 172/5
establish 144/15
established 26/6, 70/23
establishments 25/9
estimate 136/6
evasive 13/1
evening 44/22, 111/7, 134/6
evenings 133/5, 134/15
event 47/21, 140/22, 163/16
events 7/14, 22/5, 138/11
evidence 4/3
Examination 2/6, 4/23, 166/15
exception 65/5, 158/24, 164/18
excess 140/13, 140/19, 141/7, 141/14, 141/22,
148/5

excluding 10/20, 10/22, 11/11, 13/5
executed 172/15, 172/16, 173/3
Exhibit 2/13, 2/15, 2/16, 2/18, 2/20, 2/22, 3/2,
3/4, 3/6, 3/7, 3/9, 3/11, 19/9, 19/12, 19/15, 20/5,
21/4, 21/7, 21/10, 21/13, 21/21, 21/25, 22/2, 22/10,
22/13, 22/21, 23/23, 24/1, 24/2, 24/10, 31/21, 35/25,
36/10, 47/5, 49/21, 50/23, 51/19, 52/4, 52/7, 52/12,
52/15, 52/18, 52/22, 53/9, 59/12, 59/14, 59/17,
59/23, 70/17, 72/4, 72/13, 74/19, 74/21, 74/23, 75/1,
75/6, 75/23, 86/21, 93/13, 93/22, 93/25, 94/12,
94/14, 94/17, 95/4, 95/7, 97/11, 97/13, 97/17,
144/19, 144/21, 144/24, 145/1, 145/4, 149/22, 150/3,
150/23, 150/25, 151/5, 151/12, 153/6, 153/7, 153/9,
153/12, 153/14, 154/3, 154/4, 154/11, 154/13,
154/16, 154/19, 154/22, 155/3, 155/22, 155/24,
156/2, 156/16, 156/21, 156/23, 156/25, 157/12,
157/14, 157/17, 157/19, 157/22, 158/6, 159/16,
159/23, 160/11, 162/13, 163/19, 163/25, 164/16,
166/18, 166/25, 167/11, 167/16, 167/18
exhibits 71/14, 86/24, 146/7
existing 32/18, 32/20
expect 116/17
expectation 128/13
Expires 169/15, 172/21, 173/21
explanation 6/20, 16/3, 16/6, 66/1
expound 40/12
expressed 172/17
eyes 40/14

### F

F-O-A 106/20
f/k/a 1/9, 4/8
faces 85/12
facilities 25/18
facility 112/13, 113/5
fact 17/22, 27/22, 39/11, 40/17, 42/19, 64/16,
138/23, 152/19, 157/13, 162/2, 162/3, 162/13,
162/19, 162/25
factor 132/18
factors 35/15
facts 150/9
failed 57/9
fair 7/7, 7/8, 8/25, 14/8, 14/13, 35/22, 55/8,
57/13, 61/2, 61/8, 63/17, 63/20, 69/13, 70/20, 75/10,
75/18, 78/9, 83/11, 95/2, 97/24, 105/13, 110/23,
121/12, 125/25, 134/10, 141/6, 141/11, 141/13,
141/21, 141/24
fall 53/12, 83/22
familiarize 133/10
family 142/17
February 1/14, 4/15, 20/15, 34/15, 50/2, 50/16,
50/24, 51/2, 51/7, 51/11, 62/25, 64/5, 64/18, 64/22,
77/2, 106/22, 107/5, 107/6, 107/23, 108/1, 117/2,
123/25, 128/18, 131/16, 131/24, 133/21, 134/19,
135/1, 135/25, 142/1, 142/13, 142/20, 143/23, 157/3,
157/4, 157/5, 158/3, 158/4, 161/1, 162/9, 162/15,
162/21, 162/23, 169/9, 170/12, 171/4, 171/11, 172/5,
173/8
federal 15/8
fees 101/4, 101/20, 102/7, 103/2, 103/23, 104/7,
104/12
Felicia 85/13, 85/14
fifth 49/20
file 10/12, 10/17, 13/22
filed 4/11, 10/10, 10/14, 15/5, 15/7, 53/19, 93/3,
97/25, 99/6, 99/18, 99/23, 100/4, 100/12, 145/7
fill 63/14, 73/13, 165/12, 165/13
filled 64/2, 146/6, 154/2, 158/9
filling 62/1, 63/3, 73/11
financial 38/12
financially 25/3, 170/11
find 88/7, 88/10, 88/13, 99/3, 171/10
fine 12/18, 16/2, 16/3, 22/18, 21/16, 54/14
finish 7/1, 7/6, 19/23, 76/19, 122/2, 139/21
finished 17/25, 20/1, 87/14, 110/2
finishes 133/1
firm 5/4, 93/18, 96/12, 96/19, 96/20, 98/14,
100/15, 101/4, 101/21, 102/8, 103/3, 103/10, 103/24,
104/14, 105/4
firm's 102/8
firms 96/20
first-time 45/20
five 8/14, 63/5, 66/18, 67/4, 67/17, 125/3, 125/6,
126/20
FL 171/7
flex 112/3, 113/11, 114/16
flip 31/20, 36/9, 47/4, 49/20, 50/22, 63/22, 159/15,
159/24, 160/10
floaters 62/17
floor 48/5, 79/22, 81/2, 81/19, 81/23, 132/9, 132/14
FLORIDA 1/1, 1/14, 4/10, 4/13, 4/15, 118/4,

174/2
Foa 106/18, 109/3
folks 25/17, 26/1, 29/1, 32/15
follow 50/1, 93/20, 131/12
follow-up 166/17
follows 4/22, 68/10
force 139/1
foreign 1/8, 1/9, 4/7, 4/8
forgot 112/14, 150/21
form 40/7, 41/7, 41/8, 41/10, 41/22, 52/25, 56/5,
  70/22, 92/2, 92/22, 96/25, 99/25, 104/1, 115/2,
  141/9, 141/16, 163/9, 163/24
formal 79/20, 80/1, 80/9, 109/24, 110/2, 110/24,
  111/1, 111/4, 112/23, 113/17
format 60/20
formatting 53/5
forms 137/7, 171/11, 171/12, 171/13
Fort 1/14, 4/14, 171/2
forum 28/9, 28/13, 28/14, 28/15, 29/5, 29/20
forums 29/19
foster 25/10
found 16/16, 88/14, 149/11, 149/14
foundation 41/23, 42/5, 43/2
four 80/20, 109/22
fourth 47/4, 58/12
frame 134/22
free 94/21
frequency 26/20, 29/13, 126/21
frequently 133/19
Friday 47/18, 48/15, 63/18, 69/15, 70/19, 72/2,
  72/3, 123/20, 127/22, 134/3, 134/11
Fridays 47/24, 47/25, 48/2, 48/4, 48/17, 48/18,
  49/10, 49/15, 65/5, 117/11, 122/18, 122/23, 122/25,
  123/1, 123/11, 123/12, 124/16, 124/17
friend 28/4, 31/6
friends 31/10, 43/7
front 52/20, 59/24, 75/7, 81/16, 130/12, 157/8,
  167/20
frustrating 116/16
full-service 123/21
full-time 50/8
function 50/8
funding 26/9
furious 116/1, 116/3
future 9/9, 9/9, 101/1, 144/2

## G

garbage 25/16, 25/17
gears 106/6, 121/8, 144/17
generated 32/2
geographical 40/5, 40/8
Georgia 6/12, 8/10, 10/17, 26/7, 30/15, 30/17,
  30/21, 30/23, 31/2, 112/14, 118/5, 118/6, 155/6
Gibson 81/5, 84/19, 110/14, 110/17
Gibson's 110/18
girl's 85/12
glad 6/9, 19/22
goal 38/7, 40/10, 42/8
goals 139/19, 139/20
goods 25/11
gracious 20/24
greater 125/12, 146/9
Green 33/15, 33/16, 33/21, 33/22, 34/6, 34/17,
  34/18, 34/20, 34/23, 80/13, 80/14, 80/19, 80/21,
  80/22, 80/24, 81/4, 81/7, 81/11, 81/14, 82/9, 82/10,
  82/14, 84/6, 84/15, 84/18, 84/22, 85/2, 113/3,
  113/15, 122/15, 123/13, 123/15, 123/18
grid 58/7
grievance 142/16
ground 6/1, 45/9, 97/5
grounds 99/13
grow 27/5
growth 25/10
guard 129/11
guess 21/5, 23/21, 31/16, 34/14, 36/6, 51/15, 56/4,
  56/7, 58/19, 86/9, 88/9, 137/1, 143/7, 148/12,
  150/15, 156/9, 161/25
guesstimated 69/5
guys 79/5, 110/14

## H

half 123/3
hand 19/8, 21/5, 21/12, 23/22, 52/6, 52/14, 59/10,
  59/16, 74/19, 93/4, 93/24, 94/11, 94/16, 97/9,
  97/15, 144/17, 144/23, 153/5, 153/11, 155/20, 156/1,
  157/16, 157/21, 169/9, 172/18
handbook 86/18
handed 19/14, 21/20, 21/22, 156/15
handing 74/25

## I

idea 27/20, 30/8, 61/25, 64/15, 73/22, 74/18, 80/8,
  126/20, 160/23
ideas 28/16
identification 19/12, 21/10, 52/12, 54/18, 59/14,
  74/23, 93/22, 94/14, 97/13, 144/21, 153/9, 155/24,
  157/19
identified 165/22
imagine 83/15
implemented 78/13, 85/19, 85/21, 86/3, 86/15,
  124/14
imposed 45/6, 124/8
impression 115/12, 116/3
improvement 129/1
in-out 167/10, 167/19
in-put 156/9, 156/24
inaccurate 26/5, 163/6, 163/11
inclusion 171/14
income 10/1
inconvenience 43/8
incurred 103/10, 103/24, 104/13, 105/4, 105/9
indicate 55/13, 56/3, 56/12, 67/16, 139/8, 146/8
indicated 10/3, 66/17, 67/4, 67/14, 116/2, 147/18,
  149/12, 149/15, 172/6
indicates 56/6, 56/7, 56/11, 63/20, 98/9
indicating 145/5
indication 101/20
industry 33/11

