UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 00-06145-CIV-DIMITROULEAS
Magistrate Judge Johnson

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others similarly
situated,

              Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a BANK OF
AMERICA CORPORATION, a foreign
corporation, f/k/a NATIONSBANK, N.A., a
national association,

              Defendant.



### NationsBank's Opposition to Plaintiffs'
### May 11, 2001 Motion to Compel Discovery

Bank of America Corporation (f/k/a BankAmerica Corporation) and Bank of America, N.A.

(f/k/a NationsBank, N.A.)(collectively referred to herein as "Bank of America"), by counsel,

responds as follows in opposition to plaintiffs' May 11, 2001 Motion to Compel Discovery ("Motion

to Compel"):



1

## Argument

I.    The Interrogatories in Which Plaintiffs Demand Information Regarding their "Co-Workers" are Overbroad and Seek Information which is Neither Relevant to this Action Nor Reasonably Likely to Lead to the Discovery of Admissible Evidence.

The motive behind the discovery requests at issue in plaintiffs' Motion to Compel is clear. Under the guise of corroboration, the discovery requests seek to launch a "fishing expedition" through Bank of America's files for additional individuals who Plaintiffs can recruit to opt into their collapsing collective action. The disputed discovery was overbroad and unduly burdensome on its face before the Court's denial of plaintiffs' Motion to Allow Notification; now, the discovery requests are also unquestionably irrelevant and beyond any reasonable construction of this action's current scope.[1]

### A.    Overbreadth

In Interrogatory 2 to plaintiffs' first, second and third sets of interrogatories, plaintiffs demand that Bank of America identify by name, address and telephone number, "each consumer Banker II, III or IV, and/or each instore banker I or II" who worked with Kimberly Drake and Roxanna Escudero (First Set of Interrogatories), Nancy Rojas (Second Set of Interrogatories) and 60 additional opt-in plaintiffs (Third Set of Interrogatories). Plaintiffs do not limit their inquiry to information regarding the time period they and the opt-in plaintiffs worked with these other Consumer Bankers and instore bankers. Instead, plaintiffs demand in Interrogatory 2 that Bank of America "specify at which banking center [each Consumer Banker] worked from December, 1997

---

[1]    Plaintiffs served their First, Second and Third Sets of Interrogatories upon Bank of America on January 16, 2001. The Court denied Plaintiffs' Motion for Notification (to potential opt-in plaintiffs) on March 26, 2001. See Dkt. Entry 199.

to the present (or, if terminated, state the date of termination). . . ." Bank of America objected to Interrogatory 2 because it seeks information regarding individuals who are unrelated to the allegations in the above-captioned action – e.g., instore bankers – and because it sought detailed information regarding the job histories of the plaintiffs' co-workers beyond that time period when the co-worker actually worked with the particular plaintiff at issue.[2]

Plaintiffs now "contend this information is relevant to establish the amount of overtime purportedly worked by each plaintiff and the instructions they may have received from their respective branch managers not to record their time." Motion to Compel, p. 11. Plaintiffs' purported justification for Interrogatory 2 establishes why it is overbroad and seeks information which is neither relevant to the above-captioned action nor reasonably likely to lead to the discovery of admissible evidence.

First, plaintiffs seek the identity of co-workers of opt-in plaintiffs who have withdrawn from this action, have been dismissed from this action or are subject to dismissal from this action pursuant to Bank of America's pending motion for summary judgment. See Dkt. Entries 219-20. In fact, of the sixty opt-in plaintiffs at issue in plaintiffs' Third Set of Interrogatories, only twenty are likely to remain in this action.[3]

---

[2]    As plaintiffs acknowledge, in an attempt to balance the competing concerns, Bank of America offered to identify the non-exempt consumer bankers with whom plaintiffs worked pursuant to a protective order prohibiting plaintiffs or plaintiffs' counsel from contacting those individuals without prior leave of court. See Motion to Compel, p.2. Plaintiffs rejected the Bank's offer.

[3]    The opt-in plaintiffs who will remain are: (1) Elke G. Adams; (2) Deborah J. Agnew; (3) Kathy Foster Andrews; (4) Annette B. Armstrong; (5) Margaret A. Buchanan; (6) Bryan K. Crowder; (7) Stephanie Dantos; (8) Dianne D. Dismukes; (9) Laurie K. DuPont; (10) Alex L. Harris; (11) Tracie R. Lappin-Blitch; (12) Peggy H. Lee; (13) Guilbert M. Parker; (14) Steven K.

3

Second, plaintiffs include within the scope of Interrogatory 2 instore bankers, who are irrelevant to the above-captioned action. See Dkt. Entry 148.