## J

information 12/11, 24/6, 25/22, 40/16, 60/23,
  72/18, 73/4, 73/18, 74/3, 74/5, 75/23, 76/3, 91/6,
  91/7, 91/9, 91/14, 92/8, 92/15, 92/17, 92/20, 96/6,
  102/6, 103/16, 103/22, 127/25, 146/6, 150/1, 150/18,
  151/1, 151/19, 154/1, 154/5, 158/8, 159/1, 159/6,
  167/7, 167/8
informed  20/18, 37/18, 68/4, 147/3
initial  74/1, 161/10
initialed  74/2
initialing  73/16
initials  61/18, 61/20, 61/23, 76/10, 76/14, 158/17,
  158/19, 158/22
inquiry  32/15
instant  14/23
instruct  13/24, 99/14, 100/21, 101/11, 105/21,
  138/6
instructed  38/25, 98/18, 112/24, 113/18, 125/3,
  148/3, 149/7, 151/24
instructing  16/4, 98/25
instruction  113/21, 149/16
instructions  145/22
instructs  12/14
instrument  172/15, 172/16
interfere  139/4
interrupt  19/24
intervening  108/24
introduced  5/2
involvement  100/14
issue  12/16, 12/18, 14/15, 65/25, 85/3, 114/14,
  114/20, 117/23, 118/24, 120/23, 121/11, 128/22,
  128/25, 137/1, 140/25, 148/10, 148/15, 161/8
issues  34/13, 38/1, 48/5, 120/6, 120/14, 125/13,
  137/18, 148/19

## J

J-A-S-M-I-N-E  9/21
January  9/23, 31/3, 36/11, 36/15, 36/20, 37/2,
  39/11, 39/14, 43/18, 46/5, 46/7, 46/23, 47/7, 47/9,
  47/14, 47/22, 48/7, 48/15, 55/9, 60/3, 60/18, 60/19,
  63/18, 63/19, 63/21, 64/22, 65/24, 70/19, 70/20,
  71/5, 72/2, 72/3, 72/5, 73/19, 117/1, 117/2, 157/3,
  157/4
Jas  37/5
Jasmine  9/21
job  18/3, 38/6, 40/3, 42/17, 86/18, 89/18, 91/10,
  107/6, 108/9, 112/25, 113/24, 132/22
join  11/20, 97/25
joined  5/6, 53/18, 53/20
joining  99/18, 99/23
Jones  8/5
jot  22/7, 23/14
jotted  71/13
Joy  81/5, 81/12, 81/14, 84/19, 85/4, 110/14, 110/20
judge  6/5
juggled  18/8
juggling  18/2
July  106/13, 106/23, 107/7, 150/10
jump  109/9
June  8/21, 79/10, 81/25, 109/20
Jury  6/5

## K

key  138/4
keyed  71/14, 156/9
kick  137/3
KIMBERLY  1/4, 4/4
King  36/23
knowledge  95/8, 101/19, 119/23, 145/4, 145/18,
  145/19
known  8/6, 138/5, 168/1, 172/15

## L

lab  79/21, 80/1, 80/10, 112/21, 113/2, 113/3, 113/4
lack  31/16, 42/4, 57/20, 73/8
lady  42/14, 112/15, 118/13
laid  23/1
LANGDON  1/20, 5/3, 171/20
Large  4/13, 25/18
Las  1/13, 4/14, 171/1
later  46/20, 65/10, 77/19, 87/17, 99/4, 111/11,
  128/22
latest  79/14, 129/5, 136/13
Lauderdale  1/14, 4/14, 171/2
law  100/15
lawful  4/2, 4/20
lawsuit  10/20, 10/21, 10/22, 11/6, 11/11, 11/12,
  11/17, 11/18, 11/20, 11/23, 12/3, 12/9, 13/5, 13/9,
  13/15, 14/7, 14/23, 14/24, 53/18, 56/25, 57/8, 96/14,

## Letters (unlabeled section)
lawsuit 171/4 ...

handle 66/6, 163/14
handling 48/5, 48/6
handwriting 72/6, 72/7, 73/7, 73/12, 74/15,
  74/17, 75/25, 76/1, 76/5, 76/7, 98/8, 158/11, 158/12,
  158/16, 158/9, 159/10, 159/11, 159/21, 159/22,
  160/8, 160/18, 160/20, 160/22, 165/4, 165/17,
  165/18, 165/22, 166/7, 166/8, 166/9, 166/22, 166/23,
  166/24, 167/1, 167/12, 167/14, 167/15, 167/20,
  167/21
handwritten  22/13, 24/14, 27/17, 27/25, 23/21,
  37/2
harass  161/8
hard  6/21, 129/4
head  6/22, 41/4, 62/9
heads  51/13
heavier  125/11
heavy  127/4
hectic  66/3
held  25/14, 26/20, 32/9
help  28/21, 31/8, 117/22, 136/24
helping  137/2
helps  6/25
hers  91/20, 91/21, 119/22
high  148/16
high-level  118/16
higher  67/6
hire  18/5
hired  19/11
Hold  41/10, 53/22, 134/1
holiday  27/19, 27/22, 36/22, 36/23
Hollywood  171/6, 171/7
home  132/23, 133/2, 133/5, 133/16, 138/5
honest  53/3, 54/22
honestly  33/2, 86/23, 87/8
horrific  47/24
horse  54/8
hour  123/3, 126/5, 139/9
hourly  109/14
hours  16/14, 18/16, 20/13, 43/23, 43/24, 45/10,
  45/22, 45/24, 46/13, 46/17, 47/2, 47/13, 47/18,
  48/10, 48/13, 48/20, 48/25, 49/1, 49/2, 49/3, 50/20,
  65/13, 67/3, 68/7, 72/9, 73/16, 76/3, 78/4, 111/25,
  112/8, 112/16, 113/9, 113/13, 117/9, 117/12, 117/13,
  121/20, 122/6, 122/7, 122/9, 122/15, 123/18, 128/14,
  129/3, 134/19, 135/2, 135/6, 135/23, 135/24, 136/6,
  136/19, 138/23, 139/18, 139/23, 140/2, 140/6,
  140/13, 140/19, 141/7, 141/14, 141/22, 144/2, 145/5,
  145/23, 145/24, 146/3, 146/9, 146/18, 146/25, 147/2,
  148/4, 148/6, 148/12, 148/13, 149/12, 149/15,
  150/18, 150/20, 151/7, 161/23, 162/2, 164/18,
  164/22, 166/23, 166/25, 167/10
HR  114/9, 114/13, 114/22, 115/9, 115/23, 117/4,
  117/18, 117/24, 118/10, 118/12, 118/13, 118/25,
  120/25, 121/1, 121/14, 121/15, 140/10, 140/13,
  161/10, 161/11, 161/18, 162/1, 162/6
HR's  117/19
Huh-uh  30/10
human  114/9, 116/20
husband  9/12, 9/14, 16/18, 18/2, 18/8, 19/4,
  96/21, 96/24, 136/7
husband's  18/11
husband/wife  97/1

100/4, 100/12, 145/7
lawsuits 10/23, 11/2, 12/7, 13/3, 13/7, 14/25
lead 100/11
learn 20/7, 28/19, 100/3, 100/14
learned 121/17
leave 31/15, 44/20, 45/8, 45/10, 45/11, 45/15, 49/13, 122/5, 123/4, 129/16, 129/24, 136/16
leaves 122/21
leaving 43/25, 45/3, 129/5, 129/23, 130/25, 132/23
left 36/12, 71/23, 77/23, 109/6, 122/5, 122/22, 128/19, 129/8, 130/21, 133/6, 135/22, 162/7, 165/7
left-hand 51/20, 55/18
legal 154/9
lending 25/22, 34/12
letter 173/6
level 109/20
levels 66/21, 66/25, 67/2
LEVINE 1/17, 11/18, 11/19, 12/3, 14/23, 171/5
life 22/6, 111/10
Limit 102/14
limited 43/10, 48/2
Line 2/11, 14/16, 46/21, 54/14, 76/19, 98/8, 99/2, 100/25, 107/18
lines 43/9, 123/3, 134/7
list 32/6, 32/14, 32/17, 32/23, 32/25
listed 98/6
Listen 57/4, 98/21
little 21/4, 25/19, 33/1, 64/8, 65/9, 68/17, 88/9, 106/6, 114/23, 121/18, 122/10, 122/18, 122/24
live 9/14, 33/22, 43/1
lived 8/12, 8/25
living 8/15, 26/1
LLP 1/17, 1/19, 171/5
loan 29/15, 29/16, 29/17, 29/18, 38/8, 38/10, 38/19, 38/20, 40/14, 40/18, 41/13, 42/15, 119/12, 119/15, 127/13, 127/14, 127/16, 127/18
loans 25/7, 27/6, 38/8, 38/13, 38/17, 127/1, 127/13, 127/19, 127/23
lobby 122/12
local 18/14
located 41/1
location 79/24, 83/18, 83/19, 83/20
locked 121/24
log 64/12, 96/7, 129/14, 129/20, 130/18, 130/23, 130/24, 131/3, 139/12, 139/14, 155/18, 164/10, 164/11, 164/12, 168/1, 168/2, 168/4
logged 65/8, 167/10
logs
Lomax 25/13, 26/15, 37/18, 39/2, 49/4, 62/8, 65/6, 77/5, 84/4, 91/8, 112/3, 114/6, 117/5, 137/14, 144/9, 146/16, 146/22
loved 137/2
lunch 4/19, 49/9, 49/15, 70/2, 70/5, 71/18, 71/19, 78/6, 114/15, 114/19, 114/21, 117/7, 131/22, 132/1, 132/3, 132/5, 132/8, 132/10, 132/11, 132/15, 132/19, 132/20, 140/25, 141/2
lunchtime 71/21
Luther 36/23