Third, if the true motive behind this interrogatory is "to establish the amount of overtime purportedly worked by each plaintiff and the instructions they may have received from their respective branch managers not to record their time," then detailed work histories for the plaintiffs' co-workers "from December 1997 to the present," which would include time periods and locations where they were not working with the plaintiffs, are irrelevant. Detailed work histories which would include information regarding banking centers at which, and banking center managers for whom plaintiffs never worked are irrelevant. The only time period for which information would be relevant would be that time period the co-worker actually worked with the plaintiff in question.

Finally, plaintiffs themselves are the best source of information on the identities of Consumer Bankers with whom they worked, and those individual's knowledge about any overtime which they may have worked. Rule 26(b)(2) encourages trial courts to limit discovery that is "unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive." Plaintiffs should be prohibited for imposing the effort and expense of their counsel's case development upon Bank of America. If plaintiffs' counsel

---

Richardson; (15) Melanie E. Rogers; (16) Leslie Slater Hill; (17) Fabiola Stewart: (18) Sheri Thomas; (19) Ron Valdez; and (20) Samuel D. Washington. The remaining opt-in plaintiffs at issue in plaintiffs' Third Set of Interrogatories have withdrawn, been dismissed pursuant to Bank of America's October 23, 2000 Motion for Summary Judgment, or are subject to dismissal pursuant to Bank of America's May 25, 2001 Motion for Summary Judgment, see Dkt. Entries 164, 177, 198, 208, 210-11 and 218; 120-122 and 199; and 219-20, respectively.

4

must know the identities of the plaintiffs' and opt-in plaintiffs' co-workers, then all they need do is ask their clients.[4]

    B.    If the Court Grants Plaintiffs' Motion to Compel, a Protective Order Prohibiting Plaintiffs from Contacting any Individual Identified by the Bank is Necessary to Prevent the Unmonitored Solicitation of these Individuals to Join as Plaintiffs.

Plaintiffs candidly acknowledge that they seek the identities of other consumer bankers at the banking centers at which they worked in order to determine, inter alia, whether other consumer bankers wish to join this action. See Motion to Compel, pp.10-11. Given this admission, if the Court grants plaintiffs' Motion to Compel, in whole or in part, Bank of America requests the Court to prohibit either plaintiffs or their counsel from contacting any of the individuals identified by the Bank without prior leave of Court.[5]

Bank of America's requested relief is consistent with Tucker v. Labor Leasing, Inc., 155 F.R.D. 687 (M.D. Fla. 1994), a case upon which plaintiffs rely. See Motion to Compel, p. 10. In Tucker, the Court first narrowed the scope of plaintiff's requested discovery; it then prohibited plaintiff or plaintiff's counsel from contacting any potential opt-in plaintiff without prior leave of Court. According to the Court, such limitations were necessary to eliminate the possibility of

---

[4]    Moreover, with regard to Escudero, Drake and Rojas, plaintiffs obtained information on the identity of co-workers from the Banking Center Managers they have already deposed in this case.

[5]    As noted above, Bank of America offered this compromise to plaintiff in the instant case in an effort to resolve this discovery dispute without the need for the Court to intervene, but plaintiffs' rejected the offer.

5

improper solicitation and the "other dangers" arising from unilateral communications in an FLSA collective action. Id. at 690.

1. Escudero

The record in the instant case also supports Bank of America's request that the Court regulate any communications between plaintiffs or their counsel and the plaintiffs' co-workers. First, the Court has denied plaintiffs' Motion for Notification and, therefore, has indicated its view that notice to the putative "class" is not appropriate. See Dkt. Entry 199. Plaintiff should not be permitted to end run this ruling through unregulated communications with plaintiffs' co-workers.

Second, as this Court is aware, the opt-in plaintiffs in this matter also were opt-in plaintiffs in other matters being prosecuted against NationsBank by plaintiffs' counsel in the instant case. See Dkt. Entry 209 at pp. 11-12. The only reasonable inference is that plaintiffs' counsel solicited each of the opt-in plaintiffs in these other cases and invited them to join here; indeed, plaintiffs' counsel have acknowledged as much. Id. While there may not be anything particularly sinister about this solicitation, it cannot be disputed that plaintiffs' counsel's unmonitored inquiries have resulted in opt-in plaintiffs joining this action who had no right to be here. Plaintiffs' counsel's failure to screen these opt-in plaintiffs and determine whether they had a viable claim in the instant case caused Bank of America and the Court to expend valuable resources to obtain dismissal of forty opt-in plaintiffs because they did not even work as Consumer Bankers during the relevant time period. See Omnibus Order dated March 26, 2001 (Dkt. Entry 199). To prevent the imposition of future, unnecessary burdens, the Court should regulate plaintiffs' counsel's contact, if any, with any of the plaintiffs' co-workers identified by Bank of America in response to the interrogatories at issue.