M

maiden 8/3
mail 54/7, 54/12
mailed 173/7
maintain 22/3, 22/4, 96/7, 128/11, 155/17
maintained 143/4
majority 89/25, 90/22
management 84/7, 110/21, 111/17, 119/24
manager 25/12, 26/15, 32/2, 37/15, 62/3, 62/4, 62/7, 62/13, 62/14, 62/15, 62/16, 63/6, 65/6, 67/5, 67/7, 73/21, 80/6, 81/3, 81/11, 81/13, 82/18, 82/19, 83/2, 83/21, 84/3, 84/8, 84/11, 84/19, 84/21, 85/8, 112/17, 113/1, 113/9, 113/12, 113/14, 144/6
managers 28/20, 33/10, 62/19
mandate 60/15
mandated 60/14
mandatory 29/6, 29/22, 35/12, 35/13, 35/16, 35/21, 50/4, 50/9, 114/17, 134/4, 134/6, 140/22
March 52/1, 52/2, 55/11, 171/14
MARK 1/20, 5/3, 19/8, 21/7, 21/17, 52/6, 59/12, 74/21, 93/15, 94/12, 97/10, 97/16, 99/2, 100/24, 144/18, 153/6, 155/21, 157/17, 171/20
marked 19/11, 19/15, 20/4, 21/9, 21/13, 21/21, 22/10, 52/11, 52/15, 53/8, 59/13, 59/17, 74/22, 74/25, 92/21, 93/25, 94/13, 94/16, 97/12, 144/20, 144/24, 149/12, 150/2, 153/8, 153/12, 154/3, 154/4, 155/23, 156/2, 156/4, 156/16, 156/21, 157/17, 157/18, 157/22, 158/6, 163/19, 163/25
marketing 28/21, 29/19, 129/1, 133/13, 134/7
married 7/22, 7/24
marry 8/1
marrying 8/3
Martin 36/23
match 23/24
material 133/7, 133/13
materials 89/22, 90/21, 90/25, 114/1, 133/12
matter 4/4, 13/11, 14/1, 39/11, 40/19, 83/16, 138/11, 161/11
matters 151/5
MCGUIRE 1/19, 5/4
measure 133/13
measures 5/11, 5/13
mediation 5/11, 5/13
medication 7/9, 7/13
meet 33/5, 41/5, 139/19, 139/20, 142/3
meeting 24/22, 24/25, 26/24, 28/15, 28/18, 28/23, 29/11, 30/20, 32/8, 50/4, 50/5, 50/8, 50/12, 69/8, 114/17, 134/3, 134/5, 134/12, 134/14, 134/15, 140/23, 147/9, 147/21, 147/12, 147/24, 148/3, 148/8, 148/18, 161/9
meetings 25/13, 26/16, 26/20, 27/3, 27/10, 29/6, 29/21, 45/1, 106/2, 134/2, 134/6, 134/11, 136/20, 137/15, 138/11, 146/15, 146/21, 147/14, 147/12, 147/16, 147/17, 148/7, 148/9
mention 78/21
mentioned 35/2, 38/3, 62/12, 82/13, 89/21, 95/23, 134/14, 137/13, 137/17, 140/11, 148/19
met 26/2, 31/7, 142/5
mild 20/14, 34/14, 75/18, 128/12, 128/16, 131/16, 131/23, 134/25, 135/25, 142/1, 142/13, 144/15, 162/22, 162/23
Midtown 80/2, 80/4, 80/7, 80/10, 80/12, 109/25, 113/13, 113/18
miles 138/3
million 38/15
mind 22/12, 43/5
minute 66/18, 159/25, 164/16
minutes 29/9, 29/10, 81/19, 161/25
missed 104/9
mistaken 28/3, 33/9, 35/17, 39/13, 77/24, 82/6, 83/3, 104/4, 123/22, 129/10
mixed 107/21
MLK 28/3
MOBLEY 1/25, 2/2, 2/23, 3/6, 3/8, 4/1, 4/19, 5/1, 7/25, 20/2, 41/17, 75/8, 86/22, 94/3, 113/18, 120/14, 158/2, 169/7, 170/7, 171/10, 172/3, 172/9, 174/4
Mobley's 3/2
moment 37/11, 43/19, 150/12
Monday 23/9, 25/14, 27/12, 49/25, 50/2, 122/19, 123/5, 123/7, 123/20, 128/19
Mondays 27/11
monitor 127/24
monitored 121/9
month 12/21, 23/5, 25/15, 26/16, 27/15, 35/18, 35/21, 47/7, 50/24, 61/1, 61/7, 63/8, 66/13, 83/4, 108/23, 119/1, 121/8, 125/10
monthly 23/3, 25/13, 26/21
months 79/12, 80/17
morning 52/5, 123/24, 131/4, 131/13, 134/4, 137/18, 164/5
mornings 134/11
mortgage 9/8, 9/9, 29/17, 40/18
motivational 28/17, 91/13
move 23/19, 72/17, 74/12
moved 38/19, 80/13
moving 23/22, 27/17, 27/24, 28/7, 30/2, 30/11, 76/2
Mr. Langdon 2/4, 2/7, 4/24, 11/3, 11/8, 12/17, 12/21, 13/14, 13/21, 14/8, 14/13, 14/15, 14/21, 14/22, 19/13, 21/11, 21/17, 21/19, 22/19, 23/17, 36/9, 37/12, 40/22, 41/8, 41/15, 41/25, 42/1, 42/16, 43/13, 51/18, 52/10, 52/13, 54/1, 54/11, 54/18, 55/1, 56/9, 57/6, 59/15, 70/15, 70/25, 71/2, 72/11, 72/15, 72/16, 72/23, 73/3, 73/6, 74/24, 77/14, 77/15, 78/20, 86/12, 88/1, 88/22, 89/11, 89/13, 91/5, 92/6, 92/13, 92/25, 93/17, 93/23, 94/15, 97/2, 97/14, 98/20, 99/1, 99/5, 99/16, 99/21, 100/2, 100/7, 101/2, 101/14, 102/1, 102/20, 103/1, 103/13, 104/6, 104/10, 105/7, 105/25, 107/19, 115/5, 115/10, 115/17, 127/7, 134/23, 134/24, 135/8, 135/15, 138/19, 135/21, 141/12, 141/20, 144/22, 146/5, 146/8, 146/13, 149/13, 149/18, 150/7, 150/24, 152/1, 152/13, 152/25, 153/10, 154/12, 155/25, 156/5, 156/13, 157/8, 157/11, 157/20, 160/1, 163/17, 164/3, 166/16, 167/8, 167/22, 168/8, 168/10
Mrs. Lomax 115/20
Mrs. Lomax's 39/3, 114/24, 115/24
Ms. Billingay 67/9, 92/19, 130/4, 138/22, 139/5, 139/8, 139/12
Ms. Billingay's 92/17
Ms. Court 159/1
Ms. Dolin 2/5, 2/8, 5/24, 11/1, 12/14, 12/15, 12/23, 13/10, 13/17, 13/19, 13/24, 14/9, 14/14, 14/15, 14/19, 20/24, 22/16, 23/15, 36/6, 37/21, 40/7,
54/7, 54/16, 54/21, 56/5, 57/4, 70/22, 72/8, 72/13, 72/22, 72/24, 73/5, 77/13, 78/18, 86/10, 87/25, 88/18, 89/9, 91/2, 92/2, 92/10, 92/22, 93/17, 94/9, 96/11, 96/19, 96/25, 98/15, 98/24, 99/2, 99/8, 99/13, 99/20, 99/25, 100/5, 100/16, 100/21, 101/6, 101/11, 101/24, 102/10, 102/14, 102/23, 103/12, 104/1, 104/9, 104/15, 105/15, 105/20, 107/17, 115/2, 115/13, 117/5, 134/21, 135/7, 141/9, 141/16, 146/2, 146/11, 149/16, 150/4, 150/13, 150/22, 151/21, 152/9, 152/23, 154/7, 156/6, 156/11, 157/2, 157/6, 157/9, 159/25, 163/9, 164/6, 164/9, 166/14, 166/19, 167/7, 167/24, 168/9, 171/9
Ms. Dolin's 55/2, 96/20, 101/4, 101/21, 102/8, 103/10, 103/24, 105/9
Ms. Drake 5/6, 53/19, 93/3, 98/1, 99/7, 99/17, 99/22, 100/4, 100/12, 145/8
Ms. Escudero 5/5, 53/19, 93/3, 97/25, 99/7, 99/18, 99/22, 100/4, 100/12, 145/8
Ms. Foa 109/4
Ms. Gibson 85/18, 110/24
Ms. Lomax 29/24, 37/24, 39/16, 45/6, 45/7, 45/14, 62/23, 65/12, 66/5, 67/11, 67/18, 69/1, 69/7, 71/22, 78/8, 78/11, 78/13, 83/1, 83/12, 84/10, 85/18, 85/21, 86/3, 86/15, 111/2, 111/5, 114/11, 116/11, 116/19, 118/14, 119/19, 120/3, 120/5, 121/15, 124/8, 125/3, 127/22, 128/7, 128/11, 132/6, 132/7, 137/21, 138/6, 138/10, 140/9, 140/13, 142/4, 145/23, 147/12, 148/3
Ms. Lomax's 91/25, 115/6, 115/12, 138/15
Ms. Mobley 5/2, 7/22, 8/9, 9/22, 10/5, 10/20, 12/22, 15/12, 19/2, 19/7, 19/14, 21/12, 21/15, 21/20, 22/21, 23/8, 23/25, 31/24, 33/14, 35/25, 40/2, 42/24, 46/6, 47/6, 52/14, 55/5, 55/11, 56/25, 58/3, 58/17, 59/16, 60/1, 66/25, 68/9, 68/21, 69/12, 70/16, 73/7, 74/2, 76/17, 85/17, 89/14, 93/2, 93/24, 96/4, 97/9, 97/15, 98/13, 99/17, 101/3, 104/10, 105/7, 106/1, 110/13, 128/4, 128/7, 132/22, 134/18, 138/14, 141/6, 142/19, 144/23, 145/20, 148/22, 151/17, 153/5, 153/11, 153/17, 154/1, 154/14, 155/20, 156/1, 156/6, 157/21, 159/15, 162/11, 163/3, 164/3, 164/10, 166/11, 166/19
MUCHNICK 1/17, 171/5