6

### 2.    Companion Cases

The need for a protective order regulating plaintiffs' counsel's communications with non-parties also is apparent from the record in other cases in the District; the same record which lead the Court to grant in the Perlman case the identical relief Bank of America now seeks here.  More specifically, in Juliet Aldred v. NationsBank of Florida, N.A., Case No. 97-7547-CIV-DIMITROULEAS ("Aldred"), the Court ordered the Bank to identify the tellers who worked at the same banking centers as the named plaintiff.  Without the Court's approval, and feeling no constraints on such communications, plaintiff's counsel sent a letter to each individual identified by the Bank pursuant to the Court's Order.  Despite this Court's practice of regulating communications with potential "class members," accord Local Rule 23.1 (Comments), plaintiff's counsel did not ask the Court to approve the communication or the content of the communication. See Aldred Court Record, Docket Entry 68.

Similarly, in Levine, et al. v. NationsBank, N.A., Case No. 98-6306-CIV-DIMITROULEAS ("Levine"), the Court authorized plaintiffs to send notice to all potential opt-in plaintiffs based on a court-approved notice and consent form. No other notice was authorized or approved by the Court. Nevertheless, after sending the initial notice and apparently distressed by the lackluster response, plaintiffs' counsel unilaterally sent a second notice to the potential opt-ins. See Levine "Omnibus Order" dated September 23, 1999.

Given plaintiffs' propensity to solicit individuals to opt into previous collective actions without court authorization and supervision, and the lack of any basis for such contact after the

7

Court's denial of Plaintiffs' Motion to Allow Notification, the information sought by plaintiffs'
interrogatories must be governed by an appropriate protective order.

II.    Plaintiffs' Demands in their Fifth Request for Production of Documents for Naomi
       Billingsley's Time Cards, Computer Logs and Security Code Entries are Overbroad.

       A.    Time Cards

In their Fifth Request for Production of Documents, plaintiffs demand production of all time
cards for Naomi Billingsley "[f]or any and all pay periods during her employment from December
17, 1997 to the present." See Plaintiffs' Fifth Request for Production ("Fifth RPD"); Request 1.
Plaintiffs' demand for these time records is overbroad and seeks information which is neither
relevant to the above-captioned action nor reasonably likely to lead to the discovery of admissible
evidence.

Naomi Billingsley is not an opt-in plaintiff in this matter.  Billingsley's time cards are
relevant to this action only because opt-in plaintiff Angela Mobley testified that she worked with
Billingsley at a banking center in Atlanta, Georgia; that she and Billingsley were the only consumer
bankers at the center; that she and Billingsley worked approximately the same number of hours; that
the banking center manager restricted her overtime but permitted Billingsley to record her overtime;
and that Billingsley's time cards, therefore, are a more accurate record of the hours Mobley actually
worked. See deposition of Angela Mobley ("Mobley Depo.") pp. 65-68, 82, 90, 134-140, copies of
which pages are attached hereto as Exhibit 1. If this true, then only the time cards for that period that
Billingsley and Mobley worked together as non-exempt consumer bankers – which, according to

cv-06145-LRJ    Document 231    Entered on FLSD Docket 06/05/2001    P

Case No. 00-06145-CIV-DIMITROULEAS
Escudero, et al vs. BankAmerica Corporation

Mobley was approximately two months – would be relevant to plaintiff Mobley's claims and Bank of America has agreed to produce those cards.

Plaintiffs' contend, however, that Bank of America must produce all of Billingsley's time cards, even for those time periods when she and opt-in plaintiff Mobley did not work together, because the time cards "support Plaintiffs' allegations that their time cards, and the time cards of employees similarly situated, are utterly inaccurate" and "demonstrate the continuing nature of Defendant's FLSA violations." See Motion to Compel, pp. 12-13. Plaintiffs' argument is nonsensical. Mobley testified that Billingsley's time cards were accurate, see Exhibit 1, Mobley Depo., pp. 134-140, and would establish her (Mobley's) true hours of work, otherwise they would have no relevance at all to plaintiffs' claims in the instant case.