N

N.A 1/10, 4/8
name 4/25, 5/3, 8/3, 9/20, 28/5, 39/20, 49/22, 55/16, 55/21, 57/21, 58/3, 58/7, 58/14, 81/8, 85/9, 85/12, 85/14, 98/3, 106/19, 117/24, 145/10, 164/11, 168/1
name's 55/20
names 8/7, 13/11, 82/8, 85/13, 148/21
Naomi 62/11, 79/1, 82/23, 91/20, 119/8, 129/10, 129/19, 130/21, 133/25, 138/7, 138/18, 139/1, 139/11, 139/12, 139/15, 147/10, 147/17, 148/8
Nate 49/24
national 1/10, 4/8
NATIONSBANK 1/10, 4/8, 8/16, 8/17, 8/20, 9/2, 9/16, 11/1, 11/12, 11/14, 12/5, 12/8, 13/6, 15/18, 16/11, 17/3, 19/3, 20/14, 25/2, 25/22, 26/12, 27/3, 28/24, 29/1, 32/7, 33/17, 39/7, 39/23, 40/4, 40/14, 40/23, 41/19, 42/23, 44/4, 44/11, 45/5, 49/12, 52/2, 53/1, 56/21, 57/1, 57/9, 57/14, 60/6, 60/12, 60/21, 75/15, 79/9, 86/5, 86/13, 86/19, 87/6, 88/14, 88/24, 89/18, 90/8, 90/24, 91/10, 91/16, 92/1, 92/9, 92/21, 93/12, 95/24, 96/8, 105/9, 106/21, 107/4, 107/22, 108/1, 109/20, 110/11, 112/13, 112/24, 116/20, 134/20, 135/2, 140/3, 146/16, 147/12, 161/1, 161/13, 162/8, 162/14
NationsBank's 95/12, 161/6
nature 13/24, 14/24, 57/16, 89/15, 111/4, 111/6
necessary 23/19, 66/1
neck 54/9
need 40/15, 68/13, 68/19, 127/16, 131/8, 136/24, 146/12
needed 26/25, 42/19, 68/20, 128/22, 149/10
needs 25/22, 25/23, 62/18
neighborhood 25/25, 26/1, 26/2, 41/20, 43/6
Neither 173/14
new 29/25, 133/22
nicknames 8/6
night 32/15, 32/11, 33/2, 111/8, 139/14, 139/16
nights 32/9, 33/7, 111/25, 129/18, 130/3, 130/24, 133/18, 133/24
nine 26/18
nod 6/22
nonsense 100/1
normal 62/7
North 118/5, 171/6
Notary 4/12, 145/13, 153/24, 163/21, 169/14, 172/20, 173/3, 173/21
notation 36/1, 74/10, 74/12

note 24/14, 31/24, 33/14, 37/6
notes 31/21, 37/2, 71/20, 91/9, 170/8
Notice 2/14, 4/11, 20/11, 33/23, 95/25, 161/15
November 82/7
number 9/24, 10/2, 18/1, 18/16, 18/24, 19/9, 19/12, 19/15, 20/13, 21/7, 21/10, 21/21, 21/25, 22/2, 22/10, 22/21, 24/1, 24/2, 24/10, 31/21, 32/4, 35/6, 35/25, 36/10, 47/5, 48/2, 49/21, 49/22, 50/23, 52/7, 52/12, 52/15, 53/9, 55/21, 55/23, 57/24, 59/1, 59/12, 59/14, 59/17, 70/18, 74/21, 74/23, 75/1, 93/15, 93/22, 93/25, 94/12, 94/14, 94/17, 94/20, 94/23, 95/4, 95/7, 97/11, 97/13, 97/17, 144/19, 144/21, 144/24, 145/2, 149/23, 150/3, 151/5, 151/12, 153/7, 153/9, 153/15, 154/3, 154/4, 154/13, 154/16, 154/19, 154/22, 155/3, 155/22, 155/24, 156/2, 156/16, 156/21, 156/23, 156/24, 157/13, 157/17, 157/19, 157/22, 158/7, 159/16, 159/23, 160/11, 162/13, 163/19, 163/25, 164/16, 165/15, 165/16, 165/21, 166/5, 167/1, 167/18
numbers 46/19, 72/22, 73/1, 73/2, 86/21, 148/15, 166/18
numerical 72/6
nutshell 46/3

O

oath 6/3, 169/2
object 13/24, 40/7, 41/7, 41/22, 42/4, 56/5, 70/22, 92/2, 92/22, 96/25, 99/13, 99/25, 100/21, 104/1, 104/19, 105/20, 107/17, 115/2, 141/9, 141/16, 163/9
objection 41/25, 43/2, 78/18, 88/17, 92/10, 100/24, 101/11, 102/10, 102/23, 152/23
obligation 6/4, 12/12, 20/7, 20/11, 33/6, 44/15, 101/4, 101/20, 102/7, 102/19, 102/22, 102/25, 103/2, 103/9, 103/23, 104/25, 105/3, 105/6, 105/8, 105/13
obtain 86/22, 108/8
occasion 129/9
occasions 33/18, 133/9
October 82/7, 83/9, 150/12, 150/16
offense 10/6, 128/5
offer 6/21, 112/1
offered 109/9, 110/10
offering 16/3, 16/6
office 20/9, 54/24, 54/25, 55/2, 113/6, 118/17, 161/16, 171/14
officer 29/15, 29/16
official 169/9, 172/18
officially 121/21, 121/23, 122/20, 123/5, 123/11, 123/22
offs 63/7
oil 46/9
Olas 1/13, 4/14, 171/1
old 9/18
one-page 52/5
open 29/8, 29/20, 31/13, 31/14, 33/20, 34/10, 34/11, 34/12, 109/8, 117/12, 122/11, 122/12, 122/24, 124/3, 131/15
opened 109/8, 121/22, 122/23
opening 122/20, 131/6, 131/13, 168/2, 168/3
operation 121/20, 122/15, 122/16, 123/18
opinion 154/6
opportunities 1/11/23
opportunity 5/20, 33/24, 39/18, 94/22, 95/10, 97/19, 101/15, 103/19, 145/1, 152/5, 152/15, 152/19, 153/14
option 18/7, 66/9
optional 119/25
order 14/2, 121/10, 138/10, 168/10
organization 26/12
organizations 26/8
organized 32/8
orientation 30/20
original 22/9, 22/17, 24/11, 52/19, 52/23, 59/24, 171/14
originally 21/22, 111/23
overtime 55/14, 56/4, 56/12, 56/14, 56/16, 56/20, 56/21, 57/1, 57/9, 57/14, 57/22, 57/23, 57/25, 58/8, 58/10, 58/11, 58/15, 59/1, 59/5, 65/7, 65/15, 65/21, 65/25, 66/2, 66/8, 66/22, 67/1, 69/1, 85/18, 85/22, 85/23, 86/3, 86/6, 86/7, 86/14, 125/22, 138/16, 143/24, 146/17, 146/18, 147/7, 147/13, 147/19, 148/4, 148/5, 148/10, 148/13, 148/15, 148/19, 150/21, 162/14, 162/16, 162/19, 164/22, 166/6

P

p.m 1/15, 24/23, 26/18, 32/24, 47/19, 123/1, 168/12
pages 21/23, 22/9, 23/4, 24/2, 24/6, 49/7, 75/24, 96/5, 154/17, 167/16, 174/3
paid 57/11, 57/14, 68/25, 69/2, 69/6, 109/13,