B.    Computer Logs

In their Fifth Request for Production of Documents, plaintiffs also demand production of "all computer logs showing times logged on and logged off for Naomi Billingsley" while employed at the Bankhead Banking Center in Atlanta, Georgia. See Fifth RPD, Request 3. Such computer records, however, are not available. Opt-in plaintiff Mobley and Billingsley worked together as non-exempt consumer bankers for approximately two months, ending in February, 1998, see Exhibit 1, and the Bank maintains records of the various times employees such as Mobley and Billingsley log on and off the computer systems only for thirty-nine days. See Affidavit of Dwight Hargrave, appended hereto as Exhibit 2. Such computer records, therefore, were erased or otherwise disposed of well before plaintiffs filed the above-captioned action.

9

Even if such records were available, their own client contradicts plaintiffs' counsel's argument in support of their demand for Billingsley's "computer logs." Plaintiffs' counsel contend here that "comparing Ms. Billingsley's time cards with her computer logs will clearly reveal how the time cards are woefully inaccurate, further evidencing Defendant's willful FLSA violations." See Motion to Compel. pp. 13-14. Again, opt-in plaintiff Mobley testified that Billingsley's time cards are accurate. Contrary to plaintiffs' counsel's premise here, comparing Billingsley's computer logs and time cards, therefore, will not establish that Billingsley's time cards are inaccurate.

C.    Security Code Entries

In their Fifth Request for Production of Documents, plaintiffs also demand production of "all security code entries for Naomi Billingsley" while employed at the Bankhead Banking Center in Atlanta, Georgia. See Fifth RPD, Request 4. Again, opt-in plaintiff's Mobley's testimony establishes why this request is irrelevant to her claims in the instant case.

Opt-in plaintiff Mobley testified that she and Billingsley used the same security code to activate and deactivate the security system at their banking center. Mobley Depo. pp. 130; see also Motion to Compel, p. 14. As a result, it will be impossible to ascertain from the security code entries, even if they could be retrieved, which employee activated or deactivated the security system at a given time on a given time. The code entries, therefore, would not be probative of the time opt-in plaintiff Mobley entered or left the banking center – which is the relevant issue to be addressed.

D.    Vault Logs or Sign-in Logs

In their Fifth Request for Production, plaintiffs also demand production of "all vault logs or sign-in logs for the Bankhead Banking Center in the Atlanta, Georgia metropolitan area" for the time

10

Case No. 00-06145-CIV-DIMITROULEAS
Escudero, et al vs. BankAmerica Corporation

period "December 17, 1997 to the present." Bank of America is searching for these records and

intends to produce those vault records for the time period opt-in plaintiff Angela Mobley was

employed at the Bankhead Banking Center, if they even can be located. However, vault logs on

sign-in log for time periods when opt-in plaintiff Mobley did not work at the Bankhead Banking

Center would have no relevance and or beyond the scope of permissible discovery.

### Conclusion

Based on the foregoing, Bank of America, by counsel, respectfully requests the Court to

enter an order denying plaintiffs' Motion to Compel Discovery; awarding Bank of America the

fees and costs expended responding to plaintiffs' Motion to Compel; and awarding such other

relief as the Court deems just and proper.

This the 4th day of June, 2001.


Michael T. Burke (Fla. Bar No. 338771)
Johnson, Anselmo, Murdoch, Burke & George, P.A.
790 East Broward Blvd., Suite 400
P.O. Box 030220
Fort Lauderdale, Florida  33303-0220
(954) 463-0100
(954) 463-2444 (Facsimile)

Richard F. Kane (NC Bar No. 5694)
Bruce M. Steen (VA Bar No. 31062)
J. Mark Langdon (NC Bar No. 19359)
McGuire Woods LLP
3700 NationsBank Plaza
Charlotte, North Carolina 28280
(704) 373-8999
(704) 373-8990  (Facsimile)

Counsel to NationsBank, N.A.

Case No. 00-06145-CIV-DIMITROULEAS
Escudero, et al vs. BankAmerica Corporation

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing in the above-captioned

proceeding has been served this day by U.S. mail, postage prepaid, upon plaintiffs' counsel as

listed below:

Susan L. Dolin, Esquire
Adam S. Chotiner, Esquire
Muchnick, Wasserman, Dolin & Levine, LLP
Presidential Circle Building, Suite 620 North
4000 Hollywood Blvd.
Hollywood, Florida 33021

Caryl Boies, Esquire
Anne E. Hinds, Esquire
Boies, Schiller & Flexner, LLP
2435 Hollywood Boulevard, Suite 200
Hollywood, Florida 33020

This the 4th day of June, 2001.