paper 70/13, 87/9, 87/11, 87/12
paperwork 81/15, 81/17, 124/6, 135/12, 135/13, 137/4
parade 137/24, 137/25, 138/2
parades 26/23
Paragraph 145/20, 145/21, 146/14, 146/19, 147/3
paragraphs 151/18
paralyzed 31/9
parens 36/1
Park 8/10
part 34/7, 42/17, 70/24, 71/16, 91/10
partake 25/20, 26/25, 138/2
participate 7/19, 20/8, 138/7, 138/10
participated 5/9, 5/18, 12/4
parties 170/10
parties?
partook 133/23
Party 3/5, 12/22, 11/12, 12/9, 100/10, 101/16, 102/3
pass 39/12, 89/7
pay 52/24, 52/25, 53/3, 53/6, 55/6, 55/9, 55/13, 55/15, 55/22, 55/25, 56/3, 56/4, 56/21, 56/23, 57/1, 57/9, 57/19, 58/2, 58/12, 58/19, 58/22, 59/4, 63/7, 64/10, 64/25, 65/15, 101/4, 101/20, 102/7, 103/2, 103/9, 123/22, 126/4, 126/8, 143/16, 146/16, 146/24, 147/13, 148/4, 161/21, 161/24, 162/12
paycheck 58/17
paychecks 53/2
payday 122/25
paydays 47/25
paying 9/8, 9/9, 16/15, 17/13, 18/1, 86/6
Payroll 2/17
pen 76/22
pencil
pending 4/9, 104/11, 127/19, 127/23
perception 159/3
perform 116/12, 132/22
performance 37/25, 40/3, 65/18, 84/9, 85/6, 89/1, 89/4, 89/21, 89/25, 90/3, 90/5, 90/7, 90/14, 90/15, 90/18, 90/21, 91/6, 92/16, 92/17, 95/24, 118/23, 120/6, 120/22, 121/11, 128/25, 142/6
performance-related 90/25
performing 112/25
period 17/12, 18/12, 18/17, 34/14, 55/9, 55/10, 56/4, 58/19, 60/3, 63/7, 64/1, 64/10, 64/25, 70/19, 71/6, 72/2, 73/18, 75/11, 77/1, 77/3, 77/8, 78/6, 79/16, 80/7, 80/17, 106/24, 129/6, 131/16, 131/23, 133/20, 134/18, 134/25, 136/5, 136/7, 136/15, 141/25, 142/10, 142/16, 142/19, 158/3
periods 88/11
peripheral 119/23
permanent 83/13, 83/18, 83/19, 83/20, 108/4, 108/6, 108/14, 113/16, 123/14
permanently 79/23, 81/2, 83/4, 83/7, 110/7
permission 24/9, 59/12, 91/25, 92/8
permit 19/22, 37/16
permitted 14/5, 31/15, 44/6, 66/21
personal 10/15, 10/16, 13/1, 22/5, 24/3, 31/15, 37/10, 42/18, 42/19, 45/9, 92/5, 142/16, 151/9, 151/13, 154/16
Personally 10/24, 91/15, 92/8, 169/7, 172/14
personnel 29/1, 67/22, 148/3
pet 8/7
petition 10/17, 15/5
phase 8/7
phone 45/13, 49/22, 151/20, 161/17, 161/22
photocopy 59/24, 75/6
pick 17/23, 19/4, 136/16
pick-up 136/12
pipe 127/13
place 22/5
placed 6/2, 16/24
Plaintiff 2/23, 3/2, 3/5, 5/7, 11/20, 12/4, 96/15, 101/16, 102/3, 106/3
Plaintiff's 1/6
Plaintiffs 1/18, 4/6
Planner 2/15, 22/2, 22/6, 71/13
plans 35/11
plate 127/10
Plaza 28/9
plenty 112/21
plus 119/11
point 14/17, 38/9, 64/4, 68/8, 74/6, 77/9, 77/17, 81/22, 82/2, 83/1, 85/8, 93/7, 128/16, 132/12, 148/22, 162/8
points 21/17, 28/18, 37/15, 38/3, 38/4, 38/18, 38/19, 38/20, 38/23, 39/1, 39/22, 39/25, 40/6, 85/1, 89/6, 89/8, 90/1, 91/13, 91/23, 102/19, 116/5, 117/7, 117/20, 117/23, 119/1, 119/2, 119/8, 119/10, 119/16, 119/17, 132/9
policy 39/7, 44/12, 44/13, 45/5, 69/7, 78/13,

143/10, 143/14, 143/21, 143/22, 166/5, 86/14, 121/18, 142/21, 142/24, 143/1, 143/4, 143/11, 143/15, 143/19, 143/21, 143/22
portion 8/16, 11/25, 36/11, 73/13, 73/24, 76/12
portions 165/12
position 106/14, 106/23, 108/15, 109/7, 109/10, 109/19
positive 165/19, 165/25
possession 20/12, 22/4, 53/7, 87/3, 89/17, 90/23, 92/16, 154/14
possible 87/9
potential 40/14, 44/7, 101/4, 102/7, 103/9, 103/23, 105/3, 105/8
practice 48/20, 49/17, 63/3, 71/5, 73/13, 73/24, 76/21, 77/9, 77/10, 77/17, 78/4, 78/5, 87/5, 131/22
pre-algebra 155/12
preceding 56/4
preface 12/25
Premium 18/18, 18/19
preparation 87/22, 93/1, 95/13, 95/15, 95/20, 96/1, 96/10, 97/3, 151/4, 151/14
prepare 87/25, 88/2, 88/4, 97/5, 151/8, 151/17
presence 26/25, 30/1, 138/1, 138/5
presented 28/21
presented 105/10
Pretty 49/19, 67/20, 138/1, 162/6
prevail 105/10
prevent 37/25
prevented 41/19, 43/15
prevents 7/2
primary 34/3, 119/22
private 16/12, 16/24, 17/7, 17/8, 17/11, 17/21, 66/4, 69/8, 141/4, 141/5
privately 69/11
privilege 12/16, 12/18, 12/24, 16/5, 97/1, 98/24, 99/14, 100/23, 103/17, 105/21
privileged 12/11, 91/3, 97/1
problem 128/6, 137/9
procedure 64/4, 111/22, 112/6, 116/12, 129/25, 130/5
procedures 131/13
proceedings 5/18, 10/10
process 5/14, 5/17, 6/1, 30/25, 68/6, 111/9, 118/12, 130/1, 136/23, 144/13
processes 5/11, 133/10
produced 52/20
product 32/16
products 32/5, 40/6, 40/25, 41/6, 41/20, 82/5, 119/20, 134/16
Professional 4/12, 170/6
professor 155/17
program 81/20
progressed 128/8
prohibited 41/4, 41/11
prohibition 40/23, 45/3, 111/20
projected 38/21
prompted 149/1, 155/1
protected 103/16
prove 120/1
provide 18/5, 20/24, 42/21, 114/19, 140/25
Public 4/12, 141/3, 145/14, 153/24, 163/21, 169/14, 172/20, 173/21
published 35/4
pull 17/24
pulled 53/3
pulling 41/3
punch 77/22, 77/25, 78/1
purpose 4/2, 27/2, 32/19, 42/8, 42/11, 172/16
purposes 23/19, 26/3, 74/8
put 13/4, 23/2, 38/10, 38/13, 39/20, 50/13, 71/24, 91/20, 117/9, 134/20, 135/23, 135/24, 156/15
putting 117/15, 128/9

Q

question 6/16, 6/19, 7/1, 7/4, 7/5, 7/7, 12/25, 13/4, 16/1, 16/8, 19/18, 29/11, 38/4, 41/23, 41/24, 42/2, 43/21, 44/19, 54/21, 57/4, 57/17, 60/9, 92/7, 100/1, 101/25, 103/8, 104/5, 104/7, 104/8, 104/9, 104/11, 104/12, 104/13, 107/3, 114/24, 115/1, 115/8, 115/11, 115/15, 115/19, 132/16, 139/21, 141/18, 143/10, 158/18, 166/17
questioning 46/22, 75/22, 76/19, 99/2, 100/25, 107/18
QUESTIONS 2/10, 5/20, 6/8, 7/11, 12/13, 14/18, 15/4, 19/20, 37/21, 37/23, 76/18, 163/8, 164/4, 164/6, 166/19, 167/22
quick 135/22
quote 120/5

**R**

R.P.R 169/14, 170/16, 171/18
racial 13/13
raises 46/21
ranked 90/2
rapport 42/18, 43/24
RE 171/8
read 19/18, 22/17, 24/20, 27/18, 27/25, 28/8, 30/3, 30/12, 36/18, 37/4, 46/6, 46/23, 47/11, 47/15, 48/7, 48/16, 49/23, 50/3, 50/18, 51/3, 51/9, 51/15, 102/2, 115/10, 115/14, 115/15, 133/8, 168/8, 168/9, 172/4, 173/15, 174/5
reading 19/23, 20/1, 171/12, 173/7
realm 25/20
rearrange 136/11
reason 7/18, 142/17, 173/11
reasons 48/3, 91/11
recall 7/14, 10/14, 15/4, 15/6, 15/7, 15/9, 15/10, 23/12, 27/21, 28/14, 29/4, 29/13, 31/12, 34/22, 36/2, 36/4, 46/3, 47/21, 50/5, 50/6, 50/7, 50/11, 53/13, 53/17, 62/9, 62/19, 62/25, 63/1, 63/24, 64/14, 64/18, 66/6, 69/9, 71/15, 71/17, 73/11, 73/17, 74/7, 76/23, 77/20, 80/3, 80/6, 81/10, 82/8, 83/9, 83/23, 85/9, 85/10, 85/13, 85/14, 86/23, 87/2, 114/12, 115/4, 115/6, 115/14, 115/22, 115/23, 116/13, 116/23, 117/21, 117/24, 118/3, 120/8, 120/9, 121/3, 122/17, 124/22, 125/16, 126/6, 126/11, 128/10, 129/5, 130/15, 131/18, 131/19, 131/20, 138/8, 138/19, 140/4, 140/21, 142/12, 142/14, 146/21, 146/23, 146/24, 147/8, 147/11, 148/2, 148/7, 148/9, 148/18, 148/21, 150/6, 151/2, 152/12, 152/14, 152/16, 152/18, 152/24, 153/1, 153/4
recap 109/24
receipt 17/15, 71/11
receive 53/21, 56/13, 58/17, 63/9, 63/25, 64/10, 64/25, 86/17, 113/21, 140/3
received 11/25, 53/1, 53/17, 54/6, 54/24, 55/3, 56/16, 63/4, 63/11, 64/7, 64/9, 65/3, 71/4, 71/11, 77/7, 100/9, 154/15
receiving 140/20, 141/15, 141/23
recess 12/20, 70/14, 135/20
recollection 35/19, 39/14, 65/23, 74/5, 75/14, 120/21, 125/19, 149/20, 151/10, 151/13
recommended 45/22
record 4/25, 12/22, 14/10, 23/25, 46/19, 48/4, 48/20, 49/17, 56/14, 57/10, 66/21, 66/25, 68/23, 70/16, 71/9, 71/25, 74/8, 76/21, 77/9, 77/10, 77/11, 77/16, 78/9, 78/14, 89/9, 89/12, 105/23, 105/24, 106/1, 113/19, 113/22, 114/2, 116/14, 125/3, 136/4, 138/15, 139/24, 141/8, 142/22, 143/12, 146/18, 148/5, 150/22, 156/15, 162/13, 162/16, 164/15, 170/8
recordation 60/1
recorded 55/13, 56/3, 56/18, 56/20, 56/22, 56/24, 57/2, 57/11, 57/13, 61/10, 77/23, 145/23, 147/14, 147/21, 162/20, 162/25, 167/19
recording 46/13, 46/17, 77/18, 86/5
records 31/18, 92/5, 133/4, 133/5, 146/19
Recross-Examination 2/8, 167/23
recruit 41/20
Redirect 2/6, 166/15
reduced 138/24, 148/13
reference 30/8, 30/17, 46/11, 47/20, 49/11, 53/14, 101/1, 128/16, 166/18, 173/6
references 31/11, 48/24
reflect 66/18, 90/7, 90/9, 90/14, 150/22
reflected 90/19
refrain 14/17
refresh 75/14
refusal 112/6
refuse 35/10
refused 39/15, 173/11
region 32/3, 33/1, 41/9
Register 2/17, 110/23, 111/1, 111/12, 111/14, 111/19, 111/21, 112/2, 112/6, 112/22, 116/7, 116/10, 117/8, 117/16
Registered 4/12, 108/7, 111/5, 114/5, 114/10, 116/19, 155/6, 170/6
regular 74/3, 136/21
rehabilitation 26/3
rejuvenate 25/6
relate 13/9
related 12/8, 20/13, 47/12, 50/8, 50/9, 50/12, 65/18, 89/17, 90/4, 90/23, 92/16, 92/17, 102/7, 103/23, 104/8, 104/12, 120/14
relates 95/24, 104/13
relation 88/24, 145/7
relationship 45/20, 110/13, 110/15, 110/21, 139/2
relationships 33/19, 44/1, 44/17
relative 170/9, 170/10
relay 117/4, 151/19
relayed 145/22
relaying 113/12