Michael T. Burke

1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
              CASE NO. 00-6145-CIV-DIMITROULEAS
 3
   ROXANNA L. ESCUDERO, and            )
 4 KIMBERLY DRAKE, on behalf of        )
   themselves and all others similary )
 5 situated,                           )
                                       )
 6              Plaintiff's            )
                                       )
 7      vs.                            )
                                       )
 8 BANKAMERICA CORPORATION,            )
   a foreign corporation d/b/a         )
 9 BANK OF AMERICA CORPORATION,        )
   a foreign corporation, f/k/a        )
10 NATIONSBANK, N.A., a national       )
   association,                        )
11                                     )
                Defendant,             )
12 -----------------------------------

13
                            337 East Las Olas Boulevard
14                          Fort Lauderdale, Florida
                            February 9, 2001
15                          10:20 a.m. - 2:25 p.m.

16
   APPEARANCES:
17
     MUCHNICK, WASSERMAN, DOLIN & LEVINE, LLP
18   BY:  SUSAN DOLIN, ESQ.
     Attorneys for the Plaintiffs
19
     MCGUIRE, WOODS, BATTLE & BOOTHE, LLP
20   BY:  J. MARK LANGDON, ESQ.
     Attorneys for the Defendant
21
                                      ORIGINAL
22              * * *

23              DEPOSITION

24              OF

25              ANGELA MOBLEY
```

1  which it was intended to track, how would you go about

2  tracking your time so you could then transfer it on to

3  the timecard once you received it?

4      A.    Well, actually I did not have to really track

5  my time with the exception of Fridays.  At that time my

6  branch manager, which was Tamara Lomax, actually

7  explained to me she was not compensating me for overtime

8  and I should be logged out every day by 5:00.

9      Q.    Let's talk about that a little bit because

10 that's something I intended to discuss later on in your

11 deposition today but we can get into that now.

12          How did Ms. Lomax inform you that you would

13 only be compensated for 40 hours a week?

14     A.    Because my threshold was not where it was

15 supposed to be, she was not willing to pay me overtime.

16     Q.    When did you have this conversation wherein

17 she told you because your threshold -- and I take that

18 to be related to performance, correct?

19     A.    Correct.

20     Q.    -- that your threshold was not where they

21 should be so you were not entitled to overtime?

22     A.    That would be when we started the timecards.

23     Q.    Your recollection as to when that was is?

24     A.    Late December or early January.  So when we

25 started time sheets, the issue was overtime.  And her

1 explanation to me was she didn't feel it was necessary
2 to compensate me overtime because my threshold was not
3 where it should have been.

4     Q.    Was this a private conversation between only
5 you and Ms. Lomax?

6     A.    I don't recall.

7     Q.    What did she tell you in this conversation as
8 to how you were then to handle your overtime?

9     A.    There was no other option.  She would actually
10 explain to me that you should be signed out by 5:00.  So
11 that means each day on my time sheet I had to be signed
12 out by 5:00.  Or say if it was -- the first week of the
13 month is a perfect example.  That's a very busy, hectic
14 week.

15         So she may say, well, you should be complete
16 this week by 5:30, regardless of what time I was
17 actually done.  She indicated to me that my time should
18 not reflect a minute over 5:30 or five o'clock, whatever
19 it was at that time.

20     Q.    Did she specifically tell you that because of
21 your threshold levels you were not permitted to record
22 overtime?

23     A.    Yes.

24     Q.    She said that in that many words, that because
25 of your threshold levels, Ms. Mobley, you cannot record

1  overtime?

2      A.    Because of my threshold levels that she would

3  not allow me to work for hours longer than she

4  indicated, which would be five o'clock or 5:30.  But a

5  senior branch manager was not allowed to stay and be

6  compensated because her threshold was always higher.

7      Q.    The senior branch manager?

8      A.    I mean the senior CB.

9      Q.    That was Ms. Billingsly?

10     A.    Yes.

11     Q.    Did Ms. Lomax ever say to you you are to sign

12  out at 5:00 every day regardless of whether you worked

13  longer or not?

14     A.    Yes, uh-huh.  She indicated to me either -- I

15  want to say maybe weekly and it depended on how the week

16  was.  She would indicate to me, you should be done this

17  week by five o'clock.

18     Q.    Did Ms. Lomax set your schedule on a weekly

19  basis?

20     A.    Pretty much after the time sheets, yes.

21     Q.    Did she set the schedules of other branch

22  personnel on a weekly schedule?

23     A.    Actually she set all our schedules before the

24  time sheets.  We had to be in at eight o'clock.  After

25  the time sheets it changed to 8:30.

68