relevancy 107/18
remain 132/14
remained 84/21
remember 6/22, 81/8, 116/25, 125/16, 162/6
reminders 22/8
repeat 99/20, 134/21
rephrase 6/9, 6/15, 86/11
Reply 3/2
report 32/1, 71/20, 124/19, 124/20, 124/21, 124/22, 125/15, 125/24, 128/13, 135/16, 136/4, 143/5, 170/7
reported 10/1, 131/4
Reporter 4/12, 5/21, 6/21, 19/8, 19/14, 21/6, 21/17, 21/20, 52/6, 59/12, 74/21, 93/15, 94/12, 97/10, 97/16, 99/1, 115/16, 144/18, 153/6, 155/21, 157/17, 170/6
REPORTER'S 170/2
reporting 123/23, 124/15, 171/1
represent 23/5, 69/21, 70/1, 70/10, 91/2, 93/11, 98/14, 158/8
representation 101/21, 102/8, 103/3, 103/11, 103/25, 105/5
representatives 25/19, 26/2
represented 5/16, 70/4
representing 101/5
represents 22/1, 22/2
request 38/23, 93/18, 116/6, 144/11, 173/15
requested 39/20, 89/15, 95/25, 114/19, 115/15, 135/11, 148/11, 170/7
Requests 2/22, 3/3, 94/8, 95/3, 95/13
require 29/24, 127/21, 137/21
required 18/14, 30/1, 34/23, 34/25, 75/15, 77/21, 78/1, 112/12, 137/14, 138/1, 143/4, 143/11, 143/16, 143/23
requirement 120/2, 124/8
requiring 142/21
residence 9/4, 9/6, 9/7, 9/10
resign 161/4, 161/6
resignation 34/15, 58/20, 62/24, 91/16, 92/9, 92/20, 106/21, 107/4, 108/1, 123/24, 128/17, 160/25
resigned 52/1, 92/1, 107/22, 135/1, 161/1
resigning 161/12, 161/15
resolve 5/16
resource 116/21
resourceful 43/10
resources 114/9, 137/6, 137/10, 137/11
respect 86/5, 110/20, 121/19, 133/18
responded 173/15
response 114/10, 114/12, 114/24, 115/7, 115/8, 115/12, 115/18, 115/20, 115/22, 115/24, 116/4, 116/8, 117/19, 141/1, 163/7
responsibilities 82/4, 91/10, 113/24, 133/23
responsibility 32/6, 40/20, 44/14, 86/18, 119/22, 119/23
responsible 5/17, 29/16, 82/21, 84/6, 105/4, 105/8
responsive 6/17
rest 73/22
restrict 16/5
restricted 40/4, 44/2
restricting 143/9
restriction 39/4, 41/18, 42/7, 42/22, 43/4, 43/14, 43/16, 43/22
restrictions 119/15, 139/9
result 145/22
retail 121/20, 121/21, 122/16
retail-wise 123/18
retain 98/13
return 43/17, 171/14
returned 70/5
revealing 100/17
review 19/16, 21/14, 39/17, 39/18, 59/20, 75/3, 88/4, 88/23, 93/2, 93/5, 94/1, 94/2, 95/12, 95/18, 101/15, 102/22, 103/5, 103/6, 103/19, 145/1, 150/2, 151/4, 151/8, 151/14, 152/5, 152/15, 153/14, 170/7
reviewed 87/19, 93/6, 93/8, 162/12, 162/13
revision 153/2
revisions 152/6, 152/15, 152/17, 152/18, 152/22
ride 133/9
Ridge 8/10, 8/12, 9/1, 9/15
right-hand 47/7, 50/25, 61/14
role 138/15, 138/22
roll 85/2
rolled 39/14, 147/5
rotate 33/18
rotation 35/3
row 73/3, 73/8, 74/3, 74/9, 76/2, 159/4, 159/10, 159/11
ROXANNA 1/3, 4/4, 171/8, 172/5
RPR 173/20
rule 40/23, 41/18, 42/22
rules 6/1
run 130/13

159/4
runs 158/15
RUTH 4/11, 169/14, 170/6, 170/16, 171/18, 173/20

**S**

safe 29/17, 111/7, 112/19, 120/16
Saint 54/8
salary 109/14, 109/15, 109/18
sale 33/23
sales 32/7, 32/20, 33/12, 38/6, 81/23, 91/12, 139/4
salesperson 137/4
sandwich 41/13
sat 161/17, 162/5
Saturday 33/13, 34/8, 34/21, 34/24, 35/1, 35/7, 35/11, 35/18, 35/21, 63/19, 70/19, 72/5, 113/13, 122/9, 134/4, 134/14, 136/22, 137/18, 140/22, 144/2, 144/4, 161/21
Saturdays 33/20, 34/10, 34/16, 35/21, 84/5, 84/14, 84/18, 84/25, 112/12, 113/8, 114/18, 122/11, 122/13, 123/15, 123/19, 123/21, 144/2, 144/12
save 87/11, 87/12, 128/23
savings 45/21
saw 71/14, 126/25
schedule 18/11, 18/13, 19/1, 35/4, 67/18, 67/22, 68/1, 68/3, 68/4, 68/10, 124/15, 124/18, 128/2, 128/7, 134/16, 136/11
scheduled 27/10, 29/12, 33/8, 123/23, 124/25, 127/9, 133/20, 134/11, 135/10, 136/12, 138/12
schedules 67/21, 67/23
scheduling 33/9
school 15/23, 16/12, 16/15, 16/25, 17/7, 17/11, 17/12, 17/21, 17/24, 18/6, 19/5, 45/18
schools 17/9, 45/20
Scott 28/5, 30/16, 31/5, 31/6
scratched 36/1, 51/12
seal 169/9, 172/18
seamless 108/21
second 23/21, 24/18, 31/20, 35/24, 40/18, 53/22, 54/17, 72/3, 74/3, 89/10, 98/5, 121/7, 121/12, 125/13, 145/11, 148/24, 149/1, 150/11, 153/21, 154/23, 158/2, 157/2, 159/24, 160/2, 160/11, 163/24
section 67/4, 69/18, 165/13, 166/6
secure 130/14
secured 108/14
Security 9/24, 10/2, 55/22, 130/6, 130/8, 130/15, 133/13, 134/7, 134/8, 137/8
seek 143/24
seeking 103/16
select 18/9
self-explanatory 171/12
sell 40/6, 40/21, 40/25, 41/5, 82/5
selling 119/19
semester 31/1, 155/8
senior 28/19, 62/4, 63/15, 67/5, 67/7, 67/8, 73/20, 82/25, 130/11, 138/25
sent 54/14, 54/19
sentence 145/21
separate 34/6, 93/19, 120/17
September 150/16
series 5/20
service 32/16, 33/21, 34/2, 34/8, 34/12, 38/7, 42/21, 43/9, 46/7, 48/5, 81/10, 85/7, 125/12, 137/3
services 25/12, 32/5, 34/12, 40/12, 42/20
session 113/2, 113/3, 113/4
sessions 112/21
set 23/4, 67/18, 67/21, 67/23, 129/22, 129/24, 134/16
settled 11/24
settlement 12/1, 14/6
seven 24/23, 25/15, 26/17, 70/8, 127/23
share 25/21, 85/4
sheet 46/14, 46/18, 46/19, 56/18, 56/19, 56/20, 57/10, 57/12, 58/2, 60/2, 60/3, 60/5, 60/24, 60/25, 61/5, 66/11, 68/6, 69/12, 69/14, 75/9, 75/11, 143/8, 143/13, 158/3, 165/15, 171/11, 172/6
sheets 46/16, 63/9, 65/25, 67/20, 67/24, 67/25, 86/1, 124/13, 143/2, 146/7, 146/11, 147/5, 151/2
shift 106/6
shifting 144/17
short 12/19, 12/23, 64/17, 70/17, 89/14
show 90/1, 150/11
sick 31/19, 37/14, 142/8, 142/12
side 23/4, 23/5, 24/18, 31/9, 51/20, 55/18
sided 63/23
sidetracked 47/17
sign 3/6, 67/11, 69/5, 129/13, 129/20, 130/18, 130/24, 131/3, 145/13, 152/3, 173/4, 173/11, 173/15
signature 98/5, 145/10, 153/21
signed 49/4, 49/11, 66/10, 66/11, 68/14, 98/1, 101/16, 102/4, 103/20, 126/4, 126/14, 126/15, 126/17, 126/19, 126/22, 129/10, 129/12, 150/19,