```
 1        Q.    When would she distribute the schedule she had
 2  created for the week?
 3        A.    There was no schedule.
 4        Q.    When would you be informed what your schedule
 5  was going to be for the week?
 6        A.    Once the time sheet process started, we were
 7  told that our hours would change from 8:00 to 8:30.
 8        Q.    I understand that.  But at what point in the
 9  week would she come to you and say, Ms. Mobley, your
10  schedule for this week will be as follows?
11        A.    She never told me that.  What she would
12  explain is that as of this week, you should be done
13  every day by 5:00.  So that meant to me I need to be
14  signed out by 5:00.
15        Q.    And the term she used was, this week you
16  should be done every day by 5:00?
17        A.    Uh-huh.  And actually to elaborate a little
18  further, I should be done this week by 5:00, but I still
19  need to get my threshold up.  So whatever that means to
20  you, you know, that's what I needed to do.
21        Q.    Did she specifically say to you, Ms. Mobley,
22  you should be done every day this week by 5:00, and if
23  you work longer than that, you are not to record that
24  time?
25        A.    That I will not be paid for it, uh-huh.
```

 1 you get started.
 2      Q.    What point in your tenure then were you
 3 basically released from your training so that your
 4 full-time responsibilities were to go out and try to
 5 attempt to sell banking products to customers?
 6      A.    If I'm not mistaken, I want to say it was
 7 October, October or November.
 8      Q.    Do you recall the names of any of the tellers
 9 with whom you worked at the Green Briar branch?
10      A.    Green Briar?
11      Q.    Yes.
12      A.    No.
13      Q.    You mentioned that you were -- while you were
14 working at Green Briar, you were also transitioning over
15 to Bankhead?
16      A.    Yes.
17      Q.    During this transition phase, who was the
18 branch manager at Bankhead?
19      A.    Initially there was no branch manager at
20 Bankhead.
21      Q.    Who was then responsible for supervising the
22 Bankhead?
23      A.    Naomi Billingsly.
24      Q.    And she was --
25      A.    She was a senior CB.

```
 1  thresholds, statistics that will show what my points
 2  were, how I ranked in the ending year, just CB
 3  performance documentation.
 4       Q.   Are these documents related solely to your
 5  performance?
 6       A.   Yes.
 7       Q.   Do they reflect the performance of any other
 8  consumer bankers employed by NationsBank at that time?
 9       A.   Actually they will reflect other banking
10  centers.
11       Q.   Just your specific banking center, Bankhead?
12       A.   That's correct.
13       Q.   So if I understand you correctly, the
14  documents would reflect your performance and Ms.
15  Billingsly's performance?
16       A.   That is correct.
17       Q.   Were there any other CB's that worked at
18  Bankhead at that time whose performance would be
19  reflected on those documents?
20       A.   We had no other CB's.
21       Q.   You said the performance materials were the
22  majority of what you had.  Can you think of any other
23  document that you have in your possession related to
24  your employment at NationsBank outside of that general
25  category of performance-related materials?
```

1    Q.   Did your branch regularly hold branch

2 meetings?

3    A.   Yes.  We had a weekly meeting every Friday

4 morning at eight o'clock.  We had one mandatory Saturday

5 meeting to clean the branch.  And occasionally we had

6 mandatory evening meetings.  But the evening meetings

7 would be along the lines of marketing, security.

8 Security is just a really big thing for the banking

9 centers.  That's really it.

10    Q.   So would it be fair to say that the branch

11 meetings on Friday mornings were a regularly scheduled

12 meeting?

13    A.   That is correct.

14    Q.   But the Saturday meeting you mentioned and the

15 meeting you would have in the evenings to discuss

16 products, there was no set schedule to those, correct?

17    A.   Correct, they were random.

18    Q.   Ms. Mobley, during the time period December,

19 '97 until the end of February of '98, how many hours on

20 the average did you put in at work for NationsBank?

21        MS. DOLIN:  Can you repeat that?  I didn't get

22    the time frame.

23        MR. LANGDON:  Yes.

24 BY MR. LANGDON:

25    Q.   From the time period of mid December of '97

1 until the end of February of '98 when you resigned, how

2 many hours on average did you work for NationsBank by

3 your calculation?

4      A.   Say between 50 and 55.

5      Q.   And on what do you base that calculation, the

6 50 to 55 hours a week?

7           MS. DOLIN:  Per week, right?

8           MR. LANGDON:  Per week.

9           THE WITNESS:  That's based on me getting there

10     prior to my scheduled times and staying after her

11     requested time, whether it be 5:00 or 5:30, to

12     actually do my paperwork.  This was really

13     difficult during the day to do your paperwork and

14     handle customers at the same time.

15 BY MR. LANGDON:

16     Q.   Did you document your actual report time and

17 your actual end time in any way?

18     A.   I did not.

19          MR. LANGDON:  Let's take a break.

20          (A recess was had.)

21 BY MR. LANGDON:

22     Q.   Before we left out on a quick break, we were

23 talking about the hours that you typically put in, the

24 actual hours you typically put in week in and week out

25 from mid December of 1997 to February of '98.  You