signing 145/17, 173/7
similarly 1/4, 4/5
single 33/20, 136/10
sit 48/3, 81/18, 95/8, 161/17, 162/4
site 79/21
sitting 81/16
situated 1/5, 4/5
situation 27/14, 39/16, 42/20, 88/10
six 50/19, 79/13
sixth 4/21
slash 158/15, 159/4
slips 136/24
small 69/10
Smoke 8/10, 8/12, 9/1, 9/15
Social 9/24, 10/2, 55/22
sort 28/17, 45/9, 45/19, 81/20, 91/12
sought 144/8
SOUTHERN 1/1, 4/10
specialist 106/16
spell 106/19
spend 112/25
spent 48/4, 81/13, 88/8, 88/14, 88/24, 96/4, 113/7
spin 84/1
split 76/3
sponsored 28/23
sporadic 126/18
spot 160/12
spring 155/8
SS 172/13
staccato-type 7/3
staff 48/2, 148/20
staffed 119/3
stamp 156/11, 156/24
Stamped 2/17, 52/8
standard 14/4, 53/6, 129/25
standardly 71/16
standards 142/3
standing 138/10
start 7/5, 45/20, 69/22, 78/6, 79/8, 79/18, 85/25, 107/20, 124/25
started 13/18, 16/10, 17/2, 17/3, 26/17, 46/16, 62/1, 65/22, 65/25, 68/6, 79/2, 81/25, 82/1, 83/6, 83/16, 85/24, 107/2, 112/11, 118/15, 144/14
starting 49/2, 49/3, 73/9, 108/20
starts 81/25, 137/25, 144/13
State 4/13, 4/15, 4/25, 26/7, 30/15, 30/17, 30/21, 30/23, 31/2, 37/20, 155/6, 169/4, 170/4, 172/2, 172/12, 173/21, 174/2
statement 140/24, 146/22
STATES 1/1, 4/10, 146/15
station 122/7
stationed 118/4, 118/6
statistics 90/1
stay 32/11, 33/2, 67/5
stayed 111/10, 133/25, 139/13
staying 135/10
stenographic 170/8
stenographically 170/6
steps 87/18
sticker 21/18
stickers 21/4
stop 14/19, 54/3
stops 18/15, 18/24
straight 108/22
straightening 24/1
strategize 28/22
street 41/12, 45/18
stressed 116/15
strike 37/18, 44/24, 48/19, 58/24, 78/7, 78/12, 83/11, 84/17, 95/10, 98/3, 120/3, 124/19
stroke 28/5, 31/7, 31/9
struggled 136/8
struggling 136/9
stub 55/19, 55/25, 56/3, 57/19, 58/2, 58/4, 58/12, 58/22, 59/4
stubs 52/24, 52/25, 53/4, 53/6, 55/6, 55/9, 55/13, 55/15, 162/12
STUCK 4/11, 14/20, 169/14, 170/6, 170/16, 171/18, 173/20
student 30/21
students 155/18
stuff 79/4, 87/16, 91/3, 124/7
style 111/17
subject 13/11, 16/3, 40/3
submission 148/23
submit 149/1, 150/10, 151/18
submitted 137/7, 150/9, 152/2
Suite 171/6
summary 26/4, 105/13, 162/12
Sunday 23/22
superseded 143/8
supervising 62/20, 82/21

supervisor 76/15
supervisor's 76/15
supervisors 110/18
support 35/6
SUSAN 1/18, 20/9, 54/24, 171/5
swamped 48/1, 48/2, 49/16
switch 64/14, 64/20, 64/24, 77/6, 121/18
switched 21/23
swore 163/20, 163/23
sworn 4/21, 145/17, 169/7, 172/3
system 81/18, 156/10

**T**

table 13/4
tails 51/13
talk 12/7, 12/18, 65/9, 118/19, 128/22
talked 45/17, 45/19, 97/6, 117/21, 138/18, 139/11, 161/18, 164/10
talking 10/23, 72/8, 72/14, 73/2, 73/4, 77/13, 135/23
Tamara 25/12, 26/15, 39/2, 49/4, 62/8, 65/6, 77/5, 85/5, 91/8, 111/16, 111/24, 112/3, 114/19, 118/7, 118/11, 118/21, 139/6, 140/7, 140/21, 146/15, 161/15
Tamara's 119/11, 143/9
tears 116/17
Telecom 106/25, 107/1, 107/9, 107/13, 108/5, 108/9, 108/15, 108/19, 108/22, 109/2, 109/4, 109/10, 109/13
teller 34/11, 122/6, 136/23, 137/18
tellers 77/24, 82/8, 85/10, 147/24, 148/9, 148/11, 148/17, 148/20
temp 108/5
temped 108/3
temporary 108/7, 108/8
ten 138/2
tendered 94/8, 95/4, 95/19, 163/18
tends 87/10
tenure 9/1, 9/16, 60/7, 60/8, 62/10, 62/21, 64/5, 64/19, 81/22, 82/2, 84/12, 84/22, 87/5, 110/11, 143/22
term 41/11, 68/15, 120/11
terminal 81/17
termination 58/18, 91/15
terms 14/6, 14/7
testified 14/22, 14/25, 15/12, 26/14, 44/11, 55/5, 63/25, 71/3, 76/25, 102/2, 111/22, 130/17, 136/3, 142/4, 145/22, 155/5
testify 7/10, 7/19, 115/5
testimony 6/3, 16/23, 17/20, 25/24, 37/17, 37/24, 51/25, 73/23, 78/3, 78/9, 87/22, 93/1, 95/13, 95/20, 96/2, 96/10, 97/4, 115/21, 116/18, 125/2, 138/9, 147/18, 153/1, 163/3, 163/20, 163/23, 166/11
testing 81/15
tests 81/15
Thank 166/14, 167/15
therapist 31/8
THEREUPON 4/18, 19/11, 21/9, 52/11, 59/13, 74/22, 93/21, 94/13, 97/12, 144/20, 153/8, 155/23, 157/18, 168/11
third 36/9, 58/2, 58/25, 70/3, 74/9
three 63/5, 80/22, 127/18, 159/17
threshold 38/24, 39/1, 39/22, 39/25, 65/14, 65/17, 65/20, 66/2, 66/21, 66/25, 67/2, 67/6, 68/19, 89/1, 89/4, 89/22, 111/18, 116/8, 120/20, 120/22, 121/12, 126/25, 132/4, 142/2, 142/6, 161/9
thresholds 90/1, 118/24, 120/15, 121/9, 128/23
thrive 27/4
thriving 38/12, 139/1
throw 21/4
Thursday 122/19, 123/7, 127/22, 128/20
Time 2/18, 2/20, 3/10, 3/11, 6/7, 8/15, 8/17, 15/17, 15/23, 15/24, 16/10, 16/12, 16/14, 16/18, 16/22, 17/2, 17/21, 18/12, 18/17, 19/16, 21/1, 25/12, 26/19, 35/5, 35/8, 35/10, 35/16, 37/9, 37/10, 37/14, 37/16, 38/10, 39/21, 39/22, 40/19, 46/1, 46/4, 46/14, 46/15, 46/16, 46/18, 46/19, 48/4, 56/18, 56/19, 56/20, 56/23, 57/10, 57/11, 57/12, 57/14, 58/18, 60/3, 60/5, 60/21, 63/18, 65/2, 63/5, 65/25, 66/11, 66/16, 66/17, 66/19, 67/20, 67/24, 67/25, 68/6, 68/24, 69/12, 69/14, 69/22, 70/5, 70/10, 71/9, 71/20, 71/21, 71/22, 71/24, 73/25, 75/9, 75/11, 75/18, 77/9, 77/10, 77/19, 77/22, 78/6, 78/7, 78/8, 78/14, 78/15, 78/25, 79/1, 80/12, 81/1, 83/21, 85/17, 85/21, 86/1, 86/3, 88/8, 88/12, 88/14, 88/24, 90/8, 90/18, 91/23, 96/4, 96/14, 112/2, 112/4, 112/9, 112/17, 112/20, 112/23, 112/25, 113/10, 113/11, 113/19, 113/22, 114/2, 114/15, 114/16, 115/13, 117/10, 117/14, 120/13, 121/16, 123/23, 124/13, 124/15, 124/19, 124/23, 124/25, 125/4, 125/14, 125/20, 125/23, 126/9, 129/16, 129/23, 131/15, 132/12, 133/9, 133/11, 134/18, 134/22, 134/25, 135/11, 135/14, 135/16, 135/17, 136/4, 136/12, 136/21, 137/11, 141/21, 142/22, 143/2, 143/5, 143/8, 143/12, 143/16, 143/19, 144/13, 145/16, 146/6, 146/11, 146/19, 147/5, 148/21, 151/2, 151/3, 154/2, 154/15, 158/3, 158/7, 162/25, 163/1, 163/18, 164/4, 165/14
timecard 48/22, 56/15, 60/6, 60/11, 60/13, 60/20, 61/18, 63/18, 63/23, 64/1, 65/3, 70/18, 71/4, 71/6, 71/10, 72/2, 73/14, 73/25, 74/2, 74/6, 75/24, 76/12, 76/22, 77/7, 87/6, 142/23, 143/6, 143/13, 145/24, 146/9, 154/20, 154/23, 156/6, 156/20, 157/13, 158/9, 158/20, 160/3, 160/12, 166/20, 166/22, 167/11, 167/19
timecards 60/14, 60/15, 62/1, 62/2, 65/22, 73/18, 75/15, 75/19, 76/17, 76/24, 86/22, 96/5, 124/1, 157/6, 157/7, 158/6, 158/8, 162/11, 162/20, 166/12
times 17/10, 17/13, 17/22, 18/1, 19/2, 32/24, 33/3, 35/13, 45/17, 49/8, 49/17, 63/15, 63/21, 64/12, 69/4, 69/14, 71/18, 76/22, 83/17, 120/8, 125/6, 125/9, 126/11, 129/16, 130/21, 135/10, 136/9, 136/10, 136/15, 144/11, 146/8, 167/18
title 90/9, 9/12
tool 91/13
tools 28/21, 129/1
top 41/4, 49/21, 56/1, 60/25, 61/2, 61/3, 61/4, 61/5, 61/6, 69/14, 70/24, 72/1, 72/12, 73/24, 75/24, 119/23, 158/8, 166/20, 166/22, 166/23, 167/10, 167/16, 167/19
topics 110/21
totals 159/2, 159/17
track 64/11, 65/1, 65/4, 77/1, 77/8, 87/18, 127/25
tracking 65/2, 127/12
tracks 63/18, 128/1
train 81/6
trained 79/19, 112/23, 113/7
training 79/2, 79/11, 79/15, 79/17, 79/20, 80/1, 80/7, 80/10, 81/13, 82/3, 83/17, 83/23, 109/24, 109/25, 110/2, 110/4, 112/11, 112/13, 112/16, 112/20, 112/24, 113/5, 113/17
transactions 81/19
transcribed 6/3
transcribes 5/21
transcript 7/3, 170/7, 170/8, 171/14
transfer 48/21, 65/2, 71/10
transferred 80/11
transferring 77/18
transition 82/17, 83/7, 108/21, 123/14
transitioned 110/7
transitioning 80/18, 82/14, 110/4
transpiring 47/21
transposed 21/15, 21/23, 24/5
traumatizing 116/14
triggered 127/2
truck 16/19
true 145/18, 170/8, 172/4
truthful 6/4, 95/7, 163/4
truthfully 7/11, 7/19
turn 51/19, 56/21, 62/2, 63/15, 73/18
turned 87/7, 108/6
two 15/3, 23/4, 31/11, 31/16, 38/9, 38/16, 63/13, 63/23, 72/19, 79/2, 79/22, 80/16, 80/22, 83/3, 95/18, 113/7, 120/10, 120/18, 120/21, 127/18, 129/25, 131/8, 131/10, 141/3, 142/14, 157/6, 157/7, 159/17, 160/3, 160/13, 164/19
two-page 36/12
type 12/9, 16/4, 29/16, 37/9, 87/21, 127/14, 128/11, 133/1, 133/12
types 29/19, 89/24