```
 1  stated that to be 50 to 55?
 2      A.    That's correct.
 3      Q.    I believe you also testified that you did not
 4  record the actual report time and the actual end time to
 5  your day during that period.  On what then do you base
 6  your estimate you were working 50 to 55 hours a week
 7  during that period?
 8      A.    I struggled trying to get my daughter.  So,
 9  no, I did not document my times, but I know there are
10  many times within every single week that my husband had
11  to rearrange his schedule to get our daughter.
12      Q.    Her scheduled pick-up time was 6:30 at the
13  latest, correct?
14      A.    That's correct.
15      Q.    Were there times during this period where you
16  were actually able to leave and pick up your daughter by
17  6:30?
18      A.    Yes, there were.  But in my average of the 10
19  to 15 hours each week, that also included the Bankhead
20  association meetings, any additional community work that
21  just was not included in our regular time.  The
22  community work could have meant come in on a Saturday
23  and kind of make sure that teller process was, you know,
24  that they didn't need anyone to help them void slips or
25  whatever.  Whatever it was, that's what I counted.
```

```
 1              But also I guess the issue for me was that I
 2   really loved what I did.  I enjoyed helping people.  And
 3   it was difficult for me to kick from service person to
 4   salesperson.  And I knew that I had to get the paperwork
 5   done.  To me that meant if I had to get it done, I had
 6   to utilize whatever my own resources were to ensure I
 7   was in compliance getting all of their forms submitted
 8   to security or whomever to, you know, not cause a
 9   problem for a customer.
10        Q.   When you refer to your own resources, are you
11   referring to your own time resources?
12        A.   That is correct.
13        Q.   You mentioned early in the deposition that Ms.
14   Lomax required you to attend the Bankhead association
15   meetings; is that correct?
16        A.   That's correct.
17        Q.   You also mentioned just now coming by on
18   Saturday morning and checking on teller issues or things
19   like that?
20        A.   Right.
21        Q.   Did Ms. Lomax require you to do that as well?
22        A.   I think I was asked to do that maybe once, but
23   a perfect example is the Bankhead business association,
24   there was a parade in the community and this was like
25   from 8 a.m. to whatever, you know, the parade starts
```

1 pretty early.  But it was required that I have presence
2 in that parade, that I partake in it.  So, no, I did not
3 walk the whole ten miles but I had to take -- I was
4 there.  I actually seen some key people that day to make
5 my presence known before going home.
6      Q.   When did Ms. Lomax instruct you that she
7 wanted you to participate in this Bankhead association?
8      A.   That I don't really recall.
9      Q.   Is it your testimony that you're under a
10 standing order from Ms. Lomax to participate in the
11 Bankhead association meetings and events no matter when
12 they were scheduled?
13      A.   That is correct.
14      Q.   Ms. Mobley, did you ever complain to anyone
15 about Ms. Lomax's role that you could not record
16 overtime you were working?
17      A.   I'm sure it was discussed between Naomi and I.
18 Naomi and I talked.  We were really close.
19      Q.   Do you specifically recall discussing that
20 with --
21      A.   Yeah.
22      Q.   Was Ms. Billingsly under a similar role?
23      A.   Similar in the fact that her hours were
24 reduced but not reduced to what mine were.  She was a
25 senior person and she had been in that banking center

```
 1 for 20 years.  Naomi was the thriving force behind the
 2 business relationship in that banking center.  So what
 3 she did not want to do was, you know, dissolve that.
 4 She did not want to interfere with all of those sales.
 5      Q.   Ms. Billingsly did not?
 6      A.   No, Tamara did not want to cause a conflict
 7 there.
 8      Q.   Did Ms. Billingsly ever indicate to you what
 9 her hour restrictions were?
10      A.   No.  But I know they were earlier because
11 Naomi -- it's interesting because we talked about this
12 dual control log.  And, you know, on average Naomi
13 possibly stayed there until 7:00 or eight o'clock every
14 night.  I could actually go in the log myself.  I would
15 say, hey, Naomi, you were here until 7:00 or eight
16 o'clock last night.  That was just common for her.
17      Q.   Did she ever complain to you that she was
18 working hours --
19      A.   Her concern was to meet those goals, and she
20 did what it took to meet those goals.
21      Q.   Let me finish my question.
22           Did Ms. Billingsly ever complain to you that
23 she was having to work hours over 40 per week which she
24 could not record?
25      A.   No.
```

140