**U**

uncommon 79/2
under-privileged 25/4
undersigned 169/6, 174/4
unfair 43/11
unit 59/5
UNITED 1/1, 4/9
units 59/8, 59/9
University 30/15, 30/18, 30/22, 30/23, 31/2
untruthful 163/6
upcoming 39/13
urgency 22/7
utilize 137/6
utilized 60/6

**V**

vacation 37/9, 37/16, 37/25, 38/22, 38/23, 39/1, 39/4, 39/6, 39/8, 39/12, 39/17, 39/24, 62/15, 62/22, 62/23, 141/25, 142/5

vendor 18/14
verify 60/23
voice 118/13
voiced 110/17
void 136/24
Volume 125/9, 125/11, 126/24, 126/25, 127/3,
127/8, 132/20
voluntary 35/16
volunteer 35/20

## W

wait 7/1, 43/8, 159/25
waiting 109/7, 162/5
waive 168/8
walk 126/3, 138/3
Walking 41/12, 54/14
WASSERMAN 1/17, 171/5
watch 131/10
weaning 80/23, 80/24, 81/1
week 27/9, 63/4, 65/13, 66/12, 66/14, 66/16,
67/15, 67/17, 68/2, 68/5, 68/9, 68/10, 68/12, 68/15,
68/18, 68/22, 69/2, 78/15, 80/19, 80/20, 80/22, 84/9,
113/7, 116/24, 125/13, 125/17, 125/18, 126/17,
127/1, 127/10, 127/22, 127/24, 128/8, 128/9, 128/12,
128/14, 135/6, 135/7, 135/8, 135/24, 136/6, 136/10,
136/19, 139/23, 140/2, 140/6, 141/14, 141/22,
145/24, 159/17, 160/3, 160/12, 160/13, 164/19
weekly 67/15, 67/18, 67/22, 125/20, 125/24,
134/3, 159/2, 159/17, 164/17
weeks 72/20, 79/13, 83/4, 83/16, 125/10
wheels 84/1
wife 31/8
willing 68/15
window 64/17
Wise 30/16, 31/5, 31/6
WITNESS 2/2, 4/1, 4/20, 10/22, 11/4, 12/8,
13/12, 13/18, 13/20, 22/18, 36/7, 40/8, 41/9, 42/6,
43/4, 51/17, 54/10, 54/22, 56/6, 72/10, 78/19, 88/21,
92/4, 92/12, 92/24, 98/19, 99/12, 100/6, 100/20,
100/21, 101/10, 101/11, 101/25, 102/13, 102/17,
102/25, 104/4, 104/24, 105/19, 135/9, 141/11,
141/18, 149/9, 149/17, 150/6, 150/15, 151/25,
152/12, 154/10, 156/8, 157/3, 163/11, 169/9, 171/13,
172/18, 173/11, 173/14
WOODS 1/19, 5/4
word 31/17, 57/20, 57/24, 73/8, 161/8
words 46/2, 66/24, 93/10, 144/4
work 5/15, 15/18, 18/15, 22/6, 22/16, 34/16,
34/23, 34/25, 35/7, 35/10, 35/17, 37/7, 37/8, 42/6,
44/5, 50/4, 50/9, 50/10, 50/12, 51/10, 67/3, 68/23,
80/1, 80/10, 80/14, 80/20, 84/2, 84/3, 84/14, 84/18,
84/22, 85/7, 106/24, 107/1, 107/5, 107/25, 108/19,
110/10, 111/7, 112/12, 118/12, 119/13, 120/6, 122/2,
123/15, 127/23, 128/24, 129/6, 133/2, 133/5, 133/15,
134/20, 135/2, 136/20, 136/22, 139/23, 140/2, 140/6,
140/12, 140/19, 141/7, 141/14, 141/22, 144/3,
144/11, 146/17, 147/13, 150/21, 162/8
work-related 50/7
worked 8/16, 8/17, 20/13, 25/5, 34/21, 38/11,
58/18, 60/12, 67/12, 69/1, 78/24, 79/20, 79/22,
80/19, 82/9, 85/11, 90/17, 106/25, 108/3, 109/24,
111/25, 113/22, 114/3, 117/10, 130/3, 142/22, 143/5,
143/12, 143/17, 144/2, 145/6, 145/24, 146/2, 146/17,
146/18, 147/20, 148/4, 151/7, 161/21, 161/23
working 18/21, 33/18, 33/21, 45/12, 47/22, 82/14,
84/7, 84/25, 88/14, 88/24, 110/13, 122/1, 128/13,
136/6, 138/16, 139/18, 143/24
worksheet 164/17
worth 38/8
wrapped 28/10
wrapping 83/23
write 78/5, 112/16, 112/24, 120/5, 151/18
writing 151/25, 152/3, 164/20, 164/23, 164/24
written 114/1, 118/11, 120/10, 120/21, 130/17
wrong 41/8

## X

X 2/1, 2/12, 3/1, 32/4

## Y

year 13/16, 13/17, 13/18, 13/20, 16/11, 17/25,
18/1, 22/23, 36/24, 38/21, 39/13, 59/6, 90/2, 107/15
year-to-date 59/7, 59/9
years 7/15, 8/14, 15/15, 17/19, 139/1
young 42/14

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 00-6145-CIV-DIMITROULEAS/JOHNSON

ROXANNA L. ESCUDERO, et al,

    Plaintiff,

vs

BANKAMERICA CORPORATION, etc.,

    Defendant.

_____/

FILED by _____ Ø.C.

MAR 15 2001

CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B

## ORDER

**THIS CAUSE** is before the Court on Plaintiffs' Motion To Compel Discovery (Docket Entry No. 173). The Court has viewed the pleadings filed incident to this matter and is otherwise duly advised in the premises. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that said motion is **GRANTED.** As for Plaintiffs' request for production of time cards, time sheets and vault logs, Defendant has represented that it is continuing its efforts to retrieve these documents and that it intends to produce said documents as soon as practicable. Accordingly, Defendant is hereby granted thirty (30) days to produce these records and if additional time is required, Defendant may petition the Court therefor. As for Plaintiffs' request for "computer log" and "alarm records" for the named individuals, said request is also granted. While this Court recognizes the burden placed on Defendant in producing the subject discovery, same does not warrant depriving Plaintiffs of what can end up being highly relevant and material information for purposes of this case. In recognition of the burden placed on Defendant in producing the subject discovery and to minimize as much as possible the burden imposed, Defendant shall have sixty (60) days within which to provide the subject discovery. Should Defendant require additional time, it may petition the Court therefor.



EXHIBIT

J



**DONE AND ORDERED** on March 15, 2001, in Chambers, at West Palm Beach,

Florida.

LINNEA R. JOHNSON
CHIEF UNITED STATES MAGISTRATE JUDGE

CC:   The Honorable William P. Dimitrouleas
      Susan L. Dolin, Esquire
      Caryl Boies, Esquire
      Richard Kane, Esquire
      Michael T. Burke, Esquire

2