```
 1        Q.    Did she ever complain to you she was having to
 2  work hours over 40 per week for which she did not
 3  receive compensation from NationsBank?
 4        A.    No, not that I can recall.
 5        Q.    Did you ever complain to anyone about having
 6  to work hours over 40 per week?
 7        A.    I complained to Tamara.
 8        Q.    Did you complain to anyone else in addition to
 9  Ms. Lomax?
10        A.    That was me complaining to the HR director
11  when I mentioned it to her.
12        Q.    You made a complaint about having to work
13  hours in excess of 40 to Ms. Lomax, to the HR person
14  that we discussed?
15        A.    That's correct.
16        Q.    To anyone else?
17        A.    No.
18        Q.    Did you complain to anyone about having to
19  work hours in excess of 40 for which you were not
20  receiving any compensation?
21        A.    I do recall complaining to Tamara specifically
22  in the event for Saturday that she made a mandatory
23  meeting for us to come and clean the branch, and my
24  statement to her was, if you're not going to compensate
25  us, at least provide lunch, and that was an issue.
```

```
 1

 2                      CERTIFICATE OF OATH

 3

 4  STATE OF FLORIDA      )
    COUNTY OF BROWARD     )
 5

 6

         I, the undersigned authority, certify that
 7  ANGELA MOBLEY, personally appeared before me
    and was duly sworn.
 8

 9       WITNESS, my hand and official seal this 20th
    day of February, 2001.
10

11

12

13
                       _____
14                     Ruth Stuck, R.P.R.
                       Notary Public - State of Florida
15                     My Commission Expires:

16

17
                              RUTH STUCK
18                     COMMISSION # CC 723874
                         EXPIRES APR 9, 2002
                            BONDED THRU
19                   ATLANTIC BONDING CO., INC.

20

21

22

23

24

25
```

170

```
 1

 2              REPORTER'S DEPOSITION CERTIFICATE

 3

 4  STATE OF FLORIDA      )
    COUNTY OF BROWARD      )

 5

 6      I, Ruth Stuck, Registered Professional Reporter,
    certify that I was authorized to and did stenographically
 7  report the deposition of ANGELA MOBLEY, that a
    review of the transcript was requested; and that the
 8  transcript is a true and complete record of my
    stenographic notes.

 9
        I further certify that I am not a relative, employee,
10  attorney, or counsel of any of the parties, nor am I a
    relative or employee of any of the parties' attorney or
11  counsel connected with the action, nor am I financially
    interested in the action.

12
        DATED this 20th day of February, 2001.

13

14

15

16                        Ruth Stuck, R.P.R.

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 00-06145-CIV-DIMITROULEAS/Johnson

ROXANNA L. ESCUDERO, and
KIMBERLY DRAKE, on behalf of
themselves and all others similarly
situated,

            Plaintiffs,

vs.

BANKAMERICA CORPORATION,
a foreign corporation d/b/a
BANK OF AMERICA CORPORATION,
a foreign corporation, f/k/a
NATIONSBANK, N.A., a national
association,

            Defendant.

## AFFIDAVIT OF DWIGHT HARGRAVE

Dwight Hargrave, being first duly sworn, deposes and says as follows:

1.    I am over 21 years of age, and suffer from no legal or mental disability or duress. I am competent to be a witness in this matter, and have personal knowledge of the facts to which I attest herein and am authorized by Bank of America (the "Bank") to execute this affidavit on its behalf.

2.    I am currently employed by the Bank as a Senior Vice President/Senior Technical Systems Manager.

3.    As part of my duties, I am responsible for the technical on-line transactional systems used by the Bank. In that capacity, I am aware of the retention period for information

concerning the date and time personal bankers (formerly known as consumer bankers) log onto and/or log off of the Bank's computers.

4.    Records of the various times each day at which each personal banker or employee logged on to and/or logged off from the Bank's computer system(s) are retained for a period of thirty-nine (39) days.

Further this affiant sayeth not.

_Dwight Hargrave_
Dwight Hargrave

STATE OF VIRGINIA

COUNTY OF _Henrico_

To Wit:

The foregoing Affidavit was personally subscribed and sworn to before me, _Donna M. Knack_, a Notary Public for the above-referenced jurisdiction, on May _16th_, 2001 by Dwight Hargrave.

_Donna M. Knack_
Notary Public

(Official Seal)

My Commission Expires: _August 31, 2004_

2